**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

GLOBAL FERTILITY & GENETICS, NEW
YORK, LLC,

                 Debtor.

Case No. 1:24-cv-07731-LGS

Bankruptcy Appeal

ANNIE LIU,

                Appellant,

- against -

DR. HU BO, GLOBAL FERTILITY &
GENETICS, NEW YORK, LLC, and ERIC
HUEBSCHER, Chapter 11 Trustee,

                Appellees.

**APPELLANT'S APPENDIX**
**VOLUME I**

BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP

299 Park Avenue
New York, New York 10171

*Attorneys for Appellant Annie Liu*

## Table of Contents

| Document | Item | Exhibit | Page |
|---|---|---|---|
| i.  Bankruptcy Docket through November 14, 2024 | 1 | -- | 1 |
| ii.  Appellee Dr. Hu Bo's Disclosure Statement in Support of Chapter 11 Plan of Reorganization, filed March 18, 2024 *(Excluding Exhibit A)* | 2 | -- | 24 |
| -    Debtor's Projections | 2 | B | 66 |
| iii.  Appellee Dr. Hu Bo's Chapter 11 Plan of Reorganization, filed March 18, 2024 | 3 | -- | 71 |
| iv.  Appellee Dr. Hu Bo's Motion to Schedule a Combined Hearing for Approval of Disclosure Statement, Approve Deadlines and Grant Related Relief, filed March 18, 2024 | 4 | -- | 110 |
| -    Notice Regarding Confirmation Hearing and Non-Voting Status | 4 | A | 133 |
| v.  Fourth Patient Care Ombudsman Report, filed May 1, 2024 | 5 | -- | 139 |
| vi. Order Scheduling a Combined Hearing for Approval of Disclosure Statement, Approval of Deadlines, and Granting Related Relief, entered May 17, 2024 *(Excluding Exhibit A)* | 6 | -- | 142 |
| vii. Appellee Dr. Hu Bo's Plan Supplement in Support of the Amended Plan of Reorganization, filed June 18, 2024 | 7 | -- | 147 |
| -    Amended and Restated Operating Agreement of Global Fertility & Genetics New York, LLC | 7 | A | 150 |
| -    LLC Agreement for The Mount Baekdu Health Service LLC | 7 | B | 156 |
| -    Schedule of Assumed or Rejected Executory Contracts and Unexpired Leases, Including Proposed Cure Amounts | 7 | C | 179 |
| -    Preliminary List of Claims and Proposed Treatment | 7 | D | 180 |
| -    Pass-Through Claims | 7 | E | 183 |
| -    Proposed Post-Emergence Management Team for Reorganized Debtor | 7 | F | 184 |
| viii.  Appellant Annie Liu's Proof of Claim, filed June 27, 2024 | 8 | -- | 192 |
| -    Operating Agreement of Global Fertility & Genetics New York, LLC | 8 | A | 199 |
| ix.  Appellant Annie Liu's Chapter 11 Plan of Reorganization, filed July 3, 2024 | 9 | -- | 239 |
| -    July 1, 2024 Agreement with Lorin Gu | 9 | A | 281 |
| -    Schedule of Estimated Claims | 9 | B | 285 |
| x.  Fifth Patient Care Ombudsman Report, filed July 3, 2024 | 10 | -- | 286 |
| xi. Transcript of July 3, 2024 Conference | 11 | -- | 289 |

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Bankruptcy Petition #: 23-10905-pb

| | |
|---|---|
| *Date filed:* | 06/06/2023 |
| *Plan confirmed:* | 09/17/2024 |
| *341 meeting:* | 09/25/2023 |
| *Deadline for filing claims:* | 04/04/2024 |

*Assigned to:* Judge Philip Bentley
Chapter 11
Voluntary
Asset

**Debtor**
**Global Fertility & Genetics, New York, LLC**
115 East 57th Street
Suites 420 & 430
New York, NY 10022
NEW YORK-NY
Tax ID / EIN: 81-3135721

represented by **Michael J Kasen**
Kasen & Kasen
115 Broadway
Ste 5th Floor
New York, NY 10006
646-397-6226
Email: mkasen@kasenlaw.com

**U.S. Trustee**
**United States Trustee**
Office of the United States Trustee - NY
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004-1408
(212) 510-0500

represented by **Mark Bruh**
DOJ-Ust
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004-1408
212-510-0500
Email: mark.bruh@usdoj.gov

**Patient Care Ombudsman**
**Patient Care Ombudsman**

represented by **David N. Crapo**
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4523
Fax : (973) 639-6244
Email: dcrapo@gibbonslaw.com

| Filing Date | # | Docket Text |
|---|---|---|
| 06/06/2023 | [1](#)<br>(38 pgs) | Chapter 11 Voluntary Petition for Non-Individual. Order for Relief Entered. Chapter 11 Plan due by 10/4/2023, Disclosure Statement due by 10/4/2023, Initial Case Conference due by 7/6/2023,Appointment of patient care ombudsman due by 07/6/2023 Filed by Michael J Kasen of Kasen & Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 06/06/2023) |

New York Southern Live System

| 06/06/2023 | | Receipt of Voluntary Petition (Chapter 11)( 23-10905) [misc,824] (1738.00) Filing Fee. Receipt number A16229663. Fee amount 1738.00. (Re: Doc # 1) (U.S. Treasury) (Entered: 06/06/2023) |
|---|---|---|
| 06/06/2023 | | Judge Philip Bentley added to the case. (Porter, Minnie). (Entered: 06/06/2023) |
| 06/06/2023 | | Deficiencies Set: Corporate Resolution Due at Time of Filing. Incomplete Filings due by 6/20/2023, (Porter, Minnie). (Entered: 06/06/2023) |
| 06/06/2023 | 2 (2 pgs) | Corporate Resolution Pursuant to LR 1074-1 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 06/06/2023) |
| 06/07/2023 | | Pending Deadlines Terminated. Corporate Resolution filed 6/6/2023. (Cappiello, Karen). (Entered: 06/07/2023) |
| 06/07/2023 | 3 (3 pgs; 2 docs) | Notice of 341(a) Meeting of Creditors 341(a) meeting to be held on 7/11/2023 at 02:00 PM at Office of UST (TELECONFERENCE ONLY) - CHAPTER 11s. (Cappiello, Karen). (Entered: 06/07/2023) |
| 06/07/2023 | 4 (2 pgs) | Notice of Meeting of Creditors *INSTRUCTIONS FOR TELEPHONIC SECTION 341 MEETING OF CREDITORS* (related document(s)3) filed by Mark Bruh on behalf of United States Trustee. 341(a) meeting to be held on 7/11/2023 at 02:00 PM at Office of UST (TELECONFERENCE ONLY) - CHAPTER 11s. (Bruh, Mark) (Entered: 06/07/2023) |
| 06/07/2023 | 5 (1 pg) | Order Scheduling Initial Case Conference signed on 6/7/2023; with hearing to be held on 7/11/2023 at 10:00 AM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 06/07/2023) |
| 06/07/2023 | 6 (9 pgs) | Affidavit Pursuant to LR 1007-2 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 06/07/2023) |
| 06/09/2023 | 7 (4 pgs) | Certificate of Mailing Re: Notice of 341(a) Meeting of Creditors (related document(s) (Related Doc # 3)) . Notice Date 06/09/2023. (Admin.) (Entered: 06/10/2023) |
| 06/21/2023 | 8 (2 pgs) | Notice of Hearing *NOTICE OF UNITED STATES TRUSTEES MOTION FOR APPOINTMENT OF A PATIENT CARE OMBUDSMAN UNDER 11 U.S.C. §§ 101(27A) AND 333* filed by Mark Bruh on behalf of United States Trustee. with hearing to be held on 7/6/2023 at 04:00 PM at Videoconference (ZoomGov) (PB) (Bruh, Mark) (Entered: 06/21/2023) |
| 06/21/2023 | 9 (5 pgs) | Motion to Appoint *MOTION OF UNITED STATES TRUSTEE FOR APPOINTMENT OF A PATIENT CARE OMBUDSMAN UNDER 11 U.S.C. §§ 101(27A) AND 333* (related document(s)8) filed by Mark Bruh on behalf of United States Trustee with hearing to be held on 7/6/2023 at 04:00 PM at Videoconference (ZoomGov) (PB). (Bruh, Mark) (Entered: 06/21/2023) |

| 06/21/2023 | [10](2 pgs) | Notice of Proposed Order /PROPOSED ORDER DIRECTING THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN UNDER 11 U.S.C. § 333 (related document(s)9) filed by Mark Bruh on behalf of United States Trustee. (Bruh, Mark) (Entered: 06/21/2023) |
| 06/22/2023 | [11](2 pgs) | Certificate of Service (related document(s)9, 10, 8) Filed by Mark Bruh on behalf of United States Trustee. (Bruh, Mark) (Entered: 06/22/2023) |
| 07/05/2023 | [12](2 pgs) | Certificate of No Objection Pursuant to LR 9075-2 (related document(s)9, 10, 11, 8) Filed by Mark Bruh on behalf of United States Trustee. (Bruh, Mark) (Entered: 07/05/2023) |
| 07/05/2023 | [13](2 pgs; 2 docs) | Notice of Cancellation of Hearing re: Motion to Appoint Ombudsman (related document(s)9, 12) (White, Greg) (Entered: 07/05/2023) |
| 07/07/2023 | [14](3 pgs) | Certificate of Mailing. (related document(s) (Related Doc # 13)) . Notice Date 07/07/2023. (Admin.) (Entered: 07/08/2023) |
| 07/10/2023 | [15](2 pgs) | Order Directing the Appointment of a Patient Care Ombudsman (Related Doc # 9) signed on 7/10/2023 (White, Greg) (Entered: 07/10/2023) |
| 07/11/2023 | | Notice of Continuance of Meeting of Creditors Filed by Mark Bruh on behalf of United States Trustee. 341(a) meeting to be held on 8/22/2023 at 02:00 PM at Office of UST (TELECONFERENCE ONLY) - CHAPTER 11s. (Bruh, Mark) (Entered: 07/11/2023) |
| 07/19/2023 | [16](8 pgs; 2 docs) | Appointment of Patient Care Ombudsman, David N. Crapo Filed by Mark Bruh on behalf of United States Trustee. (Attachments: # 1 Declaration of David N. Crapo)(Bruh, Mark) (Entered: 07/19/2023) |
| 07/20/2023 | [17](3 pgs) | Notice of Appearance and Request for Service of Papers filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 07/20/2023) |
| 08/10/2023 | [18](2 pgs; 2 docs) | Notice of Status Conference; with hearing to be held on 9/26/2023 at 10:00 AM at Teleconference Line (CourtSolutions) (PB) (White, Greg) (Entered: 08/10/2023) |
| 08/12/2023 | [19](4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # 18)) . Notice Date 08/12/2023. (Admin.) (Entered: 08/13/2023) |
| 08/21/2023 | | Notice of Continuance of Meeting of Creditors Filed by Mark Bruh on behalf of United States Trustee. 341(a) meeting to be held on 9/25/2023 at 02:00 PM at Office of UST (TELECONFERENCE ONLY) - CHAPTER 11s. (Bruh, Mark) (Entered: 08/21/2023) |
| 08/31/2023 | [20](1 pg) | Notice of Patient Care Ombudsman Report filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 08/31/2023) |
| 09/11/2023 | [21](11 pgs) | Application to Employ Kasen & Kasen, P.C. as Attorney for the Debtor filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC Responses due by 9/29/2023, with presentment to be held on |

| | | |
|---|---|---|
| | | 10/6/2023 (check with court for location). (Kasen, Michael) (Entered: 09/11/2023) |
| 09/11/2023 | [22](#)<br>(2 pgs) | Notice of Presentment (related document(s)[21](#)) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. with presentment to be held on 10/6/2023 (check with court for location) Objections due by 9/29/2023, (Kasen, Michael) (Entered: 09/11/2023) |
| 09/14/2023 | [23](#)<br>(5 pgs) | Certificate of Service (related document(s)[21](#), [22](#)) Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 09/14/2023) |
| 09/15/2023 | [24](#)<br>(8 pgs) | Ombudsman Report for the period of 07/19/2023 through 09/14/2023 Filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 09/15/2023) |
| 09/18/2023 | [25](#)<br>(12 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 06/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 09/18/2023) |
| 09/24/2023 | [26](#)<br>(13 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 07/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 09/24/2023) |
| 09/24/2023 | [27](#)<br>(13 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 08/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 09/24/2023) |
| 09/26/2023 | [28](#)<br>(2 pgs; 2 docs) | Notice of Status Conference; with hearing to be held on 10/31/2023 at 02:00 PM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 09/26/2023) |
| 09/28/2023 | [29](#)<br>(4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # [28](#))) . Notice Date 09/28/2023. (Admin.) (Entered: 09/29/2023) |
| 10/04/2023 | [30](#)<br>(11 pgs) | Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC with hearing to be held on 10/31/2023 at 10:00 AM at Videoconference (ZoomGov) (PB). (Kasen, Michael) (Entered: 10/04/2023) |
| 10/04/2023 | [31](#)<br>(2 pgs) | Notice of Hearing *[Amended]* (related document(s)[30](#)) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. with hearing to be held on 10/31/2023 at 02:00 PM at Videoconference (ZoomGov) (PB) (Kasen, Michael) (Entered: 10/04/2023) |
| 10/31/2023 | [32](#)<br>(1 pg) | Notice of Patient Care Ombudsman Report *Second* filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 10/31/2023) |
| 11/14/2023 | [33](#)<br>(5 pgs) | Ombudsman Report for the period of 09/15/2023 through 11/14/2023 Filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 11/14/2023) |

| 12/05/2023 | 34<br>(55 pgs) | Proposed Disclosure Statement filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 12/05/2023) |
|---|---|---|
| 12/05/2023 | 35<br>(19 pgs) | Chapter 11 Plan (related document(s)34) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 12/05/2023) |
| 12/15/2023 | 36<br>(10 pgs) | Notice of Appearance /Notice of Appearance and Request for Service of Papers filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 12/15/2023) |
| 12/15/2023 | 37<br>(47 pgs) | Motion to Appoint Trustee /Motion of Dr. Hu Bo for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo with hearing to be held on 1/23/2024 at 11:00 AM at Videoconference (ZoomGov) (PB). (Rosenblatt, Andrew) (Entered: 12/15/2023) |
| 12/22/2023 | 38<br>(2 pgs) | Order Authorizing the Retention of Kasen & Kasen, P.C. as Attorney for the Debtor (Related Doc # 21) signed on 12/22/2023 (White, Greg) (Entered: 12/22/2023) |
| 12/28/2023 | 39<br>(8 pgs) | Amended Notice of Hearing /Amended Notice of Motion (related document(s)37) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with hearing to be held on 1/23/2024 at 11:00 AM at Videoconference (ZoomGov) (PB) Objections due by 1/16/2024, (Rosenblatt, Andrew) (Entered: 12/28/2023) |
| 01/16/2024 | 40<br>(16 pgs) | Motion to Appoint Trustee OBJECTION TO (related document(s)37) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 01/16/2024) |
| 01/19/2024 | 41<br>(37 pgs; 3 docs) | Reply to Motion /Reply Brief in Further Support of Motion of Dr. Hu Bo for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) (related document(s)37, 40) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # 1 Declaration of Yihan Hu # 2 Certificate of Service) (Rosenblatt, Andrew) (Entered: 01/19/2024) |
| 01/24/2024 | 42<br>(3 pgs; 2 docs) | Notice of Continued Hearing re: Motion of Dr. Hu Bo for Entry of an Order Directing the Appointment of a Chapter 11 Trustee (related document(s)37); with hearing to be held on 2/20/2024 at 02:00 PM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 01/24/2024) |
| 01/26/2024 | 43<br>(4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # 42)) . Notice Date 01/26/2024. (Admin.) (Entered: 01/27/2024) |
| 02/06/2024 | 44<br>(3 pgs) | Affidavit Supplemental Certification of Annie Liu in Support of Opposition to Motion to Appoint Chapter 11 Trustee (related document(s)41, 40, 42) Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 02/06/2024) |

**Appendix Page 005**

| | | |
|---|---|---|
| 02/09/2024 | [45](#)<br>(12 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 09/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 02/09/2024) |
| 02/09/2024 | [46](#)<br>(12 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 10/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 02/09/2024) |
| 02/09/2024 | [47](#)<br>(12 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 11/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 02/09/2024) |
| 02/09/2024 | [48](#)<br>(12 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 12/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 02/09/2024) |
| 02/13/2024 | [49](#)<br>(11 pgs; 2 docs) | Declaration */Second Supplemental Declaration of Yihan Hu in Further Support of Movant Dr. Hu Bos Motion for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* (related document(s)[37](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # [1](#) Certificate of Service) (Rosenblatt, Andrew) (Entered: 02/13/2024) |
| 02/15/2024 | [50](#)<br>(2 pgs) | Letter *regarding Global Fertility & Genetics New York, LLC Chapter 11 Case No.: 23-10905 (PB) Status Update* (related document(s)[37](#)) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 02/15/2024) |
| 02/19/2024 | [51](#)<br>(2 pgs) | Memorandum Endorsed Order: The parties' proposed procedure for the hearing on February 20, 2024 is approved signed on 2/16/2024 (related document(s)[50](#)) (White, Greg) (Entered: 02/19/2024) |
| 02/20/2024 | [52](#)<br>(2 pgs) | Order Extending Exclusive Periods for the Filing and Solicitation of Acceptance of a Chapter 11 Plan (Related Doc # [30](#)) signed on 2/20/2024 (White, Greg) (Entered: 02/20/2024) |
| 02/23/2024 | [53](#)<br>(3 pgs) | Order Continuing Hearing on Motion of Dr. Hu Bo for Entry of an Order Directing the Appointment of a Chapter 11 Trustee signed on 2/23/2024 (related document(s)[37](#)); with hearing to be held on 3/28/2024 at 10:00 AM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 02/23/2024) |
| 02/23/2024 | [54](#)<br>(15 pgs; 3 docs) | Motion to Set Last Day to File Proofs of Claim filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Attachments: # [1](#) Proposed Order # [2](#) Proposed Form of Notice) (Kasen, Michael) (Entered: 02/23/2024) |
| 02/26/2024 | [55](#)<br>(4 pgs) | Ombudsman Report for the period of 11/15/2023 through 02/26/2024 Filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 02/26/2024) |
| 03/01/2024 | [56](#)<br>(5 pgs) | Order Granting Motion to Set Last Day to File Proofs of Claim (Related Doc # [54](#)) signed on 3/1/2024. Proofs of Claim due by 4/4/2024 (White, |

| | | Greg) (Entered: 03/01/2024) |
|---|---|---|
| 03/05/2024 | [57](#) (79 pgs) | Transcript regarding Hearing Held on 02/20/2024 At 2:00 PM RE: Notice Of Continued Hearing Re: Motion Of Dr. Hu Bo For Entry Of An Order Directing Appointment Of A Chapter 11 Trustee. Remote electronic access to the transcript is restricted until 6/3/2024. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 3/12/2024. Statement of Redaction Request Due By 3/26/2024. Redacted Transcript Submission Due By 4/5/2024. Transcript access will be restricted through 6/3/2024. (Ramos, Jonathan) (Entered: 03/05/2024) |
| 03/07/2024 | [58](#) (1 pg) | Certificate of Service (related document(s)[56](#)) Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/07/2024) |
| 03/12/2024 | [59](#) (31 pgs; 2 docs) | Motion to Appoint Trustee *Notice and Motion of the United States Trustee for Entry of an Order Directing the Appointment of a Chapter 11 Trustee* (related document(s)[53](#)) filed by Mark Bruh on behalf of United States Trustee with hearing to be held on 3/28/2024 at 10:00 AM at Videoconference (ZoomGov) (PB). (Attachments: # [1](#) Declaration of Mark Bruh) (Bruh, Mark) (Entered: 03/12/2024) |
| 03/12/2024 | [60](#) (46 pgs) | Affidavit Pursuant to LR 1007-2 *AMENDED* (related document(s)[53](#), [6](#)) Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [61](#) (24 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 06/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [62](#) (21 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 07/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [63](#) (25 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 08/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [64](#) (21 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 09/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [65](#) (24 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 10/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | [66](#) (25 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 11/30/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |

| | | |
|---|---|---|
| 03/12/2024 | 67<br>(25 pgs) | Amended Chapter 11 Monthly Operating Report for the Month Ending: 12/31/2023 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | 68<br>(25 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 01/31/2024 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/12/2024 | 69<br>(27 pgs) | Chapter 11 Monthly Operating Report for the Month Ending: 02/29/2024 Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/12/2024) |
| 03/14/2024 | 70<br>(3 pgs) | Certificate of Service (related document(s)59) Filed by Mark Bruh on behalf of United States Trustee. (Bruh, Mark) (Entered: 03/14/2024) |
| 03/15/2024 | 71<br>(27 pgs) | Affidavit *Certification of Annie Liu re: Post-petition Tax Obligations* (related document(s)53) Filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/15/2024) |
| 03/15/2024 | 72<br>(2 pgs) | Notice of Appearance *of Brad Jeffrey Axelrod* filed by Brad Jeffrey Axelrod on behalf of Kevin J. Doody. (Axelrod, Brad) (Entered: 03/15/2024) |
| 03/15/2024 | 73<br>(2 pgs) | Notice of Appearance *of Brad Jeffrey Axelrod* filed by Brad Jeffrey Axelrod on behalf of Annie Liu. (Axelrod, Brad) (Entered: 03/15/2024) |
| 03/18/2024 | 74<br>(87 pgs) | Disclosure Statement filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 03/18/2024) |
| 03/18/2024 | 75<br>(39 pgs) | Chapter 11 Plan *of Reorganization for Global Fertility & Genetics New York, LLC* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 03/18/2024) |
| 03/18/2024 | 76<br>(29 pgs) | Motion to Approve */for Entry of an Order (I) Scheduling a Combined Hearing for Approval of Disclosure Statement and Confirmation of Plan, (ii) Approving Deadlines Related Thereto, and (III) Granting Related Relief* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo with hearing to be held on 4/9/2024 at 02:00 PM at Videoconference (ZoomGov) (PB). (Rosenblatt, Andrew) (Entered: 03/18/2024) |
| 03/18/2024 | 77<br>(3 pgs) | Notice of Hearing *to Consider Approval of Motion of Dr. Hu Bo, as Plan Proponent for Entry of an Order (I) Scheduling a Combined Hearing for Approval of Disclosure Statement and Confirmation of Plan, (ii) Approving Deadlines Related Thereto, and (III) Granting Related Relief* (related document(s)76) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with hearing to be held on 4/9/2024 at 02:00 PM at Videoconference (ZoomGov) (PB) (Rosenblatt, Andrew) (Entered: 03/18/2024) |
| 03/18/2024 | 78<br>(5 pgs) | Certificate of Service filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 03/18/2024) |

| 03/19/2024 | [79](#)<br>(53 pgs) | Proposed Amended Disclosure Statement *First Amended* (related document(s)[34](#)) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/19/2024) |
|---|---|---|
| 03/19/2024 | [80](#)<br>(19 pgs) | Amended Chapter 11 Plan *First Amended* (related document(s)[35](#)) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/19/2024) |
| 03/22/2024 | [81](#)<br>(14 pgs) | Application for Appointment of Chapter 11 Trustee *OBJECTION TO* (related document(s)[59](#)) filed by Michael J Kasen on behalf of Global Fertility & Genetics, New York, LLC. (Kasen, Michael) (Entered: 03/22/2024) |
| 03/25/2024 | [82](#)<br>(2 pgs) | Letter *regarding In re Global Fertility & Genetics New York, LLC Chapter 11 Case No.: 23-10905 (PB) - Status Update* Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 03/25/2024) |
| 03/27/2024 | [83](#)<br>(3 pgs; 2 docs) | Notice of Time Change of Hearing (related document(s)[37](#), [59](#)); with hearing to be held on 3/28/2024 at 09:30 AM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 03/27/2024) |
| 03/27/2024 | [84](#)<br>(38 pgs) | Chapter 11 Plan *for Global Fertility & Genetics New York, LLC* filed by Brad Jeffrey Axelrod on behalf of Kevin J. Doody, Annie Liu. (Axelrod, Brad) (Entered: 03/27/2024) |
| 03/27/2024 | [85](#)<br>(2 pgs) | Letter *to the Honorable Philip Bentley* (related document(s)[84](#)) Filed by Brad Jeffrey Axelrod on behalf of Kevin J. Doody, Annie Liu. (Axelrod, Brad) (Entered: 03/27/2024) |
| 03/28/2024 | [86](#)<br>(3 pgs; 2 docs) | Notice of Conference (related document(s)[37](#), [59](#)); with hearing to be held on 3/29/2024 at 12:00 PM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 03/28/2024) |
| 03/29/2024 | [87](#)<br>(2 pgs) | Order Directing Appointment of a Chapter 11 Trustee (Related Doc. Nos. [37](#) & [59](#)) signed on 3/29/2024 (White, Greg) (Entered: 03/29/2024) |
| 03/29/2024 | [88](#)<br>(4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # [83](#))) . Notice Date 03/29/2024. (Admin.) (Entered: 03/30/2024) |
| 03/30/2024 | [89](#)<br>(4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # [86](#))) . Notice Date 03/30/2024. (Admin.) (Entered: 03/31/2024) |
| 04/03/2024 | [90](#)<br>(9 pgs; 2 docs) | Application for Appointment of Chapter 11 Trustee *Eric Huebscher* (related document(s)[87](#)) filed by Mark Bruh on behalf of United States Trustee. (Attachments: # [1](#) Declaration of Eric Huebscher) (Bruh, Mark) (Entered: 04/03/2024) |
| 04/04/2024 | [91](#)<br>(1 pg) | Order Approving Appointment of Chapter 11 Trustee (Related Doc # [90](#)) signed on 4/4/2024 (White, Greg) (Entered: 04/04/2024) |

| | | |
|---|---|---|
| 04/04/2024 | [92](#)<br>(1 pg) | Appointment of Chapter 11 Trustee /*Notice of Approval of Appointment of Trustee* (related document(s)[91](#)) Filed by Mark Bruh on behalf of United States Trustee. (Bruh, Mark) (Entered: 04/04/2024) |
| 04/10/2024 | [93](#)<br>(1 pg) | Letter (related document(s)[76](#)) Filed by Eric Michael Huebscher on behalf of Eric Michael Huebscher. (Huebscher, Eric) (Entered: 04/10/2024) |
| 04/10/2024 | [94](#)<br>(31 pgs) | Transcript regarding Hearing Held on 03/29/24 at 1:00 P.M. RE: Bench Ruling. Remote electronic access to the transcript is restricted until 7/9/2024. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Access Transcripts, LLC.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 4/17/2024. Statement of Redaction Request Due By 5/1/2024. Redacted Transcript Submission Due By 5/13/2024. Transcript access will be restricted through 7/9/2024. (Su, Kevin) (Entered: 04/12/2024) |
| 04/12/2024 | [95](#)<br>(2 pgs) | Notice of Appearance *of Patrick Zheng* filed by Brad Jeffrey Axelrod on behalf of Annie Liu. (Axelrod, Brad) (Entered: 04/12/2024) |
| 04/12/2024 | [96](#)<br>(2 pgs) | Notice of Appearance *of Patrick Zheng* filed by Brad Jeffrey Axelrod on behalf of Kevin J. Doody. (Axelrod, Brad) (Entered: 04/12/2024) |
| 04/17/2024 | [97](#)<br>(8 pgs; 2 docs) | Notice of Adjournment of Hearing (related document(s)[76](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with hearing to be held on 5/14/2024 at 2:00 p.m. at Videoconference (ZoomGov) (PB). (Attachments: # [1](#) Certificate of Service)(Rosenblatt, Andrew) Modified on 4/23/2024 (Lopez, Mary). (Entered: 04/17/2024) |
| 04/17/2024 | [98](#)<br>(22 pgs; 3 docs) | Application to Employ Farrell Fritz, P.C. as Attorneys for Chapter 11 Trustee filed by Martin G Bunin on behalf of Eric Michael Huebscher with presentment to be held on 5/7/2024 (check with court for location). (Attachments: # [1](#) Exhibit A - Bunin Declaration # [2](#) Exhibit B Proposed Order) (Bunin, Martin) (Entered: 04/17/2024) |
| 04/17/2024 | [99](#)<br>(3 pgs) | Notice of Presentment / *Notice of Presentment of Order Authorizing the Employment and Retention of Farrell Fritz, P.C. as Attorneys for the Chapter 11 Trustee Pursuant to Section 327(a) of the Bankruptcy Code* (related document(s)[98](#)) filed by Martin G Bunin on behalf of Eric Michael Huebscher. with presentment to be held on 5/7/2024 (check with court for location) Objections due by 5/3/2024, (Bunin, Martin) (Entered: 04/17/2024) |
| 04/17/2024 | [100](#)<br>(3 pgs) | Notice of Appearance filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 04/17/2024) |
| 04/18/2024 | [101](#)<br>(6 pgs) | Certificate of Service (related document(s)[99](#), [98](#), [100](#)) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 04/18/2024) |
| 04/24/2024 | [102](#)<br>(14 pgs; 2 docs) | Motion to Extend Time / *Chapter 11 Trustee's Motion for Entry of an Order (A) Extending Deadline for Filing Proofs of Claim; and (B) Approving Form and Manner of Notice Thereof* (related |

**Appendix Page 010**

| | | |
|---|---|---|
| | | document(s)58, 54, 56) filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Attachments: # 1 Exhibit A - Proposed Order with Notice) (Pascarella, Darren) (Entered: 04/24/2024) |
| 04/24/2024 | 103 (3 pgs) | Notice of Presentment *of Order (A) Extending Deadline for Filing Proofs of Claim; and (B) Approving Form and Manner of Notice Thereof* (related document(s)102) filed by Darren Pascarella on behalf of Eric Michael Huebscher. with presentment to be held on 5/20/2024 at 12:00 PM at Courtroom 601 (PB) Objections due by 5/13/2024, (Pascarella, Darren) (Entered: 04/24/2024) |
| 04/24/2024 | 104 (6 pgs) | Certificate of Service (related document(s)102, 103) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 04/24/2024) |
| 04/25/2024 | 105 (2 pgs) | Supplemental Certificate of Service (related document(s)99, 101, 98, 104, 102, 100, 103) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 04/25/2024) |
| 05/01/2024 | 106 (3 pgs) | Ombudsman Report for the period of 02/27/2024 through 05/01/2024 Filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 05/01/2024) |
| 05/01/2024 | 107 (15 pgs; 3 docs) | **(WITHDRAWN, see Document No. 122)** Motion to Compel / *Chapter 11 Trustee's Motion for Entry of an Order, Pursuant to 11 U.S.C. 542(e), Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs* filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Attachments: # 1 Exhibit A - List of Financial Records # 2 Exhibit B - Proposed Order) (Pascarella, Darren) **Modified on 6/14/2024 (Bush, Brent)** (Entered: 05/01/2024) |
| 05/01/2024 | 108 (7 pgs; 2 docs) | Motion to Shorten Time / *Chapter 11 Trustee's Motion to Schedule a Hearing on Shortened Notice on the Chapter 11 Trustee's Motion Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs* (related document(s)107) filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Attachments: # 1 Exhibit A - Proposed Order) (Pascarella, Darren) (Entered: 05/01/2024) |
| 05/02/2024 | 109 (2 pgs) | Order Scheduling Hearing on Shortened Notice to Consider the Chapter 11 Trustee's Motion Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs (Related Doc # 108) signed on 5/2/2024; with hearing to be held on 5/14/2024 at 02:00 PM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 05/02/2024) |
| 05/03/2024 | 110 (2 pgs) | Affidavit of Service (related document(s)107, 109, 108) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 05/03/2024) |
| 05/03/2024 | 111 (2 pgs) | Affidavit of Service (related document(s)107, 109, 108) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 05/03/2024) |

| 05/07/2024 | [112](#)<br>(5 pgs) | Bond Issued by Travelers Casualty and Surety Company of America in the amount of $50,000.00 Filed by Eric Huebscher. (Cappiello, Karen) (Entered: 05/07/2024) |
|---|---|---|
| 05/08/2024 | [113](#)<br>(3 pgs) | Order Authorizing the Employment and Retention of Farrell Fritz, P.C. as Attorneys for the Chapter 11 Trustee (Related Doc # [98](#)) signed on 5/8/2024 (White, Greg) (Entered: 05/08/2024) |
| 05/10/2024 | [114](#)<br>(2 pgs) | Notice of Adjournment of Hearing *on Chapter 11 Trustee's Motion Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs* (related document(s)[107](#) filed by Darren Pascarella on behalf of Eric Michael Huebscher. with hearing to be held on 5/21/2024 at 03:00 PM at Videoconference (ZoomGov) (PB) (Pascarella, Darren) (Entered: 05/10/2024) |
| 05/16/2024 | [115](#)<br>(2 pgs) | Notice of Adjournment of Hearing *on Chapter 11 Trustee's Motion Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs* (related document(s)[107](#) filed by Darren Pascarella on behalf of Eric Michael Huebscher. with hearing to be held on 6/18/2024 at 04:00 PM at Videoconference (ZoomGov) (PB) (Pascarella, Darren) (Entered: 05/16/2024) |
| 05/17/2024 | [116](#)<br>(11 pgs) | Order signed on 5/17/2024 Granting Motion (I) Scheduling a Combined Hearing for Approval of Disclosure Statement and Confirmation of Plan, (II) Approving Deadlines Related Thereto, and (III) Granting Related Relief (Related Doc # [76](#)) . Hearing to be held on 7/9/2024 at 10:00 AM at Courtroom 601 (PB). (Gomez, Jessica) (Entered: 05/17/2024) |
| 05/21/2024 | [117](#)<br>(8 pgs; 2 docs) | Order (A) Extending Deadline for Filing Proofs of Claim; and (B) Approving Form and Manner of Notice Thereof (Related Doc # [102](#)) signed on 5/21/2024 (White, Greg) (Entered: 05/21/2024) |
| 05/22/2024 | [118](#)<br>(6 pgs) | Certificate of Service */ (I) Order (A) Extending Deadline for Filing Proofs of Claim; and (B) Approving Form and Manner of Notice Thereof; and (II) Notice of Extended Deadline Requiring Filing of Proofs of Claim on or Before June 28, 2024* (related document(s)[117](#)) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 05/22/2024) |
| 05/23/2024 | [119](#)<br>(17 pgs; 3 docs) | Application to Employ Huebscher & Co. as Financial Advisor *to Chapter 11 Trustee* filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Attachments: # [1](#) Exhibit A - Huebscher Declaration # [2](#) Exhibit B - Proposed Order) (Pascarella, Darren) (Entered: 05/23/2024) |
| 05/23/2024 | [120](#)<br>(3 pgs) | Notice of Presentment *of Order Authorizing the Employment and Retention of Huebscher & Co. as Financial Advisor to the Chapter 11 Trustee Pursuant to Section 327(a) of the Bankruptcy Code* (related document(s)[119](#)) filed by Darren Pascarella on behalf of Eric Michael Huebscher. with presentment to be held on 6/13/2024 (check with court for location) Objections due by 6/10/2024, (Pascarella, Darren) (Entered: 05/23/2024) |

**Appendix Page 012**

| | | |
|---|---|---|
| 05/23/2024 | 121<br>(8 pgs) | Certificate of Service (related document(s)120, 119, 117) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 05/23/2024) |
| 06/12/2024 | 122<br>(2 pgs) | Notice of Withdrawal *of Chapter 11 Trustee's Motion for Entry of an Order, Pursuant to 11 U.S.C. 542(e), Compelling SND & Associates, Inc. to Immediately Turn Over Recorded Information Relating to the Debtor's Financial Affairs* (related document(s)114, 107, 115, 109) filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 06/12/2024) |
| 06/18/2024 | 123<br>(45 pgs) | Chapter 11 Plan */Notice of Filing of Plan Supplement of Dr. Hu Bo, as Plan Proponent, in Support of the Amended Plan of Reorganization of GFG Fertility & Genetics New York, LLC Pursuant to Chapter 11 of the Bankruptcy Code* (related document(s)75, 74) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 06/18/2024) |
| 06/19/2024 | 124<br>(15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 03/31/2024 Filed by Eric Michael Huebscher on behalf of Eric Michael Huebscher. (Attachments: # 1 March 2024 DIP bank statement) (Huebscher, Eric) (Entered: 06/19/2024) |
| 06/21/2024 | 125<br>(3 pgs) | Order Authorizing the Employment and Retention of Huebscher & Co. as Financial Advisor to the Chapter 11 Trustee (Related Doc # 119) signed on 6/20/2024 (White, Greg) (Entered: 06/21/2024) |
| 06/24/2024 | 126<br>(88 pgs; 2 docs) | Amended Plan */Dr. Hu Bos Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (related document(s)75) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # 1 Exhibit Redline Original Filed Plan vs. Amended Plan for Filing)(Rosenblatt, Andrew) (Entered: 06/24/2024) |
| 06/25/2024 | 127<br>(6 pgs) | Certificate of Service (related document(s)126, 123) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 06/25/2024) |
| 06/25/2024 | 128<br>(6 pgs) | Memorandum Endorsed Order re: Scheduling/Deadlines signed on 6/25/2024 (White, Greg) (Entered: 06/25/2024) |
| 06/26/2024 | 129<br>(15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 04/30/2024 Filed by Eric Michael Huebscher on behalf of Eric Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 06/26/2024) |
| 06/26/2024 | 130<br>(15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 05/31/24 Filed by Eric Michael Huebscher on behalf of Eric Michael Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 06/26/2024) |
| 06/28/2024 | 131<br>(6 pgs) | Certificate of Service *Regarding Confirmation Hearing Notice* (related document(s)116) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 06/28/2024) |

| Date | Doc | Description |
|---|---|---|
| 07/01/2024 | [132](#) (128 pgs) | Objection to Confirmation of Plan *and Disclosure Statement of Dr. Hu* (related document(s)[126](#), [74](#)) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/01/2024) |
| 07/02/2024 | [133](#) (1 pg) | Letter *Requesting (1) Status Conference and (2) Increase to Page Limit for Brief* (related document(s)[132](#)) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/02/2024) |
| 07/03/2024 | [134](#) (4 pgs; 2 docs) | Notice of Presentment *of Order Allowing Witness and Interpreter to Appear by Videoconference and Granting Related Relief* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with presentment to be held on 7/3/2024 at 12:00 PM at Courtroom 601 (PB) Objections due by 7/3/2024, (Attachments: # [1](#) Proposed Order)(Rosenblatt, Andrew) (Entered: 07/03/2024) |
| 07/03/2024 | [135](#) (6 pgs; 2 docs) | Motion to Allow*/Motion of Dr. Hu Bo for Entry of an Order Granting Permission to Appear by Videoconference Accompanied by an Interpreter and Related Relief* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo with hearing to be held on 7/3/2024 at 12:00 PM at Courtroom 601 (PB) Objections due by 7/3/2024,. (Attachments: # [1](#) Proposed Order) (Rosenblatt, Andrew) (Entered: 07/03/2024) |
| 07/03/2024 | [136](#) (47 pgs) | Chapter 11 Plan *of Reorganization for Global Fertility & Genetics New York, LLC Proposed by Annie Liu, Creditor and Interested Party* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/03/2024) |
| 07/03/2024 | [137](#) (9 pgs) | Letter / *Chapter 11 Trustee's (a) Statement in Accordance with Sections 1106(a)(3) and (4) of the Bankruptcy Code; and (b) Report Under 1106(a)(5) of the Bankruptcy Code* (related document(s)[75](#), [126](#), [123](#)) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 07/03/2024) |
| 07/03/2024 | [138](#) (3 pgs) | Ombudsman Report for the period of 05/02/2024 through 07/03/2024 Filed by David N. Crapo on behalf of Patient Care Ombudsman. (Crapo, David) (Entered: 07/03/2024) |
| 07/03/2024 | [139](#) (3 pgs) | Certificate of Service (related document(s)[137](#)) Filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 07/03/2024) |
| 07/07/2024 | [140](#) (92 pgs; 2 docs) | Second Amended Plan */Dr. Hu Bos Second Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (related document(s)[75](#), [126](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with hearing to be held on 7/9/2024 at 10:00 AM at Courtroom 601 (PB) (Attachments: # [1](#) Redline Amended Plan vs Second Amended Plan)(Rosenblatt, Andrew) (Entered: 07/07/2024) |
| 07/07/2024 | [141](#) (46 pgs) | Memorandum of Law *of Dr. Hu Bo, as Plan Proponent, (I) In Response to Objection to Confirmation of the Amended Plan of Reorganization, and (II) In Support of Confirmation* (related document(s)[132](#), [75](#), [126](#), [123](#), [140](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/07/2024) |

| | | |
|---|---|---|
| 07/07/2024 | [142](#)<br>(582 pgs; 11 docs) | Statement /Declaration of Yihan Hu in Support of Plan Confirmation (related document(s)[126](#), [75](#), [123](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # [1](#) Exhibit A - July 3 Report # [2](#) Exhibit B - Disclosure Statement with Projections # [3](#) Exhibit C - Debtor's Plan # [4](#) Exhibit D - Operating Reports # [5](#) Exhibit E - Amended Certification of Annie Liu # [6](#) Exhibit F - Power of Attorney # [7](#) Exhibit G - Dr Hu Bo Amended Plan # [8](#) Exhibit H - Notice of Filing of Plan Supplement # [9](#) Exhibit I - Transcript of March 29 Hearing # [10](#) Exhibit J - Unfiled Second Amended Plan) (Rosenblatt, Andrew) (Entered: 07/07/2024) |
| 07/08/2024 | [143](#)<br>(5 pgs) | Motion to Authorize : Letter Motion in Limine to Exclude Eric Huebschers Letter dated July 3, 2024 [Dkt. No. 137] from Evidence at the Confirmation Hearing on July 9, 2024 filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/08/2024) |
| 07/08/2024 | [144](#)<br>(3 pgs) | Response to Motion in Limine filed by Annie Liu (related document(s)[143](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/08/2024) |
| 07/08/2024 | [145](#)<br>(2 pgs) | Certificate of Service (related document(s)[142](#), [141](#), [140](#)) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/08/2024) |
| 07/08/2024 | [146](#)<br>(12 pgs) | Supplemental Objection to Confirmation of Amended Plan of Annie Liu to Dr. Hu Bos Second Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC (related document(s)[140](#)) filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/08/2024) |
| 07/09/2024 | [147](#)<br>(88 pgs; 2 docs) | First Amended Plan Chapter 11 Plan Of Reorganization For Global Fertility & Genetics New York, LLC Proposed By Annie Liu, Creditor And Interested Party (related document(s)[136](#)) filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # [1](#) First Amended Plan Redlined Version)(Spence, Robert) (Entered: 07/09/2024) |
| 07/09/2024 | [148](#)<br>(7 pgs) | Statement : Omnibus Objections Of Annie Liu To Witness And Exhibit Lists For Confirmation Hearing Scheduled For July 9, 2024 At 10:00 Am (ET) filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/09/2024) |
| 07/09/2024 | [149](#)<br>(3 pgs) | Statement of Annie Liu - Preliminary List of Exhibits filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/09/2024) |
| 07/09/2024 | [156](#)<br>(37 pgs) | Transcript regarding Hearing Held on 07/03/24 at 11:00 A.M. RE: Conference. Remote electronic access to the transcript is restricted until 10/7/2024. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Access Transcripts, LLC.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 7/16/2024. Statement of Redaction Request Due By 7/30/2024. Redacted Transcript Submission Due By 8/9/2024. Transcript access will be restricted through 10/7/2024. (Su, Kevin) (Entered: 07/12/2024) |

| 07/10/2024 | 150 (3 pgs) | Notice of Appearance filed by Alexander Nicas on behalf of Recharge Capital. (Nicas, Alexander) (Entered: 07/10/2024) |
|---|---|---|
| 07/10/2024 | 151 (2 pgs) | Statement /Dr. Hu Bos Supplemental List of Hearing Exhibits filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/10/2024) |
| 07/10/2024 | 152 (4 pgs) | Objection /Dr. Hu Bo Objections to Exhibits Listed in Annie Liu Hearing Exhibit List for the July 9, 2024 Confirmation Hearing (related document(s)149) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/10/2024) |
| 07/10/2024 | 153 (3 pgs) | Notice of Appearance filed by Thomas Alan Draghi on behalf of Annie Liu. (Draghi, Thomas) (Entered: 07/10/2024) |
| 07/10/2024 | 154 (4 pgs) | Statement /Dr. Hu Bo Preliminary List of Hearing Exhibits filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/10/2024) |
| 07/10/2024 | 155 (6 pgs; 2 docs) | Motion to Allow- Motion of Recharge Capital for Entry of an Order Authorizing Mr. Lorin Gu to Appear by Videoconference and Granting Related Relief filed by Alexander Nicas on behalf of Recharge Capital with hearing to be held on 7/11/2024 at 10:00 AM at Courtroom 601 (PB) Objections due by 7/11/2024,. (Attachments: # 1 Proposed Order) (Nicas, Alexander) (Entered: 07/10/2024) |
| 07/12/2024 | 157 (2 pgs) | Order Allowing Witnesses to Appear by Videoconference and Granting Related Relief (Related Doc # 155) signed on 7/12/2024 (White, Greg) (Entered: 07/12/2024) |
| 07/12/2024 | 158 (2 pgs) | Certificate of Service (related document(s)155) filed by Alexander Nicas on behalf of Recharge Capital. (Nicas, Alexander) (Entered: 07/12/2024) |
| 07/12/2024 | 159 (3 pgs; 2 docs) | Notice of Hearing; with hearing to be held on 7/22/2024 at 10:00 AM at Courtroom 601 (PB) (White, Greg) (Entered: 07/12/2024) |
| 07/12/2024 | 160 (4 pgs; 2 docs) | Notice of Presentment of Order Allowing Witness to Appear by Videoconference and Granting Related Relief filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with presentment to be held on 7/15/2024 at 12:00 PM at Courtroom 601 (PB) Objections due by 7/15/2024, (Attachments: # 1 Proposed Order)(Rosenblatt, Andrew) (Entered: 07/12/2024) |
| 07/12/2024 | 161 (6 pgs; 2 docs) | Motion to Allow/Motion of Dr. Hu Bo for Entry of an Order Granting Permission to Appear by Videoconference and Related Relief filed by Andrew Rosenblatt on behalf of Dr. Hu Bo with Presentment to be held on 7/15/2024 at 12:00 PM. Objections due by 7/15/2024,. (Attachments: # 1 Proposed Order) (Rosenblatt, Andrew) **Docket Text Modified on 7/15/2024 (Bush, Brent)** (Entered: 07/12/2024) |
| 07/14/2024 | 162 (4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # 159)) . Notice Date 07/14/2024. (Admin.) (Entered: 07/15/2024) |

| | | |
|---|---|---|
| 07/15/2024 | [163](#)<br>(6 pgs) | Response *of Dr. Hu Bo, as Plan Proponent, to Supplemental Objection of Annie Liu to Dr. Hu Bos Second Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (related document(s)[146](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/15/2024) |
| 07/15/2024 | [164](#)<br>(3 pgs) | Letter *to the Honorable Philip Bentley regarding Service of Late Subpoena* Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/15/2024) |
| 07/15/2024 | [165](#)<br>(4 pgs) | Declaration *of Kevin J. Doody* (related document(s)[140](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/15/2024) |
| 07/15/2024 | [166](#)<br>(3 pgs; 2 docs) | Amended Notice of Hearing (related document(s)[159](#)); with hearing to be held on 7/19/2024 at 10:00 AM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 07/15/2024) |
| 07/15/2024 | [167](#)<br>(7 pgs) | Letter *In Response To Dr. Hu's Letter Regarding Subpoena of Kevin Doody* (related document(s)[164](#)) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/15/2024) |
| 07/15/2024 | [168](#)<br>(7 pgs) | Letter *[CORRECTED] In Response To Dr. Hu's Letter Regarding Subpoena of Dr. Kevin Doody* (related document(s)[164](#), [167](#)) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/15/2024) |
| 07/15/2024 | [169](#)<br>(13 pgs) | Statement *Notice of Filing of Plan Supplement of Annie Liu, as Plan Proponent, In Support of The First Amended Plan of Reorganization of Global Fertility & Genetics New York, LLC Pursuant to Chapter 11 of the Bankruptcy Code* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/15/2024) |
| 07/15/2024 | [170](#)<br>(7 pgs) | Statement *: Declaration of Lorin Gu in Support of Confirmation of the First Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC, Proposed By Annie Liu, Creditor and Interested Party* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/15/2024) |
| 07/15/2024 | [171](#)<br>(23 pgs) | Memorandum of Law *In Support of Confirmation of First Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC Proposed By Annie Liu* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/15/2024) |
| 07/16/2024 | [172](#)<br>(1 pg) | Notice of Appearance filed by Theodore R. Snyder on behalf of Kevin J. Doody. (Snyder, Theodore) (Entered: 07/16/2024) |
| 07/16/2024 | [173](#)<br>(3 pgs) | Letter *to the Court re: Subpoenas Addressed to Dr. Doody* Filed by Theodore R. Snyder on behalf of Kevin J. Doody. (Snyder, Theodore) (Entered: 07/16/2024) |
| 07/16/2024 | [174](#)<br>(97 pgs) | Motion for Payment of Administrative Expenses */Application of Dr. Hu Bo, Pursuant to Sections 503(B)(3)(D) and 503(B)(4) of the* |

| | | |
|---|---|---|
| | | *Bankruptcy Code, for Allowance and Payment of Professional Fees and Expenses and Other Contributions.* filed by Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/16/2024) |
| 07/16/2024 | [175](#) (13 pgs) | Statement *[CORRECTED (to replace Exhibit A)] Notice of Filing of Plan Supplement of Annie Liu, as Plan Proponent, In Support of The First Amended Plan of Reorganization of Global Fertility & Genetics New York, LLC Pursuant to Chapter 11 of the Bankruptcy Code* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/16/2024) |
| 07/16/2024 | [176](#) (2 pgs) | Letter *Regarding Procedural Posture* (related document(s)[169](#)) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/16/2024) |
| 07/16/2024 | [177](#) (20 pgs) | Amended Statement *: Notice of Filing of Amended And Supplemented Plan Supplement of Annie Liu, As Plan Proponent, In Support of The First Amended Plan of Reorganization of Global Fertility & Genetics New York, LLC Pursuant To Chapter 11 of The Bankruptcy Code* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/16/2024) |
| 07/16/2024 | [178](#) (3 pgs) | Letter *In Preliminary Response to 503(b) Claim, and Letters of 7/16/24 from Counsel for Dr. Hu and Counsel for Dr. Doody* (related document(s)[173](#), [176](#), [174](#)) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/16/2024) |
| 07/17/2024 | [179](#) (2 pgs) | Statement *: Supplemental List of Exhibits In Connection with First Amended Plan of Annie Liu* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/17/2024) |
| 07/17/2024 | [180](#) (2 pgs) | Notice of Appearance *for Annie Liu, Creditor and Party In Interest* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/17/2024) |
| 07/17/2024 | [181](#) (4 pgs) | Certificate of Mailing. (related document(s) (Related Doc # [166](#)) . Notice Date 07/17/2024. (Admin.) (Entered: 07/18/2024) |
| 07/24/2024 | [182](#) (5 pgs) | Statement *: Post-Trial Submission of Annie Liu, Creditor and Party In Interest* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 07/24/2024) |
| 07/24/2024 | [183](#) (6 pgs) | Statement */Dr. Hu Bo Post-Confirmation Hearing Submission Providing Citations to the Record in Support of His Second Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (related document(s)[140](#)) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/24/2024) |
| 07/24/2024 | [184](#) (6 pgs) | Statement */ Chapter 11 Trustee's Post-Confirmation Hearing Submission* (related document(s)[123](#), [140](#)) filed by Darren Pascarella on behalf of Eric Michael Huebscher. (Pascarella, Darren) (Entered: 07/24/2024) |

| 07/26/2024 | 185<br>(7 pgs) | Statement /*Dr. Hu Bo's Post-Confirmation Hearing Submission Providing Evidentiary Support to Find That Ms. Liu's Competing Plan of Reorganization is Not Confirmable* (related document(s)136, 147) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 07/26/2024) |
|---|---|---|
| 08/01/2024 | 186<br>(7 pgs) | Statement *: Annie Liu's Post-Confirmation Hearing Reply in Response to Dr. Hu Bo's Submission Regarding the Confirmability of Annie Liu's Plan* filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 08/01/2024) |
| 08/01/2024 | 187<br>(131 pgs) | Transcript regarding Hearing Held on 07/19/24 at 9:58 A.M. RE: Confirmation Hearing. Remote electronic access to the transcript is restricted until 10/30/2024. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Access Transcripts, LLC.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 8/8/2024. Statement of Redaction Request Due By 8/22/2024. Redacted Transcript Submission Due By 9/3/2024. Transcript access will be restricted through 10/30/2024. (Su, Kevin) (Entered: 08/02/2024) |
| 08/06/2024 | 188<br>(2 pgs) | Order Allowing Witness to Appear by Videoconference and Granting Related Relief (Related Doc # 161) signed on 8/6/2024 (White, Greg) (Entered: 08/06/2024) |
| 08/06/2024 | 189<br>(2 pgs) | Order Allowing Witnesses and Interpreter to Appear by Videoconference and Granting Related Relief (Related Doc # 135) signed on 8/6/2024. (White, Greg) (Entered: 08/06/2024) |
| 09/05/2024 | 190<br>(41 pgs; 3 docs) | Letter *to Judge Bentley Regarding Dr. Hu's Proposed Confirmation Order* Filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Attachment - TM Registration # 2 Attachment - Proposed Comments to Dr. Hu's Proposed Confirmation Order)(Spence, Robert) (Entered: 09/05/2024) |
| 09/06/2024 | 191<br>(3 pgs) | Letter *regarding Plan Confirmation/IP Issue* (related document(s)190) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 09/06/2024) |
| 09/08/2024 | 192<br>(45 pgs) | Memorandum Decision Confirming Dr. Hu Bo's Chapter 11 Plan of Reorganization signed on 9/7/2024 (White, Greg) (Entered: 09/08/2024) |
| 09/10/2024 | 193<br>(36 pgs) | Notice of Proposed Order /*[Proposed] Findings of Fact, Conclusions of Law, and Order (I) Confirming Dr. Hu's Third Amended Chapter 11 Plan of Reorganization, and (II) Granting Related Relief* (related document(s)75, 126, 140) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 09/10/2024) |

| | | |
|---|---|---|
| 09/10/2024 | 194 (44 pgs) | Third Amended Plan /*Dr. Hu Bo's Third Amended Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (related document(s)75, 126, 140) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 09/10/2024) |
| 09/11/2024 | 195 (40 pgs; 3 docs) | Letter *to Judge Bentley Regarding Annie Liu's Comments to Dr. Hu's Revised Proposed Confirmation Order and Related Matters* Filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Attachment 1 - Revised Proposed Confirmation Order with Redlined Comments (R Spence - Annie Liu) # 2 Attachment 2 - Chase UCC 1)(Spence, Robert) (Entered: 09/11/2024) |
| 09/12/2024 | 196 (38 pgs; 2 docs) | Letter *to Judge Bentley Regarding Annie Liu's Revised Comments to Dr. Hu's Revised Proposed Confirmation Order* Filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Attachment - Annie Liu's Revised Comments to Dr. Hu's Revised Proposed Confirmation Order)(Spence, Robert) (Entered: 09/12/2024) |
| 09/17/2024 | 197 (80 pgs) | Findings of Fact, Conclusions of Law, and Order Confirming Dr. Hu's Third Amended Chapter 11 Plan of Reorganization and Granting Related Relief signed on 9/17/2024 (White, Greg) (Entered: 09/17/2024) |
| 09/23/2024 | 198 (127 pgs; 3 docs) | Notice of Appeal (related document(s)192, 197) filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Order Confirming Dr. Hu Bo's Plan # 2 Memorandum Decision Confirming Dr. Hu Bo's Plan)(Spence, Robert) (Entered: 09/23/2024) |
| 09/23/2024 | | Receipt of Notice of Appeal( 23-10905-pb) [appeal,97] ( 298.00) Filing Fee. Receipt number A16801739. Fee amount 298.00. (Re: Doc # 198) (U.S. Treasury) (Entered: 09/23/2024) |
| 10/07/2024 | 199 (400 pgs; 11 docs) | Designation of Contents (appellant). filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Liu Exhibit 24 - KJD PLLC and GFG Signed Administrative Service Agreement (Part 1) # 2 Liu Exhibit 24 (Part 2) KJD PLLC and GFG Signed Administrative Service Agreement # 3 Liu Exhibit 25 - Lorin Gu Resume # 4 Liu Exhibit 26 - Prospective Sale Plan Proposal from Silver Birch Group # 5 Liu Exhibit 31 - AK20 Holding LLC Proof of $510,000 of Deposit for Annie Lius Plan [REDACTED] # 6 Liu Exhibit 32 - Screen Shot of Properties Related to Scan of Signed ASA in October 2019 # 7 Liu Exhibit 33 - Citrin Cooperman Agreement Signed By Dr. Doody # 8 Liu Exhibit 34 - Proof of Funds from Recharge Capital UBS [REDACTED] # 9 Hearing Transcript July 11, 2024 # 10 Hearing Transcript July 17, 2024) (Spence, Robert) (Entered: 10/07/2024) |
| 10/11/2024 | 200 (2 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 24-cv-7731 Judge Lorna G. Schofield (related document(s)198) (Rouzeau, Anatin). (Entered: 10/11/2024) |
| 10/16/2024 | 201 (1 pg) | Certificate of Service (related document(s)199) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 10/16/2024) |

| | | |
|---|---|---|
| 10/18/2024 | 202<br>(106 pgs; 7 docs) | Counter Designation (appellee) */Appellee Dr. Hu Bo's Counterstatement of Issues on Appeal and Designation of Additional Items to be Included in the Record on Appeal* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # 1 Hu Exhibit 45 # 2 Hu Exhibit 46 # 3 Hu Exhibit 47 # 4 Hu Exhibit 48 # 5 Hu Exhibit 60 # 6 Hu Exhibit 61) (Rosenblatt, Andrew) (Entered: 10/18/2024) |
| 10/18/2024 | 203<br>(9 pgs; 2 docs) | Motion to Strike */Appellee Dr. Hu Bo's Motion for Entry of an Order Striking Certain Items from Appellant Annie Liu's Statement of Issues and Designation of Record on Appeal* (related document(s)199) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Attachments: # 1 Exhibit A - Proposed Order) (Rosenblatt, Andrew) (Entered: 10/18/2024) |
| 10/23/2024 | 204<br>(2 pgs) | Notice of Hearing (related document(s)203) filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with hearing to be held on 11/12/2024 at 03:00 PM at Videoconference (ZoomGov) (PB) Objections due by 11/5/2024, (Rosenblatt, Andrew) (Entered: 10/23/2024) |
| 10/23/2024 | 205<br>(2 pgs) | Certificate of Service (related document(s)202, 203, 204) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 10/23/2024) |
| 10/31/2024 | 206<br>(7 pgs) | Letter *to Judge Bentley regarding Effective Date Conditions Precedent* Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 10/31/2024) |
| 10/31/2024 | 207<br>(2 pgs) | Certificate of Service (related document(s)206) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 10/31/2024) |
| 10/31/2024 | 208<br>(2 pgs) | Letter *to Judge Bentley In Response to Andrew Rosenblatt's Letter of Today's Date* (related document(s)206) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 10/31/2024) |
| 11/01/2024 | 209<br>(2 pgs) | Letter *to Judge Bentley regarding the Effective Date Conditions Precedent of the Plan* Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 11/01/2024) |
| 11/06/2024 | 210<br>(5 pgs; 2 docs) | Notice of Presentment *of Stipulation and Order Removing Items from Record on Appeal* filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. with presentment to be held on 11/8/2024 (check with court for location) (Attachments: # 1 Stipulation and Order)(Rosenblatt, Andrew) (Entered: 11/06/2024) |
| 11/08/2024 | 211<br>(15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 06/30/2024 Filed by Eric Michael Huebscher on behalf of Eric Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 11/08/2024) |
| 11/08/2024 | 212<br>(15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 07/31/204 Filed by Eric Michael Huebscher on behalf of Eric Huebscher. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 11/08/2024) |
| 11/08/2024 | 213 (15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 08/31/24 Filed by Eric Michael Huebscher on behalf of Eric Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 11/08/2024) |
| 11/08/2024 | 214 (15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 09/30/2024 Filed by Eric Michael Huebscher on behalf of Eric Michael Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 11/08/2024) |
| 11/08/2024 | 215 (15 pgs; 2 docs) | Chapter 11 Monthly Operating Report for the Month Ending: 10/31/2024 Filed by Eric Michael Huebscher on behalf of Eric Huebscher. (Attachments: # 1 Bank Statement)(Huebscher, Eric) (Entered: 11/08/2024) |
| 11/08/2024 | 216 (2 pgs) | Certificate of No Objection Pursuant to LR 9013-3 (related document(s)210) Filed by Andrew Rosenblatt on behalf of Dr. Hu Bo. (Rosenblatt, Andrew) (Entered: 11/08/2024) |
| 11/08/2024 | 217 (3 pgs) | So Ordered Stipulation Removing Items from Record on Appeal (Related Doc # 203) signed on 11/8/2024 (White, Greg) (Entered: 11/08/2024) |
| 11/08/2024 | 218 (3 pgs; 2 docs) | Notice of Cancellation of Hearing re: Appellee Dr. Hu Bo's Motion for Entry of an Order Striking Certain Items from Appellant Annie Liu's Statement of Issues and Designation of Record on Appeal (related document(s)203) (White, Greg) (Entered: 11/08/2024) |
| 11/10/2024 | 219 (5 pgs) | Certificate of Mailing. (related document(s) (Related Doc # 218)) . Notice Date 11/10/2024. (Admin.) (Entered: 11/11/2024) |
| 11/12/2024 | 220 (61 pgs; 3 docs) | Motion for Stay Pending Appeal (related document(s)192, 194, 197) filed by Robert J. Spence on behalf of Annie Liu. (Attachments: # 1 Exhibit A - Dr. Hu Bo's Third Amended Plan of Reorganization for Debtor Global Fertility & Genetics New York, LLC # 2 Exhibit B - Proposed Order Granting Stay)(Spence, Robert) (Entered: 11/12/2024) |
| 11/13/2024 | 221 (2 pgs) | Order to Show Cause Scheduling Conference on Motion for Stay Pending Appeal and Granting Temporary Restraining Order signed on 11/13/2024 (related document(s)220); with hearing to be held on 11/15/2024 at 10:00 AM at Videoconference (ZoomGov) (PB) (White, Greg) (Entered: 11/13/2024) |
| 11/13/2024 | 222 (2 pgs) | Declaration Pursuant to LBR 9077-1 (related document(s)220) filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 11/13/2024) |
| 11/13/2024 | 223 (2 pgs) | Certificate of Service (related document(s)221, 222, 220) Filed by Robert J. Spence on behalf of Annie Liu. (Spence, Robert) (Entered: 11/13/2024) |

| 11/14/2024 | [224](#)<br>(2 pgs; 2 docs) | Notice of Transmittal of Record of Appeal. All documents have been filed with the United States District Court for the Southern District of New York. Record of Appeal is Complete and Available Electronically under Civil Case Number 24-cv-7731 assigned to the Honorable Lorna G. Schofield. Check the District Court Docket Sheet for the Briefing Schedule. (related document(s)[198](#)) (Rouzeau, Anatin). (Entered: 11/14/2024) |
|---|---|---|

## PACER Service Center

### Transaction Receipt

| 11/15/2024 09:50:33 | | | |
|---|---|---|---|
| **PACER Login:** | BeckerGlynn | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 23-10905-pb Fil or Ent: filed From: 5/1/2023 To: 11/15/2024 Doc From: 0 Doc To: 99999999 Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

**NORTON ROSE FULBRIGHT (US) LLP**
Andrew Rosenblatt, Esq.
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
andrew.rosenblatt@nortonrosefulbright.com

*Counsel to Dr. Hu Bo*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | X | |
| In re: | X | |
| | X | Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X | |
| NEW YORK, LLC | X | Case No.:  23-10905-PB |
| | X | |
| Debtor. | X | |
| | X | |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125**
**OF THE BANKRUPTCY CODE IN SUPPORT OF CHAPTER 11**
**PLAN OF REORGANIZATION PROPOSED BY DR. HU BO**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION and IMPORTANT INFORMATION ABOUT THIS DISCLOSURE
STATEMENT ........................................................................................................ 1

    A.   Purpose of This Document ........................................................................ 4
    B.   Confirmation Procedures ......................................................................... 5
    C.   Disclaimer ................................................................................................. 7

II. BACKGROUND ................................................................................................ 7

    A.   Description and History of the Debtor's Business ................................... 7
    B.   Principals/Affiliates of Debtor's Business ............................................... 8
    C.   Management of the Debtor Before and During the Bankruptcy Case ............... 8
    D.   Events Leading to the Chapter 11 Filing ................................................. 9
    E.   Significant Events During the Bankruptcy ............................................ 10

III. SUMMARY OF THE PLAN OF REORGANIZATION ..................................... 16

    A.   What Creditors and Interest Holders Will Receive Under the Plan ............. 16
    B.   Unclassified Claims ............................................................................... 16
    C.   Classified Claims and Interests ............................................................. 19
    D.   Means of Effectuating the Plan ............................................................. 21
    E.   Other Provisions of the Plan ................................................................. 22
    F.   Tax Consequences of Plan ..................................................................... 27
    G.   Risk Factors ........................................................................................... 27

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ......................... 28

    A.   Who May Vote or Object ...................................................................... 28
    B.   Liquidation Analysis ............................................................................. 32
    C.   Feasibility ............................................................................................. 34

V. EFFECT OF CONFIRMATION OF PLAN ....................................................... 35

    A.   Discharge and General Injunction ........................................................ 35
    B.   Revocation or Withdrawal of the Plan .................................................. 36
    C.   Binding Effect ....................................................................................... 36
    D.   Revesting of Property in the Debtor ...................................................... 36
    E.   Modification of Plan ............................................................................. 36
    F.   Post-Confirmation Conversion/Dismissal ............................................. 37

VI. CONCLUSION ............................................................................................... 37

Schedule A .......................................................................................................... 39

Schedule B .......................................................................................................... 40

Schedule C .......................................................................................................... 40

EXHIBIT "A" ...................................................................................................... 41

EXHIBIT "B" ...................................................................................................... 82

**Appendix Page 025**

# I.

## INTRODUCTION AND IMPORTANT
## INFORMATION ABOUT THIS DISCLOSURE STATEMENT

Dr. Hu Bo (the "***Dr. Hu***") seeks confirmation of the Chapter 11 plan of reorganization for debtor Global Fertility & Genetics New York, LLC (the "***Debtor***") attached hereto as Exhibit A (as may be amended, the "***Plan***").[1]  The Plan is being proposed by Dr. Hu, in his capacity as the Plan Proponent,[2] pursuant to sections 1121(c), 1125 and 1126 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq*. (the "***Bankruptcy Code***") and Rule 3016 of the Federal Rules of Bankruptcy Procedure.  Dr. Hu is proposing an alternative and competing plan to the Debtor Plan (as defined below) to ensure that Creditors get paid in full as soon as possible and that the Debtor emerges from bankruptcy as a financially healthy and well-funded business that can carry on the important mission of providing world-class fertility and related services to its broad customer base, including its China-based clientele.

The Plan, among other things, proposes to treat all Classes of Creditors as "***unimpaired***." Specifically, if the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, ***Creditors holding Allowed Claims shall receive payment in full in cash on or as soon as practicable after the Effective Date of the Plan***, and Creditors holding litigation or other contested contingent claims (the "***Pass-Through Claims***") will have those Claims pass-through the Chapter 11 Case unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, without regard to the automatic stay or the Debtor's Discharge and with all parties' respective rights, remedies, claims and defenses as they existed on the Petition

---

[1]     Capitalized terms used, but not otherwise defined herein, shall have the meanings and definitions ascribed to them in the Plan.

[2]     All references to Dr. Hu regarding the Plan are in his capacity as the Plan Proponent.

**Appendix Page 026**

Date fully preserved. Dr. Hu estimates that his total contribution to fund distributions under the Plan, including both the face amount of Allowed Claims and the asserted amount of Pass-Through Claims, will be approximately $1.2 million. Under the Plan, existing equity Interests will be extinguished and Interest Holders will receive no distributions. In consideration for Dr. Hu funding distributions and unimpairing Creditors under the Plan, Dr. Hu (or an entity designated by Dr. Hu) will receive 100% of the newly issued equity interests in the Reorganized Debtor.

The proposed treatment of Creditors under this Plan is indisputably and significantly better than the proposed treatment of Creditors under the plan proposed by the Debtor (as may be amended, the "**Debtor Plan**"), which requires Holders of Claims to wait up to five years for payment in full, without any assurance of actually receiving full payment. The Plan, as opposed to the Debtor Plan, does not make Creditors wait to be paid or expose them to the Debtor's on-going credit risk.

Moreover, implementation of the Plan will allow the Debtor the best chance to flourish as a going-concern business. Dr. Hu has extensive experience and expertise overseeing medical and fertility-related businesses. Dr. Hu holds a master's degree in medical imaging and has nearly 35 years of medical and administrative management experience. Notably, Dr. Hu, with his wife, founded Ciming Health Checkup Management Group ("**Ciming**") in 2002. Ciming is one of the largest and most successful general healthcare providers in China and Dr. Hu, as the Chairman of Ciming, is considered a leader and innovator in the medical field. Notably, Ciming has invested in numerous medical projects in China, including the Boao Lecheng International Medical Tourism Pilot Zone, which is a "first of its kind" government-approved cluster of medical projects that was designed to attract high-end medical talent and world-class medical tourism. Dr. Hu, through Ciming, is the owner of two projects in the zone, including a hospital which focuses on

**Appendix Page 027**

patients suffering from chronic diseases, and a world-class medical center servicing patients suffering infertility (the Reproductive Center of BoAo International Hospital). Dr. Hu has also worked on collaborative healthcare projects with U.S. partners, including the Institute for Health and Productivity Management (located in Arizona), which resulted in the creation of "The China-U.S. Institute for Health Security & Human Resource Productivity." This collaboration focuses on, among other things, research and development for health and productivity management in China.

Importantly, Dr. Hu has also committed to fund the Reorganized Debtor with no less than *$5 million* to stabilize the business, promote and encourage the facility's growth, and to ensure its ability to satisfy on-going operating expenses.

This Disclosure Statement was compiled from information obtained by Dr. Hu from numerous sources believed to be accurate to the best of Dr. Hu's knowledge, information, and belief. Some of the information contained in this Disclosure Statement, including (i) the description and history of the Debtor's business, (ii) events leading up to the Chapter 11 Case, and (iii) significant events occurring in the Chapter 11 Case, were all derived from the Disclosure Statement prepared and filed by the Debtor in connection with the Debtor Plan (CM/ECF No. 34). Similarly, unless otherwise indicated, all financial information, projections and liquidation analyses contained in this Disclosure Statement were prepared by the Debtor's management in consultation with their professional advisors and were copied from the Debtor's Disclosure Statement. In order to reduce inconsistencies and potential factual disputes with the Debtor, Dr. Hu, in preparing this Disclosure Statement, has tried to make as few changes as possible to the Debtor's Disclosure Statement. Dr. Hu's professionals have not independently verified any of the

Appendix Page 028

information set forth in this Disclosure Statement and are not responsible for any inaccuracies that may be contained in this Disclosure Statement or the Plan.

CREDITORS AND INTEREST HOLDERS OF THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE DISCLOSURE STATEMENT AND PLAN IN THEIR ENTIRETY.

### A.      Purpose of This Document

This Disclosure Statement summarizes the Plan, and provides certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.  Although, as described below, Dr. Hu does not believe any Creditor or Interest Holder is entitled to vote on the Plan, the information contained in this Disclosure Statement is still important to permit Creditors and Interest Holders to fully understand their rights, the proposed treatment of their respective Claims and Interests and whether there is any need or basis to object to confirmation of the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

- **WHO CAN VOTE ON OR OBJECT TO THE PLAN;**

- **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., WHAT YOUR CLAIM WILL RECEIVE IF THE PLAN IS CONFIRMED), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION;**

- **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

- **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN;**

- **THE EFFECT OF CONFIRMATION; AND**

- **THE FEASIBILITY OF THE PLAN.**

**Appendix Page 029**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

Bankruptcy Code section 1125 requires a disclosure statement to contain "adequate information" concerning the plan of reorganization. The term "adequate information" is defined in Bankruptcy Code section 1125(a) as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the plan. At this time, the Bankruptcy Court has made no determination as to whether the information contained in this Disclosure Statement is adequate, nor has it approved this document in accordance with Bankruptcy Code section 1125. Given Dr. Hu's position that no Creditor or Interest Holder is entitled to vote on the Plan, Dr. Hu does not intend to seek separate approval of the Disclosure Statement and the Plan, but rather intends to request that the Bankruptcy Court approve and confirm the Disclosure Statement and the Plan, respectively, at the same time.

### B. Confirmation Procedures

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

5

### 1. Time and Place of the Confirmation Hearing

The hearing at which time the Bankruptcy Court will determine whether to (i) approve the

Disclosure Statement, and (ii) confirm the Plan, will take place on **May 16, 2024, 2024 at 2:00**

**p.m.** (ET) before the Honorable United States Bankruptcy Judge Philip Bentley, via Zoom (the

"***Confirmation Hearing***").

### 2. No Creditor or Interest Holder is Entitled to Vote on the Plan

In most Chapter 11 cases, creditors and equity interest holders will typically vote on

whether to accept or reject the plan of reorganization, and the plan proponent will usually seek

approval of a voting and solicitation package that includes a ballot that is sent to all creditors and

interest holders for voting purposes.  However, as described in Section IV(A) below, under the

Plan neither Creditors nor Interest Holders are entitled to vote on the Plan, because (i) Creditors

will be treated as unimpaired under the Plan and, thus, will be conclusively deemed to have

accepted the Plan, and (ii) Interest Holders will receive no distributions on account of their Interests

under the Plan and, thus, will be deemed to have rejected the Plan.

### 3. Deadline for Objecting to Confirmation of the Plan

Objections to approval of the Disclosure Statement and/or confirmation of the Plan must be

filed with the Bankruptcy Court and served upon Andrew Rosenblatt, Esq. at Norton Rose

Fulbright (US) LLP, 1301 Avenue of the Americas, New York, New York 10019 and other parties

as may be ordered by the Bankruptcy Court by no later than **April 25, 2024 at 4:00 p.m. (ET)**.

(the "***Objection Deadline***").

4.      **Contact Person for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Andrew Rosenblatt, Esq. at Norton Rose Fulbright (US) LLP by calling him at (212) 408-5559 or emailing him at andrew.rosenblatt@nortonrosefulbright.com.

C.      **Disclaimer**

Dr. Hu, without independent verification, has relied on information provided by the Debtor in preparing this Disclosure Statement.  It should be noted that the Debtor has indicated that the financial data relied upon in connection with preparation of the Debtor's Disclosure Statement (and thus the Plan Proponent's Disclosure Statement) is based upon the Debtor's management's experience and understanding of its market and based upon operational adjustments the Debtor has made in recent years and further anticipates making upon confirmation of a plan.

Unless otherwise noted, Dr. Hu represents that everything stated in the Disclosure Statement is true to the best of his knowledge, information and belief.

**PLEASE NOTE THAT APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.**

### II.

### BACKGROUND

A.      **Description and History of the Debtor's Business**

The Debtor is a limited liability company organized under the laws of the state of Delaware on July 5, 2016, and is authorized to do business in New York.  The Debtor owns and operates a fertility clinic from space the Debtor leases at 115 East 57th Street, Suites 420 & 430, New York,

7

New York 10022.  The Debtor provides management services to KJD Fertility PLLC, the current

medical provider for the clinic, and performs laboratory services related to fertility treatments.

A large portion of the Debtor's business caters to patients from China and as such, the

Debtor's business was severely impacted by the COVID-19 pandemic when travel from China to

the United States was greatly restricted.

### B.     Principals/Affiliates of Debtor's Business

The Debtor is wholly owned by its sole member, GFG Holding Group Co., LLC

("***Holdings***").   Holdings, in turn, is owned by its members: (i) Dr. Hu, who holds a 70%

membership interest in Holdings, and, as such, is the Debtor's largest stakeholder; (ii) Jun Jing Liu

a/k/a Annie Liu ("***Liu***"), who holds a 15% membership interest in Holdings and currently serves

as the Director, President and Chief Executive Officer of the Debtor and manages its day-to-day

business operations; and (iii) Dr. Kevin Doody ("***Dr. Doody***"), who holds a 15% membership

interest in Holdings and additionally owns 100% of KJD Fertility PLLC, the entity that currently

serves as the medical provider at the Debtor's facility.

Until April 2023, Dr. Hu provided funding to the Debtor to pay for operating expenses.  In

total, Dr. Hu contributed well over $4.5 million to fund the Debtor's operations since its inception

in 2016.  Dr. Hu was not contractually obligated to provide funding to the Debtor, but did so in

order for the business to pay on-going operating expenses and satisfy other financial obligations.

### C.     Management of the Debtor Before and During the Bankruptcy Case

Prior to and during the course of this bankruptcy case, Liu has served as the President and

CEO of the Debtor and the sole limited liability company director of the Debtor, making all day-

to-day business decisions on behalf of the Debtor.  According to the Debtor, pre-petition and

during the course of this case, the Debtor had and continues to have a contractual obligation to pay

8

**Appendix Page 033**

Liu an annual salary of $400,000.00.[3]  According to the Debtor, this salary has rarely been paid in full and Liu is purportedly owed $317,066.00 in pre-petition salary and $322,900 in post-petition salary (as of December 5, 2023).[4]

Kenny Smalls, MSC ("*Smalls*") has served as the director of the Debtor both prior to and during this bankruptcy case.  Smalls' day-to-day responsibilities include overseeing the lab operations and identifying potential business opportunities.  According to the Debtor, pre-petition and during this case, the Debtor had and continues to have a contractual obligation to pay Smalls an annual salary of $95,000.00.  As per the Debtor, Smalls is a seasoned professional with over 25 years of experience in the field of Human Embryology and Fertility.

According to the Debtor, Dr. Glenn Moodie has served as the director of the lab since 2017.  Dr Moodie's base since 1999 has been Long Island IVF located on Long Island, NY.  Dr. Moodie is paid approximately $4,000.00 per month.

According to the Debtor, Dr. Kevin Doody has served as the Scientific Director of the Debtor since the Debtor's inception.  The relationship between Dr. Doody and the Debtor is more fully described herein.

### D.    Events Leading to the Chapter 11 Filing

According to the Debtor, several factors have contributed to its financial difficulties.  The Debtor's business required significant capital investment to build a world class fertility clinic and laboratory and receive the necessary regulatory approvals to operate its laboratory.

---

[3]  Dr. Hu has never seen a copy of Liu's purported employment agreement, nor does Dr. Hu believe that a copy of the agreement was ever filed with the Bankruptcy Court.

[4]  Dr. Hu reserves all rights to object to or otherwise challenge any claim filed by Liu on account of unpaid wages or otherwise.

Following the completed buildout of its facility, in 2016 and again in March 2021 the tenant that occupied the space above the Debtor experienced floods that led to significant time during which the Debtor was unable to operate.

Additionally, because a significant portion of the Debtor's business concentrates on providing services to Chinese Nationals and other foreigners who do not have access to fertility treatment in their home countries, the travel restrictions that were put in place as a result of the Covid-19 pandemic, had a significant negative impact on the Debtor's business.

According to the Debtor, these factors and others resulted in the instant bankruptcy case. The Debtor has also alleged that the bankruptcy filing was caused by Dr. Hu's refusal to continue to fund the Debtor's operations. Dr. Hu takes exception with the Debtor's position, and notes that he provided over $4.5 million in approximately 22 separate payments to fund the Debtor's operations. These payments were not loans, but rather were contributions made by Dr. Hu when funds were needed and requested by the Debtor's management. Notably, Dr. Hu had no contractual obligation to make these contributions, but did so in order to fund operations so the Debtor could continue as a going concern and because he cares very much about the clinic and its purpose. Dr. Hu only ceased providing additional funding to the Debtor when its management team refused or was unable to account for the use of funds previously advanced and/or newly requested.

**E.      Significant Events During the Bankruptcy**

**1.      Bankruptcy Proceedings**

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 6, 2023. Thereafter, on July 10, 2023, the Bankruptcy Court entered an Order appointing David Crapo (the "**PCO**") as a Patient Care Ombudsman (CM/ECF No. 15).

10

According to the Debtor, shortly after the appointment of the PCO, the Debtor met with the PCO at the Debtor's facility. The PCO filed reports on August 31, 2023 (CM/ECF No. 20), September 15, 2023 (CM/ECF No. 24), October 31, 2023 (CM/ECF No. 32) and November 14, 2023 (CM/ECF No. 33).

Beginning on or about June 21, 2023, the Debtor engaged in negotiations with counsel for Dr. Hu regarding a potential transaction that would allow the Debtor to exit bankruptcy as quickly as possible and maximize value for all stakeholders. Following the exchange of information and a short due diligence period, Dr. Hu made a proposal to the Debtor to serve as the "stalking horse bidder" in a potential sale of substantially all of the Debtor's assets. Unfortunately, the parties' negotiations did not result in a sale and the Debtor instead decided to proceed with the Debtor Plan, which was filed on December 5, 2023 (CM/ECF No. 35).

On December 15, 2023, Dr. Hu filed a motion seeking an order appointing a Chapter 11 trustee to replace the Debtor's existing management (CM/ECF No. 37) (the "***Trustee Motion***"). The Trustee Motion was based on Dr. Hu's position that, among other things, the Debtor Plan was an egregious "insider-plan" that was: (i) unfavorable to Creditors; (ii) unfair to Interest Holders; and (iii) a thinly-veiled scheme that would permit Liu and Dr. Doody to essentially acquire the Debtor for little consideration. A preliminary hearing was held on the Trustee Motion on January 23, 2024, and a second hearing was held on February 20, 2024, at which time (i) the Bankruptcy Court heard oral argument on the Trustee Motion, and (ii) the Office of the United States Trustee (the "***US Trustee***") indicated its support for the Trustee Motion. The hearing on the Trustee Motion has been continued to March 28, 2024. As of the date hereof, the Trustee Motion remains pending.

11

On December 22, 2023, the Bankruptcy Court entered an order approving the employment of Kasen & Kasen, P.C. as counsel to the Debtor, effective as of the petition date (CM/ECF No. 38).

On February 23, 2024, the Debtor filed a motion to set a bar date in the Chapter 11 Case (CM/ECF No. 54). On March 1, 2024, the Court entered an order (CM/ECF No. 56), setting April 4, 2024 as the last date for filing claims against the Debtor that arose (or were deemed to have arisen) before the Petition Date for all creditors, including section 503(b)(9) claimants (the "***Bar Date***").

On March 12, 2024, the US Trustee filed its own motion seeking the appointment of a Chapter 11 trustee (CM/ECF No. 59). The motion alleges certain actions undertaken by the Debtor's existing management that constitutes "gross mismanagement of the Debtor's affairs, fraud, and/or dishonesty" that warrants the appointment of a trustee. As of the date hereof, the US Trustee's motion remains pending and will likely be resolved at the same time, and in conjunction with, the Trustee Motion filed by Dr. Hu.

### 2.    Other Legal Proceedings

In addition to the proceedings discussed above, the Debtor has indicated that it is currently involved in the following non-bankruptcy legal proceedings:

The Debtor is a defendant in an employment discrimination lawsuit pending in the Supreme Court of New York, New York County, captioned as *Alexis Cancel v. Global Fertility and Genetics, Inc. et al*, Index Number 152435/2018 (the "***Alexis Cancel Lawsuit***"). It is Dr. Hu's understanding that Liu has also been personally named as a defendant in the Alexis Cancel Lawsuit. There was also an appeal associated with this matter in the First Department Appellate Division, assigned Index Number 2021-00058.

The Debtor is also a Plaintiff in a suit in the Supreme Court of New York, New York County related to the flooding experienced by the tenant above the Debtor that caused significant interruption to the Debtor's business. This case is captioned *Global Fertility et al v. Spa Castle Premier 57, Inc. et al* and assigned Index Number 151013/2023.

The Debtor was also a defendant in an eviction action in New York County Civil Court, captioned as *Eldad Prime, LLC v. Global Fertility and Genetics, Inc.* and assigned Index Number LT-301744/23/NY. This matter was resolved pre-petition.

### 3. Actual and Projected Recovery of Preferential or Fraudulent Transfers

Given the nature of this case, and in light of the anticipated 100% payout to Creditors, coupled with the uncertainty associated with any potential avoidance actions and the cost of pursuing such actions, Dr. Hu does not intend to undertake such action and as such does not expect any recovery from preferential or fraudulent transfers.

### 4. Procedures Implemented to Resolve Financial Problems

According to the Debtor, in an effort to remedy the problems that led to the bankruptcy filing, the Debtor has, among things, diversified its clientele to increase its domestic patients and expanded its international marketing beyond China.

Dr. Hu is skeptical that the measures taken by the Debtor since its bankruptcy filing will in any way improve operations or financial performance. On the other hand, if the Plan is approved and implemented, Dr. Hu has committed to fund the Reorganized Debtor with no less than $5 million to promote growth and to pay operating expenses in the ordinary course of its business. This $5 million contribution is in addition to amounts paid to fund distributions to Creditors under the Plan. It is Dr. Hu's strong belief that approval of the Plan will ensure that the Reorganized Debtor is well-funded and financially strong.

13

5.      **Current and Historical Financial Conditions**

The Debtor has never been profitable and, since its inception, has regularly had to rely on contributions made by Dr. Hu to fund operations.

On a conservative basis, between 2017 and 2023, Dr. Hu (or a company owned and controlled by Dr. Hu) made no less than 22 contributions to the Debtor in an amount exceeding $4.5 million.

The Debtor has claimed that, during the course of its bankruptcy case, it has "continued to grow" and "anticipates this growth to continue and for the Debtor to thrive upon reorganization." These claims are highly dubious and have been the subject of dispute among the Debtor, Dr. Hu and the US Trustee, who has claimed that the Debtor's business is "operating at a loss" and is generally in financial turmoil.

Notably, in connection with the filing of its Disclosure Statement for the Debtor Plan, the Debtor prepared financial projections related to its business. Attached hereto as Exhibit B is a five-year financial projection prepared by the Debtor (the "***Projections***"). The Projections purport to include income and expenses of both the Debtor and of KJD Fertility, PLLC (a non-debtor).

Given that Dr. Hu does not have access to the Debtor's books and records or other information that might be relevant in preparing an accurate and reliable valuation model, Dr. Hu must rely on the financial information provided by the Debtor in connection with the filing of the Debtor Plan.

Although Dr. Hu is relying on the Debtor's financial analysis, Dr. Hu has serious doubts as to the accuracy and reliability of the totality of the Debtor's Projections.[5] Nevertheless, Dr. Hu

---

[5]     To the extent it becomes necessary, Dr Hu reserves the right to put forth his own valuation and/or to challenge any different or supplemental valuation submitted by or on behalf of the Debtor.

**Appendix Page 039**

is relying on the Debtor's financial information for the limited purpose of establishing that the Debtor is insolvent and that there is no equity value in the Interests.  Based on the financial information provided by the Debtor, as well as the Debtor Plan, which proposes to extinguish existing equity Interests without making any distribution on account thereof, it appears that the Debtor is insolvent and the existing Interests are worthless.  As set forth in Section IV(B) below, the Debtor ascribed a "liquidation value" to its Assets of only $181,900.00.[6]  Although liquidation value may be materially less than going-concern value, there is a significant delta between the asset valuation put forth by the Debtor and the amount of Claims and related debt obligations that remain outstanding.

Moreover, in its latest Operating Report filed on March 12, 2024 (CM/ECF No. 69), for the month ending February 29, 2024, the Debtor stated that its total asset value is $1,021,323 and its total liabilities total $1,123,740, reflecting a negative equity value/net worth of $102,417.[7]

Finally, the Debtor has estimated that its 2023 net income is $116,700.98.  *See* Projections at Exhibit B.  Given that the Debtor has no funded debt and, therefore, pays no interest, the Debtor's EBITDA (earnings before interest, taxation, depreciation and amortization) should be relatively close to this amount.[8]  An informal enterprise value calculation can be done by multiplying the Debtor's net income (reflective of EBITDA) by an appropriate industry multiple. With respect to most healthcare companies, businesses, like the Debtor's, doing less than $1

---

[6]  This amounts represents the Debtor's calculation of the liquidation value of its assets in a hypothetical Chapter 7 case.  The actual valuation of the Debtor's business could be materially higher than this amount.

[7]  The Debtor did not provide any back-up to support its calculations of asset value and total liabilities. Nevertheless, the Debtor has asserted that it has a negative equity value of over $100,000.

[8]  The Debtor has not provided depreciation or amortization figures to be included in an EBITDA calculation. Nevertheless, to the extent there is any depreciation or amortization to report, it is likely very small and should not have a material impact on any valuation calculation.

**Appendix Page 040**

million in annual adjusted profit will usually have an industry multiple of between 2.5-4x.[9]
Applying a 4x multiple, which is the high end of this range, would yield an enterprise value for
the Debtor of approximately $467,000.  Notably, companies with $1m-$3m in annual profit
typically have an industry multiple of between 3.5-6x, and companies with more than $3m in
annual profit will likely have an industry multiple between 5-8x.  Even applying a 6x multiple to
the Debtor, would yield an enterprise value of only $700,000.  Dr. Hu's New Value Contribution
(as defined below) will far exceed this amount.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

### A.     What Creditors and Interest Holders Will Receive Under the Plan

The Plan classifies claims and interests in various classes.  The Plan states whether each
class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class
will receive.

### B.     Unclassified Claims

Certain types of claims are not placed into voting classes.  They are not considered impaired
and they do not vote on the Plan because they are automatically entitled to specific treatment
provided for them in the Bankruptcy Code.  As such, Dr. Hu has not placed the following claims
in a class:

### 1.     Administrative Expenses and Fees

Administrative expenses are claims for fees, costs or expenses of administering the
Debtor's Chapter 11 Case which are allowed under Bankruptcy Code section 503(b), including all
professional compensation requests pursuant to sections 330 and 331 of the Bankruptcy Code.  The

---

[9]     Source: https://www.minervaequity.com/healthcare-company-valuation-multiples/.

**Appendix Page 041**

Bankruptcy Code requires that all administrative expenses, including fees payable to the Bankruptcy Court and the US Trustee which were incurred during the pendency of the case, be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

As per the information provided in the Debtor's Disclosure Statement, the following chart purports to list all of the Debtor's unpaid administrative fees and expenses ("***Compensation***"), an estimate of future professional fees and other administrative claims and fees and their treatment under the Plan:

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| KASEN & KASEN, P.C. Attorney for the Debtor | $[TBD] - $[TBD] | Paid in full on the Effective Date or when otherwise Allowed by Order of the Bankruptcy Court or by other agreement | Professional Fees |
| Office of U.S. Trustee Fees | $2,000.00 - $4,000.00 | Paid in full on the Effective Date | Statutory Fee Claim |
| Jing Jun Liu a/k/a Annie Liu | [$322,900.00][10] | Paid in full on the Effective Date or when otherwise Allowed by Order of the Bankruptcy Court or by other agreement | Unpaid Post-Petition Wages |
| | TOTAL [$TBD - $TBD] | | |

**<u>Bankruptcy Court Approval of Professional Compensation Required</u>**

Pursuant to the Bankruptcy Code, the Bankruptcy Court must rule on all professional compensation and expenses listed in this chart (*i.e.* the claim of Kasen & Kasen, as Debtor's

---

[10] The Plan Proponent reserves the right to object to the Allowance of this and all other administrative expense claims.

counsel) before the compensation and expenses will be owed.  The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Bankruptcy Court must rule on the application.  Only the amount of compensation and reimbursement of expenses allowed by the Bankruptcy Court will be owed and required to be paid under the Plan as an Administrative Expense Claim.

Each Professional Person who asserts a further Administrative Expense Claim that accrues before the Confirmation Date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date of the Plan.  Failure to file such an application timely shall result in the Professional Person's claim being forever barred and discharged.  Each and every other person asserting an Administrative Expense Claim shall be entitled to file a motion for allowance of the asserted Administrative Expense Claim within thirty (30) days of the Effective Date of the Plan, or such Administrative Expense Claim shall be deemed forever barred and discharged.  No motion or application is required to fix the fees payable to the Clerk's Office or US Trustee, as such fees are determined by statute.

As indicated above, Dr. Hu estimates that he may need to pay several hundreds of thousands of dollars of Administrative Expense Claims on or as soon as practicable after the Effective Date of the Plan, unless a claimant has agreed to be paid later or the Bankruptcy Court has not yet ruled on the claim.

### 2. Priority Tax Claims

Priority tax claims are certain unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  Unless the holder of such a section 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim in regular

18

installments paid with interest as determined by applicable non-bankruptcy law over a period not exceeding five years from the order for relief.

The Debtor has stated that it does not believe that it will have any priority tax claims.

**C.    Classified Claims and Interests**

**1.    Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate.  The Debtor has stated that it does not believe that there exist any secured creditors.

**2.    Classes of Priority Unsecured Claims**

Certain priority claims that are referenced in Bankruptcy Code sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The Debtor has stated that it does not believe that any priority unsecured claims referred to in Bankruptcy Code sections 507(a)(3), (a)(4), (a)(5), (a)(6) or (a)(7) exist.

**3.    Class of General Unsecured Claims**

General unsecured claims are uncollateralized claims not entitled to priority under Bankruptcy Code section 507(a).  The following chart identifies the Plan's treatment of the class containing ***all*** of Debtor's general unsecured claims:

**Appendix Page 044**

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 1 | General unsecured claims<br><br>Total amount of claims will be determined following the expiration of the Bar Date | No<br><br>Deemed to Accept | Payment of 100% of Allowed Claims to be paid in full in cash on or as soon as practicable after the Effective Date as set forth on Schedule A hereto.<br><br>Pass-Through Claims, which are identified on Schedule B hereto and currently only includes a Claim on account of the Alexis Cancel Lawsuit, to survive the bankruptcy unimpaired and to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. |

**4.      Class(es) of Interest Holders**

Interest Holders are the parties who hold ownership interest (*i.e.*, equity interest) in the Debtor.  If the debtor is a corporation, entities holding preferred or common stock in the debtor are interest holders.  If the debtor is a partnership, the interest holders include both general and limited partners.  If the debtor is a limited liability company, like the Debtor in this case, entities holding membership interests or units in the Debtor are interest holders.  The following chart identifies the Plan's treatment of the classes of Interest Holders:

**Appendix Page 045**

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 2 | Existing Equity Interests<br><br>Sole member GFG Holding Co., LLC | Yes<br><br>Deemed to Reject | This class of Interest Holders is comprised of the sole member of the Debtor. Upon the Effective Date of the Plan and upon the making of the New Value Contribution, Dr. Hu (or a an entity designated by Dr. Hu) will replace GFG Holding Co., LLC as the member of the Debtor and will be vested with 100% of the newly issued equity interests in the Reorganized Debtor. |

**D. Means of Effectuating the Plan**

**1. Funding for the Plan**

The Plan will be funded by a one-time cash contribution by Dr. Hu in an amount sufficient to pay all Allowed Claims and Pass-Through Claims in full (the "***New Value Contribution***"). Dr. Hu has also committed to contribute no less than ***$5 million*** to fund growth opportunities for the Reorganized Debtor and permit the Reorganized Debtor to satisfy operating expenses as they come due in the ordinary course of business.

**2. Post-confirmation Management**

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the director(s) and officer(s) of the Reorganized Debtor on and after the Effective Date shall be (i) Yihan Hu and/or (ii) Dr. Hu. Dr. Hu reserves the right to change his designation of directors and officers for the Reorganized Debtor. Dr. Hu intends to update and finalize the Reorganized Debtor's proposed post-bankruptcy management team as part of the filing of the Plan Supplement.

**Appendix Page 046**

3. **Disbursing Agent**

The Reorganized Debtor or Dr. Hu's designee shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Reorganized Debtor or Dr. Hu's designee shall serve as the disbursing agent without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

4. **New Value Contribution**

Dr. Hu will contribute value to the Debtor that is new, substantial, necessary for a successful reorganization, and reasonably equivalent in value to the retained equity. The new value will be in the form of Cash in an amount sufficient to pay all Allowed Claims in full on or as soon as practicable after the Effective Date, and to cover the potential amount of any Pass-Through Claims that may ultimately be Allowed. The Plan Proponent estimates that its total New Value Contribution will be approximately $1.2 million. In addition, Dr. Hu has committed to fund the Reorganized Debtor with no less than $5 million to promote the growth of the business and meet all operating expenses post-emergence from bankruptcy.

The total value of this New Value Contribution significantly exceeds the value of the equity in the Reorganized Debtor that will be retained by or issued to Dr. Hu or his designee under the Plan.

E. **Other Provisions of the Plan**

1. **Executory Contracts and Unexpired Leases**

The Plan provides that all executory contracts and unexpired leases, except for those specifically rejected by the Debtor in writing or previously rejected by Bankruptcy Court order, shall be assumed pursuant to section 365 of the Bankruptcy Code.

**Appendix Page 047**

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of executory contracts or unexpired leases, as described in the Plan and Plan Supplement, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtor, the Estate, and all parties in interest in the Chapter 11 Case; and (iii) providing that the requirements for assumption or assumption and assignment of any executory contract or unexpired lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of executory contracts or unexpired leases pursuant to the Plan are effective as of the Effective Date.

Any monetary defaults under each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date of the Plan, or (ii) the date that the Cure Cost is determined by order of the Bankruptcy Court.

At least one week prior to the Objection Deadline (the "***Plan Supplement Filing Date***"), or such later date as is authorized by the Bankruptcy Court, Dr. Hu will file a Plan Supplement containing a schedule of executory contracts and unexpired leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtor pursuant to the Plan, along with proposed Cure Costs, if any, to be filed and served upon affected contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.

**Appendix Page 048**

2. **Retention of Jurisdiction**

Upon the occurrence of the Effective Date, the Reorganized Debtor shall be entitled to manage its affairs without further order of this Bankruptcy Court. However, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all usual and customary matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a. Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

b. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professional Persons authorized pursuant to the Bankruptcy Code or the Plan;

c. Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any executory contract or unexpired lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

d. Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

f. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g. Resolve any cases, controversies, suits, or disputes that may arise in connection with the interpretation or enforcement of the Plan or any entity's obligation incurred in connection with the Plan;

**Appendix Page 049**

h.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

i.  Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with enforcement of the Plan;

j.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k.  Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

l.  Enter an order or final decree concluding or closing the Chapter 11 Case;

m.  Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

n.  Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

o.  Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

p.  Enforce all orders previously entered by the Bankruptcy Court; and

q.  Hear any other matter not inconsistent with the Bankruptcy Code.

### 3.  Procedures for Resolving Contested Claims

Dr. Hu and/or the Reorganized Debtor, as the case may be, shall have 45 days subsequent to the Effective Date to object to the allowance of any Claims; *provided, however*, that following the Bar Date and, as part of the Plan Supplement, Dr. Hu intends to include a preliminary schedule of Claims that the Plan Proponent believes are or will be Allowed or Disputed.

### 4.  Effective Date and Timing of Distributions

The Plan will become effective on the Effective Date, which is the date on which the order confirming (*i.e.*, approving) the Plan becomes final and all conditions precedent set forth in the

**Appendix Page 050**

Plan have been satisfied or waived by Dr. Hu. Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims deemed Allowed before the Effective Date shall be made on or as soon as practicable after the Effective Date.

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of any Disputed Claims that become Allowed after the Effective Date, including, without limitation, the Pass-Through Claims, shall be made no later than the first day that is ten (10) Business Days after the Disputed Claims become Allowed Claims. Dr. Hu shall file by the Plan Supplement Filing Date a schedule in the Plan Supplement identifying, if any, Claims that are or are likely to be Disputed; *provided, however*, that the Plan Proponent shall have the right to amend and supplement the schedule of Disputed Claims and, as noted above, shall have 45 days subsequent to the Effective Date to object to the allowance of any Claims.

Except as otherwise provided herein, on or as soon as practicable after the Effective Date, each Holder of an Allowed Claim shall receive the full amount of the distributions set forth in the Plan. Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 5. Modification

Dr. Hu may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in section 1127(b) of the Bankruptcy Code.

F. **Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  THE PLAN PROPONENT CANNOT AND DOES NOT OPINE AS TO ANY TAX CONSEQUENCES ASSOCIATED WITH THE PLAN.

G. **Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan.  You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors.  Based on the analysis of the risks summarized below, Dr. Hu believes that the Plan is viable and will meet all requirements of confirmation:

a. **The Plan May Not Be Confirmed**.  Even though Creditors are unimpaired and are deemed to accept the Plan, the Plan may not be confirmed if the Bankruptcy Court determines that the Plan does not meet the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.  Dr. Hu believes that the Plan satisfies all of the relevant section 1129 requirements.  There can be no assurance, however, that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

b. **Non-Consensual Confirmation**.  Because the Plan extinguishes equity Interests, Interest Holders are deemed to conclusively reject the Plan.  Therefore, Dr. Hu is seeking to "cram down" the Plan on existing Interest Holders.  Although Dr. Hu believes that the Plan satisfies the requirements for cramdown under section 1129 of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will also conclude that such requirements have been satisfied.

c. **Risk of Non-Occurrence of the Effective Date.**  Although Dr. Hu believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date in fact will occur.

# IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  Dr. Hu CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, that Creditors or Interest Holders have accepted the Plan, that the Plan pays Creditors at least as much as Creditors would receive in a hypothetical Chapter 7 liquidation, and that the Plan is feasible.  These requirements are ***not*** the only requirements for confirmation.

### A.     Who May Vote or Object

### 1.     Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 2.     Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against a plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### a. What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

> AS NOTED ABOVE, THE BANKRUPTCY COURT HAS ENTERED AN ORDER ESTABLISHING **APRIL 4, 2024** AS THE BAR DATE FOR FILING A PROOF OF CLAIM.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest is not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b. What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the plan. A class is impaired if the plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the plan fails to pay the members of that class 100% of their claim.

As noted above and set forth below, Dr. Hu believes that no Creditor or Interest Holder is entitled to vote on the Plan because: (i) Creditors will be treated as unimpaired under the Plan and, thus, are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and (ii) Interest Holders will receive no distributions on account of their equity Interests and, thus, are conclusively deemed to have rejected the Plan pursuant to section 1126(g)

**Appendix Page 054**

of the Bankruptcy Code.  Parties who dispute Dr. Hu's characterization of their Claim or Interest as being impaired or unimpaired may file an objection to the Plan contending that Dr. Hu has incorrectly characterized the class.

### 3.   Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority under Bankruptcy Code section 507(a)(1), (a)(2), and (a)(7); and (4) claims in classes that do not receive or retain any value under the plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the plan.  Claims entitled to priority pursuant to Bankruptcy Code section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims or interests in classes that do not receive or retain any value under the plan do not vote because such classes are deemed to have rejected the plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO CONFIRMATION OF THE PLAN.

In this case, as noted above, the Plan proposes to treat all Creditors as unimpaired, either through payment of their Allowed Claims in full in Cash on or as soon as practicable after the Effective Date or, with respect to contested and contingent litigation clams (*i.e.*, Pass-Through Claims), having those claims pass through the Chapter 11 Case unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, without regard to the automatic stay or the Debtor's Discharge and with all parties' respective rights, remedies, claims and defenses as they existed on the Petition Date fully preserved.  As such, all Creditors shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of

the Bankruptcy Code, and shall not be entitled to vote. On the other hand, existing equity Interests under the Plan will be extinguished, with Interest Holders receiving no distribution on account of their Interests. As such, Interest Holders are presumptively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and shall not be entitled to vote.

### 4. Who Can Vote in More Than One Class

[RESERVED]

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm a plan unless (1) at least one impaired class has accepted the plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the plan, unless the plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section IV.A.8..

### 6. Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the plan when more than one-half in number and at least two-thirds in dollar amount of the allowed claims that actually voted, voted in favor of the plan. A class of interests is considered to have accepted the plan when at least two-thirds in amount of the allowed interest-holders of such class which actually voted, voted to accept the plan.

Under the Plan, the voting thresholds for plan approval are not implicated because no Creditor or Equity Interest Holder is entitled to vote on the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if impaired classes do not accept the proposed plan, the Bankruptcy Court may nonetheless confirm the plan if the nonaccepting classes are treated in the manner required by the Bankruptcy Code. The process by which nonaccepting classes are forced to be

**Appendix Page 056**

bound by the terms of the plan is commonly referred to as "cramdown". The Bankruptcy Code allows a plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all statutory requirements, except the voting requirements of section 1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the plan as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

### 8. Request for Confirmation Despite Nonacceptance by Impaired Class

Dr. Hu requests confirmation of the Plan under section 1129(b)(2)(C) of the Bankruptcy Code with respect to Class 2 (Interest Holders), which is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Dr. Hu believes that the Plan satisfies the cramdown requirements set forth in section 1129(b)(2)(C)(ii) of the Bankruptcy Code with respect to Class 2, because no holder of any interest that is junior to the Interests will receive or retain any property under the Plan. Dr. Hu reserves the right to modify this Plan to the extent that confirmation pursuant to section 1129(b) requires modification.

### B. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the plan, then that claimant or interest holder must receive or retain under the plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining

Appendix Page 057

sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

In order for the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all Creditors and Interest Holders who do not accept or are deemed to reject the Plan will receive at least as much under the Plan as such Holders would receive under a Chapter 7 liquidation. Dr. Hu maintains that this requirement is met here for the reasons set forth below.

The following is an analysis prepared by the Debtor (taken from the Debtor's Disclosure Statement) that demonstrates that all Creditors and Interest Holders will receive at least as much under the Plan as such Creditors or Interest Holders would receive under a Chapter 7 liquidation:

**Assets**

| | |
|---|---|
| Cash in DIP Account | $6,000.00 |
| Customer Deposits | $50,000.00 |
| Office Furniture and Equipment | $7,000.00 |
| Other Machinery and Fixtures | $118,900.00 |
| **TOTAL ASSETS** | **$181,900.00** |

**Liabilities**

| | |
|---|---|
| Chapter 7 Admin. Expenses | $10,000.00 |
| Chapter 11 Admin Expenses | $70,000.00 |

| | |
|---|---|
| **TOTAL AVAILABLE FOR UNSECURED CREDITORS** | **$101,900.00** |
| **ESTIMATED CLAIMS (AS OF THE DATE HEREOF)** | **$904,642.18[11]** |

The above-analysis shows that Creditors, who are receiving payment in full under the Plan, will receive more than they would in a hypothetical Chapter 7, as Creditors in a Chapter 7 case would

---

[11] This amount is calculated based on the Debtor's Schedules, and also includes purported unpaid wages that are owed to Liu for the post-petition period. Notably, this amount does *not* include (i) any claims for professional fees or fees owed to the US Trustee, (ii) any amounts that may be owed to Alexis Cancel on account of the Alexis Cancel Lawsuit, and (iii) any amounts owed under the Debtor's real property lease, which Dr. Hu understands is current. As noted above, in its latest Operating Report, the Debtor has estimated total liabilities at $1,123,740.

only receive a *pro rata* share of $101,900.  The analysis also confirms that Interest Holders would receive no distribution in a hypothetical Chapter 7 case, as there would be insufficient funds to pay unsecured creditors in full and, thus, nothing left to distribute to Interest Holders.

### C.  Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims that are entitled to be paid on such date.  This requirement is easily satisfied under the Plan as Dr. Hu will pay in full in Cash all Allowed Claims on or as soon as practicable after the occurrence of the Effective Date.  Dr. Hu will also make sure that the Reorganized Debtor has sufficient cash to pay in full any Pass-Through Claim(s) that are ultimately Allowed.

The second aspect considers whether the Reorganized Debtor will have enough cash over the life of the Plan to make the required plan payments.  This second aspect of feasibility is not implicated under the Plan, because all Allowed Claims will be paid immediately on or as soon as practicable after the occurrence of the Effective Date.

In summary, the Plan proposes to pay 100% of Allowed Claims immediately upon the Debtor's emergence from bankruptcy.  Moreover, as noted above, Dr. Hu has committed to fund the Reorganized Debtor with a cash contribution of no less than $5 million.  This amount will be more than sufficient to allow the Reorganized Debtor to pay operating expenses in the ordinary course and to conduct business as a financially healthy going concern for the foreseeable future.

**Appendix Page 059**

Accordingly, Dr. Hu believes, on the basis of the foregoing, that the Plan is feasible.

## V.

## EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge and General Injunction

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on and after the Effective Date, all Persons who have held, hold, or may hold Claims of any kind or nature against the Debtor, whether known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and debts, whether or not (a) a proof of claim is filed or is deemed filed under section 501 of the Bankruptcy Code, (b) such claim is Allowed under the Plan, or (c) the holder of such Claim has accepted the Plan, are permanently enjoined, on and after the Confirmation Date, from (w) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure provided for in the Plan and the Bankruptcy Code and Bankruptcy Rules, (x) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor or the Reorganized Debtor on account of any such Claim, (y) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Debtor or the Reorganized Debtor on account

**Appendix Page 060**

of any such Claim and (z) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or the Reorganized Debtor or against the property or interests in property of the Debtor or the Reorganized Debtor on account of any such Claim, to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

### B.     Revocation or Withdrawal of the Plan

If Confirmation of the Plan does not occur or if, after Confirmation occurs, the Debtor elects to terminate or withdraw the Plan, the Plan shall be deemed null and void.  In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or its Estate or any other persons, or to prejudice in any manner the rights of the Debtor or its Estate or any person in any further proceeding involving the Debtor or its Estate.

### C.     Binding Effect

Upon the occurrence of the Effective Date, the provisions of the Plan shall be binding upon Debtor, all Creditors and all Interest Holders, regardless of whether such Claims or Interest Holders are impaired or whether such parties accept the Plan.

### D.     Revesting of Property in the Debtor

Except as provided in the Plan, the occurrence of the Effective Date of the Plan revests all of the property of the Estate in the Reorganized Debtor.

### E.     Modification of Plan

Dr. Hu may modify the Plan at any time before Confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or voting on the Plan.

Dr. Hu may also modify the Plan at any time after Confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after

36

notice and a hearing. Dr. Hu further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

### F.     Post-Confirmation Conversion/Dismissal

[RESERVED]

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the US Trustee post-confirmation until such time as the case is closed pursuant to a final decree.

## VI.

## CONCLUSION

Dr. Hu believes that the Plan is in the best interest of all Creditors and is demonstrably better than the Debtor Plan which would impair creditors, delay distributions on account of Creditor claims and expose Creditors to the Debtor's on-going credit risk. The Plan, vis-à-vis the Debtor Plan, is also fair and equitable to existing Interest Holders as the equity Interests are, based on the Debtor's own valuation and terms of the Debtor Plan, out of the money. Accordingly, Dr. Hu believes that the Bankruptcy Court should confirm the Plan, which would permit the Debtor to exit bankruptcy as a well-funded going concern business under new management.

*[Signature page follows]*

Dated: New York, New York
March 7, 2024

Respectfully submitted,
DR. HU BO, as Plan Proponent

By: _____

Yihan Hu, as Agent on behalf of Dr. Hu

NORTON ROSE FULBRIGHT (US) LLP
Andrew Rosenblatt, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
andrew.rosenblatt@nortonrosefulbright.com

*Counsel to Dr. Hu Bo*

38

**Schedule A**

[To be included in the Plan Supplement and completed following the occurrence of the Bar Date and an analysis of the Claims filed]

### ALLOWED CLAIMS TO BE PAID UPON EMERGENCE

| Claimant | Claim Number | Claim Amount |
|----------|--------------|--------------|
|          |              | $ |
|          |              | $ |
|          |              | $ |
|          |              | $ |

**Schedule B**

[To be included in the Plan Supplement to the extent any additional contingent litigation claims
are identified following the occurrence of the Bar Date]

## PASS-THROUGH CLAIMS TO BE RESOLVED POST-EMERGENCE

| Claimant | Claim Number | Claim Amount |
|---|---|---|
| Alexis Cancel | | $_____ |

**Schedule C**

[To be included in the Plan Supplement to the extent any additional contingent litigation claims
are identified following the occurrence of the Bar Date]

## DISPUTED CLAIMS

| Claimant | Claim Number | Claim Amount |
|---|---|---|
| | | |

# EXHIBIT "B"

## DEBTOR'S PROJECTIONS

## GFG 2023 SUMMARY 5 YEARS PROJECTION

| Expense Estimate | Year 2023 Estimate | 2024 Expense Estimate | 2025 Expense Estimate | 2026 Expense Estimate | 2027 Expense Estimate | 2028 Expense Estimate |
|---|---|---|---|---|---|---|
| 维持/Facility Maintenance | | | | | | |
| 设备/Equipment Rental Roche | 30,000.00 | $18,748.26 | 18,748.26 | 18,746.26 | $25,000.00 | 25,000.00 |
| 办公物品/ Office Supply | 12,000.00 | $10,000.00 | 10,000.00 | 12,000.00 | $12,000.00 | 12,000.00 |
| 医疗垃圾Medical Waste Disposal | 4,000.00 | $3,930.39 | 3,153.33 | 4,000.00 | $4,200.00 | 4,300.00 |
| 房租 Rent | 309,949.32 | $234,000.00 | 234,000.00 | 234,000.00 | $234,000.00 | 253,000.00 |
| 电费 Eletricity and Areas | 30,000.00 | $30,000.00 | 30,000.00 | 30,000.00 | $30,000.00 | 30,000.00 |
| 电话 Verizon Telephone & Internet & Vonage | 10,320.00 | $9,150.00 | 10,320.00 | 10,320.00 | $9,150.00 | 10,320.00 |
| 监控Security Monitoring | 7,500.00 | $7,545.07 | 7,500.00 | 7,500.00 | $7,500.00 | 7,500.00 |
| 电脑系统 Computer Software -Graet America | 0.00 | $0.00 | 0.00 | 0.00 | $0.00 | 0.00 |
| IT / MS office arichiving and support -Krantz Security | 27,600.00 | $48,000.00 | 48,000.00 | 48,000.00 | $48,000.00 | 50,000.00 |
| 医疗系统 EIVF EMR | 17,844.00 | $17,844.00 | 20,400.00 | 20,400.00 | $20,400.00 | 20,400.00 |
| Groceries | 2,000.00 | $3,000.00 | 3,000.00 | 3,000.00 | $3,000.00 | 3,000.00 |
| Cleaning Ashland | 8,400.00 | $9,000.00 | 9,000.00 | 9,000.00 | $9,000.00 | 9,000.00 |
| 制服Uniform- Unitex | 3,600.00 | $3,600.00 | 3,600.00 | 4,000.00 | $4,000.00 | 4,000.00 |
| Total | $463,213.32 | $394,817.72 | $397,721.59 | $400,966.26 | $406,250.00 | $428,520.00 |
| | | | | | | |
| 人员/Employee Salary | | | | | | |
| *ADMINISTRATION* | | | | | | |
| CEO | 400,000.00 | $400,000.00 | 420,000.00 | 440,000.00 | $450,000.00 | 450,000.00 |
| 总监Diretor & Embryologist | 95,000.00 | $95,000.00 | 105,000.00 | 125,000.00 | $145,000.00 | 145,000.00 |
| 国际部经理International Patient Coodinator | 75,000.00 | $75,000.00 | 80,000.00 | 80,000.00 | $85,000.00 | 85,000.00 |
| 实验室主任 Lab Director( Dr.Moody) | 48,000.00 | $48,000.00 | 48,000.00 | 48,000.00 | $48,000.00 | 48,000.00 |
| 胚胎师Embryologist _ Senior | 145,000.00 | $145,000.00 | 145,000.00 | 145,000.00 | $150,000.00 | 150,000.00 |
| 2nd Junior Embroylogist | 120,000.00 | $130,000.00 | 120,000.00 | 120,000.00 | $130,000.00 | 130,000.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Angology Lab Tech | 65,000.00 | $62,000.00 | 65,000.00 | 65,000.00 | $62,000.00 | 65,000.00 |
| Biller | 60,000.00 | $60,000.00 | 60,000.00 | 60,000.00 | $60,000.00 | 60,000.00 |
| 前台 Front desk _ 1 | 65,000.00 | $65,000.00 | 65,000.00 | 65,000.00 | $65,000.00 | 65,000.00 |
| Front Desk & Patient Coordinator TIFFINY | 50,000.00 | $60,000.00 | 60,000.00 | 60,000.00 | $60,000.00 | 60,000.00 |
| Total | $1,123,000.00 | $1,140,000.00 | $1,168,000.00 | $1,208,000.00 | $1,255,000.00 | $1,258,000.00 |
| *Total Admin Salary* | | | | | | |
| | | | | | | |
| *CLINICAL* | | | | | | |
| 医生 Doctor 1 ( Thornton ) | 400,000.00 | $400,000.00 | 400,000.00 | 400,000.00 | $400,000.00 | 400,000.00 |
| Doctor 2 ( NP TO MD) | 0.00 | $175,000.00 | 300,000.00 | 300,000.00 | $300,000.00 | 300,000.00 |
| Medical Assistant -Senior （clinical Manager ) | 65,000.00 | $65,000.00 | 65,000.00 | 65,000.00 | $75,000.00 | 85,000.00 |
| Medical Assistant - junior | 55,000.00 | $55,000.00 | 55,000.00 | 60,000.00 | $65,000.00 | 65,000.00 |
| 护士 Register Nurse 1 | 98,500.00 | $98,500.00 | 98,500.00 | 98,500.00 | $98,500.00 | 98,500.00 |
| 护士 Register Nurse 2 | 100,000.00 | $100,000.00 | 100,000.00 | 100,000.00 | $100,000.00 | 100,000.00 |
| Medical assistant 3 | 65,000.00 | $65,000.00 | 65,000.00 | 65,000.00 | $65,000.00 | 65,000.00 |
| Sonographor | 80,000.00 | $80,000.00 | 80,000.00 | 80,000.00 | $85,000.00 | 85,000.00 |

## GFG 2023 SUMMARY 5 YEARS PROJECTION

| | | | | | | |
|---|---|---|---|---|---|---|
| *Total Clinical Salary* | $863,500.00 | $1,038,500.00 | $1,163,500.00 | $1,168,500.00 | $1,188,500.00 | $1,198,500.00 |
| | | | | | | |
| Total Salary | $1,986,500.00 | $2,178,500.00 | $2,331,500.00 | $2,376,500.00 | $2,443,500.00 | $2,456,500.00 |
| | | | | | | |
| 员工福利/Payroll and Insurance | | | | | | |
| Employee health insurance | 96,000.00 | $81,976.64 | 96,000.00 | 96,000.00 | $100,000.00 | 100,000.00 |
| Worker Compensation For GFG & KJD | 4,691.00 | $4,212.00 | 4,691.00 | 4,691.00 | $50,000.00 | 50,000.00 |
| 医生保险Mal Practice Insurance | 35,000.00 | $50,000.00 | 50,000.00 | 50,000.00 | $50,000.00 | 50,000.00 |
| NFP Property | 28,000.00 | $28,000.00 | 28,000.00 | 28,000.00 | $30,000.00 | 30,000.00 |
| NFP GFG General Liability and professional | 28,280.00 | $28,280.00 | 28,280.00 | 28,280.00 | $28,280.00 | 28,280.00 |
| Employment Practices Liability (EPL) | 5,000.00 | $5,000.00 | 5,000.00 | 5,000.00 | $5,200.00 | 5,200.00 |
| Total | $196,971.00 | $197,468.64 | $211,971.00 | $211,971.00 | $263,480.00 | $263,480.00 |
| | Yr 2023 spent | Yr 2024 Estimate | Yr 2025 Estimate | Yr 2026 Estimate | Yr 2027 Spent | Yr 2028 Spent |

**Appendix Page 068**

| 医疗/Clinical Expense | | | | | | |
|---|---|---|---|---|---|---|
| 医疗气Medical Gas | 12,000.00 | $12,000.00 | 12,000.00 | 15,000.00 | $15,000.00 | 15,000.00 |
| 药材Medical Supplies | 50,000.00 | $50,000.00 | 60,000.00 | 60,000.00 | $75,000.00 | 75,000.00 |
| 实验室费用Laboraty Fee | 200,000.00 | $200,000.00 | 200,000.00 | 200,000.00 | $200,000.00 | 200,000.00 |
| Total | $262,000.00 | $262,000.00 | $272,000.00 | $275,000.00 | $290,000.00 | $290,000.00 |
| | | | | | | |
| | | | | | | |
| 专业服务/Professional Services | | | | | | |
| 国际商旅International Travel | 10,000.00 | $20,000.00 | 20,000.00 | 25,000.00 | $30,000.00 | 30,000.00 |
| 牌照 Mebership & License & Permit | 15,000.00 | $15,000.00 | 15,000.00 | 15,000.00 | 18,000.00 | 18,000.00 |
| 法务Legal | 65,000.00 | $65,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| 税务Accounting & Book keeper | 15,000.00 | $15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| 国内的Dometics Travel for Conference | 0.00 | $10,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| 其他Misc Expense | 0.00 | $10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| | | | | | | |
| Total | $105,000.00 | $135,000.00 | $100,000.00 | $105,000.00 | $113,000.00 | $113,000.00 |
| | | | | | | |
| 宣传/Advertising & Promotion | | | | | | |
| US CHINESE MARKETING | | | | | | |
| 中文电视Sino Vision | 25,000.00 | 18,214.00 | 18,214.00 | 25,000.00 | 18,214.00 | 25,000.00 |
| 侨报INTERNET Ads+ Fight Flyer + WeiBO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 世界日报World Journal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Japense news paper | 8,600.00 | 9,000.00 | 9,000.00 | 9,000.00 | 10,000.00 | 10,000.00 |
| Japense Patient Coordinator and Maketing | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 |
| Total | $51,600.00 | $45,214.00 | $45,214.00 | $52,000.00 | $46,214.00 | $53,000.00 |
| US LOCAL MAEKETING | | | | | | |
| 社交媒体 Social Media and Website development | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |

Appendix Page 069

## GFG 2023 SUMMARY 5 YEARS PROJECTION

| | | | | | | |
|---|---|---|---|---|---|---|
| 商业活动策划 ASRM / ESHER/ LGBT Events Sponser | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| Social Media Person | 36,000.00 | 3,600.00 | 36,000.00 | 36,000.00 | 36,000.00 | 36,000.00 |
| Zocdoc | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| Total | $128,000.00 | $95,600.00 | $128,000.00 | $128,000.00 | $128,000.00 | $128,000.00 |
| Europen Marketing | | | | | | |
| Europe Market/ kinderwage | 65,000.00 | 60,000.00 | 65,000.00 | 65,000.00 | 65,000.00 | 65,000.00 |
| Total | $65,000.00 | $60,000.00 | $65,000.00 | $65,000.00 | $65,000.00 | $65,000.00 |
| CHINA MARKETING EXPENSE | | | | | | |
| China Marketing Team | 250,000.00 | 250,000.00 | 250,000.00 | 300,000.00 | 300,000.00 | 350,000.00 |
| Total | $250,000.00 | $250,000.00 | $250,000.00 | $300,000.00 | $300,000.00 | $350,000.00 |
| Total Annual Maketing Expense | $494,600.00 | $450,814.00 | $488,214.00 | $545,000.00 | $539,214.00 | $596,000.00 |
| | | | | | | |
| 预算总数 | $3,508,284.32 | $3,618,600.36 | $3,801,406.59 | $3,914,437.26 | $4,055,444.00 | $4,147,500.00 |
| Monthly Expense | $292,357.03 | $301,550.03 | $316,783.88 | $326,203.11 | $337,953.67 | $345,625.00 |

| 2023 and 5 years income projections | 2023 E | 2024 E | 2025 E | 2026 E | 2027E | 2028E |
|---|---|---|---|---|---|---|
| Estimate Total Revenue | $3,675,000.00 | $4,645,000.00 | $5,745,000.00 | $6,505,000.00 | $7,865,000.00 | $8,165,000.00 |
| KJD Ferlity Revenue | $1,102,500.00 | $1,393,500.00 | $1,723,500.00 | $1,951,500.00 | $2,359,500.00 | $2,449,500.00 |
| Global Fertility and Genetics Revenue | $2,572,500.00 | $3,251,500.00 | $4,021,500.00 | $4,553,500.00 | $5,505,500.00 | $5,715,500.00 |
| Estimate Total Expense | $3,508,284.32 | $3,618,600.36 | $3,801,406.59 | $3,914,437.26 | $4,055,444.00 | $4,147,500.00 |
| KJD Ferlity Expense | $1,052,485.30 | $1,085,580.11 | $1,140,421.98 | $1,174,331.18 | $1,216,633.20 | $1,244,250.00 |
| Global Fertility and Genetics Expense | $2,455,799.02 | $2,533,020.25 | $2,660,984.61 | $2,740,106.08 | $2,838,810.80 | $2,903,250.00 |
| Estimate Total Income | $166,715.68 | $1,026,399.64 | $1,943,593.41 | $2,590,562.74 | $3,809,556.00 | $4,017,500.00 |
| Global Fertility ESTIMATE NET INCOME | $116,700.98 | $718,479.75 | $1,360,515.39 | $1,813,393.92 | $2,666,689.20 | $2,812,250.00 |

| Laboratory Function & Volume | 2023 | 2024 E | 2025 E | 2026 E | 2027 E | 2028 E |
|---|---|---|---|---|---|---|
| IVF + Freeze All (Including donor cycles) | 252 | 300 | 360 | 400 | 450 | 500 |
| FET | 190 | 190 | 220 | 200 | 250 | 270 |
| Total | 442 | 490 | 580 | 600 | 700 | 770 |

**NORTON ROSE FULBRIGHT (US) LLP**
Andrew Rosenblatt, Esq.
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
andrew.rosenblatt@nortonrosefulbright.com

*Counsel to Dr. Hu Bo*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | X |
| | X |
| | X    Chapter 11 |
| GLOBAL FERTILITY & GENETICS, | X |
| NEW YORK, LLC | X    Case No.:  23-10905-PB |
| | X |
| Debtor. | X |
| | X |

**DR. HU BO'S CHAPTER 11 PLAN OF REORGANIZATION**
**FOR GLOBAL FERTILITY & GENETICS NEW YORK, LLC**

Dr. Hu Bo, the Plan Proponent, respectfully submits its plan of reorganization for debtor

Global Fertility & Genetics New York, LLC pursuant to sections 1121(c), 1125 and 1126 of the

Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure, in the form

annexed hereto and made a part hereof.

i

## TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS AND INTERPRETATION ...................................................... 2

1.1  Definitions............................................................................................................. 2
1.2  Interpretation: Application of Definitions and Rules of Construction............................. 11
1.3  Exhibits ............................................................................................................... 12
1.4  Time Periods ........................................................................................................ 12

SECTION 2.    TREATMENT OF CLAIMS ............................................................... 13

2.1  Unclassified Claims ............................................................................................... 13
2.2  Classification and Specification of Treatment of Claims .................................................. 16
2.3  Treatment and Voting Rights of Claims and Interests..................................................... 17

SECTION 3.    ACCEPTANCE OR REJECTION OF THE PLAN ........................................ 18

3.1  Impaired Classes Vote ........................................................................................... 18
3.2  Presumed Acceptance of the Plan ............................................................................. 19
3.3  Presumed Rejection of the Plan ............................................................................... 19
3.4  Voting Classes ...................................................................................................... 19
3.5  Modification of Treatment of Class 1 Claims............................................................... 19
3.6  "Cram Down" Request ........................................................................................... 19

SECTION 4.    MEANS FOR IMPLEMENTATION OF THE PLAN.................................... 20

4.1  Funding for the Plan............................................................................................... 20
4.2  Continued Corporate Existence ................................................................................ 20
4.3  Corporate Action................................................................................................... 20
4.4  Vesting of Assets ................................................................................................... 21
4.5  Issuance of New Equity Interests.............................................................................. 22
4.6  Exemption from Certain Transfer Taxes and Recording Fees........................................... 22
4.7  Directors and Officers of the Reorganized Debtor ........................................................ 23
4.8  Continuation of Insurance Policies ........................................................................... 24
4.9  Bar Date for Professional Fee Claims ........................................................................ 24
4.10 Bar Date for Other Administrative Expense Claims....................................................... 24

SECTION 5.    TREATMENT OF EXECUTORY CONTRACTS/UNEXPIRED LEASES... 25

SECTION 6.    PROVISIONS GOVERNING DISTRIBUTIONS .......................................... 25

6.1  Disbursing Agent .................................................................................................. 25
6.2  Manner of Payment and Amount to Be Distributed ....................................................... 26
6.3  Saturday, Sunday or Holiday ................................................................................... 26
6.4  Withholding Taxes................................................................................................. 27

SECTION 7.    EFFECTIVE DATE ......................................................................... 27

7.1  Conditions Precedent to Effective Date ...................................................................... 27
7.2  Waiver of Conditions Precedent ............................................................................... 28
7.3  Notice of Effective Date ......................................................................................... 28
7.4  Effect of Failure of Conditions Precedent ................................................................... 28

**Appendix Page 072**

7.5    Right to Modify the Plan Until Substantial Consummation ............................................. 28
7.6    Substantial Consummation of the Plan ........................................................................... 28

SECTION 8.        EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE ............ 29

8.1    Binding Effect................................................................................................................. 29
8.2    Discharge of Claims........................................................................................................ 29
8.3    Exculpation and Limitation of Liability ......................................................................... 29
8.4    General Injunction .......................................................................................................... 30

SECTION 9.        RETENTION OF JURISDICTION ................................................................. 30

SECTION 10.       MISCELLANEOUS PROVISIONS................................................................. 32

10.1 Revocation or Withdrawal of this Plan............................................................................ 32
10.2 Payment of Statutory Fees ............................................................................................... 32
10.3 Notices ............................................................................................................................. 33
10.4 Severability ...................................................................................................................... 33
10.5 Validity and Enforceability.............................................................................................. 33
10.6 Controlling Documents .................................................................................................... 34
10.7 Filing of Additional Documents ...................................................................................... 34
10.8 Direction to a Party .......................................................................................................... 34
10.9 Reservation of Rights....................................................................................................... 34
10.10     Governing Law ........................................................................................................... 35
10.11     Headings ..................................................................................................................... 35
10.12     No Admissions............................................................................................................ 35

Appendix Page 073

## INTRODUCTION

Dr. Hu Bo proposes this plan of reorganization for the Debtor pursuant to section 1121(c) of the Bankruptcy Code.  Capitalized terms used throughout this Plan shall have the meanings ascribed to them in Section 1, below.

Dr. Hu is proposing an alternative and competing plan to the one previously filed by the Debtor to ensure that Creditors get paid in full as soon as possible and that the Debtor emerges from bankruptcy as a financially healthy and well-funded business that can carry on the important mission of providing world-class fertility and related services to its broad customer base, including its China-based clientele.

The Plan, among other things, proposes to treat all Classes of Creditors as "unimpaired." Specifically, if the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, ***Creditors holding Allowed Claims shall receive payment in full in cash on or as soon as practicable after the Effective Date of the Plan***, and Creditors holding litigation or other contested contingent claims will have those Claims pass-through the Chapter 11 unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, without regard to the automatic stay or the Debtor's Discharge and with all parties' respective rights, remedies, claims and defenses as they existed on the Petition Date fully preserved.

The proposed treatment of Creditors under this Plan is indisputably and significantly better than the proposed treatment of Creditors under the plan proposed by the Debtor, which requires Holders of Claims to wait up to five years for payment in full, without any assurance of actually receiving full payment.  The Plan, as opposed to the Debtor's plan, does not make Creditors wait to be paid or expose them to the Debtor's on-going credit risk.

Moreover, implementation of the Plan will allow the Debtor the best chance to flourish as a going-concern business.  Dr. Hu has extensive experience and expertise overseeing medical and

1

fertility-related businesses. Dr. Hu holds a master's degree in medical imaging and has nearly 35 years of medical and administrative management experience. As described in more detail in the Disclosure Statement, Dr. Hu founded, and is currently the Chairman of, the Ciming Health Checkup Management Group, which is one of the largest and most successful general healthcare providers in China. Dr. Hu is considered a leader and innovator in the medical field and has spearheaded numerous projects both in China and the U.S., including specifically in the reproduction and fertility field.

Importantly, Dr. Hu has also committed to fund the Reorganized Debtor with no less than *$5 million* to stabilize the business, promote and encourage the facility's growth, and to ensure its ability to satisfy on-going operating expenses.

## SECTION 1.    DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

The following terms used herein shall have the respective meanings defined below:

1.1.1    *Action* shall mean any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.2    *Administrative Claims Bar Date* shall mean the deadline for filing requests for payment of Administrative Expense Claims, including Professional Fee Claims, which shall be 30 days after the Effective Date.

1.1.3    *Administrative Expense* shall mean a Claim against the Debtor for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor; (b) Professional Fee Claims; (c) any Claim

2

specified in section 503(b)(9) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code.

    1.1.4    ***Allowed*** when used as an adjective preceding the words "Claims" or "Interest", shall mean any Claim against or Interests of the Debtor, proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claim or Interest against such Debtor, or, if no proof of claim or Interest is filed, which has been or hereafter is listed by the Debtor as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed with the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules, or as to which any objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  Unless otherwise specified in the Plan, "Allowed Claim" and "Allowed Interest" shall not, for purposes of computation of distributions under the Plan, include interest on the amount of such Claim or Interest from and after the Petition Date.

    1.1.5    ***Allowed Unsecured Claim*** shall mean an Unsecured Claim that is or has become an Allowed Claim.

    1.1.6    ***Bankruptcy Code*** shall mean title 11 of the United States Code, as now in effect or hereafter applicable to the Chapter 11 Case.

    1.1.7    ***Bankruptcy Court*** shall mean the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case and, to the extent of any reference made pursuant to 28 U.S.C. § 158, the unit of such District Court constituted pursuant to 28 U.S.C. § 151.

1.1.8    **Bankruptcy Rules** shall mean the rules and forms of practice and procedure in bankruptcy, promulgated under 28 U.S.C. Section 2075 and also referred to as the Federal Rules of Bankruptcy Procedure, as amended.

1.1.9    **Bar Date** means April 4, 2024 at 11:59 p.m. (Eastern time), the deadline by which proof of claim forms for prepetition Claims are required to be filed against the Debtor.

1.1.10   **Business Day** means and refers to any day except Saturday, Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), and any other day on which commercial banks in New York, New York are authorized or required by law to close.

1.1.11   **Cash** means cash and cash equivalents including, without limitation, checks and wire transfers.

1.1.12   **Chapter 11 Case** shall mean a case under Chapter 11 of the Bankruptcy Code in which Global Fertility & Genetics, New York LLC is the Debtor.

1.1.13   **Claim** shall mean any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.  All claims as such term is defined in section 101(5) of the Bankruptcy Code.

1.1.14   **Class** shall mean a grouping of substantially similar Claims or Interests for common treatment thereof pursuant to the terms of this Plan.

1.1.15   **Confirmation** shall mean the entry of an order by the Bankruptcy Court approving the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.1.16 **Confirmation Hearing** shall mean a hearing conducted before the Bankruptcy Court for the purpose of considering confirmation of the Plan and approval of the Disclosure Statement.

1.1.17 **Confirmation Order** shall mean an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.1.18 **Creditor** shall mean any person that has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtor's Estate of any kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code. This includes all persons, corporations, partnerships, or business entities holding Claims against the Debtor.

1.1.19 **Debt** shall have the meaning ascribed to it in section 101(12) of the Bankruptcy Code.

1.1.20 **Debtor** shall mean Global Fertility & Genetics, New York, LLC.

1.1.21 **Disallowed** shall mean, with respect to a Claim, or any portion thereof, that such Claim or portion thereof: (a) has been disallowed by either a Final Order or pursuant to a settlement or stipulation between the Debtor and the holder of the Claim; or (b)(i) is valued on the Debtor's Schedules at zero dollars ($0) or denominated as contingent, disputed or unliquidated and (ii) as to which a bar date has been established but no proof of claim has been filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.1.22 **Disbursing Agent** shall mean the Reorganized Debtor or Dr. Hu's designee, as applicable, which shall act as the disbursing agent for the purpose of making all distributions to Holders of Allowed Claims pursuant to the provisions of the Plan and Confirmation Order.

1.1.23 **Discharge** shall mean the complete extinguishment of the liability of the Debtor in respect to any Claim or Debt, as and to the extent further described in Section 8.2 of the Plan.

1.1.24 **Disclosure Statement** shall mean the Disclosure Statement filed by Dr. Hu in respect of the Plan as required pursuant to Section 1125 *et seq.* of the Bankruptcy Code, as the same may be altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.1.25 **Disputed** shall mean, with respect to a Claim, or any portion thereof, that such Claim or portion thereof is neither an Allowed Claim nor a Disallowed Claim, and includes, without limitation, any Claims that: (a) is not included on the Debtor's Schedules or is reflected on the Schedules as being valued at zero dollars, or as contingent, unliquidated or disputed; or (b) is the subject of an objection filed in the Bankruptcy Court that has not been withdrawn or overruled by a Final Order of the Court.

1.1.26 **Distribution** shall mean any payment to the holder of a Claim as provided in this Plan.

1.1.27 **Dr. Hu** shall mean Dr. Hu Bo, the Plan Proponent, including any designee of Dr. Hu.

1.1.28 **Effective Date** shall mean the day on which the Confirmation Order becomes a Final Order and all conditions to effectiveness of the Plan have been satisfied and/or waived by Dr. Hu, as the Plan Proponent.

1.1.29 **Estate** shall mean the estate of the Debtor created by the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.1.30 **Exculpated Parties** shall mean, collectively: (a) the Debtor; (b) the Reorganized Debtor; (c) Dr. Hu, in his capacity as the Plan Proponent; and (d) with respect to each of the

6

foregoing Persons or entities in clauses (a) through (c), such Person's or entity's Related Persons, in each case in their capacity as such.

1.1.31 *Final Order* shall mean an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

1.1.32 *General Unsecured Claim* shall mean a Claim against the Debtor of any kind or nature including, without limitation, on account of trade credit, contract, personal injury, or arising from the rejection of an executory contract or unexpired lease, that (a) is not secured by property of the Estate or otherwise entitled to treatment as a secured claim under section 506 of the Bankruptcy Code; (b) is not otherwise entitled to priority under sections 503 or 507 of the Bankruptcy Code; and (c) is not otherwise an Administrative Expense Claim, Professional Fee

**Appendix Page 080**

Claim, Claim for U.S. Trustee Fees, Priority Tax Claim, Non-Tax Priority Claim, or Secured Claim.

1.1.33  **Holder** shall mean the beneficial holder of any Claim or Interest.

1.1.34  **Impaired** shall mean, when used as an adjective preceding the words "Class of Claims" or "Class of Interest", that the Plan alters the legal, equitable, or contractual rights of the members of that class.

1.1.35  **Interest** shall mean any equity security (as defined in section 101(16) of the Bankruptcy Code) or membership interest in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

1.1.36  **Interest Holder** shall mean the Holder of an Interest in the Debtor.

1.1.37  **New Value Contribution** shall mean the cash contribution to be made by Dr. Hu on or as soon as practicable after the Effective Date of the Plan, in an amount sufficient to pay in full all Allowed Claims, including the asserted amount of any Pass-Through Claim(s).

1.1.38  **Non-Tax Priority Claim** shall mean a Claim against the Debtor, other than an Administrative Expense Claim, Priority Tax Claim, or Professional Fee Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.1.39  **Pass-Through Claim** shall mean each of (i) the claim of Alexis Cancel arising from that certain employment discrimination lawsuit pending in the Supreme Court of New York, New York County, captioned as *Alexis Cancel v. Global Fertility and Genetics, Inc. et al*, Index Number

8

152435/2018, and (ii) any other contingent litigation claim that is designated as such by Dr. Hu on or before the Plan Supplement Filing Date, if any.

1.1.40  ***Person*** shall mean an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government or any political subdivision thereof or other entity, including, without limitation, the Debtor, the Reorganized Debtor and Dr. Hu, in his capacity as the Plan Proponent.

1.1.41  ***Petition Date*** shall mean June 6, 2023, which is the date the Debtor filed its petition for relief commencing the Chapter 11 Case.

1.1.42  ***Plan*** shall mean this Chapter 11 plan of reorganization filed by Dr. Hu for the Debtor, as it may be altered, modified, or amended from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

1.1.43  ***Plan Proponent*** shall mean Dr. Hu Bo.

1.1.44  ***Plan Supplement*** shall mean one or more supplements to the Plan to be filed with the Bankruptcy Court in advance of the Confirmation Hearing which shall contain, without limitation, the following information: (i) a schedule setting forth the Reorganized Debtor's proposed post-Effective Date management team, (ii) a list of all executory contracts and/or unexpired leases to be Assumed or Assumed and Assigned to the Debtor or Reorganized Debtor, as the case may be, including proposed Cure Costs, if any, (iii) forms of organizational and/or corporate governance documents in respect of the Reorganized Debtor, and (iv) an updated schedule listing all known Allowed Claims and any Disputed Claims, and the amounts thereof, all in form and substance acceptable to Dr. Hu in his sole discretion.

9

1.1.45 ***Plan Supplement Filing Date*** shall mean the day that is no less than seven (7) calendar days prior to the deadline set by the Court for Creditors and Interest Holders to object to the Plan or Disclosure Statement, unless such later date is approved by the Bankruptcy Court.

1.1.46 ***Priority Non-Tax Claim*** shall mean a Claim entitled to priority under Sections 507(a)(2),(3), (4), (5), (6) or (7) of the Bankruptcy Code, but only to the extent it is entitled to priority in payment under any such subsection.

1.1.47 ***Priority Tax Claim*** shall mean any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

1.1.48 ***Priority Tax Creditor*** shall mean a Creditor holding a Priority Tax Claim.

1.1.49 ***Proceedings*** shall mean the Chapter 11 Case of the Debtor.

1.1.50 ***Professional Fee Claim*** shall mean and refers to a Claim by any and all Professional Persons as provided for in sections 327, 328, 330 and 503(b) of the Bankruptcy Code.

1.1.51 ***Professional Persons*** shall mean and refers to all attorneys, accountants, appraisers, consultants, and other professionals retained or to be compensated pursuant to an order of the Bankruptcy Court entered under sections 327, 328, 330, or 503(b) of the Bankruptcy Code.

1.1.52 ***Related Person*** shall mean, with respect to any Person or entity, in each case solely in its capacity as such, such Person's or entity's (a) predecessors, successors, assigns, subsidiaries, and affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, Estate, and nominees.

**Appendix Page 083**

1.1.53 **Reorganized Debtor** shall mean the Debtor after the occurrence of the Effective Date of the Plan.

1.1.54 **Schedules** shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor in this Chapter 11 Case on June 6, 2023 (CM/ECF No. 1)., as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented through the Effective Date.

1.1.55 **Secured Claim** shall mean and refers to a Claim which is secured by a valid lien, security interest, or other interest in property in which the Debtor has an interest which has been perfected properly as required by applicable law, but only to the extent of the value of the Debtor's interest in such property, determined in accordance with section 506(a) of the Bankruptcy Code.

1.1.56 **Unimpaired** shall mean with respect to any Class, that such Class is not Impaired.

1.1.57 **Unsecured Claim** shall mean any Claim against the Debtor which arose or which is deemed by the Bankruptcy Code to have arisen prior to the Petition Date for such Debtor, and which is not (i) a secured claim pursuant to section 506 of the Bankruptcy Code, as modified by section 1111(b) of the Bankruptcy Code, or (ii) a Claim entitled to priority under sections 503 or 507 of the Bankruptcy Code.

1.1.58 **U.S. Trustee Fees** shall mean all fees and charges assessed against the Estate of the Debtor under 28 U.S.C. § 1930 together with interest, if any, under 31 U.S.C. § 3717.

**1.2** **Interpretation: Application of Definitions and Rules of Construction**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, Subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the

11

Disclosure Statement, and if not defined therein, in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified.  If a time or date is specified for any payments or other Distribution under the Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.  Unless otherwise specified, references to Dr. Hu in the Plan shall be in his capacity as the Plan Proponent.

## 1.3    Exhibits

All exhibits and schedules to the Plan (including those set forth in or attached as exhibits to the Plan Supplement) are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

## 1.4    Time Periods

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**Appendix Page 085**

## SECTION 2.    TREATMENT OF CLAIMS

**2.1    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, Dr. Hu has not placed the following claims in a Class.  The treatment of these claims is provided below.

2.1.1    *Administrative Expense Claims*.  Administrative Expense Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed pursuant to section 503(b) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims have not been classified and are treated as described in this Section 2.1 of the Plan.  Except as otherwise provided in the Plan, by written agreement of the Holder of an Allowed Administrative Expense Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Expense Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Expense Claim. Notwithstanding anything in the Plan to the contrary, the Holder of an Allowed Administrative Expense Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Administrative Expense Claim and Dr. Hu or the Reorganized Debtor.

As to other Allowed Administrative Expense Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim: (i) shall be paid by the Reorganized Debtor as soon as reasonably practicable after the Effective Date or on the date the order allowing such Administrative Expense Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Expense Claim, Cash equal

13

to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Expense Claim.

Administrative Expense Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Debtor or the Reorganized Debtor, as the case may be, in the ordinary course of business and without Bankruptcy Court approval.

2.1.2 *Priority Tax Claims*. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, as applicable, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided, however*, that the Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium. The Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the Confirmation of the Plan.

2.1.3 *Non-Tax Priority Claims*. Unless the Holder of an Allowed Non-Tax Priority Claim and the Debtor or the Reorganized Debtor, as applicable, agree to a different treatment, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on

14

which Non-Tax Priority Claim becomes an Allowed Claim, each Holder of an such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (i) Cash equal to the unpaid portion of such Allowed Claim or (ii) such other less favorable treatment as to which Dr. Hu or the Reorganized Debtor, as applicable, and the Holder of such Allowed Claim shall have agreed upon in writing. Notwithstanding anything in the Plan to the contrary, the Holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Non-Tax Priority Claim and the Debtor or the Reorganized Debtor, as applicable.

*The Debtor has indicated that there are no Non-Tax Priority Claims.*

2.1.4    ***Professional Fee Claims***.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as described herein.  All Professional Persons or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date, and (b) shall be paid in full, in Cash, by the Reorganized Debtor (i) as soon as practicable after the Effective Date or the date the order allowing such Administrative Expense Claim becomes a Final Order; or (ii) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and Dr. Hu or the Reorganized Debtor, as applicable.  The Reorganized Debtor is authorized to pay its Professional Persons for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

**Appendix Page 088**

2.1.5  *US Trustee Fees*.  US Trustee Fees include all fees and charges assessed against the Debtor under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717.  All US Trustee Fees not paid prior to the Effective Date shall be paid by the Reorganized Debtor as soon as practicable after the Effective Date.

**2.2**    **Classification and Specification of Treatment of Claims**

All Claims, except those described in Section 2.1, are placed in the following Classes of Claims, pursuant to section 1123(a)(1) of the Bankruptcy Code, which section specifies the treatment of such Classes of Claims and of their Impaired or Unimpaired status, pursuant to sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan.

Subject to all other applicable provisions of this Plan, classified Claims shall receive the respective treatments set forth below.  This Plan will not provide any Distribution on account of a Claim to the extent that such Claim has been Disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.  Except as specifically provided in this Plan, this Plan will not provide any Distribution on account of a Claim, the payment of which has been assumed by a third party.  Any Holder of any Claim in any Class may agree, pursuant to section 1123(a)(4) of the Bankruptcy Code, to a treatment of such Claim that is less favorable (but not more favorable) than any other Claim in such Class.

16

**Appendix Page 089**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation of the Plan, and Distributions pursuant to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Expense Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | US Trustee Fee Claims | No | Does Not Vote |
| 1 | General Unsecured Claims | No | Deemed to Accept |
| 2 | Equity Interests | Yes | Deemed to Reject |

## 2.3    Treatment and Voting Rights of Claims and Interests

### 2.3.1    *Class 1 - General Unsecured Claims*

**Classification**:  Class 1 Claims consists of all General Unsecured Claims.

**Treatment**:  On, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in Cash as follows:

(a)    General Unsecured Claims set forth on Annex A to the Plan or in a schedule to be included in the Plan Supplement will be paid from the New Value Contribution to be made by Dr. Hu, as set forth in Annex A hereto or the Plan Supplement, as the case may be.

(b)    Those General Unsecured Claims set forth in Annex B to the Plan or in a schedule to be included in the Plan Supplement, which are designated as the Pass-Through Claims, shall survive unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative

17

body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. Payment on any Pass-Through Claim shall be made no later than the first day that is ten (10) Business Days after such Pass-Through Claim becomes an Allowed General Unsecured Claim.

The foregoing payments and/or treatment shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim.

**Voting**:  Class 1 is Unimpaired and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and votes of such Holders will not be solicited with respect to such General Unsecured Claims.

### 2.3.2  *Class 2 -  Existing Equity Interests*

**Classification**:  Class 2 consists of all existing Interests.  This Class of Holders of Interests is comprised of the Debtor's sole member, GFG Holding Co., LLC.

**Treatment**:  On the Effective Date, each Holder of an Interest shall have such Interest extinguished, cancelled, released, and discharged and without any distribution.

**Voting**:  Class 2 is Impaired and Holders of Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Interests are not entitled to vote to accept or reject the Plan, and votes of such Holders will not be solicited with respect to such Interests.

## SECTION 3.    ACCEPTANCE OR REJECTION OF THE PLAN

### 3.1    Impaired Classes Vote

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the plan is accepted by the Holders of at least two-thirds in dollar amount and more than one-

half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

## 3.2    Presumed Acceptance of the Plan

Class 1 is Unimpaired under the Plan and is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

## 3.3    Presumed Rejection of the Plan

Class 2 will not receive or retain any property under this Plan and is, therefore, deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

## 3.4    Voting Classes

There are no Classes of Claims or Interests entitled to vote on the Plan.

## 3.5    Modification of Treatment of Class 1 Claims

Dr. Hu or the Reorganized Debtor, as the case may be, may modify the treatment of any Allowed Class 1 Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Class 1 Claim whose Allowed Claim is being adversely affected, or as Allowed by Bankruptcy Court order prior to the Effective Date.

## 3.6    "Cram Down" Request

Because Class 2 is deemed to reject the Plan, Dr. Hu will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

**Appendix Page 092**

## SECTION 4.    MEANS FOR IMPLEMENTATION OF THE PLAN

### 4.1    Funding for the Plan

Dr. Hu shall fund all distributions under the Plan with the New Value Contribution.  The New Value Contribution will be an amount sufficient to pay all Creditors in full, including the face amount of any Pass-Through Claims.  Dr. Hu has also committed to fund the Reorganized Debtor with no less than $5 million to promote growth opportunities for the Reorganized Debtor and permit the Reorganized Debtor to satisfy operating expenses as they come due in the ordinary course of business.

### 4.2    Continued Corporate Existence

Except as otherwise provided in the Plan, the Debtor, as the Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with the Reorganized Debtor, the Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and the Reorganized Debtor's organizational documents, as the Reorganized Debtor may determine is reasonable and appropriate.

### 4.3    Corporate Action

On the Effective Date, the Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan, including: (i) the selection of the directors and officers of the Reorganized Debtor; (ii) the distribution of new Interests to Dr. Hu as provided herein; (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), and all such

20

actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor and any corporate action required by the Debtor, Dr. Hu, in his capacity as Plan Proponent, or the Reorganized Debtor in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by Dr. Hu or the directors, or officers of the Debtor or the Reorganized Debtor or otherwise.

On or before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor, including the new Interests to be issued to Dr. Hu (or an entity to be designated by Dr. Hu), and any and all agreements, documents, securities, and instruments relating to the foregoing.

The authorizations and approvals contemplated by this Section 4.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

**4.4     Vesting of Assets**

Except as otherwise provided in the Plan, on the Effective Date, all Assets, including all Claims, rights, intellectual property rights, and causes of action, shall vest in the Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims), interests, and causes of action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

**Appendix Page 094**

On or prior to the occurrence of the Effective Date, any Person holding property of the Debtor, including any property that was developed or registered by, for, or on behalf of the Debtor, shall be turned over and assigned to the Reorganized Debtor. For the avoidance of doubt, this includes any intellectual property rights that were developed by or for the Debtor, such as trademark rights associated with the Debtor's business, but that are or have been held or registered in the name of other Persons.

## 4.5    Issuance of New Equity Interests

On the Effective Date, the Reorganized Debtor shall issue all securities, notes, instruments, membership interests, certificates, and other documents required to be issued pursuant to the Plan. All of the new Interests issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the new Interests is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

On the Effective Date, the Reorganized Debtor and Dr. Hu, as the Holder of the new Interests, shall enter into new organizational and/or corporate governance documents (which shall be in substantially the form included in the Plan Supplement). The new organizational and/or corporate governance documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of the new Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtor.

## 4.6    Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (b) the making,

22

**Appendix Page 095**

assignment, or recording of any lease or sublease; or (c) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

**4.7      Directors and Officers of the Reorganized Debtor**

The post-confirmation management of the Reorganized Debtor will be Dr. Hu and/or Yihan Hu, and will be designated in the Plan Supplement.

The current members of the board of directors or board of managers, or the sole manager, as applicable, of the Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtor on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the Debtor on the Effective Date. Each of the directors, managers, sole managers and officers of the Reorganized Debtor shall serve pursuant to the terms of the new organizational and/or corporate governance documents of the Reorganized Debtor and may be designated, replaced or removed in accordance with such new organizational and/or corporate governance documents.

**Appendix Page 096**

**4.8     Continuation of Insurance Policies**

All insurance policies pursuant to which the Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed and assumed and assigned to the Reorganized Debtor and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

**4.9     Bar Date for Professional Fee Claims**

Each Professional Person retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must file with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 30 days after the Effective Date.  All applications for the allowance of Professional Fee Claims that are not timely filed shall be forever barred.  Objections to such applications may be filed in accordance with the Bankruptcy Rules.  The Bankruptcy Court shall determine all such Professional Fee Claims.

**4.10    Bar Date for Other Administrative Expense Claims**

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Expense Claims must file and serve on the Debtor or Reorganized Debtor, as applicable, requests for the payment of such Administrative Expense Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Debtor or the Reorganized Debtor, the Estate, or its property without the need for any objection by the Debtor or the Reorganized Debtor, or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Expense Claims shall be deemed fully satisfied, released, and discharged.

24

**Appendix Page 097**

## SECTION 5.     TREATMENT OF EXECUTORY CONTRACTS/UNEXPIRED LEASES

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor except (i) insurance policies that have not been assumed and retained by the Debtor pursuant to Section 4.8, or (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, will be deemed to be assumed or assumed and assigned to the Reorganized Debtor on the Effective Date.  If any party to an executory contract or unexpired lease that is being assumed and assigned to the Reorganized Debtor objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court.  All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor.  In the event of a dispute regarding the amount of any cure payments, or the ability of the Debtor or the Reorganized Debtor, as applicable, to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Debtor, or assumed and assigned to the Reorganized Debtor, Dr. Hu or the Reorganized Debtor, as applicable, will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute.  The contracts and leases which will be assumed and assigned to the Reorganized Debtor, and their respective cure costs, will be identified in the Plan Supplement.

## SECTION 6.     PROVISIONS GOVERNING DISTRIBUTIONS

### 6.1     Disbursing Agent

The Reorganized Debtor or Dr. Hu's designee, as applicable, shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan.  The Reorganized

Debtor or Dr. Hu's designee shall serve as the disbursing agent without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**6.2      Manner of Payment and Amount to Be Distributed**

Unless otherwise agreed by the Reorganized Debtor or Dr. Hu, as applicable, and the recipient of a Distribution under the Plan, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the disbursing agent.

Except as otherwise provided herein, Distributions under the Plan will be made only to the Holders of Allowed Claims.  Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any Distribution otherwise provided to Creditors under the Plan.

Except as otherwise provided herein, on, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which a Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

**6.3      Saturday, Sunday or Holiday**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

**Appendix Page 099**

**6.4     Withholding Taxes**

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**SECTION 7.     EFFECTIVE DATE**

**7.1     Conditions Precedent to Effective Date**

The Effective Date shall not occur unless each of the following conditions are satisfied or waived as set forth in Section 7.2 below:

7.1.1     *Confirmation Order*.  The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance reasonably acceptable to Dr. Hu, which shall be in force and effect and not subject to any stay of effectiveness.

7.1.2     *Authorizations.*  Dr. Hu and/or the Reorganized Debtor, as applicable, shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

7.1.3     *No Material Amendments.*  The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with the consent of Dr. Hu.

**7.2    Waiver of Conditions Precedent**

Dr. Hu may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**7.3    Notice of Effective Date**

Dr. Hu shall file a notice of the Effective Date with the Bankruptcy Court, and serve it on all Creditors and parties in interest, within five (5) Business Days after the occurrence of the Effective Date.  Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**7.4    Effect of Failure of Conditions Precedent**

If the Effective Date does not occur, then, upon notice by Dr. Hu to the Bankruptcy Court, (a) the Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or causes of action; (ii) prejudice in any manner the rights of the Debtor, Dr. Hu or any other entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, Dr. Hu or any other entity.

**7.5    Right to Modify the Plan Until Substantial Consummation**

Until the Plan has been substantially consummated, Dr. Hu shall have the right to modify the Plan to the extent permitted by Section 1127 of the Bankruptcy Code.

**7.6    Substantial Consummation of the Plan**

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

**Appendix Page 101**

# SECTION 8.    EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

## 8.1    Binding Effect

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind and inure to the benefit of the Debtor, the Reorganized Debtor, Dr. Hu, as Plan Proponent, and each Holder of a Claim against or Interest in the Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, Dr. Hu's, and Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has accepted or rejected the Plan or is deemed to have accepted or rejected the Plan.

## 8.2    Discharge of Claims

Except as otherwise expressly provided in the Plan or Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims.

## 8.3    Exculpation and Limitation of Liability

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTOR; PROVIDED THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; PROVIDED FURTHER THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT; PROVIDED FURTHER THAT THE FOREGOING

Appendix Page 102

SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER.

**8.4    General Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DEBTOR, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DEBTOR BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN, OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (W) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (X) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, (Y) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (Z) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR THE REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.

**SECTION 9.    RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all usual and customary matters

arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142

of the Bankruptcy Code, including jurisdiction to:

a.  Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

b.  Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professional Persons authorized pursuant to the Bankruptcy Code or the Plan;

c.  Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure costs arising therefrom, including cure costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any executory contract or unexpired lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

d.  Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.  Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

f.  Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g.  Resolve any cases, controversies, suits, or disputes that may arise in connection with the interpretation or enforcement of the Plan or any entity's obligation incurred in connection with the Plan;

h.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

i.  Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with enforcement of the Plan;

j.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**Appendix Page 104**

k. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

l. Enter an order or final decree concluding or closing the Chapter 11 Case;

m. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

n. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

o. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

p. Enforce all orders previously entered by the Bankruptcy Court; and

q. Hear any other matter not inconsistent with the Bankruptcy Code.

## SECTION 10.    MISCELLANEOUS PROVISIONS

### 10.1    Revocation or Withdrawal of this Plan

Dr. Hu reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order.  If Dr. Hu revokes or withdraws this Plan before the Confirmation Date, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against Dr. Hu or to prejudice in any manner the rights of Dr. Hu in any further proceedings.

### 10.2    Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the US Trustee and Reorganized Debtor, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

**10.3    Notices**

All notices or requests in connection with this Plan shall be in writing and given by mail or overnight mail (with a contemporaneous e-mail copy, which shall not constitute notice) addressed to:

> To the Plan Proponent or Reorganized Debtor
>
> Norton Rose Fulbright (US) LLP
> Andrew Rosenblatt, Esq.
> 1301 Avenue of the Americas
> New York, New York 10019
> Email: andrew.rosenblatt@nortonrosefulbright.com

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in this Chapter 11 Case.  Any such Holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Debtor or Reorganized Debtor.

**10.4    Severability**

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

**10.5    Validity and Enforceability**

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with

**Appendix Page 106**

the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

## 10.6    Controlling Documents

In the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan, the provisions of the Confirmation Order shall control and take precedence.

## 10.7    Filing of Additional Documents

At any time before substantial consummation of the Plan, Dr. Hu or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

## 10.8    Direction to a Party

On or after the Effective Date, Dr. Hu or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

## 10.9    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.

**10.10   Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

**10.11   Headings**

Headings are used in this Plan for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

**10.12   No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by Dr. Hu or the Reorganized Debtor with respect to any matter set forth herein.

*[Signature page follows]*

Dated: New York, New York
March 17ᵗʰ, 2024

Respectfully submitted,
DR. HU BO, as Plan Proponent

By: _____

Yihan Hu, as Agent on behalf of Dr. Hu


NORTON ROSE FULBRIGHT (US) LLP
Andrew Rosenblatt, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com

*Counsel to Dr. Hu Bo*

36

**NORTON ROSE FULBRIGHT (US) LLP**
Andrew Rosenblatt, Esq.
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
andrew.rosenblatt@nortonrosefulbright.com

*Counsel to Dr. Hu Bo*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Hearing Date: April 9, 2024**
**Hearing Time: 2:00 p.m. via Zoom**

|  |  |  |
|---|---|---|
| In re: | X | |
| | X | |
| | X | Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X | |
| NEW YORK, LLC | X | Case No.:  23-10905-PB |
| | X | |
| Debtor. | X | |
| | X | |

**MOTION OF DR. HU BO, AS PLAN PROPONENT, FOR ENTRY OF AN ORDER
(I) SCHEDULING A COMBINED HEARING FOR APPROVAL OF
DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN, (II) APPROVING
DEADLINES RELATED THERETO, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY JUDGE:

Dr. Hu Bo ("**Dr. Hu**"), in his capacity as the "Plan Proponent" and party-in-interest in the

above-captioned bankruptcy case (the "**Chapter 11 Case**") of Global Fertility & Genetics New

York, LLC (the "**Debtor**"), by and through his undersigned counsel, hereby submits this motion

(the "**Motion**") for entry of an order (the "**Procedures Order**"): (i) scheduling a combined hearing

(the "**Confirmation Hearing**") to consider (a) approval of the *Disclosure Statement Pursuant to*

*Section 1125 of the Bankruptcy Code in Support of Chapter 11 Plan of Reorganization Proposed*

*By Dr. Hu Bo* dated March 17, 2024 (including all exhibits thereto and as amended, supplemented

or otherwise modified from time to time, the "***Disclosure Statement***") and (b) confirmation of *Dr. Hu Bo's Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* dated March 17, 2024 (including all exhibits thereto and as amended, supplemented, or otherwise modified from time to time, the "***Plan***"),[1] both of which have been filed contemporaneously with this Motion; (ii) approving certain deadlines in connection with approval of the Disclosure Statement and confirmation of the Plan; and (iii) granting related relief.  In support of this Motion, Dr. Hu respectfully represents as follows:

## PRELIMINARY STATEMENT

This Chapter 11 Case has been plagued by delay and procrastination.  The Debtor has been mired in bankruptcy for nearly ten months and is no closer to exiting bankruptcy now than it was the day the case was filed.  This egregious delay has been due primarily to the Debtor's mismanagement of the case and the conflicts of interest of the Debtor's sole manager and decision-maker, Annie Liu.

In an attempt to hasten the Debtor's emergence from bankruptcy, Dr. Hu took the drastic step of filing a motion seeking to appoint a Chapter 11 trustee to replace the Debtor's management.  That motion was supported by the Office of the United States Trustee and remains pending before the Court.  While Dr. Hu continues to believe that a Chapter 11 trustee could help facilitate the Debtor's successful exit from bankruptcy and continues to advance that motion, Dr. Hu's ultimate objective is to fund the Debtor's exit from bankruptcy as part of a transaction that will ensure that the Debtor emerges from bankruptcy as a financially healthy and well-funded going-concern

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

**Appendix Page 111**

business that can carry on the important mission of providing world-class fertility and related services to its broad customer base, including its China-based clientele.

To this end, now that the Debtor's exclusive period to file and solicit acceptances of its own plan of reorganization has expired, Dr. Hu is proposing an alternative and competing plan to the Debtor Plan (as defined below) to ensure that creditors get paid in full as soon as possible and that the Debtor has the best chance to flourish as a going-concern business.

The Plan, among other things, proposes to treat all classes of creditors as "***unimpaired***." Specifically, if the Plan is confirmed by the Court and becomes effective, ***creditors holding allowed claims will receive payment in full in cash on or as soon as practicable after the effective date of the Plan***. Existing equity interests will be extinguished and interest holders will receive no distributions. In consideration for Dr. Hu funding distributions and satisfying creditor claims in full, the Plan provides that Dr. Hu (or an entity designated by Dr. Hu) would receive 100% of the newly issued equity interests in the reorganized debtor.

The proposed treatment of creditors under Dr. Hu's competing Plan is indisputably and significantly better than the proposed treatment of creditors under the plan proposed by the Debtor (as may be amended, the "***Debtor Plan***"), which requires holders of claims to wait up to five years for payment in full, without any assurance of actually receiving full payment. Simply put, Dr. Hu's Plan, as opposed to the Debtor Plan, does not make creditors wait to be paid or expose them to the Debtor's on-going credit risk.

Under the Plan, no creditor or interest holder is entitled to vote to accept or reject the Plan. Indeed, all creditors are unimpaired and, thus, are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Interest holders will receive no distribution under the Plan and, thus, are presumptively deemed to reject the Plan pursuant to section 1126(g) of the

3

Bankruptcy Code. Given that no party-in-interest is entitled to vote on the Plan, there is no need for Dr. Hu to seek separate approval of the Disclosure Statement or to solicit votes for approval of the Plan. Accordingly, in the interest of judicial economy, Dr. Hu believes it is appropriate for the Court to schedule one combined hearing to consider both approval of the Disclosure Statement and confirmation of the Plan.

## I.    JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Standing Order of Reference in this District.* This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The legal and statutory predicates for the relief sought herein are sections 105, 1123(a), 1125, 1126, and 1128 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), Rules 2002, 3016, 3017, 3018, 3020, and 9006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

## II.    FACTUAL BACKGROUND

### A.    General Background and Filing of the Bankruptcy Case

3.      On June 6, 2023 (the "***Petition Date***"), the Debtor filed a voluntary petition (the "***Petition***") for relief under Chapter 11 of the Bankruptcy Code. *See Chapter 11 Voluntary Petition for Non-Individual* (CM/ECF No. 37). Included as part of the Petition, the Debtor filed its *Statements of Financial Affairs and Schedules of Assets and Liabilities* (collectively, and as may be amended from time to time, the "***Schedules***"). The Debtor has continued to operate its business and manage its property as a debtor-in-possession in accordance with sections 1107 and 1108 of

4

the Bankruptcy Code.  Although Dr. Hu has sought the appointment of a Chapter 11 trustee, at this time no trustee or examiner has been appointed in this Chapter 11 Case.  No Official Committee of Unsecured Creditors or other statutory committee has been constituted.

4.     The Debtor, a Delaware limited liability company, is a reproductive endocrinology and fertility center that, in conjunction with a non-debtor fertility medical practice, KJD Medical, PLLC ("*KJD*"), provides a full panoply of fertility services, including in-vitro fertilization treatments, egg freezing, surrogacy services, artificial insemination and donor egg-IVF treatments. A large portion of the Debtor's business caters to patients from China.  Upon information and belief, the Debtor is a "fertility clinic" that is not licensed to practice medicine in the State of New York.  As such, it cannot, and does not, directly provide medical services.  Accordingly, the Debtor has entered into a relationship with KJD, a New York-licensed medical practice, which provides medical care at the Debtor's facility.

5.     GFG Holding Group Co., LLC ("*Holdings*") owns 100% of the membership interests of the Debtor.  Holdings, in turn, is controlled by Dr. Hu (holding 70%), Jun Jung (Annie) Liu ("*Liu*") (holding 15%) and Dr. Kevin J. Doody ("*Dr. Doody*") (holding 15%).  Dr. Doody owns and controls KJD.  In accordance with the Debtor's Operating Agreement, dated as of October 6, 2016, Holdings appointed Liu as the sole director of the Debtor.  In that role, Liu has sole decision-making authority over the Debtor.  Liu is also currently the chief executive officer of the Debtor, and has held that position since the Debtor's inception in 2016.

6.     On October 4, 2023, the Debtor filed a *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* (CM/ECF No. 30).  On October 31, 2023, a hearing was held on the motion, at which time the Court issued an oral ruling approving the motion, but modifying the exclusivity extension periods that had been requested by the Debtor.  The Debtor

**Appendix Page 114**

failed to submit a proposed order reflecting the Court's ruling until February 2024. Nevertheless, the Court extended the Debtor's time to file a Chapter 11 plan of reorganization from October 4, 2023 to December 4, 2023.

7.    On December 5, 2023, one day after exclusivity terminated, the Debtor filed the Debtor Plan (CM/ECF No. 35) and an accompanying Disclosure Statement (CM/ECF No. 34). The Debtor Plan is an insider "new value" plan that proposes to pay all creditors in full over a five-year period (in 60 monthly installments), while extinguishing equity interests without making any distribution on account thereof. The Debtor Plan also proposes to distribute 100% of the equity interests in the reorganized Debtor to Liu and Dr. Doody—for little consideration other than the purported foregoing of certain claims and the bartering of services—thus completely extinguishing Dr. Hu's majority ownership stake in the Debtor.

8.    On December 15, 2023, Dr. Hu filed a motion seeking the appointment of a Chapter 11 trustee to replace the Debtor's management (the "***Trustee Motion***").[2]  *See Motion of Dr. Hu Bo for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)* (CM/ECF No. 37).  The motion was brought due to, among other things, (i) the lack of progress and information provided to stakeholders during the course of the Chapter 11 Case, (ii) the Debtor's mismanagement and poor financial performance of the Debtor both before and during the bankruptcy case, and (iii) Liu's conflicts of interest, which have prevented her from carrying out her duties to act as an independent estate fiduciary and to take actions that are in the best

---

[2]    The Trustee Motion was supported by the Declaration of Yihan Hu (CM/ECF No. 37) (the "***Hu Declaration***"). Yihan Hu is Dr. Hu's daughter.  She has served as her father's proxy, with his authority, for all purposes related to matters concerning the Debtor, including, among other things, speaking on his behalf with his attorneys to assist with advancing his interests through the filing of this Motion.  For purposes of this Motion, Dr. Hu incorporates by reference and relies on the Hu Declaration, and the supplemental declarations filed by Yihan Hu in support of the Trustee Motion, to support the background facts asserted herein.  *See* Supplemental and Second Supplemental Declarations of Yihan Hu at (CM/ECF No. 41) and (CM/ECF No. 41), respectively.

interest of creditors and other stakeholders. In particular, Dr. Hu took exception with the Debtor Plan, which, in Dr. Hu's view, is a blatant example of Liu placing her personal interests over those of the Debtor's creditors and other stakeholders. Dr. Hu does not believe the Debtor Plan is feasible or in anyone's best interests, other than those of Liu and Dr. Doody.

9.      On February 20, 2024, the Court entered a formal order, consistent with its prior oral ruling, extending the exclusive periods for the Debtor to file and solicit approval of a Chapter 11 plan of reorganization (CM/ECF No. 53) (the "*Exclusivity Order*"). The Exclusivity Order extended the Debtor's exclusivity periods (i) from October 4, 2023 to December 4, 2023 for filing a plan and (ii) from December 4, 2023 to February 2, 2024 for soliciting acceptance of a plan. As of February 2, 2024, the Debtor had not sought to solicit acceptances of the Debtor Plan. Thus, at the time the Exclusivity Order was entered, the Debtor's exclusivity period had expired. As such, any party-in-interest, including Dr. Hu, is permitted to file a competing Chapter 11 plan of reorganization.

10.     On February 23, 2024, the Debtor filed a motion to set a bar date in the Chapter 11 Case. *See Motion to Set Last Day to File Proofs of Claim* (CM/ECF No. 54). On March 1, 2024, the Court entered an order (CM/ECF No. 56) (the "*Bar Date Order*") setting April 4, 2024 as the last date for filing claims against the Debtor that arose (or were deemed to have arisen) before the Petition Date for all creditors, including section 503(b)(9) claimants (the "*Bar Date*").

11.     On March 12, 2024, the US Trustee filed its own motion seeking the appointment of a Chapter 11 trustee (CM/ECF No. 59). The motion alleges certain actions undertaken by the Debtor's existing management that constitutes "gross mismanagement of the Debtor's affairs, fraud, and/or dishonesty" that warrants the appointment of a trustee. As of the date hereof, the US

**Appendix Page 116**

Trustee's motion remains pending and will likely be resolved at the same time, and in conjunction with, the Trustee Motion filed by Dr. Hu.

## III. THE PLAN AND DISCLOSURE STATEMENT

12.     Contemporaneously with the filing of this Motion, Dr. Hu, in his capacity as the Plan Proponent, has filed a competing Plan, and accompanying Disclosure Statement, that he believes is indisputably a better alternative for both creditors and the Debtor.  If confirmed, the Plan would pay creditors 100% of their allowed claims on, or as soon as practicable after, the Effective Date of the Plan and would permit certain litigation claims to "pass-through" the Chapter 11 unimpaired, with all parties' respective rights and defenses preserved.  Dr. Hu has also committed to fund the reorganized debtor with no less than $5 million, to stabilize the business, promote and encourage growth opportunities and to ensure that the Debtor can pay on-going operating expenses as they come due in the ordinary course of business.  The Plan would also permit Dr. Hu to install a new management team to oversee operations.  In short, the Plan would pay creditors in full, without leaving them exposed to the Debtor's credit risk, and would provide the Debtor with a much-needed fresh start with new management and significant funding to thrive and grow its business.[3]

13.     In accordance with section 1126 of the Bankruptcy Code, the Plan contemplates classifying holders of Claims and Interests into certain Classes for all purposes, as follows:[4]

---

[3]     The statements contained herein are summaries of the provisions contained in the Plan and Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred therein.  If there is a discrepancy between the terms herein and the Plan or Disclosure Statement, the Plan or Disclosure Statement, as applicable, shall govern and control.  For a more detailed description of the Plan, please refer to the Disclosure Statement.

[4]     In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Section II of the Plan.

8

Appendix Page 117

| Class | Claim/Interest | Status and Voting Rights | Treatment |
|---|---|---|---|
| 1 | General Unsecured Claims | Unimpaired<br><br>Deemed to Accept<br><br>Not Entitled to Vote | Payment of 100% of Allowed Claims to be paid in full in cash on or as soon as practicable after the Effective Date.<br><br>Pass-Through Claims to survive the bankruptcy unimpaired and to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. |
| 2 | Interests | Impaired<br><br>Deemed to Reject<br><br>Not Entitled to Vote | This class of Interest Holders is comprised of the sole member of the Debtor. Upon the Effective Date of the Plan and upon the making of the New Value Contribution, Dr. Hu (or a an entity designated by Dr. Hu) will replace GFG Holding Co., LLC as the member of the Debtor and will be vested with 100% of the newly issued equity interests in the Reorganized Debtor. |

14.     As set forth above, no holders of Claims or Interests are entitled to vote on the Plan because each such holder holds a Claim or Interest that either is (i) unimpaired under the Plan and is deemed to accept the Plan (Class 1); or (ii) impaired and is deemed to reject the Plan (Class 2). Specifically, all holders of Claims in Class 1, which consists of all General Unsecured Creditors, are unimpaired and, thus, are conclusively deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Interest holders in Class 2, which consists solely of Holdings, will receive no distribution under the Plan and, thus, are presumptively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

9

**Appendix Page 118**

15.     The Plan contemplates that the Plan Proponent will file a Plan Supplement that contains, among other things, the following information and/or documents: (i) a schedule of claims that are likely to be Allowed (with claim amounts); (ii) a schedule of claims that are likely to be Disputed, if any; (iii) a schedule setting forth Pass-Through Claims;[5] (iv) a list of executory contracts and unexpired leases to be assumed, assumed and assigned and/or rejected, including proposed cure costs, if any; (v) a list of proposed officers and directors of the Reorganized Debtor; and (vi) forms of any corporate governance and/or organizational documents for the Reorganized Debtor.

## IV.     RELIEF REQUESTED

16.     By this Motion, Dr. Hu respectfully requests entry of the proposed Procedures Order, substantially in the form submitted herewith: (i) scheduling one combined hearing to consider both approval of the Disclosure Statement and confirmation of the Plan; (ii) fixing certain dates and deadlines in connection with confirmation of the Plan as set forth in the Confirmation Schedule (defined below); (iii) approving the Confirmation Hearing Notice (as defined below) to be given to all creditors and interest holders; and (iv) granting other related relief.

17.     A summary of the key dates Dr. Hu seeks to establish, subject to the Court's approval and availability, by the Procedures Order are as follows (the "***Confirmation Schedule***"):

| EVENT | DATE |
|---|---|
| Service of Confirmation Hearing Notice to all Creditors and Interest Holders | Within three (3) Business Days of the entry of the Procedures Order |
| Deadline to File Plan Supplement | April 18, 2024 |
| Deadline to Object to approval of the Disclosure Statement and Confirmation of the Plan | April 25, 2024 at 4:00 p.m. (ET) |

---

[5]     The Plan Proponent anticipates that it will be able to compile the Claims information to be provided in (i)-(iii) within a couple of weeks of the expiration of the Bar Date. As set forth in the Plan, the Plan Proponent reserves the rights to amend, supplement and/or alter the Claims schedules and designation of Claims thereunder.

| EVENT | DATE |
|---|---|
| Deadline for Plan Proponent to File Confirmation Brief and/or Reply to any Plan or Disclosure Statement Objections | May 9, 2024 at 4:00 p.m. (ET) |
| Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan | May 16, 2024 at 2:00 p.m. (ET), via Zoom, or the earliest date the Court is available thereafter |

## V.     BASIS FOR RELIEF REQUESTED

### A.     A Combined Hearing is Appropriate in These Circumstances

18.     Section 1128 of the Bankruptcy Code provides that "[a]fter notice, the court shall hold a hearing on confirmation of a plan" and that "[a] party in interest may object to confirmation of a plan." 11 U.S.C. § 1128; *see also* Fed. R. Bankr. P. 3017(c).[6]  Section 105(d)(2)(B)(vi) of the Bankruptcy Code expressly authorizes the Court to "issue an order . . . that . . . provides that the hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan" where the Court deems a combined hearing to be "appropriate to ensure that the case is handled expeditiously and economically." *See* 11 U.S.C. § 105(d)(2)(B)(vi); *see also In re Gulf Coast Oil Corp.*, 404 B.R. 407, 425 (Bankr. S.D. Tex. 2009) ("Section 1125(f) authorizes combined plans and disclosure statements in small business cases and § 105(d) authorizes the court to combine them in other cases.").

19.     In *In re Amster Yard Assocs.*, 214 B.R. 122 (Bankr. S.D.N.Y. 1997), one of the few decisions from this district addressing this issue, the bankruptcy court recognized that section 1125(b) of the Bankruptcy Code authorizes a bankruptcy court to combine the hearing on approval of a disclosure statement and confirmation of a plan in "small business" cases, and also noted that section 105(d) of the Bankruptcy Code authorizes the procedure in other cases. *Id*. at 124.

---

[6]     Bankruptcy Rule 3017(c) provides that "[o]n or before approval of the disclosure statement, the court . . . .  may fix a date for the hearing on confirmation."  Fed. R. Bankr. P. 3017(c).

Ultimately, based on the specific circumstances of the case, the court rejected the request of the secured lender, who had filed a competing plan, for a combined hearing, holding that permitting immediate solicitation of the plan and combining the hearing on the disclosure statement and plan would circumvent the disclosure statement approval process proscribed by section 1125(b). *Id.* However, the court noted that in a circumstance, like the one in this Chapter 11 Case, where plan solicitation is ***not*** required, there is no need for the court to approve the disclosure statement prior to confirmation. *Id.* at 124, fn. 5 ("This does not mean that a court can never combine the disclosure statement and confirmation hearings. Unimpaired classes are deemed to accept the plan, and their votes need not be solicited. 11 U.S.C. § 1126(f). ***If all classes are unimpaired and no solicitation is required, the court does not have to approve a disclosure statement prior to confirmation, if ever.***") (emphasis added).

20.     Consistent with the foregoing authority, Dr. Hu respectfully requests that the Court consolidate the hearing to consider approval of the Disclosure Statement and confirmation of the Plan at the single Confirmation Hearing. Such relief is appropriate under the circumstances. Indeed, the primary purpose of a disclosure statement is to provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision regarding how to vote on the plan. *See, e.g., In re Maxus Energy Corp.*, 639 B.R. 51, 70 (Bankr. D. Del. 2022) ("The purpose of a disclosure statement is … for the debtor to provide parties with adequate information for purposes of voting on a debtor's confirmation plan.") *(citing* House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 104 (2005) ("Before creditors and stockholders may be solicited to vote on a chapter 11 plan, the plan proponent must file a disclosure statement that provides adequate information to holders of claims and interests so they can make a decision as to whether or not to vote in favor of the plan.")); *In re Neptune World Wide Moving, Inc.*, 111

**Appendix Page 121**

B.R. 457, 461 (Bankr. S.D.N.Y. 1990) ("[D]isclosure statements in the course of voluntary reorganizations are critical to the decisions of creditors to accept or reject proposed plans….").

21.     Where, as here, no creditors or interest holders are entitled to vote on the plan, there is no need for the Court to separately approve the Disclosure Statement and require a two-step confirmation approval process.  *See Amster Yard Assocs.*, 214 B.R. at 124, fn. 5.

22.     Dr. Hu submits that a combined hearing will streamline and expedite the confirmation process, which will inure directly to the benefit of the Debtor's estate and its creditors by hastening the implementation of the Plan and limiting the amount of time the Debtor remains in Chapter 11.  A combined hearing will also spare Dr. Hu, the Debtor and the estate from additional administrative expenses associated with a two-stage process, and promote judicial efficiency and economy.

### B.     The Court Should Approve the Setting of Certain Dates Related to Confirmation of the Plan

23.     Dr. Hu requests that the Court approve the setting of certain dates described herein in accordance with section 1128 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

*The Plan Supplement Filing Date*

24.     As described above, Dr. Hu intends to file a Plan Supplement well in advance of the proposed Confirmation Hearing to provide the Court and all stakeholders with, among other things, the following information and or documents: (i) a schedule of Claims that are likely to be Allowed, (ii) a schedule of Claims that are likely to be Disputed, if any, (iii) a schedule setting forth Pass-Through Claims, (iv) a list of executory contracts and unexpired leases to be assumed, assumed and assigned and/or rejected, including proposed cure costs, if any, (v) a list of proposed officers and directors of the Reorganized Debtor, and (vi) forms of any corporate governance and/or organizational documents for the Reorganized Debtor.

13

25.     In order to be in a position to prepare the Plan Supplement—in particular the various Claims schedules—Dr. Hu must be able to review the Claims Register of filed claims asserted against the Debtor following the expiration of the April 4, 2024 Bar Date.  Accordingly, Dr. Hu proposes April 18, 2024, which is two weeks after the Bar Date, as the Plan Supplement Filing Date.

26.     Dr. Hu believes that two weeks from the Bar Date is a sufficient amount of time for him and his legal team to review the Debtor's Claims Register and formulate final or, at the very least, preliminary positions regarding whether claims are likely to be Allowed or Disputed.  This period should also be sufficient to allow Dr. Hu to identify executory contracts and unexpired leases that he seeks to assume, including cure amounts, if any, associated with such contracts and leases, as well as any contracts and/or leases that he may seek to reject.  Finally, the proposed Plan Supplement Filing Date should be sufficient for Dr. Hu and his legal team to prepare and submit draft forms of the proposed corporate organization and governance documents for the Reorganized Debtor.

### The Objection Deadline

27.     Dr. Hu requests that the Court direct the manner in which objections to approval of the Disclosure Statement and confirmation of the Plan shall be made.  Pursuant to Bankruptcy Rule 3020(b)(1), objections to confirmation of a plan must be filed and served "within a time fixed by the court." Fed. R. Bankr. P. 3020(b)(1).  Specifically, the Debtor requests that the Court establish April 25, 2024 at 4:00 p.m. (ET) as the deadline (the "***Objection Deadline***") by which objections to approval of the Disclosure Statement and confirmation of the Plan or requests for modifications to the Plan, if any, must be filed and served.

28.     Dr. Hu further requests that objections to approval of the Disclosure Statement, confirmation of the Plan or proposed modifications to the Plan, if any, must:

**Appendix Page 123**

a. be in writing;

b. conform to the Bankruptcy Rules and Local Rules;

c. state the name and address of the objecting party and the amount and nature of the Claim or Interest of such entity;

d. state with particularity the basis and nature of any objection to the Disclosure Statement, the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and

e. be filed, together with a proof of service, with the Court and served on the notice parties identified herein on or prior to the Objection Deadline.

***The Deadline to File a Confirmation Brief and/or Reply
to any Plan and Disclosure Statement Objection***

29. Dr. Hu also requests that he (and other parties in support of the Plan) be permitted to file a brief in support of confirmation of the Plan and/or a reply to any objections to the approval of the Disclosure Statement and confirmation of the Plan by no later than May 12, 2024.

***The Confirmation Hearing***

30. In accordance with Bankruptcy Rule 3017(c) and section 1128 of the Bankruptcy Code (requiring a confirmation hearing with respect to any Chapter 11 plan), Dr. Hu requests that the Confirmation Hearing be scheduled on May 16, 2024 at a time to be set by the Court or such other date thereafter at the Court's earliest convenience.

### C. The Court Should Approve the Form of the Confirmation Hearing Notice and Related Procedures

31.     Pursuant to Bankruptcy Rule 2002(b), Dr. Hu is required to provide notice to all holders of claims or equity interests of the time fixed for filing objections to the combined hearing on approval of a disclosure statement and confirmation of a chapter 11 plan.  Fed. R. Bankr. P. 2002(b).  To satisfy this requirement, upon entry of the Procedures Order, Dr. Hu intends to send to all known holders of Claims and Interests a copy of the notice, substantially in the form attached to the Procedures Order as **Exhibit A** (the "***Confirmation Hearing Notice***").  In accordance with Bankruptcy Rules 2002 and 3017(d), the Confirmation Hearing Notice shall contain, among other things:

a.     notice of the filing of the Disclosure Statement and Plan;

b.     the time, date and place for the Confirmation Hearing;

c.     the Objection Deadline and the manner in which objections shall be filed;

d.     a disclosure regarding the exculpation and injunction provisions of the Plan; and

e.     instructions on how to obtain electronic or print copies of any of the Plan Documents (as defined below).

32.     The Confirmation Notice will also notify creditors and interest holders that they are ***not*** entitled to vote to accept or reject the Plan based on the proposed treatment of Claims and Interests under the Plan.

33.     In an effort to conserve resources, Dr. Hu proposes to not mail printed copies of the Disclosure Statement, the Procedures Order, and the Plan (collectively, the "***Plan Documents***") to those parties receiving the Confirmation Hearing Notice.  Instead, as set forth in the Confirmation Hearing Notice, Dr. Hu proposes to provide directions therein for such parties to obtain copies of the Plan Documents via a request by email to Dr. Hu's counsel, Norton Rose Fulbright (US) LLP, attention Andrew Rosenblatt at andrew.rosenblatt@nortonrosefulbright.com, who will as soon as

**Appendix Page 125**

reasonably practicable upon receipt of such request either email or mail (by first class mail) the Plan Documents to the requesting party (by whichever method is preferred by the requesting party). Dr. Hu will also alert notice parties that copies of the Plan and Disclosure Statement have been filed on, and are available from, the Court's electronic (ECF) docket which can be accessed for a fee at http://www.nysb.uscourts.gov.

34.    Dr. Hu respectfully requests that the Court find that the Confirmation Hearing Notice complies with the requirements of Bankruptcy Rules 2002(b) and (d). Dr. Hu further requests that the Court determine that the Confirmation Hearing Notice contains sufficient disclosure regarding the exculpation and injunction provisions contained in Section 8 of the Plan.

## VI.    WAIVER OF MEMORANDUM OF LAW

35.    Because the legal basis upon which Dr. Hu relies is incorporated herein and the Motion does not raise any novel issues of law, Dr. Hu respectfully requests that the Court waive the requirement to file a separate memorandum of law in support of this Motion pursuant to Local Rule 9013-1(b).

## VII.    NO PRIOR REQUEST

36.    No prior request for the relief sought in this Motion has been made to this Court or any other court.

## VIII.    NOTICE

37.    Notice of the Motion was provided to (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to the Debtors, (c) the Patient Care Ombudsman appointed in this Chapter 11 Case; and (d) any party requesting notice under Bankruptcy Rule 2002.

**Appendix Page 126**

## IX. <u>CONCLUSION</u>

WHEREFORE, Dr. Hu respectfully requests that this Court enter the form Procedures Order attached hereto (a) granting the relief requested herein, and (b) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
     March 18, 2024

Respectfully submitted,

**NORTON ROSE FULBRIGHT (US) LLP**

By: */s/ Andrew Rosenblatt*_____
Andrew Rosenblatt, Esq.
Norton Rose Fulbright (US) LLP
1301 Avenue of the Americas
New York, New York 10119
Telephone: (212) 408-5100
Facsimile: (212) 318-3400
*andrew.rosenblatt@nortonrosefulbright.com*

*Counsel to Dr. Hu Bo*

18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | X | |
| In re: | X | |
| | X | Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X | |
| NEW YORK, LLC | X | Case No.: 23-10905-PB |
| | X | |
| Debtor. | X | |
| | X | |

**[PROPOSED] ORDER (I) SCHEDULING A COMBINED HEARING**
**FOR APPROVAL OF DISCLOSURE STATEMENT AND**
**CONFIRMATION OF PLAN, (II) APPROVING DEADLINES**
**RELATED THERETO, AND (III) GRANTING RELATED RELIEF**

Upon the *Motion of Dr. Hu Bo, as Plan Proponent, for Entry of an Order (I) Scheduling a Combined Hearing for Approval of Disclosure Statement and Confirmation of Plan, (II) Approving Deadlines Related Thereto, and (III) Granting Related Relief* (the "***Motion***");[1] and based on the record in this Chapter 11 Case; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference in this District*; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has been given; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and the Court having reviewed the Motion and having

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

heard the statements in support of the relief requested therein at a hearing before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND THAT:

A.     The exclusive periods for the Debtor to file and solicit acceptances of a Chapter 11 plan of reorganization have expired, and Dr. Hu has the necessary authority to propose and prosecute the competing Plan and submit an accompanying Disclosure Statement.

B.     Dr. Hu has provided adequate notice of the Motion, and the time fixed for filing objections thereto, and no other or further notice need be provided with respect to the Motion.

C.     The notice substantially in the form attached hereto as **Exhibit A** (the "***Confirmation Hearing Notice***") and the procedures set forth below for providing such notice to known creditors and interest holders of the time, date and place of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "***Confirmation Hearing***"), and the contents of the Confirmation Hearing Notice comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

**NOW THEREFOR, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.     The Motion is **GRANTED** to the extent set forth herein.

2.     The Confirmation Schedule is approved in its entirety as follows:

| EVENT | DATE |
|---|---|
| Service of Confirmation Hearing Notice to all Creditors and Interest Holders | Within three (3) Business Days of the entry of the Procedures Order |
| Deadline to File Plan Supplement | April 18, 2024 |
| Deadline to Object to approval of the Disclosure Statement and Confirmation of the Plan | April 25, 2024 at 4:00 p.m. (ET) |
| Deadline for Plan Proponent to File Confirmation Brief and/or Reply to any Plan or Disclosure Statement Objections | May 9, 2024 at 4:00 p.m. (ET) |

| EVENT | DATE |
|---|---|
| Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan | May 16, 2024 at 2:00 p.m. (ET), via Zoom or the earliest date the Court is available thereafter |

3.      The combined hearing on approval of the adequacy of the Disclosure Statement and confirmation of the Plan is scheduled for **May 16, 2024 at 2:00 p.m. (ET), via Zoom** (the "***Confirmation Hearing***").  The deadline to file objections to the adequacy of the Disclosure Statement and confirmation of the Plan is **April 25, 2024 at 4:00 p.m. (ET)** (the "***Objection Deadline***").  The Confirmation Hearing may be continued from time to time by the Court or Dr. Hu without further notice other than adjournments announced in open court.

4.      The Deadline for Dr. Hu (and other parties in support of the Plan) to file a brief in support of confirmation of the Plan and/or a reply to any objections to the final approval of the Disclosure Statement and confirmation of the Plan is **May 9, 2024 at 4:00 p.m. (ET)**.

5.      Objections to the adequacy of the Disclosure Statement and confirmation of the Plan, if any, must:

a.      be in writing;

b.      conform to the Bankruptcy Rules and Local Rules;

c.      state the name and address of the objecting party and the amount and nature of the Claim or Interest of such entity;

d.      state with particularity the basis and nature of any objection to the Disclosure Statement, the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and

e.      be filed, together with a proof of service, with the Court and served on the following parties: (i) counsel to Dr. Hu, Norton Rose Fulbright (US) LLP, 1301 Avenue of the Americas, New York, NY 10019 (Attn: Andrew Rosenblatt, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York; (iii) counsel to the Debtors; (iv) the Patient Care Ombudsman appointed in this Chapter 11 Case; and (v) any party requesting notice under Bankruptcy Rule 2002.

3

6.      The Confirmation Hearing Notice, in substantially the form attached hereto as **Exhibit A**, complies with the requirements of Bankruptcy Rules 2002(b), 2002(d), and 3017(d) and is approved in all respects.  The Confirmation Hearing Notice shall be served upon the Debtor's known creditors, interest holders and all parties requesting notice pursuant to Bankruptcy Rule 2002 within three (3) Business Days from the entry of this Order, or as soon as reasonably practicable thereafter.  As part of the Confirmation Hearing Notice package sent to creditors and interest holders, Dr. Hu shall not be required to include hard copies of any Plan Documents, including the Plan and/or Disclosure Statement.  Instead, Dr. Hu is authorized to provide in the Confirmation Hearing Notice instructions to notice recipients that they may request copies of the Plan Documents by emailing counsel to Dr. Hu, Andrew Rosenblatt, Esq. at Norton Rose Fulbright (US) LLP, andrew.rosenblatt@nortonrosefulbright.com.   Upon receipt of any request by any creditor or interest holder to receive a copy of any of the Plan Documents, counsel for Dr. Hu shall provide such documents to the requesting party as soon as reasonably practicable by email or by first class mail, based on the preference of the notice party.

7.      Dr. Hu shall not be required to solicit the votes of creditors and interest holders with respect to accepting or rejecting the Plan because such holders either are unimpaired and presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or impaired and deemed to reject the Plan under section 1126(g) Bankruptcy Code.  Such non-voting holders will nevertheless receive a copy of the Confirmation Hearing Notice.

8.      The procedures for service of the Confirmation Hearing Notice and related notices set forth in the Motion satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

9.      Dr. Hu is authorized to make non-material changes to the Disclosure Statement, Plan, Confirmation Hearing Notice, and related pleadings without further order of the Court, including without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the foregoing documents before their distribution.

10.      Dr. Hu is hereby authorized to take any action necessary or appropriate to implement the terms of, and the relief granted in, this Order without seeking further order of the Court.

11.      The terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

12.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
        April __, 2024

_____
HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY JUDGE

5

**Appendix Page 132**

# EXHIBIT A

### Notice Regarding Confirmation Hearing and Non-Voting Status

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | X |  |
| In re: | X |  |
|  | X | Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X |  |
| NEW YORK, LLC | X | Case No.: 23-10905-PB |
|  | X |  |
| Debtor. | X |  |
|  | X |  |

**NOTICE OF: (A) NON-VOTING STATUS TO HOLDERS OF UNIMPAIRED**
**CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN AND**
**HOLDERS OF IMPAIRED INTERESTS DEEMED TO REJECT THE**
**PLAN; AND (B) COMBINED HEARING TO CONSIDER APPROVAL**
**OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF**
**THE PLAN AND THE OBJECTION DEADLINE RELATED THERETO**

     **PLEASE TAKE NOTICE THAT** on March 18, 2024, Dr. Hu Bo ("**Dr. Hu**"), in his capacity as the "Plan Proponent" and party-in-interest in the above-captioned bankruptcy case (the "**Chapter 11 Case**") of Global Fertility & Genetics New York, LLC (the "**Debtor**"), filed the following documents: (a) *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code in Support of Chapter 11 Plan of Reorganization Proposed By Dr. Hu Bo* (CM/ECF No. 74) (including all exhibits thereto and as amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**"); and (b) *Dr. Hu Bo's Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York, LLC* (CM/ECF No. 75) (including all exhibits thereto and as amended, supplemented, or otherwise modified from time to time, the "**Plan**").[1]

     **PLEASE TAKE NOTICE THAT** on April ___, 2024, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (CM/ECF No. __) (the "**Procedures Order**") authorizing Dr. Hu, as the Plan Proponent, to provide notice of his intent to seek confirmation of the Plan pursuant to certain procedures set forth therein.

     **PLEASE TAKE FURTHER NOTICE THAT** you are a holder or potential holder of a Claim against the Debtor that is **not** entitled to vote on the Plan due to the nature and treatment of such Claim under the Plan. Specifically, a holder of a Claim in a class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan or Disclosure Statement, as applicable. The statements contained herein are summaries of the provisions contained in the Plan and Disclosure Statement and do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred therein. If there is a discrepancy between the terms herein and the Plan or Disclosure Statement, the Plan or Disclosure Statement, as applicable, shall govern and control. For a more detailed description of the Plan, please refer to the Disclosure Statement.

Bankruptcy Code and is **not** entitled to vote on the Plan. Further, a holder of a Claim or Interest in a class that is Impaired under the Plan and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code is **not** entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** a combined hearing to consider approval of the Disclosure Statement and confirm the Plan (the "***Confirmation Hearing***") will commence on **May 16, 2024 at 2:00 p.m. (ET)**, **via Zoom**, before the Honorable Philip Bentley, United States Bankruptcy Judge. Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or Dr. Hu without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the Local Rules or otherwise. In accordance with the Plan, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing by further action of Dr. Hu and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**PLEASE TAKE FURTHER NOTICE THAT** the Bankruptcy Court has established **April 25, 2024 at 4:00 p.m. (ET)**, as the last date and time for filing and serving objections to the adequacy of the information in the Disclosure Statement and to confirmation of the Plan (the "***Objection Deadline***"). Any objection to the approval of the Disclosure Statement and confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such Entity, (d) state with particularity the basis and nature of any objection to the Disclosure Statement, the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (e) be filed with the Clerk of the Bankruptcy Court for the Southern District of New York, and served on the following parties: (i) counsel to Dr. Hu, Norton Rose Fulbright (US) LLP, 1301 Avenue of the Americas, New York, NY 10019 (Attn: Andrew Rosenblatt, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York; (iii) counsel to the Debtors; (iv) the Patient Care Ombudsman appointed in this Chapter 11 Case; and (v) any party requesting notice under Bankruptcy Rule 2002, with proof of service of such objection filed when and as required under the Local Rules of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, the Plan and the Procedures Order may be obtained by any of the following means: (a) calling Andrew Rosenblatt, Esq., counsel for Dr. Hu, at (212) 408-5559; (b) emailing Andrew Rosenblatt, Esq., counsel for Dr. Hu, at andrew.rosenblatt@nortonrosefulbright.com; and/or (c) visiting (for a fee) PACER at **http://www.nysb.uscourts.gov**.

1.    The following chart summarizes the classification and treatment of Claims and Interests under the Plan:

| **Class** | **Claim/Interest** | **Status and Voting Rights** | **Treatment** |
|---|---|---|---|
| Unclassified | Administrative Expense Claims | Unimpaired<br><br>Not Entitled to Vote | Payment of 100% of Allowed Claims to be paid in full in cash on or as soon as practicable after the Effective Date. |

66711/0002-47121078v2

**Appendix Page 135**

| Class | Claim/Interest | Status and Voting Rights | Treatment |
|---|---|---|---|
| | | | |
| Unclassified | Priority Tax Claims | Unimpaired<br><br>Not Entitled to Vote | Payment of 100% of Allowed Claims to be paid in full in cash on or as soon as practicable after the Effective Date. |
| 1 | General Unsecured Claims | Unimpaired<br><br>Deemed to Accept<br><br>Not Entitled to Vote | Payment of 100% of Allowed Claims to be paid in full in cash on or as soon as practicable after the Effective Date.<br><br>Pass-Through Claims to survive the bankruptcy unimpaired and to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. |
| 2 | Interests | Impaired<br><br>Deemed to Reject<br><br>Not Entitled to Vote | This class of Interest Holders is comprised of the sole member of the Debtor.  Upon the Effective Date of the Plan, existing Interests will be extinguished and Dr. Hu (or a an entity designated by Dr. Hu) will be vested with 100% of the newly issued equity interests in the Reorganized Debtor. |

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

PLEASE TAKE FURTHER NOTICE THAT **SECTION 8** OF THE PLAN CONTAINS EXCULPATION AND INJUNCTION PROVISIONS.

**Injunction, and Exculpation Provisions**

Section 8 of the Plan contains the following injunction, and exculpation provisions. **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE INJUNCTION, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

3

Section 8.3 of the Plan provides for the exculpation of certain parties:

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTOR; PROVIDED THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; PROVIDED FURTHER THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT; PROVIDED FURTHER THAT THE FOREGOING SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER.

Section 8.4 of the Plan establishes a general injunction:

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DEBTOR, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DEBTOR BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN, OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (W) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING

4

**ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (X) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, (Y) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (Z) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR THE REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.**

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES. IF YOU HAVE QUESTIONS REGARDING YOUR RIGHTS UNDER THE PLAN OR ANYTHING STATED HEREIN OR THEREIN, YOU MAY CONTACT DR. HU'S COUNSEL AT THE ADDRESS PROVIDED BELOW.

Dated: New York, New York
      April ___, 2024

Respectfully submitted,

**NORTON ROSE FULBRIGHT (US) LLP**

By: _____
Andrew Rosenblatt, Esq.
Norton Rose Fulbright (US) LLP
1301 Avenue of the Americas
New York, New York 10119
Telephone: (212) 408-5100
Facsimile: (212) 318-3400
*andrew.rosenblatt@nortonrosefulbright.com*

*Counsel to Dr. Hu Bo*

66711/0002-47121078v2

David N. Crapo, CIPP-US
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4523
Facsimile: (973) 639-6244
dcrapo@gibbonslaw.com
*Patient Care Ombudsman*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GLOBAL FERTILITY & GENETICS NEW YORK LLC,<br><br>Debtor and Debtor-in-Possession | Chapter 11<br><br>Case No. 23-10905-PB |

### FOURTH PATIENT CARE OMBUDSMAN REPORT

**SUBMITTED: May 1, 2024**

**BY:**

**DAVID N. CRAPO, CIPP-US**
**PATIENT CARE OMBUDSMAN**

## I.    INTRODUCTION

This fourth report of the Patient Care Ombudsman ("**PCO**") is issued pursuant to the author's appointment on July 19, 2023 as the PCO by the United States Trustee for Region 2 ("**U.S. Trustee**") for debtor Global Fertility & Genetics New York, LLC ("**Debtor**").  The appointment arises under section 333 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*), which provides for the appointment of a patient care ombudsman "to monitor the quality of patient care and to represent the interests of the patients of the health care business."  The Debtor's operations constitute "health care businesses" for purposes of the Bankruptcy Code.  *See* 11 U.S.C. §101(27A).  This report covers the period from February 27, 2024 through May 1, 2024, 2024 ("**Fourth Reporting Period**"). During the Fourth Reporting Period, the PCO found no evidence of a decline in the quality of patient care and safety at the Debtor's facility.

## II.    THE PCO'S INVESTIGATION DURING THE FOURTH REPORTING PERIOD

Staff Licensing.  During the Fourth Reporting Period the PCO reviewed the appropriate New York licensing agencies' records and confirmed that each member the Debtor's clinical staff has continued to maintain any required licenses or approvals.  At least one of the Debtor's physicians has privileges at a nearby acute care hospital.  None of the Debtor's clinical staff have been the subject of disciplinary proceedings in the State of New York. None of the clinical staff are on the exclusion list maintained by the Unites States Department of Health and Human Services.  During the Fourth Reporting Period, the PCO was unable to locate any customer reviews concerning either the Debtor or its clinical staff issued during the Fourth Reporting Period.

Chapter 11 Trustee.  On April 4, 2024, the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") appointed Eric M, Huebscher ("**Trustee**") as Chapter 11 Trustee for the Debtor.  Based on the pleadings in support and in opposition to the appointment of the Trustee, as well as oral argument in support of the motion for appointment, governance and financial issues appear to have provided the impetus for Mr. Huebscher's appointment.  Neither the movant nor the Debtor alleged any decline in the quality of patient care and safety at the Debtor's facility.  Nevertheless, the PCO intends to resume visiting the Debtor's facility to assure that the quality of patient care and safety is not compromised.

Litigation and Reviews.  The PCO's review of media reports and other publicly available documentation did not reveal the initiation of any litigation against either the Debtor or its clinical employees alleging malpractice or professional negligence.  There have been few reviews of the Debtor.  The reviews in 2024 were positive.

## III.    FINDINGS

Based on his investigation, publicly available information and information provided by the Debtor, and subject to receipt of the documents and information identified immediately above, the PCO, the PCO has made the following findings:

**Finding #1:** The PCO has not received any information indicating that quality of care provided to the Debtor's patients (including patient safety) is not acceptable and is currently declining or is otherwise being materially compromised.

**Finding #2:** In light of the lack of any negative information about the Debtor and its clinical staff, the oversight and supervision provided by the Debtor's clinical staff appears to sufficient to uncover quality of care deficits as they arise.

**Finding #3:** The PCO's receipt on a regular basis of updates to the information the PCO requests from the Debtor and periodic visits to the Debtor's facility will provide a reasonable basis to monitor whether the quality of care (including patient safety) provided by the Debtor is declining or otherwise materially compromised.

## IV.    CONCLUSION

An analysis of publicly available information, as well as information provided by the Debtor, regarding the current performance of the Debtor and its existing structures reveals a facility that apparently continues to provide the same level of patient care and safety it historically provided since before the Debtor's bankruptcy filing.

.                              Respectfully submitted to the Court on May 1, 2024 by:

/s/ David N. Crapo
David N. Crapo, Esq.
Patient Care Ombudsman

3088380.1 117878-109299554
**Appendix Page 141**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | X |
| | X |
| | X   Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X |
| NEW YORK, LLC | X   Case No.: 23-10905-PB |
| | X |
| Debtor. | X |
| | X |

### ORDER (I) SCHEDULING A COMBINED HEARING
### FOR APPROVAL OF DISCLOSURE STATEMENT AND
### CONFIRMATION OF PLAN, (II) APPROVING DEADLINES
### <u>RELATED THERETO, AND (III) GRANTING RELATED RELIEF</u>

Upon the *Motion of Dr. Hu Bo, as Plan Proponent, for Entry of an Order (I) Scheduling a Combined Hearing for Approval of Disclosure Statement and Confirmation of Plan, (II) Approving Deadlines Related Thereto, and (III) Granting Related Relief* (the "***Motion***");[1] and based on the record in this Chapter 11 Case; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference in this District*; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has been given; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors and other parties in interest; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court;

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND THAT:

A. The exclusive periods for the Debtor to file and solicit acceptances of a Chapter 11 plan of reorganization have expired, ~~and Dr. Hu has the necessary authority to propose and prosecute the competing Plan and submit an accompanying Disclosure Statement~~. **[PB 5.17.24].**

B. Dr. Hu has provided adequate notice of the Motion, and the time fixed for filing objections thereto, and no other or further notice need be provided with respect to the Motion.

C. The notice substantially in the form attached hereto as **Exhibit A** (the "*Confirmation Hearing Notice*") and the procedures set forth below for providing such notice to known creditors and interest holders of the time, date and place of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "*Confirmation Hearing*"), and the contents of the Confirmation Hearing Notice comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

**NOW THEREFOR, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. The Motion is **GRANTED** to the extent set forth herein.

2. The Confirmation Schedule is approved in its entirety as follows:

| EVENT | DATE |
|---|---|
| Service of Confirmation Hearing Notice to all Creditors and Interest Holders | Within three (3) Business Days of the entry of the Procedures Order |
| Deadline to File Plan Supplement | June 18, 2024 |
| Deadline to Object to approval of the Disclosure Statement and Confirmation of the Plan | June 26, 2024 at 4:00 p.m. (ET) |

**Appendix Page 143**

| EVENT | DATE |
|---|---|
| Deadline for Plan Proponent to File Confirmation Brief and/or Reply to any Plan or Disclosure Statement Objections | July 2, 2024 at 4:00 p.m. (ET) |
| Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan | July 9, 2024 at 10:00 a.m. (ET), or the earliest date the Court is available thereafter |

3. The combined hearing on approval of the adequacy of the Disclosure Statement and confirmation of the Plan is scheduled for **July 9, 2024 at 10 a.m. (ET)** (the "***Confirmation Hearing***").  The deadline to file objections to the adequacy of the Disclosure Statement and confirmation of the Plan is **June 26, 2024 at 4:00 p.m. (ET)** (the "***Objection Deadline***").  The Confirmation Hearing may be continued from time to time by the Court or Dr. Hu without further notice other than adjournments announced in open court.

4. The Deadline for Dr. Hu (and other parties in support of the Plan) to file a brief in support of confirmation of the Plan and/or a reply to any objections to the final approval of the Disclosure Statement and confirmation of the Plan is **July 2, 2024 at 4:00 p.m. (ET)**.

5. Objections to the adequacy of the Disclosure Statement and confirmation of the Plan, if any, must:

a. be in writing;

b. conform to the Bankruptcy Rules and Local Rules;

c. state the name and address of the objecting party and the amount and nature of the Claim or Interest of such entity;

d. state with particularity the basis and nature of any objection to the Disclosure Statement, the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and

e. be filed, together with a proof of service, with the Court and served on the following parties: (i) counsel to Dr. Hu, Norton Rose Fulbright (US) LLP, 1301 Avenue of the Americas, New York, NY 10019 (Attn: Andrew Rosenblatt, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York; (iii) counsel to the Chapter 11 trustee, Farrell Fritz, P.C., 622 Third Avenue, 37th Floor, New York, NY 10017 (Attn.: Martin G. Bunin, Esq. and Patrick Collins, Esq.); (iv)

counsel to the Debtors; (v) the Patient Care Ombudsman appointed in this Chapter 11 Case; and (vi) any party requesting notice under Bankruptcy Rule 2002.

6.      The Confirmation Hearing Notice, in substantially the form attached hereto as **Exhibit A**, complies with the requirements of Bankruptcy Rules 2002(b), 2002(d), and 3017(d) and is approved in all respects. The Confirmation Hearing Notice shall be served upon the Debtor's known creditors, interest holders and all parties requesting notice pursuant to Bankruptcy Rule 2002 within three (3) Business Days from the entry of this Order, or as soon as reasonably practicable thereafter. As part of the Confirmation Hearing Notice package sent to creditors and interest holders, Dr. Hu shall not be required to include hard copies of any Plan Documents, including the Plan and/or Disclosure Statement. Instead, Dr. Hu is authorized to provide in the Confirmation Hearing Notice instructions to notice recipients that they may request copies of the Plan Documents by emailing counsel to Dr. Hu, Andrew Rosenblatt, Esq. at Norton Rose Fulbright (US) LLP, andrew.rosenblatt@nortonrosefulbright.com. Upon receipt of any request by any creditor or interest holder to receive a copy of any of the Plan Documents, counsel for Dr. Hu shall provide such documents to the requesting party as soon as reasonably practicable by email or by first class mail, based on the preference of the notice party.

7.      Dr. Hu shall not be required to solicit the votes of creditors and interest holders with respect to accepting or rejecting the Plan because **the Plan treats** such holders either ~~**are as**~~ unimpaired, and **therefore such holders are** presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, or ~~**impaired**~~ **as not entitled to receive or retain any property on account of their claims or interests,** and **therefore such holders are** deemed to reject the Plan under section 1126(g) Bankruptcy Code. Such non-voting holders will nevertheless receive a copy of the Confirmation Hearing Notice. **Nothing in this Order or the Confirmation Hearing Notice**

shall constitute a finding that the classes designated as "unimpaired" under the Plan are, in fact, unimpaired pursuant to section 1124 of the Bankruptcy Code. [PB 5.17.24].

8.    The procedures for service of the Confirmation Hearing Notice and related notices set forth in the Motion satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

9.    Dr. Hu is authorized to make non-material changes to the Disclosure Statement, Plan, Confirmation Hearing Notice, and related pleadings without further order of the Court, including without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the foregoing documents before their distribution.

10.    Dr. Hu is hereby authorized to take any action necessary or appropriate to implement the terms of, and the relief granted in, this Order without seeking further order of the Court.

11.    The terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

12.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
        May 17, 2024

        _/s/ Philip Bentley_____
        **Hon. Philip Bentley**
        **United States Bankruptcy Judge**

**NORTON ROSE FULBRIGHT (US) LLP**  
Andrew Rosenblatt, Esq.  
1301 Avenue of the Americas  
New York, New York  10019  
Telephone: (212) 408-5100  
Facsimile: (212) 541-5369  
andrew.rosenblatt@nortonrosefulbright.com  

*Counsel to Dr. Hu Bo*

**Hearing Date: July 9, 2024**  
**Hearing Time: 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | X | |
| | X | |
| | X | Chapter 11 |
| GLOBAL FERTILITY & GENETICS | X | |
| NEW YORK, LLC | X | Case No.:  23-10905-PB |
| | X | |
| Debtor. | X | |
| | X | |

**NOTICE OF FILING OF PLAN SUPPLEMENT OF DR. HU BO,**  
**AS PLAN PROPONENT, IN SUPPORT OF THE AMENDED PLAN OF**  
**REORGANIZATION OF GFG FERTILITY & GENETICS NEW YORK, LLC**  
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on March 17, 2024, Dr. Hu Bo ("***Dr. Hu***"), in his capacity

as the "Plan Proponent" and party-in-interest in the above-captioned bankruptcy case (the

"***Chapter 11 Case***") of Global Fertility & Genetics New York, LLC (the "***Debtor***"), filed (i) the

*Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code in Support of Chapter 11*

*Plan of Reorganization Proposed By Dr. Hu Bo* [Docket No. 74] (including all exhibits thereto and

as amended, supplemented or otherwise modified from time to time, the "***Disclosure Statement***")

and (b)  *Dr. Hu Bo's Chapter 11 Plan of Reorganization for Global Fertility & Genetics New York,*

*LLC* [Docket No. 75] (including all exhibits thereto and as further amended, supplemented, or

otherwise modified from time to time, the "***Plan***"),[1] with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***").

      **PLEASE TAKE FURTHER NOTICE** that, on May 17, 2024, the Bankruptcy Court entered an order [Docket No. 116] (the "***Confirmation Procedures Order***") approving a confirmation timeline that included, among other things, a deadline of June 18, 2024 by which date Dr. Hu is required to file a plan supplement to the Plan.

      **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Confirmation Procedures Order, Dr. Hu hereby submits this plan supplement (the "***Plan Supplement***"), consisting of the following documents, each as may be amended, modified, or supplemented from time to time by Dr. Hu in accordance with the Plan as set forth below:

| Exhibit | Plan Supplement Document |
|:---:|:---:|
| A | Proposed Amended and Restated Operating Agreement of Global Fertility & Genetics New York, LLC |
| B | Proposed Limited Liability Company Agreement for The Mount Baekdu Health Service LLC[2] |
| C | List of Proposed Assumed or Rejected Agreements and Proposed Cure Amounts |
| D | Preliminary List of Claims and Proposed Treatment |
| E | List of Pass-Through Claims |
| F | Preliminary List of Proposed Post-Emergence Management Team for Reorganized Debtor |

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[2]    This is the entity designated by Dr. Hu to own the equity interests of the Reorganized Debtor.

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in this Plan Supplement remain subject to continuing negotiations among Dr. Hu, the Chapter 11 Trustee, the Debtor and other interested parties. Subject to the terms and conditions of the Plan, Dr. Hu reserves all rights to amend, revise, or supplement this Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided by the Plan or by order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Confirmation Procedures Order, a combined hearing (the "***Confirmation Hearing***") to consider approval of the Disclosure Statement and confirmation of the Plan, shall be held on July 9, 2024 at 10:00 a.m. (ET) before the Honorable Philip Bentley, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 601, New York, NY 10004-1408. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or Dr. Hu without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on other parties entitled to notice.

Dated: New York, New York
      June 18, 2024

Respectfully submitted,

**NORTON ROSE FULBRIGHT (US) LLP**
By: ___/s/ Andrew Rosenblatt_____
Andrew Rosenblatt, Esq.
Norton Rose Fulbright (US) LLP
1301 Avenue of the Americas
New York, New York 10119
Telephone: (212) 408-5100
Facsimile: (212) 318-3400
*andrew.rosenblatt@nortonrosefulbright.com*

*Counsel to Dr. Hu Bo*

**Appendix Page 149**

# EXHIBIT A

## Amended and Restated Operating Agreement
## of Global Fertility & Genetics New York, LLC

AMENDED AND RESTATED
OPERATING AGREEMENT
OF
GLOBAL FERTILITY & GENETICS, NEW YORK, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of Global Fertility & Genetics, New York, LLC (the "Company"), effective as of [●], 2025 (the "Effective Date"), is entered into by and between the Company and The Mount Baekdu Health Service LLC, as the sole member of the Company (the "Member").

WHEREAS, the Company was formed as a limited liability company on July 5, 2016 by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "Act");

WHEREAS, on June 6, 2023, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and commenced Chapter 11 Case No. 23-10905-pb (the "Bankruptcy Case");

WHEREAS, on [●], 2024, the Bankruptcy Court confirmed the Chapter 11 plan of reorganization of Dr. Hu Bo for the Company in connection with the Bankruptcy Case, pursuant to which, among other things, the Member has become the sole member of the Company (the "Reorganization Plan"); and

WHEREAS, the Member desires to set forth herein the terms and conditions regarding the membership in and management of the Company.

NOW, THEREFORE, the Member agrees as follows:

1.      Name. The name of the Company is Global Fertility & Genetics, New York, LLC.

2.      Purpose. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

3.      Principal Office; Registered Agent.

        (a)      Principal Office. The location of the principal office of the Company shall be 115 E 57th St Ste 420-430, New York, New York 10022, or such other location as the Member may from time to time designate.

        (b)      Registered Agent. The registered agent of the Company for service of process in the State of Delaware and the registered office of the Company in the State of Delaware shall be that person and location reflected in the Certificate of Formation. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the

Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, in the manner provided by law.

4. <u>Members</u>.

(a) <u>Initial Member</u>. The Member owns 100% of the membership interests in the Company. The name and the business, residence, or mailing address of the Member are as follows:

| Name | Address |
|------|---------|
| The Mount Baekdu Health Service LLC | [●] |

(b) <u>Additional Members</u>. One or more additional members may be admitted to the Company with the written consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c) <u>Membership Interests; No Certificates</u>. The Company will not issue any certificates to evidence ownership of the membership interests.

5. <u>Management</u>.

(a) <u>Authority; Powers and Duties of the Member</u>. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights, and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient, or advisable to effectuate the purposes of this Agreement.

(b) <u>Election of Officers; Delegation of Authority</u>. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "<u>Officer</u>"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any officer set forth in this Agreement and any instrument designating such officer and the authority delegated to such officer.

**Appendix Page 152**

6.    Liability of Member; Indemnification.

(a)    Liability of Member. Except as otherwise required under the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being the Member or participating in the management of the Company.

(b)    Indemnification. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim, or expense (including attorneys' fees) whatsoever incurred by the Member relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member on behalf of the Company; provided, however, that any indemnity under this Section 6(b) shall be provided out of and to the extent of Company assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

7.    Term. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 11.

8.    Initial Capital Contributions. The Member hereby agrees to contribute to the capital Company such cash, property, or services as determined by the Member in accordance with the Reorganization Plan ("Capital Contributions").

9.    Tax Status; Income and Deductions.

(a)    Tax Status. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state income tax purposes and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

(b)    Income and Deductions. All items of income, gain, loss, deduction, and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction, and credit of the Member.

10.    Distributions. Distributions shall be made to the Member at the times and in the amounts as determined by the Member; provided that distributions shall only be made to the Member from Funds Available for Distribution. For purposes of this Section 10, "Funds Available for Distribution" means, with respect to any applicable period of measurement: (a) the sum of (i) the gross cash receipts of the Company for such period from all sources whatsoever, including all revenues, interest, income and proceeds derived by the Company from its operations (other than Capital Contributions); plus (ii) all cash amounts previously reserved by the Company, if the Member determines that the specific purposes for which such amounts were reserved are no longer applicable; minus (b) the sum of: (i) all operating costs and expenses of the Company payable for such period and capital expenditures made or reserved for during such period (without deduction,

- 3 -

however, for any capital expenditures, charges for depreciation or other expenses not paid in cash or expenditures from reserves); plus (ii) all debt service, including principal and interest, paid during such period on all indebtedness of the Company; plus (iii) all amounts specifically reserved as determined by the Member for working capital, capital improvements, payments of periodic expenditures, debt service or other purposes. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Member if such distribution would violate applicable law.

11. <u>Dissolution; Liquidation</u>.

(a) The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member; or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b) Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c) Notwithstanding <u>Section 10</u>, in the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); (ii) second, to the establishment of and additions to reserves that are determined by the Member to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and (iii) thereafter, to the Member.

(d) Upon the completion of the winding up of the Company, the Member shall file a Certificate of Cancellation in accordance with the Act.

12. <u>Miscellaneous</u>.

(a) <u>Amendments</u>. Amendments to this Agreement may be made only with the written consent of the Member.

(b) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(c) <u>Severability</u>. In the event that any provision of this Agreement shall be declared to be invalid, illegal, or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality, and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has executed this Agreement to be effective as of the date first above written.

GLOBAL FERTILITY & GENETICS, NEW YORK, LLC

By:  The Mount Baekdu Health Service
     LLC, its sole member


By:_____
    Name:
    Title:


THE MOUNT BAEKDU HEALTH SERVICE LLC


By:_____
    Name:
    Title:

# EXHIBIT B

## <u>LLC Agreement for The Mount Baekdu Health Service LLC</u>



THE MOUNT BAEKDU HEALTH SERVICE LLC


LIMITED LIABILITY COMPANY AGREEMENT


Dated as of [●], 2024

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................... 1

ARTICLE II GENERAL PROVISIONS............................................................ 5

ARTICLE III MANAGEMENT AND OPERATION OF THE COMPANY............................. 7

ARTICLE IV DISTRIBUTIONS ...................................................................... 9

ARTICLE V CAPITAL ACCOUNTS; ALLOCATIONS; EXPENSES ................................. 10

ARTICLE VI BOOKS AND REPORTS; TAX MATTERS......................................... 12

ARTICLE VII DISSOLUTION......................................................................... 14

ARTICLE VIII TRANSFER OF MEMBERS' INTERESTS ...................................... 15

ARTICLE IX MISCELLANEOUS .................................................................... 16

**Appendix Page 158**

LIABILITY COMPANY OPERATING AGREEMENT
OF
THE MOUNT BAEKDU HEALTH SERVICE LLC
(a Delaware limited liability company)

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of THE MOUNT BAEKDU HEALTH SERVICE LLC (the "Company"), dated as of [●], 2024, is entered into by and among Yihan Hu (the "Class A Member") and Kenneth Smalls and Dr. Melvin Thornton (each, a "Class B Member" and, collectively the "Class B Members" and, together with the Class A Member, the "Members" and each individually, a "Member").

W I T N E S S E T H:

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation (the "Certificate of Formation") with the Secretary of State of Delaware (the "Secretary of State") on May 28, 2024;

WHEREAS, on June 6, 2023, Global Fertility & Genetics, New York, LLC, a Delaware limited liability company ("GFG NY"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and commenced Chapter 11 Case No. 23-10905-pb (the "Bankruptcy Case");

WHEREAS, on [●], 2024, the Bankruptcy Court confirmed the Chapter 11 plan of reorganization of Dr. Hu Bo for GFG NY in connection with the Bankruptcy Case, pursuant to which, among other things, the Company has become the sole member of GFG NY and owns all of the issued and outstanding GFG NY membership interests (the "GFG NY Interests");

WHEREAS, concurrently with the execution and delivery of this Agreement by the Members, the Company is issuing Class B Units (as defined below) to the Class B Members in accordance with the terms and conditions set forth in written notices dated as of the date hereof from the Company to the Class B Members (each, a "Grant Notice"); and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I
Definitions

SECTION 1.1 Definitions. Unless the context otherwise requires, the following terms shall have the following meanings for purposes of this Agreement:

- 1 -

"<u>Act</u>" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 <u>et seq.</u>, as it may be amended from time to time, and any successor to such statute.

"<u>Agreement</u>" has the meaning set forth in the preamble hereto.

"<u>Assignee</u>" has the meaning set forth in <u>Section 8.1(b)</u>.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereto.

"<u>Business Day</u>" means a day which is not a Saturday, Sunday or a day on which banks in New York City are closed.

"<u>Capital Account</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Capital Contribution</u>" of a Member means the aggregate amount of cash and the aggregate fair market value of any other assets contributed by such Member to the Company.

"<u>Carrying Value</u>" with respect to any asset of the Company means the asset's adjusted basis for federal income tax purposes, except that the Carrying Values of all such assets shall be adjusted to equal their respective fair market values (as determined by the Manager in her sole and absolute discretion) on the occurrence of any of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f) (if the Manager in her sole and absolute discretion determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company) in accordance with the rules of such regulation and Treasury Regulations Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property using any method permitted by Treasury Regulations Section 1.704-3 as determined by the Manager in her sole and absolute discretion. If the Carrying Value of an asset has been determined or adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f), such Carrying Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses. The Carrying Value of any asset distributed to any Member shall be adjusted immediately prior to such distribution to equal its fair market value, as determined by the Manager in her sole and absolute discretion.

"<u>Certificate of Formation</u>" has the meaning set forth in the recitals hereto.

"<u>Class A Member</u>" has the meaning set forth in the preamble hereto.

"<u>Class A Units</u>" means the units of Members' Interest designated as Class A Units which are issued in exchange for Capital Contributions to the Company made on account of such Class A Units.

"<u>Class B Member</u>" has the meaning set forth in the preamble hereto.

"<u>Class B Units</u>" means units of Members' Interest designated as Class B Units upon issuance by the Company and that entitle the holders of such Class B Units to their share of the

- 2 -

Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement, but shall not entitle such holders by virtue of owning such Class B Units to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members, except as required by non-waivable provisions of the Act. Class B Units shall be subject to vesting and forfeiture as determined by the Manager in her sole and absolute discretion, as set forth in the Grant Notice sent to the applicable Class B Member by the Company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means The Mount Baekdu Health Service LLC.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or other period, except that (i) with respect to any property the Carrying Value of which differs from its adjusted tax basis for federal income tax purposes and which difference is being eliminated by use of the "remedial allocation method" pursuant to Treas. Reg. §1.704-3(d), Depreciation for such Fiscal Year or other period shall be the amount of book basis recovered for such Fiscal Year or other period under the rules prescribed by Treas. Reg. §1.704-3(d), and (ii) with respect to any other property, the Carrying Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Carrying Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided, that, if the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Carrying Value using any reasonable method selected by the Manager.

"Fiscal Year" has the meaning set forth in Section 2.8.

"GFG NY" has the meaning set forth in the recitals hereto.

"GFG NY Interests" has the meaning set forth in the recitals hereto.

"Grant Notice" has the meaning set forth in the recitals hereto.

"Interest" means the entire membership interest owned by a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all the terms and provisions of this Agreement.

"Manager" means Yihan Hu, in her capacity as the manager of the Company, or such other person as may from time to time be designated in writing by a majority-in-interest of the holders of Class A Units (based on Capital Contributions) to replace the then current Manager, in such person's capacity as manager of the Company.

"Member" has the meaning set forth in the preamble hereto.

- 3 -

"<u>Nonrecourse Deductions</u>" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c). The amount of Nonrecourse Deductions of the Company for a Fiscal Year or other period equals the net increase, if any, in the amount of Partnership Minimum Gain of the Company during that Fiscal Year or other period, reduced (but not below zero) by the aggregate distributions during the year of proceeds of Nonrecourse Liabilities that are allocable to an increase in Partnership Minimum Gain, with such other modifications as provided in Treasury Regulations Section 1.704-2(c).

"<u>Nonrecourse Liability</u>" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"<u>Participation Threshold</u>" has the meaning set forth in <u>Section 2.2(b)(ii)</u>.

"<u>Partner Nonrecourse Debt Minimum Gain</u>" means an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"<u>Partner Nonrecourse Deductions</u>" has the meaning set forth in Treasury Regulations Sections 1.704-2(i)(2) and 1.704-2(i)(2).

"<u>Partnership Audit Provisions</u>" means Sections 6221 through 6241 of the Code, together with any guidance issued thereunder or successor provisions, and any applicable provision of state or local tax law.

"<u>Partnership Minimum Gain</u>" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"<u>Partnership Representative</u>" has the meaning set forth in <u>Section 6.2(b)</u>.

"<u>Percentage Interest</u>" means, with respect to any Member as of any date of determination, a fraction expressed as a percentage, the numerator of which is the number of Class A Units and Class B Units held by such Member as of such date of determination, and the denominator of which is the sum of the total number of Class A Units and Class B Units held by all Members as of such date of determination.

"<u>Person</u>" means an individual, partnership, trust, estate, association, corporation, limited liability company or other entity.

"<u>Profits</u>" and "<u>Losses</u>" means, for each Fiscal Year or other period, the taxable income or loss of the Company, or particular items thereof, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) with the following adjustments: (a) all items of income, gain, loss or deduction allocated pursuant to <u>Section 5.3</u> shall not be taken into account in computing such taxable income or loss; (b) any income of the Company that is exempt from federal income taxation and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss; (c) if the

- 4 -

Carrying Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (d) upon an adjustment to the Carrying Value of any asset, pursuant to the definition of Carrying Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation"; and (f) except for items in (a) above, any expenditures of the Company not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.

"Secretary of State" has the meaning set forth in the recitals hereto.

"Transfer" has the meaning set forth on Section 8.1(a).

"Unvested Distribution Amount" has the meaning set forth in Section 4.1(c).

ARTICLE II
General Provisions

SECTION 2.1 Formation. The Company was formed on May 28, 2024 by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware pursuant to and in accordance with the Act. The Manager is hereby designated as authorized persons, within the meaning of the Act, to execute, deliver and file the any amendments and/or restatements of the Certificate of Formation and any other certificates necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

SECTION 2.2 Members.

(a) The Company may issue Interests in the form of Class A Units and Class B Units. Class B Units shall be non-voting except as may be expressly provided herein. Exhibit A hereto contains the name and address of, and the capital contributions made by, and the Class A Units and Class B Units held by each Member as of the date of this Agreement. Exhibit A shall be revised by the Manager from time to time to reflect the admission or withdrawal of Members in accordance with the terms of this Agreement and changes in the Member address information set forth therein.

(b) Class B Units.

(i) Each Class B Unit is intended to qualify and be treated as a separate "profits interest" within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343, and distributions to each of the Class B Members pursuant to this Agreement shall be limited to the extent necessary so that each Class B Unit of such Class B Members qualifies as a "profits interest" under Rev. Proc. 93-27 (including by establishing a threshold amount ("Participation Threshold") of cumulative distributions that must be made in respect of a

- 5 -

Class A Unit pursuant to Section 4.1(a)(ii) after the issuance of such Class B Unit before such Class B Units may receive any distributions), and this Agreement shall be interpreted accordingly. The Participation Threshold with respect to any Class B Units shall be set forth in the applicable Grant Notice and shall be adjusted (in the sole and absolute discretion and as determined by the Manager) after the grant of such Class B Units (including as a result of the issuance of new equity interests) to preserve treatment of such Class B Units as profits interests; provided, that the Participation Threshold for the Class B Units issued as of the date hereof shall initially be zero.

(ii)     Additionally, in accordance with Rev. Proc. 2001-43, 2001-2 C.B. 191, the Company shall treat a Member holding Class B Units as the owner of such Class B Units from the date it is granted, and shall file its IRS Form 1065, and issue appropriate Schedule K-1s to such Member, allocating to such Member its distributive share of all items of income, gain, loss, deduction and credit associated with such Class B Units. Each holder of Class B Units agrees to take into account such distributive share in computing its federal income tax liability for the entire period during which it holds the Class B Units. The Company and each holder of Class B Units agree not to claim a deduction (as wages, compensation or otherwise) for the fair market value of such Class B Units issued to such holder. The undertakings contained in this Section 2.2(b)(ii) shall be construed in accordance with Section 4 of Rev. Proc. 2001-43.

(iii)     Each Member holding Class B Units shall make and file with the Internal Revenue Service a timely "Section 83(b) Election" in such form as required by applicable Treasury Regulations. Any Section 83(b) Election shall be filed within thirty days after the grant date of Class B Units to such Member.

SECTION 2.3 Name. The Company shall conduct its activities under the name of "The Mount Baekdu Health Service LLC." The Company's business may be conducted under any other name or names as the Manager may determine, provided that the name shall always contain the words "Limited Liability Company" or the letters "LLC." The Manager shall give prompt notice of any such name change to each other Member.

SECTION 2.4 Limitation of Liability. (a) Except as provided in the Act or as such Member shall otherwise expressly agree in writing, no Member of the Company shall be obligated personally for any debt, obligation or liability of the Company or of any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company.

(b)     In no event shall any Member or former Member (i) be obligated to make any capital contribution or payment to or on behalf of the Company or (ii) have any liability to return distributions received by such Member from the Company, in each case except as otherwise specifically provided in this Agreement, as such Member shall otherwise expressly agree in writing or as may be required by applicable law.

SECTION 2.5 Term. The existence of the Company shall continue unless and until the Company is dissolved, wound up and terminated in accordance with Article VII. No Member shall have the right, and each Member hereby agrees not to, withdraw from the Company, nor to

- 6 -

dissolve, terminate or liquidate, or to petition a court for the dissolution, termination or liquidation of the Company, in each case except as expressly provided in this Agreement.

SECTION 2.6 Purpose. The purpose of the Company shall be to acquire, invest in, own, hold, manage, dispose of and otherwise deal with the GFG NY Interests and any other lawful business, purpose or activity for which limited liability companies may be formed under the Act that is expressly agreed to in writing by the Manager.

SECTION 2.7 Registered Office and Registered Agent; Mailing Address. The name and address of the Company's registered agent for service of process in the State of Delaware as of the date of this Agreement is as set forth in the Certificate of Formation. The mailing address of the Company shall be c/o Yihan Hu, [●] or at such other place as may from time to time be determined by the Manager.

SECTION 2.8 Fiscal Year. The Fiscal Year of the Company shall end on December 31 of each year.

ARTICLE III
Management and Operation of the Company

SECTION 3.1 Management. (a) Except as otherwise provided herein, the management, control and operation of the business and affairs of the Company shall be vested exclusively with the Manager. The Manager shall have the authority to exercise all powers necessary and convenient for the business of the Company set forth in Section 2.6, on behalf and in the name of the Company, subject to compliance with the restrictions and other provisions of this Agreement. The Manager shall have the exclusive authority on behalf of the Company to vote, to give consent or otherwise act with respect to the GFG NY Interests, including, but not limited to, the right to sell, assign, transfer, convey, encumber or otherwise dispose of the GFG NY Interests and collect distributions made to the Company with respect to the GFG NY Interests. Upon the resignation, death or incapacity of the Manager or removal of the Manager by the Class A Member, a new manager shall be designated in writing by a majority-in-interest of the holders of Class A Units (based on Capital Contributions).

(b) Except as expressly provided in this Agreement, Members as such shall have no right to, and shall not, take part in the management or affairs of the Company, nor in any event shall any Member as such have the power to act for or bind the Company.

SECTION 3.2 Certain Duties and Obligations of the Manager. (a) The Manager shall take all action which may be necessary or appropriate on her part (i) for the formation and continuation of the Company as a limited liability company under the Act and (ii) for the development, maintenance, preservation and operation of the business of the Company in accordance with the provisions of this Agreement and applicable laws and regulations.

(b) The Manager shall take (and each Member agrees to cooperate with the Manager and approves of the Manager taking on such Member's behalf) all action which is

- 7 -

**Appendix Page 165**

reasonably necessary in order to protect the limited liability of the Members under the laws of any jurisdiction in which the Company is doing business.

SECTION 3.3 <u>Exculpation and Indemnification</u>.  (a)  Notwithstanding any other terms of this Agreement, whether express or implied, or any obligation or duty at law or in equity, neither the Manager (including as Partnership Representative) nor any Member shall be liable to the Company or any other Member for any act or omission (in relation to the Company, this Agreement, or any transaction or investment contemplated hereby or thereby) taken or omitted in good faith by the Manager or a Member and in the reasonable belief that such act or omission is in, or is not contrary to, the best interests of the Company and is within the scope of authority granted to the Manager or such Member unless it is determined by any court, governmental body of competent jurisdiction or arbitrator or arbitration panel in a final, non-appealable judgment or award, or admitted by the Manager or such Member in a settlement of any lawsuit, that such act or omission resulted from fraud, bad faith, willful misconduct, gross negligence, a violation of applicable securities laws or a breach of this Agreement and except that nothing herein shall constitute a waiver or limitation of any rights which the Manager or a Member or the Company may have under applicable securities laws or of any rights under other laws which as a matter of law may not be waived.

(b)  To the fullest extent permitted by law, the Company shall indemnify and save harmless (but only to the extent of its assets) the Manager (including as Partnership Representative) and each Member from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Manager or such Member may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of or in connection with the Company, its property, its business or affairs; *provided* that neither the Manager nor any Member shall be entitled to indemnification under this Section with respect to any claim, issue or matter in which it is determined by any court, governmental body of competent jurisdiction or arbitrator or arbitration panel in a final, non-appealable judgment or award, or admitted by the Manager or such Member in a settlement of any lawsuit, that the Manager or such Member has engaged in fraud, bad faith, willful misconduct, gross negligence or a breach of this Agreement and except that nothing herein shall constitute a waiver or limitation of any rights which a Member or the Company may have under applicable securities laws or of any rights under other laws which as a matter of law may not be waived.  To the fullest extent permitted by law, expenses (including legal fees) incurred by the Manager or any Member in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of a written undertaking by or on behalf of the Manager or Member to repay such amount to the extent that it shall be determined that the Manager or such Member is not entitled to be indemnified as authorized in this Section.  The rights of indemnification provided herein shall exist whether or

- 8 -

not the person is the Manager or a Member at the time any such claim, liability or expense is asserted, paid or incurred.

## ARTICLE IV
### Distributions

SECTION 4.1 <u>Distributions</u>. (a) Subject to <u>Section 4.2</u> and to the maintenance of reserves for reasonably expected expenses and liabilities of the Company, if any, distributions to the Members of cash proceeds or other amounts received by the Company in respect of the GFG NY Interests or any other assets of the Company shall be made as soon as practicable following the receipt thereof. Subject to <u>Section 2.2(b)</u>, <u>Section 4.1(c)</u> and <u>Section 4.2</u>, all distributions to the Members shall be made as follows: (i) first, to the Class A Member until the Class A Member has received pursuant to this clause (i) an amount equal to its Capital Contributions in respect of Class A Units; and (ii) thereafter, to the Members in accordance with their respective Percentage Interests. Except as otherwise expressly provided in this <u>Article IV</u> or in <u>Article VII</u>, no Member shall have the right to withdraw capital from the Company or to receive any distribution or return of any capital contribution.

(b) Distributions pursuant to this <u>Article IV</u> may be made in cash or other assets (including GFG NY Interests). Distributions of GFG NY Interests shall be made in the same manner as if cash in an amount equal to the fair market value of such GFG NY Interests were to be distributed. Distributions consisting of both cash and GFG NY Interests shall be made, to the extent practicable, in the same proportions of cash and GFG NY Interests to each Member receiving such distributions. To the extent practicable, distributions consisting of or including GFG NY Interests shall be made in a manner such that each Member entitled to receive such a distribution shall receive GFG NY Interests with the same rights attendant thereto (including registration, voting and anti-dilution rights) as the other Members receiving such GFG NY Interests in any concurrent distribution.

(c) The portion of any distribution that would otherwise be made in respect of any unvested Class B Units shall not be distributed with respect to such Class B Units and instead shall be recorded as an "<u>Unvested Distribution Amount</u>" in the Company's books and records at the time of such distribution, and in connection with any subsequent distribution, if any (or at such earlier time as the Manager shall elect in her sole discretion), the portion of the Unvested Distribution Amount in respect of any Class B Units that vest following such prior distribution shall be distributed by the Company to the holder of such Class B Units (in proportion to the portion of such Class B Units which vested after the establishment of the Unvested Distribution Amount in respect thereof) before the Company makes any distributions prescribed by <u>Section 4.1(a)</u>; provided that, (x) if any portion of such Class B Units expires, is cancelled, repurchased, forfeited, ceases to vest or is otherwise acquired by the Company, the Unvested Distribution Amount attributable to such portion of such Class B Units shall be distributed among the holders of the remaining outstanding Units pursuant to <u>Section 4.1(a)</u> (but subject to <u>Section 2.2(b)</u>), and (y) for the avoidance of doubt, in the event that there are no subsequent distributions which would be made in respect of such Class B Units, no amount shall be owed in respect of the Unvested Distribution Amount.

SECTION 4.2 <u>Tax Distributions</u>. The Manager shall, in the event the Company has available cash that was received in respect of the GFG NY Interests, as determined by the Manager in her sole and absolute discretion, make tax distributions to the Members in respect of taxable income allocated thereto, at such times and in such amounts as determined by the Manager in her sole and absolute discretion. Any tax distribution made to a Member pursuant to this <u>Section 4.2</u> shall be treated as an advance of amounts otherwise distributable to such Members pursuant to this Agreement. For avoidance of uncertainty, no such tax distributions shall be made in connection with the disposition of all GFG NY Interests.

SECTION 4.3 <u>Indemnification and Reimbursement for Payments on Behalf of a Member</u>. If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, taxes, interest or penalties payable pursuant to the Partnership Audit Provisions, and withholding taxes), then such Person (the "<u>Indemnifying Person</u>") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Person, and, at the option of the Company with the approval of the Manager:

(a) promptly upon notification of an obligation to indemnify the Company, the Indemnifying Person shall make a cash payment to the Company equal to the full amount to be indemnified, and/or

(b) the Company shall make distributions to the Indemnifying Person net of the amount to be indemnified or reduce subsequent distributions that would otherwise be made to the Indemnifying Person, until the Company has recovered the amount to be indemnified (and the amount withheld shall not be treated as a Capital Contribution but shall be treated as distributed to such Member).

An Indemnifying Person's obligation to indemnify the Company under this <u>Section 4.3</u> shall survive the dissolution, liquidation, winding up and termination of the Company, and for purposes of this <u>Section 4.3</u>, the Company shall be treated as continuing in existence.

ARTICLE V
Capital Accounts; Allocations; Expenses

SECTION 5.1 <u>Capital Accounts</u>. A separate capital account (a "<u>Capital Account</u>") shall be established and maintained for each Member. The Capital Account of each Member shall be credited with such Member's Capital Contributions, if any, to the Company, all Profits allocated to such Member pursuant to <u>Section 5.2</u> and any items of income or gain which are specially allocated pursuant to <u>Section 5.3</u>; and shall be debited with all Losses allocated to such Member pursuant to <u>Section 5.2</u>, any items of loss or deduction of the Company specially allocated to such Member pursuant to <u>Section 5.3</u>, and all cash and the Carrying Value of any property (net of liabilities assumed by such Member and the liabilities to which such property is subject) distributed by the Company to such Member. To the extent not provided for in the preceding sentence, the Capital Accounts of the Members shall be adjusted and maintained in accordance with the rules of

- 10 -

Treasury Regulations Section 1.704-1(b)(2)(iv), as the same may be amended or revised. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed in order to comply with Treasury Regulations Section 1.704-1(b), the Manager may make such modification. Any references in any section of this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above. In the event of any transfer of any interest in the Company in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

SECTION 5.2 <u>Allocations of Profits and Losses</u>. Except as otherwise provided in this Agreement, Profits and Losses of the Company for each Fiscal Year or other period (and to the extent necessary, individual items of income, gain, loss or deduction of the Company) shall be allocated among the Members in a manner such that the Capital Account of each Member, after giving effect to the special allocations set forth in <u>Section 5.3</u> below and taking into account any contributions and distributions made in respect of such Fiscal Year or other period, is immediately after making such allocation, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to <u>Section 7.3</u> if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their respective Carrying Values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 7.3</u> to the Members immediately after making such allocation, minus (ii) such Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets (for purposes of this <u>Section 5.2</u>, applying the provisions of <u>Section 4.1</u> as if all issued but unvested Class B Units were vested Class B Units at such time).

SECTION 5.3 <u>Special Allocations</u>.

(a) <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision in this <u>Article V</u>, if there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Company taxable year), the Members shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This <u>Section 5.3(a)</u> is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations Sections and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(b) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such

Member in an amount and manner sufficient to eliminate the deficit balance in such Member's Capital Account created by such adjustments, allocations or distributions as promptly as possible.

(c)    Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 5.3(c) shall be made only if and to the extent that a Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article V have been tentatively made as if Section 5.3(b) and this Section 5.3(c) were not in this Agreement.

(d)    Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Capital Account balances.

(e)    Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Member who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(j).

SECTION 5.4 Tax Allocations.  For income tax purposes, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; *provided* that in the case of any asset the Carrying Value of which differs from its adjusted tax basis for United States federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any manner determined by the Manager) so as to take account of the difference between Carrying Value and adjusted basis of such asset.

SECTION 5.5 Expenses.  Except as otherwise agreed to by the Members, the Company shall bear and be responsible for all expenses incurred in connection with the operation of the Company.

ARTICLE VI
Books and Reports; Tax Matters

SECTION 6.1 General Accounting Matters.  Full and accurate books of the Company showing all capital accounts, receipts, expenditures, assets, liabilities, profits and losses of the Company shall be maintained at the principal place of business of the Company or at such other place or places as the Members shall determine.  Each Member shall have the right at all reasonable times and upon reasonable notice to inspect and make copies (or to have a representative inspect and make copies) at such Member's own expense of all books of account and all records maintained by the Company.  The books of the Company shall be maintained in

- 12 -

accordance with such method of accounting as determined by the Manager in her sole and absolute discretion.

SECTION 6.2 <u>Certain Tax Matters</u>.

(a)    The Manager, at the expense of the Company, shall prepare or cause to be prepared all federal, state and local, as well as foreign, if any, tax returns of the Company for each year for which such returns are required to be filed and shall file or cause such returns to be timely filed.  The Manager shall determine the appropriate treatment of each item of income, gain, loss, deduction and credit of the Company and the accounting methods and conventions under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of any such item or any other method or procedure related to the preparation of such tax returns.  The Manager may cause the Company to make or refrain from making any and all elections permitted by such tax laws.  The Company shall furnish to each Member such information as shall be necessary for the preparation by such Member of his federal, state and local income tax returns.  No Member shall treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.  Each Member hereby undertakes promptly to provide to the Manager, at her request, any and all information, statements or certificates which the Manager may at any time reasonably judge necessary to comply with the applicable law relating to taxes of any jurisdiction, or in order to minimize any obligation which the Company may have to withhold tax on distributions to such Members.

(b)    The Manager (or such person as designated by the Manager) shall serve as the "partnership representative" as defined in Section 6223 of the Code (the "<u>Partnership Representative</u>").  The Partnership Representative shall have all of the rights, duties, authority and powers of a partnership representative provided for in the Partnership Audit Provisions. Without limiting the foregoing, the Partnership Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company that are permitted or required by the applicable provisions of the Partnership Audit Provisions (including a "push-out" election under section 6226 of the Code or any analogous election under state or local tax Law). Each Member agrees to cooperate with the Partnership Representative and to do or refrain from doing any or all things requested by the Partnership Representative (including paying any and all resulting taxes, additions to tax, penalties and interest in a timely fashion) in connection with any examination of the Company's affairs by any federal, state, or local tax authorities, including resulting administrative and judicial proceedings. The Company shall reimburse the Partnership Representative for all expenses incurred in connection with its duties as the Partnership Representative, and the Partnership Representative is authorized to expend Company funds for professional services and costs associated therewith. The Company shall indemnify, hold harmless and advance expenses to the Partnership Representative in respect of any and all claims, damages, liabilities, costs (including, without limitation, the costs of litigation and reasonable attorneys' fees and expenses) and causes of action arising out of, resulting from or attributable, in whole or in part, to the Partnership Representative's actions and decisions in its conduct as Partnership Representative for the Company, to the fullest extent allowed by applicable law, including with respect to the tax liability of the Company and/or with respect to the tax liability of the Members in connection with the operations of the Company. If the Company is required by law to make any

- 13 -

payment to any governmental authority that is attributable to a Member arising under the Partnership Tax Audit Rules, as determined by the Partnership Representative, then such Member shall indemnify and contribute to the Company in full for the entire amount paid (including interest, penalties and related expenses). The Manager may offset distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the Company under this Section 6.2(b) and may treat any amount payable under this Section 6.2(b) as an amount payable pursuant to Section 4.3. The provisions of this Section 6.2(b) will (i) survive the dissolution of the Company and/or any sale, exchange, liquidation, retirement, termination, or other disposition of the applicable Member's Interest; and (ii) remain binding on the Members for as long a period of time as is necessary to resolve any and all matters regarding the taxation of the Company or the Members with the Internal Revenue Service (or analogous state, local, or non-U.S. governmental entity) or any judicial authority.

ARTICLE VII

Dissolution

SECTION 7.1 Dissolution. The Company shall be dissolved and subsequently terminated with the consent of the Manager and a majority-in-interest of the holders of Class A Units (based on Capital Contributions). The death, retirement, resignation, expulsion, dissolution or bankruptcy of any Member shall not cause the dissolution of the Company.

SECTION 7.2 Winding-up. When the Company is dissolved, the business and property of the Company shall be wound up and liquidated by the Manager or, if there is no Manager, a liquidator appointed by a majority-in-interest of the holders of Class A Units (based on Capital Contributions).

SECTION 7.3 Final Distribution. Within 120 calendar days after the effective date of dissolution of the Company, the assets of the Company shall be distributed in the following manner and order:

(a) to the payment of the expenses of the winding-up, liquidation and dissolution of the Company;

(b) to pay all creditors of the Company, other than Members in respect of distributions already owing to them, either by the payment thereof or the making of reasonable provision therefor;

(c) to establish reserves, in amounts established by the Manager or such liquidator, to meet other liabilities of the Company; and

(d) to pay, in accordance with the terms agreed among them and otherwise on a pro rata basis, all creditors of the Company that are Members in respect of distributions already owing to them, either by the payment thereof or the making of reasonable provision therefor.

The remaining assets of the Company shall be applied and distributed among the Members in accordance with and subject to Section 4.1. For purposes of the application of this Section 7.3 and

- 14 -

determining Capital Accounts on liquidation, all unrealized gains, losses and accrued income and deductions of the Company shall be treated as realized and recognized immediately before the date of distribution and allocated pursuant to Sections 5.2 and 5.3.

SECTION 7.4 No Obligation to Restore Capital Accounts. No Member whose Capital Account balance is a negative or deficit amount (either during the existence of the Company or upon liquidation) shall have any obligation to return any amounts previously distributed to such Member or to contribute cash or other assets to the Company to restore or make up the deficit in such Member's impaired Capital Account.

ARTICLE VIII
Transfer of Members' Interests

SECTION 8.1 Transfer of Membership Interests by Members. (a) No Member may, directly or indirectly, assign, sell, exchange, transfer, pledge, encumber, hypothecate or otherwise dispose ("Transfer") all or any portion of such Member's Interest without the prior written consent of the Manager, which consent may be given or withheld in the Manager's sole and absolute discretion; *provided* that, in the case of a Member that is an individual, such consent shall not be necessary in connection with a Transfer upon such Member's death to his or her estate or heirs.

(b) Upon a Class A Member's Transfer of all or any part of such Member's Class A Units in the Company to any person under Section 8.1(a) (the "Assignee"), such Assignee shall be admitted as a substitute member in lieu of or in addition to such transferor Class A Member, as applicable, and shall have all the rights of a substituted Class A Member. Upon a Class B Member's Transfer of all or any part of such Member's Class B Units in the Company to an Assignee, such Assignee shall be admitted as a substitute member in lieu of such transferor Class B Member only with the written consent of the Manager, which consent may be given or withheld in the Manager's sole and absolute discretion; *provided* that, in the event of the death of a Class B Member, his or her personal representatives during the period of administration of his estate shall succeed to his rights and liabilities hereunder as a Member, and anything in this Agreement to the contrary notwithstanding, the decedent's interest may be assigned in the distribution of his estate pursuant to the intestate laws of the domiciliary state of the decedent or to any person pursuant to a bequest in the decedent's will. Any person to whom such an assignment or bequest is made shall thereupon succeed to the decedent's interest as a Member and, upon his execution of the agreement specified in Article IX, shall have all the rights of a substituted Member.

(c) Unless an Assignee is admitted as a substitute Member in accordance with Section 8.1(b), a Transfer by a Member of all or any part of such Member's interest in the Company shall not release such Member from any of such Member's obligations or liabilities, or limit the Manager's rights with respect to such Member, of any nature whatsoever arising under this Agreement, and such Assignee shall be entitled only to allocations and distributions with respect to its Interest and shall have no right to vote such Interest, to participate in the management of the Company or to any accounting or information concerning the affairs of the Company and shall not have any of the other rights of a Member under this Agreement.

- 15 -

SECTION 8.2 <u>Other Transfer Provisions</u>.  To the fullest extent permitted by law, any purported Transfer by a Member of all or any part of its interest in the Company in violation of this <u>Article VIII</u> shall be null and void and of no force or effect.

ARTICLE IX<br><u>Miscellaneous</u>

SECTION 9.1 <u>Waiver of Rights to Accounting/Partition</u>.  Except as may be otherwise required by law in connection with the winding-up, liquidation and dissolution of the Company, each Member hereby irrevocably waives any and all rights that it may have to maintain an action for judicial accounting or for partition of any of the Company's property.

SECTION 9.2 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  In particular, the Company is formed pursuant to the Act, and the rights and liabilities of the Members shall be as provided therein, except as herein otherwise expressly provided.

SECTION 9.3 <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns and, in particular, the estate of a deceased member shall remain liable for all of such Member's obligations hereunder to the extent that such obligations are not affected by such Member's death under the terms hereof.

SECTION 9.4 <u>Notices</u>.  Whenever notice is required or permitted by this Agreement to be given, such notice shall be in writing (including email, facsimile or similar writing) and shall be given to any Member at its address, facsimile number or email address shown in on <u>Exhibit A</u> hereto.  Each such notice shall be effective (i) if given by email or facsimile, upon electronic confirmation of receipt and (ii) if given by any other means, when delivered to and receipted for at the address of such Member, as the case may be, specified as aforesaid.

SECTION 9.5 <u>Entire Agreement</u>.  This Agreement, together with the separate written agreements referenced herein, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.  Except as expressly provided herein, this Agreement and such separate written agreements supersede all prior agreements and understandings between the parties with respect to such subject matter.

SECTION 9.6 <u>Amendments</u>.  This Agreement may be amended or modified with the consent of the Manager and a majority-in-interest of the holders of Class A Units (based on Capital Contributions); provided that this Agreement may not be amended or modified in a manner that is materially adverse to the rights and preferences of the holders of the Class B Units that is disproportionate to any adverse effect on the holders of the Class A Units without the prior written consent of a majority-in-interest of the holders of Class B Units (based on Percentage Interest).

- 16 -

SECTION 9.7 <u>Titles</u>.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text hereof.

SECTION 9.8 <u>Representations and Warranties</u>.  (a) Each Member represents, warrants and covenants to the other Members that:

(i)  such Member has the legal capacity to enter into this Agreement and perform such Member's obligations hereunder;

(ii)  this Agreement has been duly executed and delivered by such Member and constitutes the valid and legally binding agreement of such Member enforceable in accordance with its terms against such Member subject to the effect of bankruptcy, insolvency, moratorium and other similar laws relating to creditors' rights generally, by general equitable principles and by an implied covenant of good faith and fair dealing;

(iii)  such Member is acquiring its interest in the Company for such Member's own account and not with a view to resale or distribution;

(iv)  such Member understands that such interests in the Company have not been registered under the Securities Act of 1933, as amended, the securities laws of any state thereof or the securities laws of any other jurisdiction, nor is such registration contemplated;

(v)  such Member has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of acquisition of an interest in the Company and understands the risks of, and other considerations relating to, an acquisition of an interest in the Company; and

(vi)  such Member's overall commitment to the Company and other investments which are not readily marketable is not disproportionate to such Member's net worth and such Member has no need for immediate liquidity in such Member's investment in its interests in the Company.

(b)  All of the representations, warranties and covenants made under this <u>Section 9.8</u> shall be deemed to be made on a continuing basis during the term of the Company and shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

SECTION 9.9 <u>Severability</u>.  Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

SECTION 9.10 <u>No Right to Future Activities</u>.  Except as otherwise specifically provided in this Agreement, a Member's rights under this Agreement or arising by virtue of its status as a Member do not include the right to participate in the future business activities of other Members.

- 17 -

SECTION 9.11 Construction; Usage Generally. The definitions in Article I or the Exhibits to this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Articles, Sections and Exhibits shall be deemed to be references to Articles and Sections of, and Exhibits to, this Agreement unless the context shall otherwise require. All Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Exhibit shall have the meaning ascribed to such term in this Agreement. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

SECTION 9.12 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page Follows]

- 18 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

_____
Yihan Hu

_____
Dr. Melvin Thornton

_____
Kenneth Smalls

**EXHIBIT A**

NAMES, ADDRESSES AND
CAPITAL CONTRIBUTIONS OF
THE MEMBERS OF THE COMPANY

| Member | Address | Capital Contribution | Class A Units | Class B Units |
|---|---|---|---|---|
| Yihan Hu | [●] Email: [●] | $[●] | 7,000 | -- |
| Dr. Melvin Thornton | [●] Email: [●] | -- | -- | 1,500 |
| Kenneth Smalls | [●] Email: [●] | -- | -- | 1,500 |

# EXHIBIT C

## Schedule of Assumed or Rejected Executory Contracts
## and Unexpired Leases, Including Proposed Cure Amounts[3]

| Description of Contract | Contract Counterparty | Proposed Treatment | Cure Amount |
|---|---|---|---|
| Real property lease for premises located at 115 East 57th St., Suites 420 and 430, New York, NY 10022 | Eldad Prime, LLC | Lease to be **assumed**. | $0.00<br><br>Dr. Hu understands that the Debtor is current on its lease obligations. |
| Administrative Services Agreement dated on or about September 27, 2019[4] between KJD Fertility PLLC and the Debtor | KJD Fertility PLLC | Contract to be **rejected**. | N/A |
| Equipment Lease (No. 9933681001) for Voluson P8 | GE HFS LLC, dba Healthcare Financial Services | Lease to be **assumed**. | $15,508.01 |

---

[3] The schedule of assumed and rejected executory contracts and unexpired leases is being prepared with the assistance and input of the Chapter 11 Trustee appointed in this Chapter 11 Case. This schedule will be updated if, and when, additional contracts and/or leases are discovered. Pursuant to the Plan, any executory contract or unexpired lease that (i) does not appear on this Schedule and designated as "assumed" or (ii) is not the subject of a separate motion to assume filed prior to Confirmation, shall be deemed rejected as of the Effective Date of the Plan.

[4] Dr. Hu understands that a purported Administrative Services Agreement may exist between the Debtor and KJD Fertility PLLC. Dr. Hu further understands that the agreement is unsigned and it is not clear if the agreement is a valid and enforceable contract. Dr. Hu reserves the right to challenge the validity of the agreement.

# EXHIBIT D

## Preliminary List of Claims and Proposed Treatment[5]

| Creditor | Asserted Claim Amount | Claim Number | Treatment |
|---|---|---|---|
| GE Precision Healthcare LLC | $4,083.72 | POC 1 | Allowed, to be paid in full. |
| New York State Department Of Labor | $211.31 | POC 2 | Allowed, to be paid in full. |
| JPMorgan Chase Bank, N.A. | $31,496.61 | POC 3 | Allowed, to be paid in full. |
| Internal Revenue Service | $0.00 | POC 4 | Claim asserted in amount of $0. To be expunged. |
| Labcorp | $4,867.89 | POC 5 | Allowed, to be paid in full. |
| NYC Dept. Of Finance | $15,798.68 | POC 6 | Allowed, to be paid in full. |
| Time Payment | $4,703.40 | POC 7 | Allowed, to be paid in full. |
| Alexis Cancel | $1,000,000.00 | POC 8 | Claim to pass-through bankruptcy and be adjudicated on the merits. |
| Annie Liu | $339,556.69 | Scheduled | Will be objected to. |
| Ashland Maintenance Org. | $1,514.66 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Chase | $30,500.00 | Scheduled | To be expunged as being duplicative of proof of claim number 3. Claim is $0. |
| Chase Cardmember Service | $65,792.00 | Scheduled | Still being reviewed. Dr. Hu understands that all but $1,000 of this claim has been paid. |
| College of American Pathologists | $6,746.00 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |

---

[5]   The claims schedule was prepared with the assistance and input of the Chapter 11 Trustee appointed in this Chapter 11 Case. This schedule is derived from proofs of claims appearing on the claims register, as well as claims that were included in the Debtor's schedules. The Bar Date to file claims does not lapse until June 28, 2024. Dr. Hu intends to amend this schedule once the final list of claims is established. Dr. Hu also reserves the right to change the proposed treatment of any claim. For claims that are designated as "still being reviewed," Dr. Hu is discussing those claims with the Chapter 11 Trustee to better understand the nature and merits of the claims.

| Creditor | Asserted Claim Amount | Claim Number | Treatment |
|---|---|---|---|
| Dr. Glenn Moodie | $16,000.00 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| EIVF | $7,606.62 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Eldad Prime | $541,988.00 | Scheduled | This claim relates to the Debtor's real property lease. The real property lease will be assumed and any cure payment will be paid in accordance with the requirements of the Bankruptcy Code. |
| First Insurance Funding | $3,456.82 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Healthcare Financial Services | $1,238.50 | Scheduled | Allowed, to be paid in full. |
| Henry Schein | $9,243.23 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Kitazato | $1,119.87 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Kratz Security Technology | $472.52 Corrected amount is $14,650.00 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Labcorp | $9,518.06 | Scheduled | To be paid to the extent different and not duplicative of proof of claim number 5 filed by Labcorp. Still being reviewed. |
| Littler | $20,000 Corrected amount is $36,175.63 | Scheduled | Allowed, to be paid in full. |
| Metro Drugs RX | $16,000.00 Corrected scheduled amount is $60,056.15 | Scheduled | Allowed, to be paid in full. |
| ProAssurance Companies | $13,719.00 | Scheduled | Allowed, to be paid in full. |
| RDL Billing | $4,081.80 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |

| Creditor | Asserted Claim Amount | Claim Number | Treatment |
|---|---|---|---|
| Roche Diagnostic | $12,314.00 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| Rosh Maternal Fetal Med | $20,000.00 | Scheduled | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |
| SHARPS Compliance of Texas LLC | $1,250.00 | Scheduled | Still being reviewed. |
| SND & Associates | $20,000.00 | Scheduled | Still being reviewed. |
| Time Payment | $1,500.00 | Scheduled | Duplicative of, and included in, proof of claim number 7, which is to be paid in full. |
| Vitro Life | $7,685.00 | | Dr. Hu understands that this claim has already been paid in full. Claim is $0. |

This Schedule does not include any Administrative Expense Claims, the bar date for which will be established by the Court in connection with confirmation of the Plan. In addition to the proposed treatment of Claims summarized above, Dr. Hu expressly reserves the right to object to and/or seek to disallow claims, if any, asserted by each of the following persons/entities:

- Dr. Kevin J. Doody;
- KJD Medical PLLC;
- Annie Liu
- Michael Kasen, Esq.

# EXHIBIT E

## Pass-Through Claims

| Creditor | Asserted Claim Amount | Claim Number | Treatment |
|---|---|---|---|
| Alexis Cancel | $1,000,000.00 | POC 8 | To pass-through the bankruptcy unimpaired and to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. The claim shall not be subject to any discharge, injunction, or stay granted in favor of the Debtor or Reorganized Debtor under the Plan. |

# EXHIBIT F

## Proposed Post-Emergence Management Team for Reorganized Debtor
(To be amended and/or supplemented prior to confirmation.)


Chief Executive Officer:     Ms. Yihan Hu (CV attached)

[Title]:     Mr. Kenny Smalls (CV attached)

[Title]:     [Ms. Valeria Kulynych][6] (CV to be provided at a later date)

---

[6]   Ms. Kulynych's appointment as a manager of the Reorganized Debtor remains subject to discussion and agreement between Dr. Hu and Ms. Kulynych.

# YIHAN HU

s5293@hotmail.com | (+1) 202-550-0045 | (+86) 13911075027

## PROFESSIONAL EXPERIENCE

**Global Medical Corporation**                                               **Beijing, China**
**CEO**                                                                        2019-Present

- Manages multinational medical and health services provider in fields, such as medical beauty, anti-aging, health check ups, and In Vitro Fertility services.
- Developing a HIPAA compliant, global service network of independent branches located in hospitals, medical universities and health care facilities.

**YIHAN BEIJING INVESTMENT CO. LTD**                                          **Beijing, China**
**Chairman**                                                                   2020 - Present

- Manages 15 people to lead conversion of derelict buildings into high-end H Mall (Medical Mall), overseeing a $10m budget, organizing bidding for architecture, construction, office services, etc., and managing vendors.
- Liaises with local regulators, tax bureau, court system, health bureau, and utility operators to resolve legacy tax issues, zoning issue, code problems to bring building into compliance and ensure legitimate operation.
- Developing strategy to provide full-spectrum health services and convenience services to enhance patient experience and negotiates with prospective tenants, attracting both research facilities and clinics, achieving 100% occupancy in presale.
- Negotiates with 3 REIT funds regarding potential acquisition deal structures.

**HUHANTWO LLC**                                                             **Menlo Park, USA**
**Manager**                                                                    2017 - Present

- Coordinated between Chairman, realtors, banks, and property managers on transactions and post-transaction processes for residential and commercial properties transactions.
- *201 El Camino Real Project: $11.38m new mixed-use development*
  - Liaised with local officials to secure permits and persuaded city council to relinquish fire easement, enabling unification of two lots to develop $8m mixed-use property bringing 12 additional mid-range rental units to market.
  - Assembled and coordinated the project team and managed subcontractor bidding within 5 months.
  - Negotiated with potential buyers of mixed-use property and coordinated with lawyers to develop loan provision for seller of $5m at 6.5% APR, completing sale at $12m.
- *241 El Camino Real: $10m conversion project*
  - Led purchase negotiations for under-utilized building and developed plan preserving historic facade while upgrading interior, completing project in 1 year despite pandemic labor and supply shortages.
  - Developed business plan and exit strategy, recruited Pear VC and co-working space for 10-year lease, achieved operational profitability.

**CIJI NETWORK TECHNOLOGY**                                    **Beijing, China**
**Co-founder, COO**                                                    2015 - 2017

- Co-founded data health-tech startup.
- Oversaw marketing, customer service, call center, procurement, and digital strategy departments managing 45+ people.
- Developed key product lines by conducting research and sourcing high-tech DNA and diagnostic providers, designing specialized test-kits, and negotiating with manufacturers for exclusive terms, achieving $2m revenue in the first year.
- Established customer and inventory operations and feedback systems from scratch, including creating multimedia customer service systems and developing training systems for back office and service teams.
- Led transactions for projects, coordinated $7m Series A investment, led due diligence and SPA drafting, and facilitated negotiations to complete the deal.
- Identified high-profile target companies, developed incentive packages, led discussions, and hired core management team, boosted company valuation by 45%. Supported post-purchase integration strategy, enabled startup to be acquired for $18m+.

**MORGAN STANLEY**                                             **Beijing, China**
**Analyst, Private Equity Department**                                 2014 – 2015

- Conducted financial and business due diligence on solar energy, retail franchise, agriculture, and healthcare projects.
- Engaged with government officials; conducted research to evaluate new investment sectors; uncovered digital health business model constraints and policy/regulatory issues limiting investment potential; identified specialized hospital providers as investment opportunities; created foundation for hospital group investment thesis.

**NATIONAL HEALTH AND FAMILY PLANNING COMMISSION**            **Beijing, China**
**Assistant to Deputy Director of Medical Reform Office of the State Council**   2013 – 2014

- Coordinated, analyzed, and integrated feedback from 18 ministries and 35 provincial governments on policy paper drafts.
- Facilitated consensus by organizing discussions on policy disagreements, drafting formal responses to suggestions.
- Conducted in-depth research to draft formal responses to disputes and facilitated consensus by organizing discussions.

**EDUCATION**

**Cheung Kong Graduate School of Business (CKGSB),**           **Beijing, China**
Executive MBA                                                          2019-2022

- Two-year part-time program preparing top business leaders in China
- The program's 9,600+ alumni are at the Vice-President level or above at China's largest private companies.
- Major courses including Corporate Finance, Corporate Structure, M&A, Organizational Behavior etc.

**Appendix Page 186**

**University of California Berkeley – University of California San Francisco** (joint program)  CA, USA
*Masters in Translational Medicine, School of Engineering and School of Therapeutic Science.*  2018-2019

Courses in: Synthetic Biology; Health Care Finance & Economics; Clinical Need-based Therapy Solutions.

**Stanford University**                                                                                           **CA, USA**
*Masters in Community Health and Prevention Research (CHPR), School of Medicine*        2017 – 2018

Courses in: Community Research; Prevention Research; Science of Healthy Living, Engineering Health Systems.

**George Washington University**                                                        **Washington D.C., USA**
*Bachelor of Arts in International Affairs, Double Minor in History and Dance*
Honors: Graduated Cum Laude, Dean's List of Elliot School of International Affairs              (2012)

- Founder of China Cultural Association, organized cross-cultural events and integration resources.
- VP, Co-founder of China Student and Scholar Association (CSSA), an independent forum for scholarly exchange.
  - launched a program pairing 100+ students with State Department diplomats for language practice.
- Internship USA-China Chamber of Commerce (2012-2013), conducted comparative research on Japan vs. USA aging industries and indicators to identify applicable models, practices, and learning opportunities for China.

## RESEARCH

**Stanford School of Medicine**                                                    **WELL Center**, 2017 – 2019

- *Community-based study of Cardiometabolic Factors and Diabetes in China*

  Partnered with Zhejiang University School of Medicine to access high-quality data resources and performed data collection to identify cardiometabolic factors and analyze the inter-relationships of conditions related to obesity within population sample.

**University of California Berkeley-UCSF**                                     **TheraNova Incubator**, 2018

- *Patient, market, and regulatory research for launch of innovative medical device.*

  Partnered with TheraNova incubator in San Francisco. Conducted research and expert interviews on regulations, intellectual property, and market to support go-to-market timeline, strategy, proof-of-concept, animal testing, first-in-human testing, FDA Presubmission, and CE marking for TheraNova's intraperitoneal, semi-implantable continuous glucose monitoring and insulin delivery device. Designed, conducted, and analyzed 200+ patient interviews to gather quantitative and qualitative information on disease and treatment experiences and perceptions.

- *Synthetic Biology approaches to removing quinoline in wastewater*

  Research done under UC Berkely Lawrence Lab, focusing on preliminary feasibility and lab testing on novel wastewater treatment approaches. Successfully altered virus and demonstrated use of magnetic nano adsorbents and bioaugmentation to remove organic contaminants from wastewater.

**China Ministry of Health, National Development and Reform Commission**          2012 - 2013

- *County-level State-owned Hospital Comprehensive Reform Piloting City's Opinion*

  Researched 50+ communities, engaging with hospitals, policy-makers, and community members to conduct quantitative and qualitative research to identify reform outcomes, service capabilities, and public sentiment, which demonstrated positive indicators for establishing a three-tiered medical system, role of county hospitals in training and guidance of township health centers, and a need for increased infrastructure, equipment, and workforce investment.

- *City-level State-owned Hospital Comprehensive Reform Piloting City's Opinion*

  Conducted qualitative and quantitative research on 100+ hospitals, identifying service levels, access issues, and factors driving citizen perception of different hospital types to design policy recommendations for strengthening community-level clinics to balance distribution of health service supply and demand, and reduce travel burden on patients.

- *Analysis of Bid Price Differences of Anti-tumor Drugs in Medical Institutions*

  Collected pricing data on top 25 anti-tumor drugs from 500+ health institutions across 31 provinces to analyze pricing differences and access disparities to develop recommendations for pricing and access policies.

## ADDITIONAL

**Certifications:** HIPAA (Stanford, 2017); CITI Research, Ethics, Compliance, and Safety Training (Stanford, 2017)

**Languages:** Chinese (Native), English (Fluent), Japanese (Basic), Korean (Basic)

**Pro Bono Consulting:** *Serve for China*, helped develop mission, strategy, and operational plan to enhance rural government policy and administration skills through education and exchange; *Beijing Oasis International Hospital*, advised on developing pediatric department and development disorder specialties.

**Curator, World Economic Forum Global Shapers Beijing Hub**, 2017-2018, mobilized group and recruited 20+ partners to raise awareness and fundraise for organizations providing services, support, and education for developmental disorders.

**Appendix Page 188**

# J. KENDALL SMALLS

234 W 148th Street Apt 5D, New York, NY 10039

PHONE: 646-739-4956 • E-MAIL: JKendallsmalls@outlook.com, Jkendallsmalls@gmail.com

## SUMMARY OF QUALIFICATIONS

➢ Chief Operating Officer of In-Vitro Fertilization Program

➢ Consultant; Building, renovation

➢ Goal-driven, compassionate, and accountable professional with over 30 years of hands-on experience in infertility including detailed research in IVF, ICSI, Blastocysts Vitrification & PCR and extensive training in IVF embryology procedures.

➢ Leadership role in training lab team on embryology techniques and lab procedure/policy development.

➢ Ability to use strong communication, organizational and problem solving skills and to liaise with various departments, institutions, and the public to raise awareness and bring support to facilities.

**Areas of expertise Include**:

- Strategic and Operational Planning    Relationship and Team Building
- Quality and Performance Improvements    Presentations, Negotiations
- Budgeting and Financing Reporting    Decision Making and Problem Solving

## EDUCATION

**University of Leeds, Leeds, United Kingdom**
Masters of Science, Clinical Embryology, **2005**

**Columbia University, New York, NY**
Post-Baccalaureate Program in Biology, **1992**

**Morgan State University, Baltimore, MD**
BS in Biology/Minor in Computer Science, **1990**

## PROFESSIONAL EXPERIENCE

**CCRM – NEW YORK**                                              **January 2022- Present**
**IVF Supervisor/Sr. Embryologist & Consultant**

**Global Fertility & Genetics**
- **Director of Operations**                                        **December 2020-Present**
- **Operations & Marketing Director**
- Embryology Manager
- Supervise Embryology and Andrology Laboratories    **December 2016 - 2020**

- Embryology and Andrology Manager

**Northwell Health, North Shore LIJ Health System**
SR. EMBRYOLOGIST                                              **October 2013 – December 2016**
- All aspects and procedures of clinical embryology

**Biogenetics**
FERTILITY CONSULTANT                                          **January 2012- Present**

*(Professional Experience Continued…)*

- Initiate and develop Health administrative seminars and Conferences based on Infertility
- Developed curriculum for CME credits based course which involved gaining academic leadership approval
- Support from health administration department and developing learning objectives and assignments

**New York Fertility Services**

CHIEF EMBRYOLOGIST                                                                   **June 2010- December 2011**
- Wrote and implemented policy and procedures for Clinical and Administrative staff.
- Patient consultations for fertility couples seeking fertility information on the various surgeries involving In-vitro fertilization procedures, specializing in male fertility issues.
- Developed laboratory protocols for JCHOA and FDA inspections as well as trained laboratory personnel on techniques and procedures.
- Effectively managed Clinical budget of 3.5 million dollar IVF laboratory facility
- Micro technique including PGD and CGH Biopsy.

**Institute for Reproductive Medicine and Science at Saint Barnabas**

EMBRYOLOGIST                                                                         **January 1999 – June 2010**
- Managed departmental budget, effectively managed 150,000 departmental budget and recommended several cost cutting saving solutions, which resulted in the initial savings of 13,000 annually
- Micro techniques including ICSI, Biopsy and assisted hatching under supervision
- Cryopreservation of embryos and blastocysts
- IVF insemination
- Confirmation of fertilization and embryo culture
- Sperm preparation for IVF and ICSI
- Train lab team on laboratory techniques and protocol
- Development of laboratory protocols and policies

**Center for Human Reproduction (CHR)**

EMBRYOLOGIST                                                                         **November 1997 – Dec. 1998**
- Identification, assessment and culture of oocytes
- Sperm preparation and insemination of oocytes
- Micro techniques including ICSI and assisted hatching under supervision
- Confirmation of fertilization and embryo culture
- Embryo transfer, cryopreservation and thawing

**Cornell University Medical College**

SUPERVISOR/SENIOR RESEARCH TECHNICIAN II                                             **August 1990 – Dec. 1996**
- Chlamydia evaluation and research with PCR Amplicor and ELISA assays; perform semen analysis according to strict Kruger criteria
- Supervised and trained medium-sized lab in sperm antibody testing
- Development of laboratory protocols and policies

---

### PRESENTATIONS

➢ Ethnic Diversity Fertility Conference, Sheraton Hotel-Brooklyn, NY (November 2011) Created and Designed Annual Conference, Designed marketing brochures which improved brand awareness and increased conference attendance by 40%
➢ American Society for Reproductive Medicine-67th National Conference-Orlando, Florida-Roundtable discussion speaker (2011) Leaders and facilitator of Round-Table Discussion on Male Infertility

---

### PROFESSIONAL AFFILIATIONS

➢ New York Embryologist Society        ➢ RESOLVE
➢ American Red Cross                   ➢ National Black Coalition Leadership on AIDS
                    ➢ Omega Psi Phi Fraternity, Inc.

*(Professional Experience Continued…)*

## COMMUNITY INVOLVEMENT

Health Officer of the Second District of Omega Psi Phi Fraternity, encompassing NY, NJ, Penn, DE & MD, responsible for implementing policy and procedures promoting health awareness.

Second District Social Action Chair, Responsible for implementing the Domestic Violence Initiative forming partnerships with such companies as Verizon developing programs throughout the district and forming a major partnership with the American Red Cross.

- Initiated Conference registration process for state to state members, and researched, reviewed and hired speakers and organizations resulting in a yearly attendance increase of 25%.

- Created an outreach database resulting in greater membership and conference registrations.

Active in community and charitable organizations; maintain extensive network of contacts in community and healthcare industry.  Developed solid relationships with providers and participate in multiple committees and use visibility as key to growing business within heightened regulatory environment.

**\*\*References Available Upon Request\*\***

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | GLOBAL FERTILITY & GENETICS NEW YORK LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 23-10905 PB |

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

ANNIE LIU
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Spence Law Office, PC
Name

55 Lumber Road, Ste 5
Number        Street

Roslyn            NY        11576
City            State        ZIP Code

Contact phone 516-336-2060

Contact email rspence@spencelawpc.com

Where should payments to the creditor be sent? (if different)

Name _____

Number        Street _____

City            State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____     Filed on ____ / ____ / _____
                                                                                            MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410                    Proof of Claim

**Appendix Page 192**
page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**  $ _____ 2,530,956.37 . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Compensation owed; Indemnification; Contractual Claims

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $ _____

**Amount of the claim that is secured:**  $ _____

**Amount of the claim that is unsecured:**  $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ _____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Appendix Page 193**

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☑ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 15,150.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  06/27/2024
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Annie Liu | | |
|---|---|---|---|
|  | First name | Middle name | Last name |

| Title | _____ |
|---|---|

| Company | _____ |
|---|---|
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | c/o Spence Law Office, PC 55 Lumber Road |
|---|---|
|  | Number    Street |
|  | Ste 5, Roslyn NY 11576 |
|  | City                                State        ZIP Code |

| Contact phone | 5163362060 | Email | rspence@spencelawpc.com |
|---|---|---|---|

**Appendix Page 194**

# RIDER TO PROOF OF CLAIM

## OF ANNIE LIU

Annie Liu's pre-petition Claim[1] and rights are derived from various loans, funds advanced by Ms. Liu for the Debtor, lawsuit(s), and unpaid compensation. Ms. Liu also has common law and/or contractual indemnification claims with respect to all loans and leases that she personally guaranteed. Ms. Liu is also entitled to indemnification in the event that she is named in any litigation involving her role with, or on behalf of, the Debtor. Copies of the various loans, leases and agreements are in the Debtor's possession.[2]

A breakdown of Ms. Liu's Claim is as follows:

| TYPE OF CLAIM | DESCRIPTION OF CLAIM | CLAIM AMOUNT |
|---|---|---|
| **INDEMNIFICATION** | | |
| Guarantee of Lease | Eldad Prime (Landlord) (Real property lease for premises located at 115 East 57th St., Suites 420 and 430, New York, NY) | $541,988.00[3] |
| Guarantee of Debt | Chase Credit Card 6975 | $51,000 |
| Guarantee of Debt | Chase Installment Loan 3003 | $67,000 |

---

[1] Ms. Liu also has an administrative claim of $274,856.22 consisting of unpaid compensation of $104,862.22 from the Filing Date though her termination by the Chapter 11 Trustee on or about June 6, 2024 and post-petition advances to the Debtor's business operations of $170,000. No bar date for administrative claims has been set by the Court but this information is intended to provide notice to the Debtor and all creditors and parties in interest of the administrative claim.

| DESCRIPTION | CLAIM AMOUNT |
|---|---|
| Unpaid Compensation 6/6/2023-6/6/24 | $104,862.22 |
| Advances to Debtor | $170,000 |
| Post-Petition Indemnification Claims | unknown |
| Potential Claims relating to termination of Claimant's employment by Debtor and recovery of Claimant's Property | unknown |
| **Total Administrative Claims** | **$274,856.22** |

[2] These details are being provided for informational purposes only and is not an acknowledgement by Claimant that she is, our should be, responsible for any liabilities of the Debtor. All of Claimant's rights and defenses are expressly reserved.

[3] The amounts set forth for the Indemnification Claims are to the best of the Claimant's knowledge as to the amounts owed or claimed by the creditors. The Claimant is claiming indemnification for the amount ultimately liquidated inclusive of attorneys fees and other costs in defending against the claims.

| | | |
|---|---|---|
| Guarantee of Lease | Equipment Lease (No. xxxx1001) for Voluson P8 | $15,508.01 |
| Lawsuit | Alexis Cancel v. GFG and Liu | $1,000,000.00 |
| Complaint | Michelle Ramos v. Global Fertility & Genetics LLC, Annie Liu, Case Number 10232551 | Unknown |
| | Other potential obligations for which Claimant may have personal liability for a company liability or for which she may be joined in an action as a party | unknown |
| Management | potential allegations or claims against Annie Liu in her capacity and in rendering her duties as officer of Debtor | Unknown |
| | | |
| | **TOTAL INDEMNIFICATION CLAIM** | **$1,675,496.01** |
| | | |
| **PRE-PETITION UNPAID COMPENSATION CLAIM** | | |
| | Unpaid Compensation 2017 | $23,564.36 |
| | Unpaid Compensation 2018[4] | $200,000.00 |
| | Unpaid Compensation 2019 | $200,000.00 |
| | Unpaid Compensation 2020 | $200,000.00 |
| | Unpaid Compensation 2021 | $68,996.00 |
| | Unpaid Compensation 2022 | $107,066.67 |
| | Unpaid Compensation 1/1/2023 to 5/31/2023 | $55,833.33 |
| | **TOTAL PRE-PETITION UNPAID COMPENSATION CLAIM** | **$855,460.36** |
| | | |
| | **TOTAL PRE-PETITION CLAIMS** | **$2,530,956.37** |

Claimant asserts the Indemnification Claims against the Debtor arising from Debtor's operating agreement attached hereto (as the same may have been modified from time to time, the "Operating Agreement") and other limited liability company documents, and/or under all applicable state, federal or common law, which rights, claims or protections for, among other things, advancement, indemnification, contribution, reimbursement, defense, are provided to the Debtor's members, officers, directors, managers and otherwise.

Claimant has or may have additional claims against the Debtor under the Operating Agreement, including without limitation setoff, contribution, and/or recoupment rights, sale, transfer, and/or cancellation of Membership interests in the Debtor and claims or derivative claims

---

[4] On or about July 9, 2021, the Debtor's governing body, at a duly called Board Meeting attended by all Board members, agreed/acknowledged that compensation of $600,000 was owed Claimant for the period 2018-2020. At a minimum, this agreement was memorialized in writing to the company's attorney on or about July 13, 2021 and in a letter to the Board dated July 7, 2021.

against other parties on behalf of the Debtor (to the extent the Debtor/estate decline to pursue such claims or because of demand futility). To the extent that Claimant is held liable by any individual, corporate, governmental or regulatory bodies as a result of any acts or omissions of the Debtor, the Debtor may be liable for indemnification to Claimant as discussed above. Nothing herein constitutes an admission or acknowledgment by Claimant in this regard.

The Debtor is already aware of the claims set forth herein for indemnification and/or has otherwise received notice of same from the Claimant. Notwithstanding the prior notice, this proof of claim shall serve as additional notice pursuant to 5.10(c) of the Operating Agreement of such Indemnification Losses (as defined in the Operating Agreement) and potential Indemnification Losses to which the Debtor's indemnification obligations apply.

**Reservation of Rights**

Claimant hereby reserves any and all rights she now has or may hereafter acquire:

(a)   to amend, supplement and/or modify this proof of claim in any respect;

(b)   to commence or continue any action and/or assert and/or prosecute any claims she has or may have against any other person or entity or third part(ies) relating to the debt claimed herein, and to assert this claim against any Debtor affiliates or members or any third-parties through any other legal or equitable remedy;

(c)   to pursue whatever claims she has or may have against the Debtor in any manner permitted by law;

(d)   to assert a right of setoff or recoupment with respect to any amounts claimed herein against any amounts claimed by the Debtor against Claimant; and

(e)   With respect to her treatment of any motions that have been or may be filed in this case.

The execution and filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver or release of Claimant's right against any person, entity, or property, which may be liable for all or any part of the claims asserted herein, including but not limited to other members of the Debtor or GFG Holding Group Co., LLC, or related or affiliated parties or third-parties, co-

**Appendix Page 197**

guarantors or co-debtors; (b) a consent by Claimant to the jurisdiction or venue of the Bankruptcy Court with respect to proceedings, if any, commenced in the Debtor's Chapter 11 case against or otherwise involving Claimant; (c) a waiver or release of Claimant's right to trial by jury in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a waiver or release of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court Judge; (e) a waiver of the right to move or to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in the Debtor's Chapter 11 case against or otherwise involving Claimant; (f) an election of remedies; or (g) a waiver or limitation of any procedural or substantive rights or defenses to any claim that may be asserted against Claimant by the Debtor, any official committee of unsecured creditors, trustee or examiner appointed in this case or any subsequent case, or any other party.

OPERATING AGREEMENT

OF

GLOBAL FERTILITY & GENETICS, NEW YORK, LLC

A DELAWARE LIMITED LIABILITY COMPANY

Table of Contents

                                                                                      Page

ARTICLE I  DEFINITIONS ....................................................................................1
     Section 1.1  Certain Defined Terms.................................................................1
ARTICLE II  FORMATION AND CONTINUATION, NAME AND TERM...........................1
     Section 2.1  Formation and Continuation .......................................................1
     Section 2.2  Name, Office and Registered Agent ............................................1
     Section 2.3  Qualification ...............................................................................2
     Section 2.4  Governing Law ...........................................................................2
     Section 2.5  Term ............................................................................................2
ARTICLE III  PURPOSES AND POWERS OF THE COMPANY .................................2
     Section 3.1  Purpose and Powers of the Company ..........................................2
ARTICLE IV  MEMBERS AND UNITS ...................................................................2
     Section 4.1  Members and Units .....................................................................2
     Section 4.2  Voting, Management, Allocation and Distribution Rights .............3
     Section 4.3  Confidentiality ............................................................................3
     Section 4.4  No Right to Withdraw ..................................................................4
     Section 4.5  Restriction of Member Access to Company Information ...............4
ARTICLE V  BOARD OF DIRECTORS ...................................................................5
     Section 5.1  General Powers and Delegation...................................................5
     Section 5.2  Composition of the Board............................................................5
     Section 5.3  Quorum .......................................................................................5
     Section 5.4  Places of Meetings ......................................................................5
     Section 5.5  Annual Meetings .........................................................................5
     Section 5.6  Special Meetings .........................................................................5
     Section 5.7  Notice of Meetings ......................................................................5
     Section 5.8  Voting ..........................................................................................6
     Section 5.9  Action Without a Meeting ...........................................................6
     Section 5.10  Indemnification; D&O Insurance ...............................................6
     Section 5.11  No Duty to Consult ..................................................................10
     Section 5.12  Transactions with Managers and Affiliates ..............................10
     Section 5.13  Officers ...................................................................................10
ARTICLE VI  CAPITAL CONTRIBUTIONS AND RESTRICTIVE COVENANT ...........10
     Section 6.1  Capital Contributions ...............................................................10
     Section 6.2  No Interest Upon Contributions.................................................10
     Section 6.3  Return of Capital Contributions ................................................10
     Section 6.4  No Liability ...............................................................................11
     Section 6.5  Additional Contributions; Member Loans ..................................11
     Section 6.6  Restrictive Covenants ...............................................................11
ARTICLE VII  ALLOCATIONS OF PROFITS AND LOSSES; DISTRIBUTIONS.................13
     Section 7.1  Capital Accounts.......................................................................13
     Section 7.2  Compliance with the Regulations ..............................................13
     Section 7.3  Distributions .............................................................................14
     Section 7.4  Definition of Profits and Losses ................................................14
     Section 7.5  Allocation of Profits and Losses ................................................14

i

**Appendix Page 200**

Table of Contents
(continued)

Page

Section 7.6  Intent and Savings Clause...................................................................16
Section 7.7  Tax Allocations; Section 754 Election ................................................17
Section 7.8  Tax Withholding ..................................................................................18
ARTICLE VIII  TRANSFERABILITY OF A MEMBER'S INTEREST................................18
Section 8.1  No Right to Resign or Withdraw ........................................................18
Section 8.2  Restriction on Transfer; Notice of Transfer .......................................18
Section 8.3  Transfers to Permitted Transferees ....................................................19
Section 8.4  Involuntary Transfers..........................................................................19
Section 8.5  Rights of Refusal.................................................................................20
Section 8.6  Requirements for All Transfers...........................................................21
Section 8.7  Required Sale ......................................................................................22
Section 8.8  Additional Members ...........................................................................23
ARTICLE IX  DISSOLUTION AND WINDING UP .........................................................24
Section 9.1  Dissolution ..........................................................................................24
Section 9.2  Death, Legal Incapacity, etc...............................................................24
Section 9.3  Distribution of Assets on Dissolution ................................................24
ARTICLE X  BOOKS AND RECORDS ...........................................................................25
Section 10.1  Fiscal Year ........................................................................................25
Section 10.2  Updates and Tax Information ............................................................25
Section 10.3  Bank Accounts: Checks, Notes and Drafts .......................................26
Section 10.4  Books and Records ............................................................................26
Section 10.5  Tax Matters Member.........................................................................26
ARTICLE XI  GENERAL PROVISIONS ..........................................................................27
Section 11.1  Notices ..............................................................................................27
Section 11.2  Choice of Law ...................................................................................27
Section 11.3  Entire Agreement; Waivers...............................................................27
Section 11.4  Counterparts......................................................................................27
Section 11.5  Invalidity ...........................................................................................27
Section 11.6  Headings ............................................................................................27
Section 11.7  Submission to Jurisdiction ................................................................28
Section 11.8  Interpretation .....................................................................................28
Section 11.9  No Third Party Beneficiary...............................................................28
Section 11.10  Continuity of Other Restrictions; Other Agreements .....................28
Section 11.11  Further Assurances; No Inconsistent Agreements...........................28
Section 11.12  Amendments ....................................................................................28
Section 11.13  Expenses ..........................................................................................29

OPERATING AGREEMENT

OF

GLOBAL FERTILITY & GENETICS, NEW YORK, LLC

A DELAWARE LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT of Global Fertility & Genetics, New York, LLC, a Delaware limited liability company (this "Agreement"), dated as of October 6, 2016 (the "Effective Date"), is by and among GLOBAL FERTILITY & GENETICS, NEW YORK, LLC (the "Company"), GFG HOLDING GROUP CO., LLC, a Delaware limited liability company ("GFG Holding"), and those other Persons named on Schedule A (as amended from time to time hereafter) who have been admitted as Members to the Company and have executed a counterpart signature page hereto.

WHEREAS, the Company was formed on July 5, 2016 (the "Formation Date") pursuant to the Act by the filing of a Certificate of Formation with the Delaware Secretary of State; and

WHEREAS, the Members desire and intend that this Agreement (a) set forth the respective rights and obligations of the Company and the Members, and (b) establish the number of and rights pertaining to each Member's Units as provided for in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises of the parties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Company agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1    Certain Defined Terms.   Capitalized terms used herein and not otherwise defined have the meanings assigned to them in Schedule 1.1 attached hereto.

ARTICLE II
FORMATION AND CONTINUATION, NAME AND TERM

Section 2.1    Formation and Continuation.   The Members hereby acknowledge the formation and continuation of the Company as a limited liability company pursuant to the Act by virtue of the Certificate of Formation filed with the Delaware Secretary of State and their intent to continue the Company upon the terms and conditions contained in this Agreement. The Members further acknowledge that this Agreement supersedes and replaces any prior understanding or agreement, whether oral or written, related to the rights and obligations of the Company and the Members.

Section 2.2    Name, Office and Registered Agent.   The name of the Company shall be Global Fertility & Genetics, New York, LLC. The principal office and place of business of the Company shall be 115 East 57th Street, Suite 420, New York, New York 10022. The Board may at any time change the location of the Company's principal place of business and establish

additional offices.  The Company's registered agent and office in the State of Delaware shall be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, County of New Castle, Delaware 19808.  The Board may at any time designate another registered agent and/or registered office and amend this Agreement and the Certificate of Formation as necessary to reflect such designation without the consent of any other Person.

Section 2.3    Qualification.  Under the direction of the Board, the Company shall from time to time take all such actions as may be deemed by the Board to be necessary or appropriate to permit the continuation of the Company as a limited liability company under the Act and to qualify the Company to act in any other state where the Board deems it necessary or desirable.  The Members shall execute such certificates, documents and instruments and take such other actions as may be necessary to enable the Company to fulfill its responsibility under this Section 2.3.

Section 2.4    Governing Law.  This Agreement and all questions with respect to the rights and obligations of the Members, the construction, enforcement, and interpretation hereof, and the formation, administration, and termination of the Company shall be governed by the provisions of the Act and other applicable laws of the State of Delaware without regard to conflict of laws rules that would have the effect of causing the application of the laws of any jurisdiction other than the State of Delaware.

Section 2.5    Term.  The term of the Company commenced on the Formation Date and shall continue in full force and effect until dissolved in accordance with the provisions of this Agreement or by operation of law.  The existence of the Company as a separate legal entity will continue until cancellation of the Certificate of Formation in the manner required by the Act.

ARTICLE III
PURPOSES AND POWERS OF THE COMPANY

Section 3.1    Purpose and Powers of the Company.  The Company may engage in any lawful business, purpose or activity for which a limited liability company may be organized under the Act.  The Company shall have all powers and rights of a limited liability company organized under the Act, to the extent such powers and rights are not proscribed by the Certificate of Formation.

ARTICLE IV
MEMBERS AND UNITS

Section 4.1    Members and Units.  The membership interests of the Company shall be represented by Units having the rights, powers and duties (including rights to participate in allocations of income, gain, loss, deduction and credit, Distributions, and voting) set forth in this Agreement.  The Units and all certificates representing the Units are and shall for all purposes be deemed to be "securities" within the meaning of and governed by Article 8 of the Uniform Commercial Code as in effect from time to time in the State of Delaware and any other relevant jurisdiction.  The Members of the Company are listed on the attached Schedule A, and the notice address, and the number of Units held by each such Member is set forth on Schedule A, as amended from time to time.

2

Section 4.2    Voting, Management, Allocation and Distribution Rights.

(a)    General.  Two or more Members may provide for the manner in which and term (including indefinitely) during which they will vote their Units by signing an agreement for that purpose which agreement shall be specifically enforceable. Notwithstanding the foregoing or any provision to the contrary contained in this Agreement, but subject to any requirement of the Act, no Member shall have any right to vote, approve or consent to any matter or transaction involving the Company, and there shall be no requirement that any meetings of the Members be called or held for any purpose.

(b)    Management Authority of the Board.  Except as otherwise provided herein or required by the Act, and pursuant to ARTICLE V of this Agreement, the management of the Company shall be vested exclusively in the Board of Directors acting as such and through the Company's Officers.  No Member, other than any Member who acts as a Director or Officer of the Company, shall be an agent of the Company for any purpose or have any right to participate in the management, business, activities or day-to-day affairs of the business, or to transact any business for the Company in its/his/her capacity as a Member, nor shall it have any power to sign for, execute any instrument on behalf of, or otherwise bind the Company in any way.

(c)    Rights to Allocations and Distributions.    The Units shall have the respective rights to allocations of Profits and Losses and Distributions as are specified in ARTICLE VII.

Section 4.3    Confidentiality.

(a)    Covenant to Keep Non-Public Information Confidential.  Each Member agrees that such Member shall keep confidential, and shall not disclose to any third Person or use for its/his/her own benefit, without the consent of the Board, any non-public information with respect to the Company that is disclosed to such Member by or on behalf of the Company, *provided* that a Member may disclose any such information (i) as has become generally available to the public, (ii) to its/his/her professional advisers who need to know such information and agree to keep it confidential, (iii) to the extent required in order to comply with contractual reporting obligations, (iv) to the extent necessary in order to comply with any law, order, regulation or ruling applicable to such Member and (v) as may be required in response to any summons or subpoena or in connection with any litigation, it being agreed that, unless such information has become generally available to the public, if such information is being requested pursuant to a summons or subpoena or a discovery request in connection with a litigation, (x) the Member shall give the Company notice of such request and shall cooperate with the Company at the Company's request so that the Company may, in its discretion, seek a protective order or other appropriate remedy, if available, and (y) in the event that such protective order is not obtained (or sought by the Company after notice), the Member (A) shall furnish only that portion of the information which, in accordance with the advice of counsel, is legally required to be furnished and (B) will exercise its/his/her reasonable best efforts to obtain assurances that confidential treatment will be accorded such

3

information. The foregoing provisions shall apply to each member of the Board, but shall not in any manner limit any other agreement in place between the Company and such Board member.

(b)     Modification.  If a court of competent jurisdiction holds that any of the foregoing restrictive covenants is unreasonable, then to the extent permitted by law, the court may render the covenants of Section 4.3 in compliance with the law, and the parties hereto agree to accept and be bound by such determination or determinations subject to their rights of appeal.

(c)     Reasonableness.   Each Member acknowledges that the covenants contained in Section 4.3 are reasonable and necessary for the protection of the legitimate business interests of the Company and its Members.

(d)     Remedies.

(i)     Each of the parties hereto acknowledges and agrees that any violation of Section 4.3(a) would cause substantial, irreparable damage and that it is impossible to measure in money the damages that would be caused by such violation.  Accordingly, each of the parties hereto acknowledges and agrees that if it/he/she violates Section 4.3(a), then the Company will be entitled to obtain injunctive relief to enforce said covenant and to prohibit the breaching party from continuing any violation of the same, and the Company will be entitled to bring actions to obtain such relief without posting any cash, bond or other surety.  The Company also will be entitled to payment by a breaching party of any and all reasonable attorneys' fees and other legal expenses, including court costs, arising from any action successfully pursued by it/him/her to enforce Section 4.3(a).

(ii)     Nothing contained in this Section 4.3(d) shall be construed as prohibiting the Company from pursuing any other remedy or remedies available for such breach or threatened breach, including recovery of damages.

(e)     Survival.  The rights and obligations contained in Section 4.3(b), Section 4.3(c) and Section 4.3(d) shall survive the termination of this Agreement.

Section 4.4     No Right to Withdraw.  Except as provided in ARTICLE VIII of this Agreement, no Member shall have any right to resign voluntarily or otherwise withdraw from the Company without the written consent of the Board.

Section 4.5     Restriction of Member Access to Company Information.  The Board shall have the right to restrict the access of any Member or Members or to keep confidential from any Member or Members, for such period of time as the Board deems reasonable, any information which the Board reasonably believes to be in the nature of a trade secret or other information the disclosure of which the Board in good faith believes is not in the best interest of the Company, could damage the Company or its business, could compromise the confidentiality of personal information pertaining to any Member or information relating to the Member's relationship with the Company which the Board determines should not be disclosed generally to the Company's

4

employees and Members, or which the Company is required by law or agreement with a third party to keep confidential.

ARTICLE V
BOARD OF DIRECTORS

Section 5.1    <u>General Powers and Delegation</u>.  The property, affairs and business of the Company shall be under the direction of and managed exclusively by a Board of Directors (together with any board of directors elected by any corporate successor to the Company, the "<u>Board</u>").  Except as otherwise expressly provided by law, the Certificate of Formation, or this Agreement (including the articles of incorporation, bylaws or shareholders agreement of any corporate successor to the Company), all of the powers of the Company shall be vested exclusively in the Board.

Section 5.2    <u>Composition of the Board</u>.  The Board shall be comprised of one Director appointed by each Member whose Unit Percentage is at least ten percent (10%).  A Member shall have the right to replace its/his/her designee as Director from time to time.  Any Member entitled to appoint a Director may (but shall not be required to) appoint himself/herself as a Director.

Section 5.3    <u>Quorum</u>.  Directors representing Members holding at least fifty-one percent (51%) of the aggregate Unit Percentages shall constitute a quorum for the purpose of conducting a meeting of the Board and transacting business.

Section 5.4    <u>Places of Meetings</u>.  All meetings of the Board shall be held at the principal office of the Company, or at such other place, either within or outside the State of Delaware, as from time to time may be fixed by the Board.  A Director may attend in person or by conference call or other means by which each participant can hear and be heard.  For purposes of this Agreement, such telephonic or other means of attendance shall be deemed in person.

Section 5.5    <u>Annual Meetings</u>.  The annual meeting of the Board, for the transaction of such business as may come before the meeting, may be held in each year on such date that is not a legal holiday as shall be determined from time to time by the Board.  There shall be no requirement that the Board schedule or hold an annual meeting.  If any day on which an annual meeting is scheduled is a legal holiday, the annual meeting shall be held on the next succeeding day not a legal holiday.  The failure to hold any one or more annual meetings shall not invalidate any Company or Board action, constitute a breach of this Agreement nor give rise to any claim by any Member, Director or any other Person, including without limitation any claim that the Company or the Board has in any way waived, altered or affected its existence, powers and authority as a limited liability company under the Act and this Agreement.

Section 5.6    <u>Special Meetings</u>.  A special meeting of the Board for any purpose or purposes may be called at any time by a Member or Members whose aggregate Unit Percentage is at least twenty-five percent (25%).  At a special meeting, no business shall be transacted and no action shall be taken other than that stated in the notice of the meeting.

Section 5.7    <u>Notice of Meetings</u>.  Notice of meetings of the Board shall be given to each Director not less than twenty-four hours before the meeting by mail, messenger, overnight

5

courier, facsimile, electronic communication or other means of written communication or by telephoning such notice to it/him/her. Any such notice shall set forth the time and place of the meeting and state the purpose for which it is called. A Director may waive any notice required by law, the Certificate of Formation or this Agreement before or after the date and time stated in the notice, and such waiver shall be equivalent to the giving of such notice. Except as provided in this Section 5.7, the waiver shall be in writing, signed by the Director entitled to the notice and filed with the minutes or company records. A Director's attendance at or participation in a meeting waives any required notice to him/her of the meeting unless the Director at the beginning of the meeting or promptly after his/her arrival objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

Section 5.8 <u>Voting</u>. At any meeting of the Board, each of the Directors in attendance shall be allocated an aggregate weighted vote equal to the Unit Percentage of the Member he/she is representing. All Board decisions shall be made by a majority percentage based upon the weighted Board votes of the present Directors.

Section 5.9 <u>Action Without a Meeting</u>. Any action required to be taken at a meeting of the Board, or any action which may be taken at a meeting of the Board, may be taken without a meeting and without any notice of such action or consent, if a consent in writing, setting forth the action so taken, shall be signed, in person or by proxy, before or after such action by the requisite Directors required to act with respect to the subject matter thereof, provided that any Director who shall not have signed such consent shall be provided with a copy of such consent as soon as practicable after the execution of the consent. Such consent shall have the same force and effect as a vote of the Directors and may be stated as such in any article or document filed with the State of Delaware or otherwise.

Section 5.10 <u>Indemnification; D&O Insurance</u>.

(a) <u>Performance of Duties; No Liability of Directors and Officers</u>. No Director or Officer of the Company shall be liable to the Company or to any Member for any act or failure to act on behalf of the Company which shall result in any loss or damage sustained by the Company or to any Member unless the loss or damage shall have been the result of gross negligence, fraud, willful misconduct or knowing violation of the criminal law by the Director or Officer in question. In performing any duties hereunder or under applicable law, each Director and Officer shall be entitled to rely in good faith on the provisions of the Company's Certificate of Formation and this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid) of the following Persons or groups: (i) one or more Officers or employees of the Company whom the Director believes in good faith to be reliable and competent in the matters presented; (ii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company as to matters the Director believes in good faith are within the Person's professional or expert competence; (iii) any committee of the Directors of which such Director is not a Member if the

6

Director believes in good faith that the committee merits confidence, or (iv) any other Person who has been selected with reasonable care by or on behalf of the Company, the Board or any committee in each case as to matters which such relying Director reasonably believes to be within such other Person's competence. No Director or Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Director or Officer of the Company or any combination of the foregoing.

(b)      Right to Indemnification.

(i)      Directors and Officers. Except as limited by law and subject to the provisions of this Section 5.10, the Company shall indemnify each Director and each Person serving as an officer of the Company (including Persons who serve at the Company's request as directors, managers, members, partners, officers, employees, agents or trustees of another organization in which the Company has any interest as a shareholder, member, creditor or otherwise) and their respective successors and assigns (each, together with their respective heirs and personal representatives, in their capacity as such, an "Indemnified Party" and, collectively the "Indemnified Parties") from and against any and all Indemnified Losses asserted against, imposed on or incurred by such Person at any time as a result of such Person's capacity as a Director or Officer or employee, including, without limitation, in connection with the actions or inactions of such Person hereunder; provided that no such indemnification shall be provided for any Indemnified Party regarding any Indemnified Losses incurred as a result of such Person's willful misconduct or knowing violation of the criminal law. Service as a Director or Officer of a legal entity controlled by the Company shall be deemed service at the request of the Company. The termination of a proceeding by judgment, order, settlement, conviction or on a plea of *nolo contendere* or its equivalent shall not of itself create a presumption that a Director or Officer acted in such a manner as to make such Director or Officer ineligible for indemnification hereunder. Except as limited by law, such indemnification may be provided by the Company with respect to losses in connection with which it is claimed that such Indemnified Party received an improper personal benefit by reason of his, her or its position, regardless whether the claim arises out of the Indemnified Party's service in such capacity, except for matters as to which it is finally determined that an improper personal benefit was received by such Indemnified Party. The Company is authorized to contract in advance to indemnify and make advances and reimbursements for expenses to any of its Directors or Officers to the same extent as provided in this Section 5.10(b)(i). The indemnification contained in this Article V shall survive termination of this Agreement.

(ii)     Others. The Company may, to a lesser extent or to the same extent that it is required to provide indemnification and make advances and reimbursements for expenses to its Director and Officers pursuant to Section 5.10(b)(i), provide indemnification and make advances and reimbursements for expenses to its employees and agents, the directors, managers, officers, employees

7

and agents of its subsidiaries and predecessor entities, and any Person serving any other legal entity in any capacity at the request of the Company, and may contract in advance to do so.  No Person's rights under Section 5.10(b)(i) shall be limited by the provisions of this Section 5.10(b)(ii).

(c)     Notice.  Promptly after receipt by an Indemnified Party of notice of any Indemnified Losses to which the indemnification obligations set forth in Section 5.10(b) would apply, the Indemnified Party shall give notice thereof in writing to the Company, but the omission to so notify the Company promptly shall not relieve the Company from any liability except to the extent that the Company shall have been prejudiced as a result of the failure or delay in giving such notice.  Such notice shall state in reasonable detail the information then available regarding the amount and nature of such Indemnified Losses.

(d)     Award of Indemnification.  Any discretionary determination required to be made hereunder by the Company in connection with its indemnification obligations, including the determination that indemnification under Section 5.10(b) is permissible and the evaluation as to the reasonableness of expenses in a specific case, shall be made in each instance by general or specific action of the Board, which action may be taken before or after a claim for indemnification, or as otherwise provided by law; provided that in the case of a claim for indemnification by a Director or an Officer, if a majority of the Directors has changed after the date of the alleged conduct giving rise to a claim for indemnification, such determination and evaluation shall, at the option of the Person claiming indemnification, be made by special counsel (which may be counsel to the Company) agreed on by the Board and such Person.  The Company shall be obliged to pay indemnification applied for by any Indemnified Party unless there is an adverse determination (as provided above) within forty-five (45) days after the application.  If indemnification is denied, the applicant may seek an independent determination of his/her right to indemnification by a court, and in such event, the Company shall have the burden of proving that the applicant was ineligible for indemnification under this Section 5.10.

(e)     Successful Defense.  Notwithstanding any contrary provisions of this Section 5.10, if any Indemnified Party has been wholly successful on the merits in the defense of any Proceeding in which he/her was involved by reason of his/her position with the Company or as a result of serving in such capacity (including termination of investigative or other Proceedings without a finding of fault on the part of such Indemnified Party), such Indemnified Party shall be indemnified by the Company against all Indemnified Losses incurred by such Indemnified Party in connection therewith.

(f)     Advance Payments.  Except as limited by law, Indemnified Losses incurred by an Indemnified Party in defending any Proceeding, including a Proceeding by or in the right of the Company, shall be paid by the Company to such Indemnified Party in advance of final disposition of the Proceeding on receipt of his/her written undertaking to repay such amount if such Indemnified Party is ultimately determined pursuant to this Section 5.10 or adjudicated to be ineligible for indemnification, which undertaking shall be an unlimited, unsecured general obligation but need not be secured and may be accepted without regard to the financial ability of such Indemnified Party to make

8

repayment; provided that no such advance payment of Indemnified Losses shall be made if it is determined by the Board pursuant to this Section 5.10 on the basis of the circumstances known at the time (without further investigation) that such Indemnified Party is ineligible for indemnification.

(g)     Employee Benefit Plan.   If the Company sponsors or undertakes any responsibility as a fiduciary with respect to an employee benefit plan, then, for purposes of this Section 5.10, (i) Indemnified Parties shall be deemed to include the Officer or employee of the Company who serves at its request in any capacity with respect to said plan, (ii) the Officer or employee shall not be deemed to have engaged in willful misconduct in respect to the Company if such Officer or employee acted in good faith and in the reasonable belief that his/her action was in the best interests of the participants or beneficiaries of said plan, and (iii) Indemnified Losses shall be deemed to include any taxes or penalties imposed on such Indemnified Party with respect to said plan under applicable law.

(h)     Non-Exclusivity.   The provisions of this Section 5.10 shall not be construed to limit the power of the Company to indemnify its Directors, Officers, employees or agents to the fullest extent permitted by law or to enter into specific agreements, commitments or arrangements for indemnification permitted by law.   The absence of any express provision for indemnification herein shall not limit any right of indemnification existing independently of this Section 5.10, including indemnification pursuant to a valid contract, indemnification by legal entities other than the Company and indemnification under policies of insurance purchased and maintained by the Company or other parties.  However, no Person shall be entitled to indemnification by the Company to the extent such Person is indemnified by another party, including an insurer.

(i)     Amendment.   The provisions of this Section 5.10 may be amended or repealed in accordance with Section 11.12; provided that no amendment or repeal of such provisions that adversely affects the rights of any Indemnified Party under this Section 5.10 with respect to his/her acts or omissions at any time prior to such amendment or repeal shall apply to any Indemnified Party without his/her prior written consent.

(j)     Savings Clause.   If this Section 5.10 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnified Party as to costs, charges and expenses (including reasonable attorneys' fees and expenses), judgments, fines and amounts paid in settlement with respect to any such Proceeding to the fullest extent permitted by any applicable portion of this Section 5.10 that shall not have been invalidated and to the fullest extent permitted by applicable law.

(k)     Insurance.  The Company may, upon the approval of the Board, obtain and maintain directors' liability insurance (or comparable coverage for managers of a limited liability company), so long as such insurance may be obtained and maintained by the Company on commercially reasonable terms as determined by the Board.  The Company shall have the power to purchase and maintain insurance on behalf of any Indemnified Party against any liability or cost incurred by such Person in any such capacity or arising

out of his/her status as such, whether or not the Company would have power to indemnify against such liability or cost.

Section 5.11    No Duty to Consult.    Except as otherwise provided herein or in the Act, the Board shall have no duty or obligation to consult with or seek the advice of the Members in connection with the conduct of the business of the Company.

Section 5.12    Transactions with Managers and Affiliates.    Subject to obtaining any consent expressly required hereunder, the Board may appoint, employ, contract, or otherwise deal with any Person, including a Director, Member or Affiliates of a Director or Member, individuals to whom a Director or Member is related, and with Persons that have a financial interest in a Member or in which a Director or Member has a financial interest, for transacting the Company's business, on such terms as shall be approved by the Board (in which decision a Director who is to provide services or whose Affiliates are to provide services may participate and vote notwithstanding his/her relationship to and interest in such services or decision, and no other Director or Member may challenge or attempt to invalidate such decision on the basis of a conflict of interest or otherwise), provided all relationships among the Director or Member and such Persons or Affiliates are disclosed to the Board in reasonable detail.

Section 5.13    Officers.    The Board shall appoint and elect, and shall have the power to terminate and remove with or without cause, such officers ("Officers") as it determines necessary or expedient in carrying out the Company's business and affairs.    Such officers shall have such duties, responsibilities and authority as shall be delegated to each of them by the Board.    Other officers may from time to time be elected by the Board and be given such titles, duties and responsibilities as are commensurate with their duties and responsibilities as determined by the Board.    The Board shall have authority to fix the compensation of, and to enter into employment agreements with and to grant Company equity or other bonus or incentive compensation to, any officer of the Company on such terms as the Board shall determine in each individual case in its sole and absolute discretion.    Each Officer shall be liable only to the extent of, and indemnified as provided in, Section 5.10.

ARTICLE VI
CAPITAL CONTRIBUTIONS AND RESTRICTIVE COVENANT

Section 6.1    Capital Contributions.    Each of the Members has made a Capital Contribution to the Company in an amount set forth on Schedule 6.1 hereto, which contributions shall be treated as Capital Contributions.    The Company shall be authorized to receive additional Capital Contributions from its Members pursuant to Section 6.5.    No Member shall be required to make any additional Capital Contribution to the Company other than those contemplated by this Section 6.1.

Section 6.2    No Interest Upon Contributions.    No Member shall be entitled to interest on its/his/her Capital Contribution.

Section 6.3    Return of Capital Contributions.    No Member shall be entitled to withdraw any part of its/his/her Capital Contribution or Capital Account or to receive any distribution from the Company except as provided specifically in this Agreement.

10

Section 6.4   No Liability.   Except as required under the Act, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

Section 6.5   Additional Contributions; Member Loans.   Except as provided in this Agreement, no Member shall be required under any circumstances to contribute any additional money or property to the Company.   Whenever the Board determines that additional capital is required and it elects not to sell any assets of the Company to provide such capital, any Member may make one or more loans to the Company in such amounts and on such terms as the Board shall determine to be in the best interests of the Company.   The Board may also approve additional Capital Contributions.  If the Board determines that additional capital is needed by the Company, the Members shall be required to make such additional Capital Contributions from time to time in such amounts as the Board deems are reasonably necessary (the foregoing, "Additional Capital"), such contributions to be made in accordance with the Members' respective Unit Percentages (such amount to be contributed by each Member, the Members' "Required Capital Contribution").  The Required Capital Contributions shall be due and payable on such date or dates as may be set forth in a written notice given by the Board (but in no event sooner than ninety (90) days after the giving of any such notice).  In the event any Member (such Member, the "Non-Contributing Member") does not make all of its/his/her Required Capital Contribution within ninety (90) days of the date such Additional Capital has been requested, then (i) each other Member (a "Contributing Member") shall have the option, for thirty (30) days thereafter, to elect to make an additional contribution in an amount equal to or, at the election of such Contributing Member, less than, the product of (x) the amount not contributed by the Non-Contributing Members and (y) a fraction having as a numerator the number of Units then held by such Contributing Member and, as a denominator, the total number of Units held by all Contributing Members, and (ii) to the extent that such Contributing Members do not make all of such additional contributions within such thirty (30) day period, any Member shall have the right for a period of thirty (30) days thereafter to loan to the Company on commercially reasonable terms the remaining balance of such amount.  The Company shall issue to each Contributing Member Units or such portion thereof as equals the Fair Market Value of such additional contribution made by each such Contributing Member, and thereafter, the Unit Percentages of the Members shall be adjusted to reflect the total Units held by each Member.  Dilution of the Unit Percentage of a Non-Contributing Member shall be the sole remedy of the Company or the other Members against the Non-Contributing Member and the Non-Contributing Member shall have no other liability for electing not to contribute.

Section 6.6   Restrictive Covenants.

(a)   Non-Competition and Non-Solicitation.

(i)   Subject to Section 6.6(a)(ii), each Member (except for GFG Holding) by his or her execution of this Agreement or joinder agreement, as the case may be, hereby covenants and agrees that for so long such he or she is a Member and for a period of two (2) years after such Member ceases being a Member, such Member shall not, without the prior approval of the Board of Directors, other than through the Company, directly or indirectly (including through an Affiliate):

11

**Appendix Page 212**

(A) own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, a management or administrative services company that provides support for fertilization and/or women's health services, or any Affiliate thereof, within fifteen (15) miles from any facility providing fertilization and/or women's health services for which the Company is providing support (an "Affiliated Facility");

(B) solicit the termination of, diversion or interference with any relationship that the Company or an Affiliated Facility has with any contractor, supplier or provider;

(C) solicit any Affiliated Facility's present or former patients or customers or use patient records of the Affiliated Facility, either clinical or financial, regardless of how these records were obtained or originated, for the purpose of contacting former patients, provided that no Member who is a physician shall be hereby prohibited from being in contact with patients that such Member brought to the Affiliated Facility; or

(D) solicit or induce any then-current representative, agent or employee of an Affiliated Facility to accept any employment or service relationship with a business other than such Affiliated Facility or another Affiliated Facility.

(ii)    Nothing herein shall be interpreted to (A) restrict a physician Member from providing professional services to patients at any facility, hospital or other healthcare provider, so long as he or she receives only direct professional billings for services to patients and no part of such compensation is for services otherwise rendered to the facility, hospital or other healthcare provider; (B) limit or unduly influence a patient's right to choose where he or she desires to receive medical or other professional healthcare services; (C) restrict a physician Member from continuing to perform those medical services that he or she is providing at a medical office as of the date on which he or she becomes a Member; (D) prevent a physician Member from holding an official position in a department at any hospital and receiving compensation therefrom; (E) restrict a physician Member from maintaining staff privileges at any facility or hospital; (F) prevent a physician Member from covering call at any hospital and receiving compensation therefrom for call only; or (G) prevent a Member from purchasing on the open market and continuing to own up to two percent (2%) of the issued shares of any company whose common stock is listed for trading on any national securities exchange or market system.

(b)    Legitimate Business Interests; Injunctive Relief.  Each party understands and acknowledges that: (i) the provisions of this Section 6.6 are designed to preserve the legitimate business interests and goodwill of the Company; (ii) any breach or threatened breach of the provisions of this Section 6.6 will result in irreparable harm and injury to

12

the Company; and (iii) monetary damages will not provide an adequate remedy. Accordingly, in the event of a breach or threatened breach of the provisions of this Section 6.6, the Board of Directors, on behalf of the Company, shall be entitled to: (A) in addition to any other legal or equitable remedies that may be available, such as the fair market value of the business lost or the damages incurred thereby, seek a temporary restraining order, preliminary injunction and permanent injunction to enjoin such breach or threatened breach (without the necessity of posting a bond); and (B) recover from the breaching party the reasonable attorneys' fees and costs incurred by the non-breaching party in enforcing the provisions of Section 6.6. The existence of any claim or cause of action by a Member against the Company or any other Member, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of the restrictive covenant set forth herein, but must be litigated separately.

(c)     Applicable Period. The provisions of this Section 6.6 shall apply for the applicable periods as set forth above. If a Member violates the restrictive covenant provisions set forth in this Section 6.6, and the Company (or any successor or permitted assign of the Company) brings legal action for injunctive or other relief, such party shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the restrictive covenant, unless a court of competent jurisdiction holds that the restrictive covenant is not enforceable in whole or in part. Accordingly, for any time period that any Member is in violation of the restrictive covenant, such time period shall not be included in calculating the duration of the restrictive covenant indicated above.

(d)     Savings Clause. In the event any restriction is found by a court of competent jurisdiction to be unenforceable to its full extent, then such restriction shall be enforced to the maximum extent allowable by law and the parties hereby consent to and authorize the court to modify these restrictions in a manner to permit their enforcement to the fullest extent of the law.

## ARTICLE VII
## ALLOCATIONS OF PROFITS AND LOSSES; DISTRIBUTIONS

Section 7.1     Capital Accounts. A separate Capital Account shall be maintained for each Member.

Section 7.2     Compliance with the Regulations. The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the requirements of Section 1.704-1(b) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts are computed to comply with such Regulations, or any debits or credits to the Capital Accounts (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or the Members), the Board may make such modifications, provided that the Board determines such modifications to these allocations are not likely to have a material effect on the amounts distributable to any Member. The Board shall also make any appropriate modifications if

13

unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

Section 7.3    Distributions.    The Board, in its sole discretion, shall determine the amount of cash or other property available for distribution to Members ("Distributions") and the timing of such Distributions. Distributions to Members shall be made to and among all Members pro rata in proportion to their respective Unit Percentages.

Section 7.4    Definition of Profits and Losses.    "Profits" and "Losses" mean, for each fiscal year or other period of the Company, an amount equal to the net taxable income or net tax loss of the Company as determined in accordance with the accounting methods followed by the Company for federal income tax purposes, but (a) taking into account any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses, (b) taking into account any expenditures of the Company described in Section 705(a)(2)(B) of the Code, or treated as such expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations and not otherwise taken into account in computing Profits and Losses, (c) excluding from the calculation any items of income, gain, loss, expense and deduction that are specially allocated pursuant to this Agreement, (d) if property contributed to the Company is valued by the Members at other than its adjusted tax basis, or if Company property is revalued pursuant to Section 1.704-1(b)(2)(iv)(f) or (g) of the Regulations, then such taxable income or loss shall be determined by reference to the Book Basis of the Company's assets and depreciation as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations and (e) in the event the Book Basis of any Company asset is adjusted in accordance with clause (b) or (c) of the definition of "Book Basis," then the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses.  Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to the Regulatory Allocations shall not be taken into account in computing Profits or Losses.

Section 7.5    Allocation of Profits and Losses.    Except as otherwise provided under this ARTICLE VII:

(a)    General Allocations of Profits and Losses.  Except as otherwise set forth below, Profits and Losses for any fiscal year or any other period shall be allocated among the Members in a manner and amount so that the Capital Account of each Member, after making such allocation, is, as nearly as possible (and subject to any requirements of Section 704(c) of the Code), equal (or in proportion thereto, if the total amount to be allocated is insufficient) to the Distributions that would be made to such Member if the Company were dissolved, its affairs wound up, and its assets sold for cash equal to their respective Book Bases, all liabilities were satisfied, and the net assets of the Company were distributed in accordance with Section 7.3 to the Members.

(b)    Regulatory Allocations.

(i)    If a net decrease occurs in Company Minimum Gain (which shall have the meaning attributed to "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Regulations) during any Company fiscal year or other period,

14

each Member shall be specially allocated items of income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This provision is intended to comply with the minimum gain chargeback requirements under Section 1.704-2(f) of the Regulations and shall be interpreted consistently with such intent.

(ii)     If a net decrease occurs in Member Nonrecourse Debt Minimum Gain (which shall have the meaning attributed to "partner nonrecourse debt minimum gain" as defined in Section 1.704-2(i)(2) of the Regulations) during any Company fiscal year or other period, there shall be allocated to each member that has a share of Member Nonrecourse Debt Minimum Gain items of income and gain for such fiscal year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain, all in accordance with Section 1.702-2(i) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This provision is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements under Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)    Any partner nonrecourse deductions (or nondeductible expenditures under Section 705(a)(2)(B) of the Code) for any fiscal year or other period shall be allocated to the Member that made, or guaranteed or is otherwise liable with respect to, the loan to which such partner nonrecourse deductions or nondeductible expenditures are attributable in accordance with the principles under Section 1.704-2(i) of the Regulations.

(iv)     If any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Regulations which causes or increases a negative balance in such Member's adjusted Capital Account (as defined by or within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)), then such Member shall be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by such Regulations, the negative balance in such Member's adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 7.5(b)(iv) shall be made if and only to the extent that a negative balance that would remain in such Member's Capital Account after all other allocations provided for in this Section 7.5 had been tentatively made as if this Section 7.5(b)(iv) were not in this Agreement. This provision is intended to constitute a "qualified income offset" within the meaning

15

of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently with such intent.

(v) If the Company makes an election under Section 754 of the Code, to the extent an adjustment to the Book Basis of any Company asset pursuant to Section 734(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases basis) or loss (if the adjustment decreases basis). Such gain or loss shall be allocated specially to the Members in a manner consistent with the manner in which Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(vi) No allocation of loss or deduction shall be made to any Member if, as a result of such allocation, such Member would have a negative balance in its/his/her adjusted Capital Account (as defined by or within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations). Any such disallowed allocation shall be made to the Members entitled to receive such allocation under Sections 1.704-1 and 1.704-2 of the Regulations in proportion to their respective Unit Percentages.

(vii) The allocations set forth in Sections Section 7.5(b)(i) through Section 7.5(b)(v) (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations including Sections 1.704-1 and 1.704-2 of the Regulations. The Regulatory Allocations shall be taken into account in allocating Profit, Loss and other items of income, gain, loss and deduction among the Members so that to the extent possible, the net amount of allocations contained in this Agreement, including the Regulatory Allocations, shall equal the net amount that would have been allocated to each Member had the Regulatory Allocations not occurred, and the Board shall take account of the fact that certain of the Regulatory Allocations will occur at a period in the future in applying these sections. The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company Distributions. Accordingly, the Board is authorized to cause the Company to allocate future Profits, Losses, and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Company Distributions will be divided among the Members pursuant to this Agreement to the extent permitted under the Regulations.

Section 7.6    Intent and Savings Clause.    The Members intend that the allocation provisions of this ARTICLE VII shall produce final Capital Account balances of the Members that will equal, to the extent possible, the liquidating Distributions to be made to the Members in the manner set forth in Section 7.3. To the extent such allocation provisions would fail to produce such final Capital Account balances, such provisions shall be amended by the Board if and to the extent necessary to produce such result and Profits and Losses or items thereof for prior open years shall be reallocated by the Board to the extent it is not possible to achieve such result with allocations of Profits and Losses and items thereof for the current and future years.

16

The Regulatory Allocations are intended to comply with certain requirements of the Regulations including Sections 1.704-1(b) and 1.704-2 of the Regulations. The Regulatory Allocations shall be taken into account in allocating Profits, Losses and other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of allocations contained in this Agreement, including Regulatory Allocations, shall equal the net amount that would have been allocated to each Member had the Regulatory Allocations not occurred, and the Board shall take account of the fact that certain of the Regulatory Allocations will occur at a period in the future in applying these sections. The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company Distributions. Accordingly, the Board is authorized to cause the Company to allocate future Profits, Losses, and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Company Distributions will be divided among the Members pursuant to this Agreement to the extent permitted under the Regulations. The Board shall have the power to amend this Agreement without the consent of the Members as it reasonably considers advisable to make the allocations and adjustments described in this Section 7.6.

Section 7.7    Tax Allocations; Section 754 Election.

(a)    If Additional Members are admitted to the Company on different dates during any fiscal year or other period, the Profit or Loss allocated to the Members for such fiscal year or other period shall be allocated during such fiscal year in accordance with Section 706 of the Code using a proration method unless the Board determines another permitted convention would give materially more equitable results.

(b)    For purposes of determining the Profit, Loss, or any other items allocable to any period, Profit, Loss, and any other items shall be determined on a daily, monthly, or other basis, as the Board shall determine using any permissible method under Section 706 of the Code and the Regulations thereunder.

(c)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profit or Loss, as the case may be, for the fiscal year or other period.

(d)    Income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its Book Basis. The Board shall make any elections or other decisions relating to such allocations in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this provision are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or such Member's share of Profit or Loss or Distributions pursuant to any provision of this Agreement. Except as otherwise set forth in this Agreement or required by the Code or the Treasury Regulations, all items of income, gain and loss for federal and state income tax purposes shall be allocated in accordance with the corresponding book income, gain and loss.

60667559v5

**Appendix Page 218**

(e)    The Board may in its discretion cause the Company to make an election for federal, state and local tax purpose, to adjust the basis of Company property pursuant to Code Section 754, 734(b) and 743(b) or comparable provision of state or local law, in connection with Transfers of Units and Distributions by the Company.

Section 7.8    <u>Tax Withholding</u>.    If the Company is required by law to make any payment to a governmental entity that is specifically attributable to a Member or a Member's status as such (including, without limitation, federal withholding taxes, state personal property taxes and state unincorporated business taxes) then such Member shall indemnify and contribute to the Company in full for the entire amount paid (including interest, penalties and related expenses).  The Board may offset Distributions to which a Member is otherwise entitled under this Agreement against such Member's obligation to indemnify the Company under this Section 7.8.  A Member's obligation to indemnify and make contributions to the Company under this Section 7.8 shall survive the termination, dissolution, liquidation and winding up of the Company and, for purposes of this Section 7.8, the Company shall be treated as continuing its existence.

ARTICLE VIII
TRANSFERABILITY OF A MEMBER'S INTEREST

Section 8.1    <u>No Right to Resign or Withdraw</u>.  Except in connection with a Transfer of all of such Member's Units in accordance with the terms and conditions of this Agreement, no Member shall have any right to voluntarily resign or otherwise withdraw from the Company without the written consent of the Board.

Section 8.2    <u>Restriction on Transfer; Notice of Transfer</u>.

(a)    Except for Transfers made in full compliance with this Section 8.2, no Member shall Transfer all or any portion of the Units held by such Member.  Any purported or attempted Transfer of Units in violation of, or without full compliance with, the terms and conditions of this Agreement shall be deemed for all purposes to be without legal effect and void *ab initio*.  The Company shall not be required to (A) Transfer on its books any Units that shall have been Transferred in violation of any of the provisions of this Agreement or (B) treat as the owner of such Units or to accord the right to vote as such owner or to pay dividends or Distributions to any Transferee to whom such Units shall have been Transferred in violation of any of the provisions of this Agreement.  Notwithstanding anything to the contrary in this Agreement, no Member may Transfer any Units without the prior written consent of the Board, which may be withheld or delayed in the Board's sole and absolute discretion, and provided, that if such consent is granted, any such Transfer shall be subject to Section 8.2(b) and all other provisions of this Section 8.2.

(b)    Before any Member holding Units (the "<u>Seller</u>") may Transfer any of such Units (other than to a Permitted Transferee), the Seller shall send to the Company and to each other Member (excluding the Seller) a copy of a written offer (conditioned solely upon the waiver or non-exercise of all rights of such Members, and due compliance with all of the provisions of this Agreement, and further conditioned upon the Transferee's

18

agreement to execute a consent or other instrument to become fully bound by the terms and conditions of this Agreement) executed by and binding upon the proposed Transferee to purchase all or any portion of the Seller's Units ("Offered Units"), together with a written notice signed by the Seller (the "Seller's Transfer Notice") stating (i) the Seller's bona fide intention to accept such offer and Transfer such Offered Units for the price and on the terms contained in the Transferee's offer, and the name and address of the proposed Transferee; (ii) the number of the Offered Units; and (iii) the bona fide cash price or, in reasonable detail, other consideration, per Unit for which the Seller proposes to Transfer such Offered Units (the "Offered Price"). Upon the request of the Company or any of the Members, the Seller shall promptly furnish information to the Company and to such Members as may be reasonably requested to establish that the offer is a Bona Fide Offer and the Transferee is financially capable of carrying out the terms of the offer and is an accredited investor as defined under Regulation D of the Securities Act.

Section 8.3    Transfers to Permitted Transferees.    In each and all cases and as a condition to any Transfer to a Permitted Transferee, (a) the Transferor shall inform the Company and each other Member by written notice prior to effecting the Transfer of Units, and (b) each Permitted Transferee shall furnish the Company with an executed counterpart copy of this Agreement pursuant to which such Permitted Transferee agrees to be bound by the terms and conditions of this Agreement. All Units Transferred to a Permitted Transferee shall continue to constitute "Units" hereunder, and each Permitted Transferee shall be admitted as a substitute Member, subject to any provision to the contrary contained in this Agreement, subject to the same terms and conditions of this Agreement as applied to the transferor of the Units Transferred, shall assume all rights and obligations of such transferor hereunder, and all of the provisions of this Agreement shall be interpreted and applied as if any Units Transferred by a Member to any Permitted Transferee were still owned by such transferor.

Section 8.4    Involuntary Transfers.

(a)    Notice of Involuntary Transfer; Acknowledgment of Reasonableness.    The Members shall notify the Company as soon as possible if and when such Member becomes aware that an Involuntary Transfer of all or any portion of such Member's Units has occurred or is reasonably foreseeable and shall provide the Company and the other Members with any information reasonably requested by either of them regarding such Involuntary Transfer or possible Involuntary Transfer. The Members acknowledge the reasonableness of the Transfer restrictions and other restrictions and conditions imposed by this Agreement in light of the purposes and objectives of this Agreement and the relationship among the Members and the Company. The provisions of this Agreement shall be specifically enforceable by the Company or any Member. Each Member waives and releases any and all claims challenging the restrictions on Transfer set forth in this Agreement, or the enforceability thereof.

(b)    Call Right Upon Involuntary Transfer.    In the event that an Involuntary Transfer is made, or the future occurrence of an Involuntary Transfer becomes in the good faith determination of the Board more likely than not and imminent, or is deemed to have been made by a Member to any Person who is not a Permitted Transferee, such Member shall automatically be deemed, without any further action on the part of any

Person, to have offered to sell all of such Member's Units for a price equal to the fair market value thereof to be determined by the Board in good faith (in which determination such Member, if then serving as a Director, shall not participate), and to have sent a Seller's Transfer Notice effective as of the date on which the Company and all of the other Members shall have discovered or been notified of the Involuntary Transfer, and the provisions of Section 8.5 shall then apply, provided, however, that if the Company and the other Members have waived or failed to timely exercise their rights of refusal under Section 8.5 with respect to any Units that have been offered for sale pursuant to this Section 8.4(b), then such Member shall have no further obligation to sell the Units as a result of the Involuntary Transfer that was made or deemed to have been made.

Section 8.5    Rights of Refusal.

(a)     Right of First Refusal.  The Company shall have the right of first refusal to purchase all or any portion of the Offered Units described in the Seller's Transfer Notice; provided, that the Company gives written notice of the exercise of such right to the Seller within sixty (60) days after the date of mailing or other transmission of the Seller's Transfer Notice to the Company (the "First Refusal Period").  Within ten (10) days after the expiration of the First Refusal Period, the Seller shall give written notice to the Company and each Member specifying the number of Offered Units not subscribed for by the Company (the "Seller's Second Notice").

(b)     Right of Second Refusal.  If the Right of First Refusal is not exercised by the Company with respect to all of the Offered Units, the Members (other than the Seller) shall have the right of second refusal to purchase pro rata all or a portion of the remaining Offered Units; provided, that the other Members electing to exercise such right of second refusal give written notice of the exercise of such right to the Seller within ten (10) days after the date of their receipt of the Seller's Second Notice (the "Second Refusal Period"). If the aggregate number of Units the other Members desire to purchase exceeds the Offered Units available, each other Member shall be entitled to purchase a fraction of the Offered Units, the numerator of which is the number of Units held by such other Member and the denominator of which is the number of Units held by all other Members exercising their Right of Second Refusal ("pro rata portion") (and if any Offered Units remain unallocated after application of the foregoing, such Units shall be allocated through successive applications thereof).  If the other Members do not elect to purchase all of the remaining Offered Units, within ten (10) days after expiration of the Second Refusal Period, the Seller shall give written notice to the Company and each Member (excluding the Seller) specifying the number of Offered Units not subscribed for by the Company and the other Members through exercise of the Right of Second Refusal (the "Seller's Final Notice").

(c)     Purchase Price.  The purchase price for the Offered Units to be purchased by the Company and/or the other Members pursuant to exercise of their rights of refusal under this Section 8.5 shall be the Offered Price and shall be payable as set forth in Section 8.5(d) hereof.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith, which determination shall be binding upon the Company, each Member and

the Seller, absent fraud or error. If the form of consideration (other than cash or cash-equivalents) offered by the Transferee are such that the Company or the other Members cannot, despite reasonable efforts, furnish the same form of consideration, then the Company and the other Members may purchase the Offered Units for substitute consideration in a cash amount determined by an independent valuation of such consideration performed by a qualified appraiser selected by the majority of the Board. The running of all time periods provided herein shall be tolled until such appraisal is completed and delivered to the Company.

       (d)    <u>Closing and Payment</u>. The closing of any purchase under this Section 8.5 and payment of the purchase price for the Offered Units purchased by the Company and/or other Members exercising their rights of refusal shall be made at the principal offices of the Company on a date reasonably acceptable to the parties within thirty (30) days after the Company's and/or other Members' receipt of the Seller's Final Notice. Payment of the purchase price shall be made, at the option of the Company or the exercising Members, (i) in cash (by check or wire transfer at the option of the purchaser), (ii) by cancellation of all or a portion of any outstanding indebtedness of the Seller to the Company or the Members, as the case may be, (iii) if the terms described in the Seller's Transfer Notice included payment of any portion of the purchase price pursuant to an installment note, by execution and delivery of an installment note having substantially similar terms, or (d) by any combination of the foregoing. At the closing, the Seller shall execute and deliver to the purchasers any certificates for the Offered Units duly endorsed for transfer or with executed stock powers.

       (e)    <u>Seller's Rights</u>. If the Company and/or the Members exercise their rights of refusal hereunder to purchase all or any of the Offered Units, then, upon the date the notice of such exercise is given by the Company or any Members, the Seller shall have no further rights as a holder of the Offered Units so purchased except the right to receive payment for such Offered Units from the Company or the Members in accordance with the terms of this Agreement, and the Seller shall forthwith cause all certificate(s) evidencing such Offered Units to be surrendered for transfer to the Company or the Members, as the case may be.

Section 8.6   <u>Requirements for All Transfers</u>. Unless waived by the Board, notwithstanding any other provision of this Agreement, Units shall not be Transferred (a) in the absence of an opinion of counsel, satisfactory to the Board, that the registration of the Transfer of the Units is not required under the Securities Act, or any other applicable federal or state securities laws; (b) unless the Transferee(s) of the Units agree in a writing in form acceptable to the Board to be completely bound by, and to take such Units subject to, all of the obligations, conditions and restrictions of this Agreement; (c) if such Transfer (either considered alone or with Transfers by other Members) would result in the termination of the Company as a "partnership" for federal income tax purposes; or (d) if such Transfer (either considered alone or with Transfers by other Members) would result in a breach or violation of any term, provision or condition of any contract, obligation or agreement to which the Company is a party or any of its assets are subject or bound.

21

Section 8.7     Required Sale.

(a)     GFG Holding will have the right at any time to cause all other Members to join GFG Holding in selling the Company (whether by equity sale, asset sale or merger) to any third party designated by GFG Holding (and, if GFG Holding so elects, all other Members will be obligated to take all actions necessary to effect such sale) (a "Sale Proposal"). The Company shall then deliver a notice (a "Required Sale Notice") with respect to such Required Sale to all Members starting that GFG Holding proposes to effectuate the Required Sale and providing the terms of the Sale Proposal. Each Member, upon receipt of a Required Sale Notice, hereby agrees, and shall be obligated (and such obligation shall be enforceable by the Company and the other Members), to (i) sell its/his/her Units and participate in the Required Sale contemplated by the Required Sale Notice, (ii) to vote, if applicable, its/his/her Units in favor of the Required Sale at any meeting of Members called to vote on or approve the Required Sale and/or to consent in writing to the Required Sale, (iii) waive all dissenters' or appraisal rights in connection with the Required Sale, (iv) enter into agreements of sale or merger agreements relating to the Required Sale and otherwise execute and deliver all agreements and instruments executed by GFG Holding effectuating such Required Sale, (v) otherwise to take all actions necessary or desirable to cause the Company and the Members to consummate the Required Sale, and (vi) upon request of GFG Holding, deliver an executed instrument of transfer with respect to its/his/her Units to counsel designated by GFG Holding, which instrument will be held in escrow by such counsel (pending receipt of the purchase price therefor). Any such Sale Proposal, and the terms of any Required Sale, may be amended or modified from time to time, and any such Required Sale Notice may be rescinded, upon the approval of the Board and GFG Holding. The Company shall give prompt written notice of any such amendment, modification or rescission to all of the Members.

(b)     Each Member acknowledges and agrees that GFG Holding shall have full plenary power and authority, as the agent of the Company, to cause the Company to enter into a transaction providing for a Required Sale and to take any and all such further action in connection therewith as GFG Holding may deem necessary or appropriate in order to consummate such Required Sale. GFG Holding, in exercising its rights under Section 8.7(a), shall, except as otherwise provided in Section 8.7(c), have complete discretion over the terms and conditions of any Required Sale effected hereby, including price, type of consideration, payment terms, conditions to closing, representations, warranties, affirmative covenants, negative covenants, indemnification, holdbacks and escrows.

(c)     The obligations of the Members pursuant to this Section 8.7 are subject to satisfaction of the following conditions:

(i)     subject to Sections Section 8.7(c)(iv) and Section 8.7(c)(v), each of the Members shall receive the same proportion of the aggregate consideration from such Required Sale that such Member would have received if such aggregate consideration had been distributed by the Company to the Members in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the Required Sale;

(ii)     if any Member is given an option as to the form, amount or timing of consideration to be received, all Members shall be given the same option;

(iii)     any expenses incurred for the benefit of the Company or all Members, and any indemnities, holdbacks, escrows and similar items relating to the Required Sale, that are not paid or established by the Company (other than those that related to representations or indemnities concerning a Member's valid ownership of its/his/her Units free and clear of all liens, claims and encumbrances or a Member's authority, power and legal right to enter into and consummate a purchase or merger agreement or ancillary documentation) shall be paid or established by the Members in proportion to the reduced amount of consideration each Member would have received if the aggregate consideration from such Required Sale had been reduced by the aggregate amount of such expenses, indemnities, holdbacks, escrows or similar items;

(iv)     in no event shall any Member have any liability in excess of the net consideration actually received by it/him/her in the Required Sale; and

(v)     in no event shall any Member be required to take any type or amount of consideration that it is not legally permitted to hold.

(d)     EACH MEMBER HEREBY EXPRESSLY AND IRREVOCABLY APPOINTS GFG HOLDING AND ITS SUCCESSORS AND ASSIGNS AS SUCH MEMBER'S PROXY AND ATTORNEY-IN-FACT TO VOTE SUCH MEMBER'S UNITS AND TAKE ANY AND ALL SUCH OTHER ACTION WITH RESPECT TO SUCH MEMBER'S UNITS AND OTHER SECURITIES OF THE COMPANY AS GFG HOLDING MAY DIRECT IN CONNECTION WITH A REQUIRED SALE EFFECTED BY GFG HOLDING IN ACCORDANCE WITH THIS SECTION 8.7 SOLELY IN THE EVENT THAT SUCH MEMBER FAILS TO VOTE SUCH MEMBER'S UNITS OR TAKE ANY AND ALL SUCH OTHER ACTION IN CONNECTION WITH A REQUIRED SALE IN ACCORDANCE WITH THIS SECTION 8.7.  SUCH APPOINTMENT OF GFG HOLDING AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE VALID THORUGH THE DATE THERE SHALL BE CONSUMMATED A REQUIRED SALE.

Section 8.8     Additional Members.  The Board may offer, grant, or sell additional Units as it determines in its sole and absolute discretion.  The issuance of additional Units and a new Member's admittance to the Company shall cause a pro rata reduction in each Member's Unit Percentage.  No new Members shall be entitled to any retroactive allocation of income, losses, or expense deductions the Company incurs.

Section 8.9     Termination of Services Agreement with a Member.  If a physician Member (other than Dr. Hu), an Affiliate of a Member (other than Dr. Hu), or a professional entity of which a Member (other than Dr. Hu) has an ownership interest (each, an "In Vitro Fertilization Provider") is a party to an agreement with the Company pursuant to which the Company is to provide administrative or management services to the In Vitro Fertilization Provider (an "Administrative Services Agreement"), then, notwithstanding any other provision to

23

the contrary contained in this Agreement, at any time after the Administrative Services Agreement is terminated or the term of the Administrative Services Agreement ends without being renewed, upon the election of either such Member or Dr. Hu, such Member shall sell, and the Company shall purchase, all of the Units then held by such Member for the Fair Market Value of such Member's Units.

ARTICLE IX<br/>DISSOLUTION AND WINDING UP

Section 9.1    Dissolution.  The Company shall be dissolved and its affairs wound up upon the first to occur of any of the following events:

(a)    the determination of the Board;

(b)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act; or

(c)    the sale or other disposition of all of the Company's assets.

Dissolution of the Company shall be effective on the day on which the event giving rise to the dissolution occurs, but the Company will not terminate until the assets of the Company have been distributed as provided in Section 9.3 and the Certificate of Formation has been canceled in the manner required by the Act.

Section 9.2    Death, Legal Incapacity, etc.  The death, bankruptcy, dissolution, insanity, incompetency or other legal incapacity, or the occurrence of any other event that causes a Member to cease to be a member of the Company, shall not cause the dissolution or termination of the Company, and the Company, notwithstanding such event, shall continue without dissolution upon the terms and conditions provided in this Agreement, and each Member, by executing this Agreement, agrees to such continuation of the Company without dissolution.

Section 9.3    Distribution of Assets on Dissolution.    Upon the winding up of the Company, the Board shall (i) take full account of the assets and liabilities of the Company, (ii) liquidate the assets (unless it determines that a Distribution of any Company property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the Fair Market Value thereof, and, (iv) subject to any reductions, set-offs, or deductions for monies then due and owing to the Company by any Members, apply and distribute the proceeds therefrom in the following order:

(a)    first, to the payment of the debts and liabilities of the Company to creditors who are neither Members nor Affiliates of Members;

(b)    second, to the setting up of any reserves that the Board may reasonably deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company (except as to those obligations and contingencies as may be due to a Member or an Affiliate of a Member).  Such reserves may be paid over by the Board to an escrow agent or trustee (selected by the Board), to be disbursed by such escrow agent or trustee in

24

payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Board shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)     third, to Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(d)     fourth, to the Members to the extent of, and in proportion to, their respective positive Capital Account balances, taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs; and

(e)     thereafter, to the Members in proportion to their respective Unit Percentages.

If any Member has a deficit balance in its/his/her Capital Account (after giving effect to all adjustments for the taxable year of liquidation), that Member shall have no obligation to make any contributions to the capital of the Company with respect to such deficit and such deficit shall not be considered a debt owed to the Company or any other person or entity for any purpose whatsoever.  Liquidation proceeds shall be paid within sixty (60) days of the end of the fiscal year in which the liquidation occurs.  Such Distributions shall be in cash or other property (which need not be distributed proportionately) or partly in both, as determined by the Board or by arbitration if the Directors cannot agree.  Any such arbitration shall be conducted in New York, New York, in accordance with the rules then obtaining of JAMS.  The decision of the arbitrator(s) shall be final and binding upon the parties and judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  If, at the time of liquidation, the Board shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Board may, in order to avoid such loss, defer liquidation.  Each Member shall look solely to the assets of the Company for the return of its/his/her Capital Contribution, and if the Company property remaining after payment or discharge of the debts and liabilities of the Company is insufficient to return the contributions of each Member, then a Member shall have no recourse against any other Member.

## ARTICLE X
## BOOKS AND RECORDS

Section 10.1   Fiscal Year.  The fiscal year of the Company shall be the calendar year or such other taxable year as may be required by Section 706(b) of the Code.

Section 10.2   Updates and Tax Information.   Not less frequently than annually, the Board shall furnish to each Member an update on the Company's progress and operations, together with any financial or other information deemed necessary or advisable by the Board. Not less frequently than annually, the Board, within ninety (90) days after the end of each calendar year (subject to any extensions by the Company of the filing of its federal income tax return), shall furnish to each Member any information (including Schedule K-1 to the Company's federal income tax return) required to enable such Member to file its/his/her federal and state income tax returns.

60667559v5

Section 10.3    Bank Accounts: Checks, Notes and Drafts.

(a)    Funds of the Company shall be deposited in an account or accounts of a type, in form and name and in such bank(s) or other financial institution(s) which are participants in federal insurance programs as selected by the Board. The Board shall arrange for the appropriate conduct of such accounts. Funds may be withdrawn from such accounts only for bona fide and legitimate Company purposes and may from time to time be invested in such short-term securities, money market funds, certificates of deposit, or other liquid assets as the Board deems appropriate.

(b)    The Members acknowledge that the Board may maintain Company funds in accounts, money market funds, certificates of deposit, other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation, or other depository insurance institutions and that the Board shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution.

(c)    Checks, notes, drafts, and other orders for the payment of money shall be signed by such persons as the Board from time to time may authorize. When the Board so authorizes, however, the signature of any such person may be a facsimile.

Section 10.4    Books and Records.  At all times during the term of the Company, the Board shall keep, or cause to be kept, full and accurate books of account, records and supporting documents, which shall reflect, completely, accurately and in reasonable detail, each transaction of the Company. The books of account shall be maintained and tax returns prepared and filed on the method of accounting determined by the Board. The books of account, records, and all documents and other writings of the Company shall be kept and maintained at the principal office of the Company.  Subject to Section 4.5, each Member or its/his/her designated representative shall, upon reasonable notice to the Board, have access to such financial books, records, and documents during reasonable business hours and may inspect and make copies of any of them at its/his/her own expense. The Board shall cause the Company to keep at its principal office the following:

(a)    a current list of the full name and last known business address of each Member;

(b)    a certified copy of the Certificate of Formation and all amendments thereto;

(c)    copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years; and

(d)    copies of this Agreement, as amended, and of any financial statements of the Company for the three most recent years.

Section 10.5    Tax Matters Member.  GFG Holding shall be the initial Tax Matters Partner within the meaning of such term as set forth in Section 6231(a)(7) of the Code, and as such shall have the right to take all actions on behalf of the Company authorized or required by

26

the Code for a Tax Matters Partner. The Board has the right to replace the Tax Matters Partner at any time.

ARTICLE XI
GENERAL PROVISIONS

Section 11.1    Notices. Except as provided herein, any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing. All such notices shall be delivered personally, by certified mail, return receipt requested (if the addressee is in the United States), or by reputable overnight courier (costs prepaid), and shall be deemed given or made upon receipt thereof or refusal to accept delivery. All such notices are to be given or made to the following addresses (or to such other address as any party may designate by a notice given in accordance with the provisions of this Section):

> If to the Company: to Global Fertility & Genetics, New York, LLC, c/o Dr. Hu Bo, Ciming Health Checkup Group, No. 91, Beiyuan Road, Chaoyang District, Beijing, 100101 China; and Proskauer Rose LLP, Eleven Times Square, New York, NY 10036 Attention: Edward S. Kornreich; and

> If to any Member: to the Member's address on record with the Company.

Section 11.2    Choice of Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without reference to the choice of law or conflicts of law principles thereof (or any jurisdiction) which would have the effect of causing the application of the laws of a jurisdiction other than the State of Delaware.

Section 11.3    Entire Agreement; Waivers. This Agreement, together with all Schedules and Appendices hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

Section 11.4    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed signature page by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart.

Section 11.5    Invalidity. In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

Section 11.6    Headings. The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

27

60667559v5

**Appendix Page 228**

Section 11.7   Submission to Jurisdiction.   Except as otherwise provided in this Agreement, each of the parties (a) agrees not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts of the State of Delaware, and (b) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it/he/she is not subject personally to the jurisdiction of the above-named courts, that its/his/her property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.   Each party shall bear its/his/her own costs in respect of any disputes arising under this Agreement.   The prevailing party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.   Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in any court of the State of Delaware having subject matter jurisdiction.

Section 11.8   Interpretation.   Unless otherwise indicated to the contrary herein by the context or use thereof: (a) the words, "herein," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (b) the words "include" and "including" shall mean "including without limitation," (c) masculine gender shall also include the feminine and neutral genders, and vice versa; and (d) words importing the singular shall also include the plural, and vice versa.

Section 11.9   No Third Party Beneficiary.   Nothing expressed or implied herein is intended to confer upon any Person, other than the parties hereto and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason hereof.

Section 11.10   Continuity of Other Restrictions; Other Agreements.   Any Units not purchased by the Company or any Member under their rights of refusal hereunder shall continue to be subject to all other restrictions imposed upon such Units by law or this Agreement, including any restrictions imposed under the Certificate of Formation or by this Agreement. This Agreement is subject to, and shall in no manner limit the right of the Company to cancel or repurchase securities (for no or any consideration) from a holder of Units pursuant to any Unit award, restriction, repurchase or other agreement between the Company and the holder of Units.

Section 11.11   Further Assurances; No Inconsistent Agreements.   The Members agree to cooperate with each other, and at the request of any other party, each party hereby agrees to execute and deliver all such further instruments and documents and take all such other actions as the other party may reasonably request in order to evidence, carry out or effectuate the consummation of the transactions contemplated by, and the intent and purposes of, this Agreement.   Neither the Company nor any Member shall take any action or enter into any agreement that is inconsistent with the rights of any party hereunder or otherwise conflicts with the provisions hereof.

Section 11.12   Amendments.   This Agreement may be amended from time to time by the written consent of Members holding at least fifty-one percent (51%) of the aggregate Unit Percentages.   Notwithstanding the preceding sentence, this Agreement may be modified by the Board to reflect the following circumstances:

28

(a)      Change in the name of the Company; provided that any such change was made in accordance with the terms of this Agreement;

(b)      Change or add the name, place of residence, or Unit Percentage of a Member or Additional Member any other information required to be set forth on Schedule A or Schedule 6.1, provided that any such change or addition was made in accordance with the terms of this Agreement;

(c)      correction of any readily identifiable scrivener's error in this Agreement; and

(d)      amendments necessary to cause the Agreement to comply with applicable law, regulation, or rule, including but not limited to, any amendment deemed necessary by the Board to permit the Company to be treated as a partnership for federal income tax purposes; provided that the Members shall have reasonable prior notice of any such amendment.

(e)      The location of the Company's registered office or the identity of Company's registered agent.

Section 11.13 Expenses. Each party agrees to bear its/his/her own legal, accounting and other professional expenses in connection with the preparation and consummation of this Agreement and the transactions contemplated hereby.

(Signatures on the following page)

29

IN WITNESS WHEREOF, the parties have executed and delivered this Operating Agreement as of the date first written above.

COMPANY:                                    GLOBAL FERTILITY & GENETICS,
                                            NEW YORK, LLC

                                            By: _____
                                            Name: Dr. Hu Bo
                                            Title:   Authorized Signatory

MEMBER:                                     GFG HOLDING GROUP CO., LLC

                                            By: _____
                                            Dr. Hu Bo, Authorized Signatory

[signature page to Operating Agreement of Global Fertility & Genetics, New York, LLC]

Schedule A
Members and Units

| Name | Units | Unit Percentage |
|---|---|---|
| GFG Holding Group Co., LLC | 100 | 100.00% |
| c/o Dr. Hu Bo | | |
| Ciming Health Checkup Group | | |
| No. 91, Beiyuan Road | | |
| Chaoyang District | | |
| Beijing,  100101 China | | |
| | | |
| Total Outstanding | 100 | 100.00% |

Schedule A

## Schedule 1.1
## Definitions

"Act" means the Delaware Limited Liability Company Act, 6 *Del. C.* Section 18-101, *et seq.*, as amended, or any successor statute thereto, and the rules and regulations promulgated thereunder.

"Additional Capital" has the meaning set forth in Section 6.5.

"Additional Member" means any Person admitted to the Company as a Member pursuant to Section 8.8.

"Administrative Services Agreement" has the meaning set forth in Section 8.9.

"Affiliate" means, with respect to any Person, (i) any other Person who directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, (ii) any other Person who is a shareholder, member, partner, director, officer, or manager of, or consultant to, such Person or of any Person described in clause (i) above, or (iii) with respect to any Member, any such Member's Permitted Transferees. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Affiliated Facility" has the meaning set forth in Section 6.6(a).

"Agreement" means this Agreement, as it may be amended from time to time, which the parties intend to constitute an operating agreement within the meaning of the Act.

"Board" or "Board of Directors" shall have the meaning set forth in Section 5.1. Each member of the Board shall be considered a "manager" of the Company for purposes of the Act, subject to the terms and conditions of this Agreement.

"Bona Fide Offer" means an offer in writing made on an arm's-length basis, by a Person who is not an Affiliate or Permitted Transferee of the recipient of the offer and who is financially capable of carrying out the terms of the offer, and binding the offeror to such terms and, in the event consummation of such terms does not result in termination of this Agreement, further binding the offeror to the terms of this Agreement.

"Book Basis" means, with respect to any asset of the Company, the adjusted basis of such asset for federal income tax purposes; provided, however, (a) if any asset other than cash is contributed to the Company, the initial Book Basis of such asset shall equal its fair market value on the date of contribution, (b) if the Capital Accounts of the Members are adjusted pursuant to Section 1.704-1(b) of the Regulations to reflect the Fair Market Value of any asset of the Company, the Book Basis of such asset shall be adjusted to equal its Fair Market Value as of the time of such adjustment in accordance with such Regulation, and (c) the Book Basis of any Company asset other than cash distributed to any Member shall be the fair market value of such asset on the date of distribution. The Book Basis of all assets of the Company shall be adjusted

A-1

thereafter by depreciation as computed for book purposes as provided in Section 1.704-1(b)(2)(iv)(g) of the Regulations and any other adjustment to the basis of such assets other than depreciation or amortization.

"Capital Account" means a separate account for each Member established and maintained in accordance with Section 1.704-1(b)(2)(iv) of the Regulations and as follows: (i) each Member's Capital Account shall be credited: (A) with all Capital Contributions made by such Member, determined as the amount of cash or, in the case of property other than cash, such property's Book Basis; (B) with such Member's allocable share of Profits; (C) with any items in the nature of income or gain that are specially allocated to such Member pursuant to this Agreement or the Regulatory Allocations; and (D) with the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member; and (ii) each Member's Capital Account shall be debited: (A) with the amount of cash and of any Company property (determined at Book Basis) distributed to such Member pursuant to any provision of this Agreement; (B) with such Member's allocable share of Losses; (C) with any items in the nature of expenses or losses that are specially allocated to such Member pursuant to the Regulatory Allocations; and (D) with the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.  In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Regulations, the Board may make such modification, provided that it is not likely to have more than an insignificant effect on the total amounts distributable to any Member pursuant to Article VII of this Agreement. The Board may adjust the Capital Accounts of the Members to reflect any revaluation of Company property in connection with (1) a contribution of money or property to the Company by a new or existing Member in exchange for Units; (2) the liquidation of the Company or the distribution of money or property to a Member in exchange for an interest in the Company; or (3) the grant of Units (other than a *de minimis* interest) as consideration for services performed for the Company by an existing Member acting in a Member capacity or a new Member acting either in a Member capacity or in anticipation of becoming a Member.

"Capital Contribution" means the amount of services, property, money or other valuable rights that each Member contributes to the Company from time to time.

"Capital Contribution Threshold" means that a total of five million dollars ($5,000,000) in Capital Contributions has been made to the Capital Accounts of all Members.

"Certificate of Formation" means the certificate of formation of the Company, and any amendments thereto, filed with the Delaware Secretary of State.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto, and the rules and regulations promulgated thereunder.

"Company" has the meaning set forth in the introductory paragraph.

"Contributing Member" has the meaning set forth in Section 6.5.

"Director" means any person serving on the Board from time to time in accordance with the provisions of Section 5.1.

"Distribution" means any actual distribution, payment or transfer of funds to the Members pursuant to the terms hereof.

"Effective Date" has the meaning set forth in the introductory paragraph.

"Fair Market Value" means, with respect to any item, the price (in cash or other consideration) at which said item would be sold in a sales transaction between a willing buyer and a willing seller negotiating on arms' length terms. The Fair Market Value of an item shall be deemed for all purposes to be equal to the Fair Market Value of such items as determined by the Board and specified in writing pursuant to a duly adopted resolution of the Board, so long as such determination is reasonable and made in good faith by the Board.

"Family Transferee" or "Family Transferees" means the spouse, children (including stepchildren and adopted children), grandchildren, grandparents, parents or siblings of a Member, the estate of such Member, and any trust established for the benefit of a Member and/or such Member's Family Transferees.

"First Refusal Period" has the meaning set forth in Section 8.5(a).

"Formation Date" has the meaning set forth in the recitals.

"GFG Holding" has the meaning set forth in the introductory paragraph.

"Indemnified Losses" means all liabilities, judgments, settlements, penalties, fines, losses, damages, taxes (including, without limitation, any excise tax assessed with respect to an employee benefit plan) and interest and penalties thereon (other than taxes based on fees, compensation, commissions or any other income received by an Indemnified Party from the Company or a subsidiary of the Company), Proceedings (whether civil or criminal, threatened, pending or completed, formal or informal, before any court or administrative or legislative body, in which an Indemnified Party may be or may have been involved as a party or otherwise or with which he/she may be or may have been threatened, while in office or thereafter) and, as the same are accrued, all costs, expenses and disbursements (including, without limitation, reasonable legal and accounting fees, expert witness fees and expenses incurred in the investigation, litigation and appeal thereof or the enforcement of any rights hereunder) of any kind and nature whatsoever incurred in connection with the foregoing.

"Indemnified Parties" has the meaning set forth in Section 5.10(b)(i).

"Indemnified Party" has the meaning set forth in Section 5.10(b)(i).

"In Vitro Fertilization Provider" has the meaning set forth in Section 8.9.

"Involuntary Transfer" means any Transfer by a Member made by operation of law or on account of any court order, spousal election or right, transfer incident to divorce or marital property settlement, death, bankruptcy or insolvency proceeding, assignment for the benefit of

A-3

creditors, attachment, levy, appointment of or the placement of a Member's assets in the hands of a receiver or custodian, the placement of any encumbrance upon or securing any type of debt or obligation with respect to any Units. An Involuntary Transfer shall be deemed to have been made by any Member if such Member or any Affiliate of such Member violates any statute relating to or governing the protection of the Company's intellectual property, confidential or proprietary information, or trade secrets, or any covenant or agreement of non-competition, non-solicitation or non-interference with the Company.

"Member" or "Members" means GFG Holding and those Persons set forth on Schedule A, as amended from time to time in accordance with this Agreement, who have been admitted as members in accordance with Article VIII and have executed a counterpart signature page of this Agreement.

"Non-Contributing Member" has the meaning set forth in Section 6.5.

"Offered Price" has the meaning set forth in Section 8.2(b).

"Offered Units" means all Units proposed to be Transferred by a Seller.

"Officer" or "Officers" means one or more Persons designated as officers from time to time in accordance with the provisions of Section 5.13.

"Permitted Transferee" means, with respect to a Member, (i) a Family Transferee of such Member, (ii) a partner, shareholder or member of such Member, and (iii) any partnership, corporation or limited liability company controlled by the Member. As used herein, "control" means the ability, by ownership of voting securities, contract or otherwise, to direct the management and affairs of a Person.

"Person" means a governmental authority or any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity.

"Proceeding" means any threatened, pending, or completed claim, action, suit, audit, investigation, or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal.

"Profits" and "Losses" have the meaning set forth in Section 7.4.

"pro rata portion" has the meaning set forth in Section 8.5(b).

"Regulations" means the United States Treasury Regulations issued under the Code (whether temporary, proposed, or final), as amended from time to time. Reference to any particular provision of the Regulations shall mean that provision of the Regulations on the date hereof.

"Regulatory Allocations" shall have the meaning set forth in Section 7.5(b).

"Required Capital Contribution" has the meaning set forth in Section 6.5.

"Required Sale Notice" has the meaning set forth in Section 8.7(a).

"Sale Proposal" has the meaning set forth in Section 8.7(a).

"Second Refusal Period" has the meaning set forth in Section 8.5(b).

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute thereto, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"Seller" has the meaning set forth in Section 8.2(b).

"Seller's Final Notice" has the meaning set forth in Section 8.5(b).

"Seller's Second Notice" has the meaning set forth in Section 8.5(a).

"Seller's Transfer Notice" has the meaning set forth in Section 8.2(b).

"Service" means the Internal Revenue Service.

"Transfer" means and includes any sale, exchange, conveyance, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including but not limited to transfers to receivers, levying creditors, trustees or receivers in bankruptcy or insolvency proceedings, or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly.

"Transferee" means any Person proposing to accept a Transfer.

"Units" means the Units of membership interest of the Company at any particular time, including the right of a Member holding such Units to any and all of the benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all of the provisions of this Agreement and the Act. The number of Units held by each Member shall be set forth on Schedule A.

"Unit Percentage" means, with respect to or in reference to a Member or Members, a share, expressed as a percentage rounded to the nearest one one-thousandth (1/1,000) of one percent, calculated by dividing the number of Units held by such Member or Members by the total number of Units of the Company then outstanding and held by Members. It is the intent of this Agreement that a Member's Unit Percentage shall be determined by reference to the number of Units held by such Member, and without reference to the Capital Contribution or Capital Account. In the event the Company issues additional Units in accordance with the terms of this Agreement, the Unit Percentage of each Unit outstanding after giving effect to such issuance shall be equal to the quotient of one divided by the total number of all then-outstanding Units.

Schedule 6.1
Capital Contributions

| Member | Capital Contribution |
| --- | --- |
| GFG Holding | $800,000 |
| Total | $800,000 |

**SPENCE LAW OFFICE, P.C.**
Robert J. Spence, Esq.
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.: (516) 336-2060
Email: rspence@spencelawpc.com


**WOLLMUTH MAHER & DEUTSCH LLP**
Brad J. Axelrod, Esq.
500 Fifth Avenue
New York, New York 10010
Tel.: 212.556.0355
Email: baxelrod@wmd-law.com


*Co-Counsel to Annie Liu*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | X |
| In re: | X |
| | X  Chapter 11 |
| GLOBAL FERTILITY & GENETICS, | X |
| NEW YORK, LLC | X  Case No.: 23-10905-PB |
| | X |
| Debtor. | X |
| | X |

**CHAPTER 11 PLAN OF REORGANIZATION**
**FOR GLOBAL FERTILITY & GENETICS NEW YORK, LLC PROPOSED BY**
**ANNIE LIU, CREDITOR AND INTERESTED PARTY**

Annie Liu (the "Plan Proponent") respectfully submits this plan of reorganization for

debtor Global Fertility & Genetics New York, LLC pursuant to sections 1121(c), 1125, and

1126 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure

(the "Plan"). This Plan replaces the previous Plan which Ms. Liu filed jointly with Dr. Kevin

J. Doody ECF No. [84]. Ms. Liu withdraws her prior plan. This Plan is filed in collaboration

with Recharge Capital ("Recharge") the Plan funding source and proposed controlling partner

in the Reorganized Debtor. A copy of the plan funding agreement by and between the Plan

Proponent and Recharge is annexed hereto as **Exhibit "A."**

1

## INTRODUCTION

The Plan Proponent proposes this plan of reorganization for the Debtor as a superior alternative to the plan filed by Dr. Hu Bo (ECF 126) (the "Hu Plan"). This Plan pays all Allowed Claims in full, in cash, and, for the Allowed General Unsecured Creditors, with post-petition interest ("PPI") at the Federal Rate,[1] on the Effective Date, *and pays equity $1 million.* Dr. Hu's plan purports to pay certain general unsecured creditors, without PPI, on a date uncertain, and pays equity nothing. This Plan thus addresses the critical issue that animates this Chapter 11 Case: namely, the need to test the value of the Debtor's equity and allocate that value. Because this Plan immediately pays $1 million to equity while Dr. Hu's plan eschews any marketing process or systematic effort to identify a buyer for the debtor's business, but simply wipes out equity for no payment whatsoever, this Plan's $1 million payment to equity is a step toward maximizing the value of the estate for its creditors and beneficial owners.[2] Because it also pays all Allowed Claims in full and effectively mirrors the other elements of Dr. Hu's plan, this Plan is superior to Dr. Hu's and should be confirmed.

Under this Plan, the Reorganized Debtor will be able to feasibly operate as a going concern. The Reorganized Debtor will be controlled, and its day-to-day management will be guided, by a new owner of the Debtor's equity (the "New Owner"), which will be an affiliate of Recharge Capital ("Recharge"), and which will be controlled by Recharge, not the Plan Proponent. Recharge is an integrated investment firm based in New York and Singapore, whose investments include Southeast Asian network of owned- and partner- fertility services

---

[1] In re LATAM Airlines Grp. S.A., No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) ("The Court agrees with Hertz and holds that if TLA was solvent, then the Debtors would have to include PPI at the federal judgment rate") (Judge Garrity was referring to: *Wells Fargo Bank, N.A. v. The Hertz Corp* (In re The Hertz Corp.), No. 20-11218, 637 B.R. 781, 2021 WL 6068390, at *11 (Bankr. D. Del. Dec. 22, 2021) ("Hertz").

[2] Creditors holding litigation or other contested contingent claims will have those Claims pass-through the Chapter 11 unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, without regard to the automatic stay or the Debtor's Discharge and with all parties' respective rights, remedies, claims and defenses as they existed on the Petition Date fully preserved. Notwithstanding the foregoing, the Plan Proponent and Reorganized Debtor reserve the right to treat Dr. Hu's contingent claim as a Pass-Through Claim or may object to the claim pursuant to the terms hereof for filing and prosecuting Claim Objections.

**Appendix Page 240**

clinics GenPrime, Mexican fertility clinic Fertilidad Integral, and AI-driven IVF software solutions-provider Embryonics. Recharge will also leverage the Plan Proponent's deep connections to the Debtor's core client pool in the Peoples Republic of China, Japan, and Korea. The Reorganized Debtor will have sufficient working capital to stabilize the business, promote and encourage the facility's growth, and ensure its ability to satisfy on-going operating expenses. At the Confirmation Hearing, the Plan Proponent will demonstrate the amount of working capital the Reorganized Debtor's business will require to operate smoothly and efficiently. The Plan Proponent presently estimates that amount to be not more than $750,000 which amount will be available on confirmation.

The Plan Proponent encourages the creditors of the estate to review both Plans carefully and select the Plan they believe is higher and better for the estate. Because there are competing plans, the Plan Proponent is also asking the Bankruptcy Court to allow a public auction process to so that the estate can achieve the highest and best offers for the equity interests of the Debtor.

## SECTION 1. DEFINITIONS AND INTERPRETATION

### 1.1 Definitions

The following terms used herein shall have the respective meanings defined below:

1.1.1 Action shall mean any lawsuit, proceeding, or other action in a court, or any arbitration.

1.1.2 Administrative Claims Bar Date shall mean the deadline for filing requests for payment of Administrative Expense Claims, including Professional Fee Claims, which shall be 30 days after the Effective Date.

1.1.3 Administrative Expense Claim shall mean a Claim against the Debtor for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including,

3

but not limited to, (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor; (b) Professional Fee Claims; (c) any Claim specified in section 503(b)(9) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code.

1.1.4     Allowed, when used as an adjective preceding the words "Claims" or "Interest", shall mean any Claim against or Interests of the Debtor, proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claim or Interest against such Debtor, or, if no proof of claim or Interest is filed, which has been or hereafter is listed by the Debtor as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed with the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules, or as to which any objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. Unless otherwise specified in the Plan, "Allowed Claim" and "Allowed Interest" shall not, for purposes of computation of distributions under the Plan, include interest on the amount of such Claim or Interest from and after the Petition Date.

1.1.5     Allowed Unsecured Claim shall mean a General Unsecured Claim that is or has become an Allowed Claim.

1.1.6     Bankruptcy Code shall mean title 11 of the United States Code, as now in effect or hereafter applicable to the Chapter 11 Case.

1.1.7     Bankruptcy Court shall mean the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case and, to the extent of any reference made pursuant to 28 U.S.C. § 158, the unit of such District Court constituted pursuant to 28 U.S.C. § 151.

1.1.8     Bankruptcy Rules shall mean the rules and forms of practice and procedure in bankruptcy, promulgated under 28 U.S.C. Section 2075 and also referred to as the Federal Rules of Bankruptcy Procedure, as amended.

1.1.9     Bar Date means the original bar date of April 4, 2024 at 11:59 p.m. (Eastern time), as extended to June 28, 2024 by Order of the Bankruptcy Court entered on May 21, 2024, or such other date as set by the Bankruptcy Court as the deadline by which proof of claim forms for prepetition Claims are required to be filed against the Debtor.

1.1.10     Business Day means and refers to any day except Saturday, Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), and any other day on which commercial banks in New York, New York are authorized or required by law to close.

1.1.11     Cash means cash and cash equivalents including, without limitation, checks and wire transfers.

1.1.12     Chapter 11 Case shall mean the case under Chapter 11 of the Bankruptcy Code with Case No. 23-10905-PB in which Global Fertility & Genetics, New York LLC is the Debtor.

1.1.13     Chapter 11 Trustee shall mean Eric M. Huebscher, as the Court-appointed Chapter 11 trustee as per the Order of the Bankruptcy Court entered on April 4, 2024.

1.1.14     Claim shall mean any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. All claims as such term is defined in section 101(5) of the Bankruptcy Code.

1.1.15    Claims Objection Deadline shall mean, subject to any extension as set forth in Section 4.5 of the Plan, the date that is the first Business Day that is at least ninety (90) days after the Effective Date. For the avoidance of doubt, the Claims Objection Deadline may be extended one or more times by the Bankruptcy Court and applies to all Claims.

1.1.16    Class shall mean a grouping of substantially similar Claims or Interests for common treatment thereof pursuant to the terms of this Plan.

1.1.17    Confirmation shall mean the entry of an order by the Bankruptcy Court approving the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.1.18    Confirmation Date shall mean the date on which the Bankruptcy Court enters the Confirmation Order.

1.1.19    Confirmation Hearing shall mean a hearing conducted before the Bankruptcy Court for the purpose of considering confirmation of the Plan and approval of the Disclosure Statement.

1.1.20    Confirmation Order shall mean an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.1.21    Creditor shall mean any person that has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtor's Estate of any kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code. This includes all persons, corporations, partnerships, or business entities holding Claims against the Debtor.

1.1.22    Debt shall have the meaning ascribed to it in section 101(12) of the Bankruptcy Code.

1.1.23    Debtor shall mean Global Fertility & Genetics, New York, LLC.

1.1.24    Disallowed shall mean, with respect to a Claim, or any portion thereof, that such Claim or portion thereof: (a) has been disallowed by either a Final Order or pursuant to a settlement or stipulation between the Debtor and the holder of the Claim; or (b)(i) is valued

6

on the Debtor's Schedules at zero dollars ($0) or denominated as contingent, disputed or unliquidated and (ii) as to which a bar date has been established but no proof of claim has been filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.1.25    Disbursing Agent shall mean the Reorganized Debtor or the Plan Proponent's designee, as applicable, which shall act as the disbursing agent for the purpose of making all distributions to Holders of Allowed Claims pursuant to the provisions of the Plan and Confirmation Order.

1.1.26    Discharge shall mean the complete extinguishment of the liability of the Debtor in respect to any Claim or Debt, as and to the extent further described in Section 8.2 of the Plan.

1.1.27    Disclosure Statement shall mean the Disclosure Statement filed by the Plan Proponent in respect of the Plan as required pursuant to Section 1125 et seq. of the Bankruptcy Code, as the same may be altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.1.28    Disputed shall mean, with respect to a Claim, or any portion thereof, that such Claim or portion thereof is neither an Allowed Claim nor a Disallowed Claim, and includes, without limitation, any Claim that: (a) is not included on the Debtor's Schedules or is reflected on the Schedules as being valued at zero dollars, or as contingent, unliquidated or disputed; or (b) is the subject of an objection filed in the Bankruptcy Court that has not been withdrawn or overruled by a Final Order of the Court.

1.1.29    Distribution shall mean any payment to the Holder of a Claim as provided in this Plan.

1.1.30    Dr. Hu shall mean Dr. Hu Bo.

7

1.1.31   Effective Date shall mean the day on which the Confirmation Order becomes a Final Order and all conditions to effectiveness of the Plan have been satisfied and/or waived by the Plan Proponent.

1.1.32   Estate shall mean the estate of the Debtor created by the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.1.33   Exculpated Parties shall mean, collectively: (a) the Debtor; (b) the Reorganized Debtor; (c) the Plan Proponent and Recharge; and (d) with respect to each of the foregoing Persons or entities in clauses (a) through (c), such Person's or entity's Related Persons, in each case in their capacity as such. For the avoidance of doubt, the Chapter 11 Trustee and his professionals shall each be deemed to be a Related Person of the Debtor and shall be treated as an Exculpated Party.

1.1.34   Final Order shall mean an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure

8

may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

1.1.35    General Unsecured Claim shall mean a Claim against the Debtor of any kind or nature including, without limitation, on account of trade credit, contract, personal injury, or arising from the rejection of an executory contract or unexpired lease, that (a) is not secured by property of the Estate or otherwise entitled to treatment as a secured claim under section 506 of the Bankruptcy Code; (b) is not otherwise entitled to priority under sections 503 or 507 of the Bankruptcy Code; and (c) is not otherwise an Administrative Expense Claim, Professional Fee Claim, Claim for U.S. Trustee Fees, Priority Tax Claim, Non-Tax Priority Claim, or Secured Claim.

1.1.36  GFG Holding means GFG Holding Group Co., LLC, the 100% parent of the Debtor.

1.1.37  Holder shall mean the beneficial holder of any Claim or Interest.

1.1.38  Impaired shall mean, when used as an adjective preceding the words "Class of Claims" or "Class of Interest", that the Plan alters the legal, equitable, or contractual rights of the members of that class.

1.1.39    Interest shall mean any equity security (as defined in section 101(16) of the Bankruptcy Code) or membership interest in the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor.

1.1.40    Interest Holder shall mean the Holder of an Interest in the Debtor.

1.1.41    Ms. Liu shall mean Annie Liu.

1.1.42   New Owner means an affiliate of Recharge, which will be controlled by Recharge, not the Plan Proponent.

1.1.43   Non-Tax Priority Claim shall mean a Claim against the Debtor, other than an Administrative Expense Claim, Priority Tax Claim, or Professional Fee Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.1.44   Pass-Through Claim shall mean each of (i) the claim of Alexis Cancel arising from that certain employment discrimination lawsuit pending in the Supreme Court of New York, New York County, captioned as Alexis Cancel v. Global Fertility and Genetics, Inc. et al, Index Number 152435/2018, (ii) the claim, if any, of Michelle Ramos arising from that certain employment discrimination complaint filed with the New York State Division of Human Rights, captioned as *Michelle Ramos v. Global Fertility & Genetics LLC, Annie Liu*, Case Number 10232551, and (iii) any other contingent litigation claim that is designated as such by the Plan Proponent prior to Confirmation.  Notwithstanding the foregoing, the Plan Proponent and Reorganized Debtor reserve the right to treat Dr. Hu's contingent claim as a Pass-Through Claim or may object to the claim pursuant to the terms hereof for filing and prosecuting Claim Objections.

1.1.45   Person shall mean an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government or any political subdivision thereof or other entity, including, without limitation, the Debtor, the Reorganized Debtor and the Plan Proponent.

1.1.46   Petition Date shall mean June 6, 2023, which is the date the Debtor filed its petition for relief commencing the Chapter 11 Case.

1.1.47   Plan shall mean this Chapter 11 plan of reorganization for the Debtor filed by the Plan Proponent, as it may be altered, modified, or amended from time to time in

Appendix Page 248

accordance with the Bankruptcy Code and the Bankruptcy Rules, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

1.1.48    Purchase Price shall mean the $1,000,000 to be distributed to Class 4;[3] approximately $913,000.00 or such lesser or greater amount sufficient to pay in full all Allowed Claims, and PPI, with respect thereto, for the Allowed General Unsecured Claims, plus an amount of not less than $750,000 to be used to fund operating and other expenses of the Reorganized Debtor following the Effective Date of the Plan.

1.1.49    Plan Proponent shall mean Annie Liu, including any designee of Annie Liu.

1.1.50    Plan Supplement shall mean one or more supplements to the Plan to be filed with the Bankruptcy Court in advance of the Confirmation Hearing which shall contain, without limitation, the following information: (i) a schedule setting forth the Reorganized Debtor's proposed post-Effective Date management team, (ii) a list of all executory contracts and/or unexpired leases to be Assumed or Assumed and Assigned to the Debtor or Reorganized Debtor, as the case may be, including proposed Cure Costs, if any, (iii) forms of organizational and/or corporate governance documents in respect of the Reorganized Debtor, and (iv) an updated schedule listing all known Allowed Claims and any Disputed Claims, and the amounts thereof, all as may be amended from time to time and in form and substance acceptable to the Plan Proponent at her discretion.

1.1.51    Priority Non-Tax Claim shall mean a Claim entitled to priority under Sections 507(a)(2),(3), (4), (5), (6) or (7) of the Bankruptcy Code, but only to the extent it is entitled to priority in payment under any such subsection.

---

[3] The Plan Proponent reserves the right to increase the equity portion of the Purchase Price at any time by filing a Plan Supplement or, to the extent proper, orally at the Confirmation Hearing.

1.1.52    Priority Tax Claim shall mean any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

1.1.53    Priority Tax Creditor shall mean a Creditor holding a Priority Tax Claim.

1.1.54    Professional Fee Claim shall mean and refers to a Claim by any and all Professional Persons as provided for in sections 327, 328, 330 and 503(b) of the Bankruptcy Code.

1.1.55    Professional Persons shall mean and refers to all attorneys, accountants, appraisers, consultants, and other professionals retained or to be compensated pursuant to an order of the Bankruptcy Court entered under sections 327, 328, 330, or 503(b) of the Bankruptcy Code, including, for the avoidance of doubt, the Chapter 11 Trustee, Huebscher & Co. and the Chapter 11 Trustee's attorneys.

1.1.56    Related Person shall mean, with respect to any Person or entity, in each case solely in its capacity as such, such Person's or entity's (a) predecessors, successors, assigns, subsidiaries, and affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, Estate, and nominees.

1.1.57    Reorganized Debtor shall mean the Debtor after the occurrence of the Effective Date of the Plan.

1.1.58    Schedules shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor in this Chapter 11 Case on June 6, 2023 (CM/ECF No. 1)., as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented through the Effective Date.

12

1.1.59    Secured Claim shall mean and refers to a Claim which is secured by a valid lien, security interest, or other interest in property in which the Debtor has an interest which has been perfected properly as required by applicable law, but only to the extent of the value of the Debtor's interest in such property, determined in accordance with section 506(a) of the Bankruptcy Code.

1.1.60 Unimpaired shall mean with respect to any Class, that such Class is not Impaired.

1.1.61    Unsecured Claim shall mean any Claim against the Debtor which arose or which is deemed by the Bankruptcy Code to have arisen prior to the Petition Date for such Debtor, and which is not (i) a secured claim pursuant to section 506 of the Bankruptcy Code, as modified by section 1111(b) of the Bankruptcy Code, or (ii) a Claim entitled to priority under sections 503 or 507 of the Bankruptcy Code.

1.1.62    U.S. Trustee Fees shall mean all fees and charges assessed against the Estate of the Debtor under 28 U.S.C. § 1930 together with interest, if any, under 31 U.S.C. § 3717.

## 1.2    Interpretation: Application of Definitions and Rules of Construction

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, Subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Disclosure Statement, and if not defined therein, in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule

13

as it may have been amended, restated, revised, supplemented or otherwise modified. If a time or date is specified for any payments or other Distribution under the Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. Unless otherwise specified, references to Ms. Liu shall be in her capacity as the Plan Proponent.

### 1.3 Exhibits

All exhibits and schedules to the Plan (including those set forth in or attached as exhibits to the Plan Supplement) are hereby incorporated by reference and made part of the Plan as if set forth fully herein.

### 1.4 Time Periods

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

## SECTION 2. TREATMENT OF CLAIMS

### 2.1 Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Plan Proponent has not placed the following claims in a Class. The treatment of these claims is provided below.

2.1.1    Administrative Expense Claims. Administrative Expense Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed pursuant to section 503(b) of the Bankruptcy Code. In accordance with section 1123(a)(1) of

14

the Bankruptcy Code, Administrative Expense Claims have not been classified and are treated as described in this Section 2.1 of the Plan. Except as otherwise provided in the Plan, by written agreement of the Holder of an Allowed Administrative Expense Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Expense Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Expense Claim. Notwithstanding anything in the Plan to the contrary, the Holder of an Allowed Administrative Expense Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Administrative Expense Claim and the Plan Proponent or the Reorganized Debtor. As to other Allowed Administrative Expense Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim: (i) shall be paid by the Reorganized Debtor as soon as reasonably practicable after the Effective Date or on the date the order allowing such Administrative Expense Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Expense Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Expense Claim.

Administrative Expense Claims representing obligations incurred by the Debtor after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Debtor or the Reorganized Debtor, as the case may be, in the ordinary course of business and without Bankruptcy Court approval.

2.1.2    Priority Tax Claims. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and

in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, as applicable, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium. The Holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the Confirmation of the Plan.

2.1.3    Non-Tax Priority Claims. Unless the Holder of an Allowed Non-Tax Priority Claim and the Debtor or the Reorganized Debtor, as applicable, agree to a different treatment, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which Non-Tax Priority Claim becomes an Allowed Claim, each Holder of such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (i) Cash equal to the unpaid portion of such Allowed Claim or (ii) such other less favorable treatment as to which the Plan Proponent or the Reorganized Debtor, as applicable, and the Holder of such Allowed Claim shall have agreed upon in writing. Notwithstanding anything in the Plan to the contrary, the Holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the Holder of an Allowed Non-Tax Priority Claim and the Debtor or the Reorganized Debtor, as applicable. The Debtor has indicated that there are no Non-Tax Priority Claims.

2.1.4    Professional Fee Claims. In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as

Appendix Page 254

described herein. All Professional Persons or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date, and (b) shall be paid in full, in Cash, by the Reorganized Debtor (i) as soon as practicable after the Effective Date or the date the order allowing such Administrative Expense Claim becomes a Final Order; or (ii) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Plan Proponent or the Reorganized Debtor, as applicable. The Reorganized Debtor is authorized to pay its Professional Persons for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

2.1.5    US Trustee Fees. US Trustee Fees include all fees and charges assessed against the Debtor under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717. All US Trustee Fees then outstanding shall be paid prior to, or upon the occurrence of, the Effective Date.

**2.2    Classification and Specification of Treatment of Claims**

All Claims, except those described in Section 2.1, are placed in the following Classes of Claims, pursuant to section 1123(a)(1) of the Bankruptcy Code, which section specifies the treatment of such Classes of Claims and of their Impaired or Unimpaired status, pursuant to sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an

17

Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan.

Subject to all other applicable provisions of this Plan, classified Claims shall receive the respective treatments set forth below. This Plan will not provide any Distribution on account of a Claim to the extent that such Claim has been Disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties. Except as specifically provided in this Plan, this Plan will not provide any Distribution on account of a Claim, the payment of which has been assumed by a third party. Any Holder of any Claim in any Class may agree, pursuant to section 1123(a)(4) of the Bankruptcy Code, to a treatment of such Claim that is less favorable (but not more favorable) than any other Claim in such Class.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation of the Plan, and Distributions pursuant to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Expense Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | US Trustee Fee Claims | No | Does Not Vote |
| 1 | Secured Claim of Chase Bank | No | Deemed to Accept |
| 2 | Secured Claim of GE HFS LLC | No | Deemed to Accept |
| 3 | General Unsecured Claims | No | Deemed to Accept |
| 4 | Equity Interests | Yes | Entitled to Vote |

**Appendix Page 256**

### 2.3    Treatment and Voting Rights of Claims and Interests

#### 2.3.1    *Class 1 – Chase Bank.*

Classification: Class 1 consists of a Secured Claim.

Treatment: KJD Fertility PLLC ("KJD") took out a loan on all assets located at the Debtor's premises at its business premises. Chase filed a UCC1 financing statement to provide notice of its security interest. The funds were utilized near the time of filing of the bankruptcy case in the Debtor's operations. While this Claim is in the name of KJD, the Debtor's business utilized the funds and there is a lien on assets located at the Debtor's premises. This secured claim, which has a balance of approximately $67,000, will be paid in full under the Plan on the Effective Date. The Plan Proponent reserves the right to resolve this matter consensually with Chase Bank by assuming the obligations through the New Owner and simply performing under the applicable loan agreement.

Voting: Class 1 is Unimpaired and Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan, and votes of such Holders will not be solicited with respect to such Class 1 Claims.

#### 2.3.2    *Class 2 – GE HFS LLC.*

Classification: Class 2 consists of a Secured Claim.

Treatment: GE HFS LLC has a lien on certain equipment utilized by the Debtor in its business operations. GE HFS LLC has a lien on these assets and has filed a UCC1 financing statement to provide notice of its security interest. This secured claim which has a balance of approximately $15,000 will be paid in full under the Plan on the Effective Date. The Plan Proponent reserves the right to resolve this matter consensually with GE HFS by assuming the obligations through the New Owner and simply performing under the applicable loan agreement.

Voting: Class 2 is Unimpaired and Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan, and votes of such Holders will not be solicited with respect to such Class 2 Claims.

### 2.3.3 *Class 3 - General Unsecured Claims*

Classification: Class 3 Claims consists of all General Unsecured Claims.

Treatment: On, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall have its Claim paid in full in Cash with PPI from June 7, 2023 to the date of payment in the amount of the Federal Rate of 5.1% as follows:

(a)    General Unsecured Claims set forth on Exhibit A to the Plan or in a schedule to be included in the Plan Supplement will be paid from the Purchase Price to be made by the Plan Proponent and Recharge, as set forth in Exhibit A hereto or the Plan Supplement, as the case may be.

(b)    Those General Unsecured Claims set forth in Exhibit A to the Plan or in a schedule to be included in the Plan Supplement, which are designated as the Pass-Through Claims, shall survive unimpaired to be resolved by a court, arbitral panel, or other judicial or administrative body of competent jurisdiction, as to which all parties fully reserve all relevant rights and defenses. Payment on any Pass-Through Claim shall be made no later than the first day that is ten (10) Business Days after such Pass-Through Claim becomes an Allowed General Unsecured Claim.

The foregoing payments and/or treatment shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim.

Voting: Class 3 is Unimpaired and Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and votes of such Holders will not be solicited with respect to such General Unsecured Claims.

### 2.3.4   *Class 4 - Existing Equity Interests*

Classification: Class 4 consists of all existing Interests. This Class of Holders of Interests is comprised of the Debtor's sole member, GFG Holding Group Co., LLC.

Treatment: On the Effective Date, GFG's Interest shall be extinguished, cancelled, released, and discharged. GFG's Interest will be paid $1 million in cash on the Effective Date.

Voting: Class 4 is Impaired and Holders of Interests are entitled to vote on the Plan.[4]

## SECTION 3.  ACCEPTANCE OR REJECTION OF THE PLAN

### 3.1      Impaired Classes Vote

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the plan is accepted by the Holders of at least two-thirds in dollar amount and more than one half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 3.2      Presumed Acceptance of the Plan

Class 1, 2 and 3 are Unimpaired under the Plan and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

### 3.3      Voting Classes

Class 4 is entitled to vote on the Plan.

### 3.4      Modification of Treatment of Class 3 Claims

---

[4] The Plan may be confirmed regardless of whether Class 4 accepts or rejects the Plan because section 1129(a)(10) of the Bankruptcy Code does not require a consenting class of interests to accept.

**Appendix Page 259**

The Plan Proponent or the Reorganized Debtor, as the case may be, may modify the treatment of any Allowed Class 3 Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the consent of the Holder of the Class 3 Claim whose Allowed Claim is being adversely affected, or as Allowed by Bankruptcy Court order prior to the Effective Date.

### 3.5     "Cram Down" Request

If Class 4 rejects the Plan, the Plan Proponent will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## SECTION 4.  MEANS FOR IMPLEMENTATION OF THE PLAN

### 4.1     Funding for the Plan

The New Owner will fund all distributions under the Plan with the Purchase Price. The Purchase Price will be the sum of the amount required to (i) pay all Creditors in full, including the face amount of any Pass-Through Claims, and postpetition interest with respect thereto, (ii) pay $1 million in the aggregate to Class 4 Interest, and (iii) fund the Reorganized Debtor with no less than $750,000, which will be paid on the Effective Date, operating expenses as they come due in the ordinary course of business.

### 4.2     Continued Corporate Existence

Except as otherwise provided in the Plan, the Debtor, as the Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with the Reorganized Debtor, the Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable law, and the Reorganized Debtor's organizational documents, as the Reorganized Debtor may determine is reasonable and appropriate.

### 4.3     Corporate Action

**Appendix Page 260**

On the Effective Date, the Confirmation Order shall be deemed to, among other things, ratify all prior corporate actions taken and to authorize all future actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan, including: (i) the selection of the directors and officers of the Reorganized Debtor; (ii) the distribution of new Interests to the New Owner as provided herein; (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor and any corporate action required by the Debtor, the Plan Proponent, or the Reorganized Debtor in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the Plan Proponent or the directors, or officers of the Debtor or the Reorganized Debtor or otherwise.

On or before the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor, including the new Interests to be issued to the New Owner, and any and all agreements, documents, securities, and instruments relating to the foregoing.

It is the intention of New Owner to offer employment, as of the Effective Date, to all current non-medical staff employees of KJD Fertility PLLC that (i) were employed by the Debtor as of the Petition Date, and/or (ii) do work that is related to the Debtor's business.

The authorizations and approvals contemplated by this Section 4.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

**4.4     Vesting of Assets**

Except as otherwise provided in the Plan, on the Effective Date, all Assets, including all Claims, rights, intellectual property rights, and causes of action, shall vest in the Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances, and interests. For the avoidance of doubt, this includes any Claims, rights and causes of action that the Estate may have against Dr. Hu, Dr. Kevin J. Doody, KJD Fertility PLLC and/or Kasen & Kasen, all of which are preserved. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims), interests, and causes of action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. The Plan Proponent is paying all allowed claims in full on the Effective Date. A schedule of the proposed treatment of claims is annexed as a schedule to the agreement between Recharge and Plan Proponent (Exhibit A). The Reorganized Debtor and the Plan Proponent reserve the right to object to any and all claims.

On or prior to the occurrence of the Effective Date, any Person holding property of the Debtor, including any property that was developed or registered by, for, or on behalf of the Debtor, shall be turned over and assigned to the Reorganized Debtor. For the avoidance of doubt, this includes any intellectual property rights that were developed by or for the Debtor, such as trademark rights associated with the Debtor's business, but that are or have been held or registered in the name of other Persons.

**4.5      Objections to Claims**

Except as expressly provided herein, the Debtor (before the Effective Date) or the Plan Proponent or the Reorganized Debtor (on or after the Effective Date), as applicable, shall have the exclusive authority and standing to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims. From and after the Effective Date, the Plan Proponent or

the Reorganized Debtor, as the case may be, shall further have the authority to resolve and settle any and all Claims without approval of the Bankruptcy Court. The Plan Proponent and/or the Reorganized Debtor intend to object, at a minimum, to the contingent claim filed by Dr. Hu unless they opt to treat the claim as a Pass Through Claim.

Any objections to Claims shall be filed and served on or before the Claims Objection Deadline, provided, however, that the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice before or after the deadline by the Plan Proponent or the Reorganized Debtor.

### 4.6     Issuance of New Equity Interests

On the Effective Date, the Reorganized Debtor shall issue all securities, notes, instruments, membership interests, certificates, and other documents to the Plan Proponent that are required to be issued pursuant to the Plan. All of the new Interests issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable and shall vest full title and ownership of the Reorganized Debtor in the New Owner free and clear of all Claims, liens, charges, other encumbrances, and interests. The issuance of the new Interests is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.

On the Effective Date, the Reorganized Debtor and the New Owner shall enter into new organizational and/or corporate governance documents (which shall be in substantially the form included in the Plan Supplement). The new organizational and/or corporate governance documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of the new Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtor.

**4.7      Exemption from Certain Transfer Taxes and Recording Fees; Post-Effective Date Tax Treatment**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (b) the making, assignment, or recording of any lease or sublease; or (c) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or government assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

Following the Effective Date, the Reorganized Debtor shall be treated as a disregarded entity for federal and all relevant state income tax purposes.

**4.8      Directors and Officers of the Reorganized Debtor**

The Plan Proponent and New Owner will designate the post-confirmation management of the Reorganized Debtor in the Plan Supplement. For the avoidance of doubt, Annie Liu will not have a managerial position in the day-to-day operations of the Reorganized

26

Debtor. She will nonetheless be employed by the New Owner and/or Reorganized Debtor in a marketing capacity with a salary/compensation to be negotiated.

The current members of the board of directors or board of managers, or the sole manager, as applicable, of the Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtor on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the Debtor on the Effective Date. Each of the directors, managers, sole managers and officers of the Reorganized Debtor shall serve pursuant to the terms of the new organizational and/or corporate governance documents of the Reorganized Debtor and may be designated, replaced or removed in accordance with such new organizational and/or corporate governance documents.

Absent an agreement to the contrary between the Chapter 11 Trustee and the Plan Proponent, the Chapter 11 Trustee shall have no further duties as the Chapter 11 Trustee upon the occurrence of the Effective Date of the Plan.

## 4.9    Continuation of Insurance Policies

All insurance policies pursuant to which the Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed or assumed and assigned to the Reorganized Debtor and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

## 4.10    Bar Date for Professional Fee Claims

Each Professional Person retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must file with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 30 days after the Effective Date. All applications for the allowance of Professional Fee Claims that are not timely filed shall be forever barred. Except as otherwise provided

27

herein, objections to such applications may be filed in accordance with the Bankruptcy Rules. The Bankruptcy Court shall determine all such Professional Fee Claims.

### 4.11    Bar Date for Other Administrative Expense Claims

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Expense Claims must file and serve on the Debtor or Reorganized Debtor, as applicable, requests for the payment of such Administrative Expense Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Debtor or the Reorganized Debtor, the Estate, or its property without the need for any objection by the Debtor or the Reorganized Debtor, or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Expense Claims shall be deemed fully satisfied, released, and discharged.

### SECTION 5.    TREATMENT OF EXECUTORY CONTRACTS/UNEXPIRED LEASES

### 5.1    General Treatment of Executory Contracts and Unexpired Leases

On the Effective Date, all executory contracts and unexpired leases shall be deemed rejected as of the Effective Date, unless such executory contract or unexpired lease: (i) is an insurance policy that is deemed assumed and retained by the Debtor pursuant to Section 4.8 of the Plan, (ii) was assumed previously by the Debtor; (iii) previously expired or terminated pursuant to its own terms; (iv) is the subject of a motion to assume filed on or before the Effective Date; or (v) is identified in the Plan Supplement to be assumed under the Plan.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection or assumption, as the case may be, of all executory contracts or unexpired leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated,

28

rejection or assumption of executory contracts and unexpired leases pursuant to the Plan shall be effective as of the Effective Date.

## 5.2 Procedures Regarding Assumption of Executory Contracts and Unexpired Leases

If any party to an executory contract or unexpired lease that is being assumed and assigned to the Reorganized Debtor objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any cure payments, or the ability of the Debtor or the Reorganized Debtor, as applicable, to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Debtor, or assumed and assigned to the Reorganized Debtor, the Plan Proponent or the Reorganized Debtor, as applicable, will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The executory contracts and unexpired leases which will be assumed and assigned to the Reorganized Debtor, and their respective proposed cure costs, will be identified in the Plan Supplement.

## 5.3 Claims Based on Rejection of Executory Contracts and Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases under this Plan, if any, must be filed with the Bankruptcy Court within thirty (30) days after the earlier of (a) service of notice of the Effective Date, or (b) service of notice of entry of an order of the Bankruptcy Court (other than the Confirmation Order) approving the rejection of a particular executory contract or unexpired lease on the counterparty thereto.

The notice of Effective Date shall set forth the deadline for filing Proofs of Claim with respect to the same. Absent order of the Bankruptcy Court to the contrary, any Claims arising

from the rejection of an executory contract or unexpired lease not filed by the applicable deadline will not be considered Allowed and such person or entity shall not be treated as a Creditor for purposes of distributions under the Plan. Claims arising from the rejection of the Debtor's executory contracts or unexpired leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 3 of the Plan, which information shall be included in the notice of the Effective Date.

## SECTION 6.     PROVISIONS GOVERNING DISTRIBUTIONS

### 6.1     Disbursing Agent

The Reorganized Debtor, the New Owner, or the Plan Proponent's designee, as applicable shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Reorganized Debtor, the New Owner or the Plan Proponent's designee shall serve as the disbursing agent without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

### 6.2     Manner of Payment and Amount to Be Distributed

Unless otherwise agreed by the Reorganized Debtor or the Plan Proponent, as applicable, and the recipient of a Distribution under the Plan, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the disbursing agent.

Except as otherwise provided herein, Distributions under the Plan will be made only to the Holders of Allowed Claims. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any Distribution otherwise provided to Creditors under the Plan.

Except as otherwise provided herein, on, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which a Claim becomes an Allowed Claim, each Holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class. Except as otherwise provided in

Appendix Page 268

the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

**6.3        Saturday, Sunday or Holiday**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

**6.4        Withholding Taxes**

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**SECTION 7.        EFFECTIVE DATE**

**7.1        Conditions Precedent to Effective Date**

The Effective Date shall not occur unless each of the following conditions are satisfied or waived as set forth in Section 7.2 below:

7.1.1        Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance reasonably acceptable to the Plan Proponent, which shall be in force and effect and not subject to any stay of effectiveness.

Appendix Page 269

7.1.2    Authorizations. The Plan Proponent and/or the Reorganized Debtor, as applicable, shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

7.1.3    No Material Amendments. The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made with the consent of the Plan Proponent.

7.1.4    Payment of Purchase Price. The Plan Proponent and/or the New Owner shall pay the full amount of the Purchase Price to the Debtor or Reorganized Debtor, as the case may be.

**7.2      Waiver of Conditions Precedent**

Other than the condition to the Effective Date set out in section 7.1.4 above (i.e., payment of the Purchase Price), the Plan Proponent may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties-in-interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**7.3      Notice of Effective Date**

The Plan Proponent shall file a notice of the Effective Date with the Bankruptcy Court, and serve it on all Creditors and parties-in-interest, within five (5) Business Days after the occurrence of the Effective Date. Such notice will include all relevant deadlines put into effect by the occurrence of the Effective Date.

**7.4      Effect of Failure of Conditions Precedent**

If the Effective Date does not occur, then, upon notice by the Plan Proponent to the Bankruptcy Court, (a) the Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute

**Appendix Page 270**

a waiver or release of any Claims, Interests, or causes of action; (ii) prejudice in any manner the rights of the Debtor, the Plan Proponent or any other entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, the Plan Proponent or any other entity.

### 7.5    Right to Modify the Plan Until Substantial Consummation

Until the Plan has been substantially consummated, the Plan Proponent shall have the right to modify the Plan to the extent permitted by Section 1127 of the Bankruptcy Code.

### 7.6    Substantial Consummation of the Plan

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## SECTION 8.    EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

### 8.1    Binding Effect

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind and inure to the benefit of the Debtor, the Reorganized Debtor, the Plan Proponent, and each Holder of a Claim against or Interest in the Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, the Plan Proponent's, and Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan and whether such Holder has accepted or rejected the Plan or is deemed to have accepted or rejected the Plan.

### 8.2    Discharge of Claims

Except as otherwise expressly provided in the Plan or Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims.

Appendix Page 271

**8.3** **Exculpation and Limitation of Liability**

EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN ON OR AFTER THE PETITION DATE AND PRIOR TO OR ON THE EFFECTIVE DATE, IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN; PROVIDED THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; PROVIDED FURTHER THAT THE FOREGOING SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, OR TO ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER; PROVIDED FURTHER THAT NOTHING IN THE PLAN SHALL LIMIT THE LIABILITY OF ATTORNEYS TO THEIR RESPECTIVE CLIENTS PURSUANT TO RULE 1.8(h) OF THE NEW YORK RULES OF PROFESSIONAL CONDUCT (22 N.Y.C.R.R. § 1200) OR AFFECT ANY CRIMINAL ENFORCEMENT ACTION. FOR THE AVOIDANCE OF DOUBT, NOTHING HEREIN SHALL BE DEEMED TO RELEASE DR. HU, YIHAN HU, AND/OR KASEN & KASEN

34

OF ANY AND ALL CLAIMS THE DEBTOR, REORGANIZED DEBTOR, AND/OR PLAN PROPONENT MAY HAVE AGAINST THOSE PARTIES.

**8.4    General Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DEBTOR, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DEBTOR BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN, OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (W) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (X) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, (Y) CREATING, PERFECTING, OR ENFORCING

Appendix Page 273

ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM AND (Z) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR THE REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM, TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.

## SECTION 9.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all usual and customary matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a. Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

b. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professional Persons authorized pursuant to the Bankruptcy Code or the Plan;

c. Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure costs arising therefrom, including cure costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any executory contract or unexpired lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

d. Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

36

e. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

f. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g. Resolve any cases, controversies, suits, or disputes that may arise in connection with the interpretation or enforcement of the Plan or any entity's obligation incurred in connection with the Plan;

h. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

i. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with enforcement of the Plan;

j. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

l. Enter an order or final decree concluding or closing the Chapter 11 Case;

m. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

n. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

o. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

p. Enforce all orders previously entered by the Bankruptcy Court; and

q. Hear any other matter not inconsistent with the Bankruptcy Code.

## SECTION 10. MISCELLANEOUS PROVISIONS

### 10.1 Revocation or Withdrawal of this Plan

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan Proponent revokes or withdraws this Plan before the Confirmation Date, then this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Plan Proponent or to prejudice in any manner the rights of the Plan Proponent in any further proceedings.

## 10.2 Payment of Statutory Fees

All outstanding fees payable pursuant to section 1930(a) of Title 28 of the U.S. Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code or as agreed to by the US Trustee and Reorganized Debtor, shall be paid prior to the Effective Date of the Plan and, thereafter, shall be due and payable for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

## 10.3 Notices

All notices or requests in connection with this Plan shall be in writing and given by mail or overnight mail (with a contemporaneous e-mail copy, which shall not constitute notice) addressed to:

> To the Plan Proponent or Reorganized Debtor
> Wollmuth Maher & Deutsch LLP
> Brad J. Axelrod, Esq.
> 500 Fifth Avenue
> New York, New York 10010
> Email: baxelrod@wmd-law.com
>
> and
>
> SPENCE LAW OFFICE, P.C.
> Robert J. Spence, Esq.
> 55 Lumber Road, Suite 5
> Roslyn, New York 11576
> Tel.: (516) 336-2060
> rspence@spencelawpc.com

38

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in this Chapter 11 Case. Any such Holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Debtor or Reorganized Debtor.

**10.4    Severability**

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

**10.5    Validity and Enforceability**

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the Confirmation Order, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

**10.6    Controlling Documents**

In the event and to the extent that any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take

**Appendix Page 277**

precedence. In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan, the provisions of the Confirmation Order shall control and take precedence.

### 10.7    Filing of Additional Documents

At any time before substantial consummation of the Plan, the Plan Proponent or the Reorganized Debtor, as appropriate, may file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

### 10.8    Direction to a Party

On or after the Effective Date, the Plan Proponent or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### 10.9    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date has occurred.

### 10.10    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

Appendix Page 278

### 10.11 Headings

Headings are used in this Plan for convenience and reference only and shall not constitute a part of this Plan for any other purpose.

### 10.12 No Admissions

Notwithstanding anything herein to the contrary, nothing contained in this Plan shall be deemed as an admission by the Plan Proponent or the Reorganized Debtor with respect to any matter set forth herein.

*[Signature page follows]*

**Appendix Page 279**

Respectfully submitted,

Dated:  New York, New York
July 3, 2024

_____
Annie Liu, Plan Proponent


SPENCE LAW OFFICE, P.C.
Robert J. Spence, Esq.
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.: (516) 336-2060
Email: rspence@spencelawpc.com


WOLLMUTH MAHER & DEUTSCH LLP
Brad J. Axelrod, Esq.
500 Fifth Avenue
New York, New York 10010
Email: baxelrod@wmd-law.com


*Co-Counsel to Annie Liu*

42

# EXHIBIT A

**Annie Liu**
**225 Cherry Street 37N**
**New York, NY 10002**

July 1, 2024

Mr. Lorin Gu
Recharge Capital

Re: Global Fertility & Genetics, New York, LLC (the "GFG Debtor")

Dear Lorin:

This confirms that Recharge Capital will, or will cause one of its affiliates to, take up a controlling 70% interest in an entity to be formed ("New GFG Owner") to acquire all of the shares of the GFG Debtor pursuant to the Chapter 11 plan of reorganization (as amended and supplemented, the "Plan") Dr. Kevin Doody and I filed in the GFG Debtor's bankruptcy case pending in the United States Bankruptcy Court for the Southern District of New York, which plan provides for an auction process to determine the highest offer for 100% of the equity interests in the GFG Debtor (the "Transaction"). As we have discussed, Dr. Doody has withdrawn his support for the Plan, but I will amend the Plan to provide that, assuming the Plan is confirmed by the Bankruptcy Court, or if we are able to purchase 100% of the equity interests in the GFG Debtor through another chapter 11 plan:

- The reorganized GFG Debtor will pay each allowed claim (including all administrative expense claims, priority claims, allowed general unsecured creditor claims, and Chapter 11 trustee commissions, costs and expenses claims, UST quarterly fees) (collectively, the "Claims") in cash in full on the later of the Plan's effective date or promptly after the date on which the claim is allowed. In order to reduce the total amount of Claims, I will waive distribution from the Debtor on any amounts I may be entitled to on account of the proof(s) of claim currently in excess of $1,000,000 for unpaid compensation and advances which I have already filed or may amend or supplement in the GFG Debtor chapter 11 case in exchange for a credit of $500,000 toward payments required herein (such credit, the "Liu Credit"). Together, we will pay *up to* $1.4 million to pay the Claims and how we allocate the responsibility for any expenditure over $1.4 million (not including Liu Credit(s)) to pay allowed Claims is to be discussed and agreed upon in writing by the parties hereto, but I shall have the option if we cannot agree, of advancing the funds necessary to the Reorganized GFG Debtor in the unlikely event allowed Claims are greater than $1.4 million; Recharge or its affiliate will pay 70% and I will pay 30% of the final Claims amount but I will have the right to use the Liu Credit toward my 30% portion in consideration of my waived claim. Recharge or its affiliate and I shall deliver our proportionate shares of the Claims amount to a designated escrow or attorney trust account in the United States of our own choosing within 14 days of the scheduled confirmation hearing date of the Plan.

- We will pay US$1 million ("Equity Purchase Amount") to the GFG Debtor's 100% parent company, in exchange for that entity's 100% membership interest in the GFG Debtor which will be cancelled. The Reorganized GFG Debtor will issue 100% of its new membership interests to New GFG Owner. Recharge or its affiliate will pay 70% of the payment to equity and I will pay the remaining 30%. It is understood that – to the extent permitted – I am a 15% member in the existing equity owner and that I will get a credit for this amount toward my 30%. Accordingly, if permitted, I will pay up to $150,000 and Recharge will pay up to $700,000.00 for a total of $850,000; and if not permitted, I will pay up to $300,000. Recharge or its affiliate and I shall deliver our proportionate shares of the Equity Purchase Amount to a designated escrow or attorney trust account in the United States of our own choosing within 14 days of the scheduled confirmation hearing date of the Plan.

1

**Appendix Page 282**

- The Reorganized GFG Debtor will be capitalized with an additional three months' worth of working capital for the business, in the expected amount of $750,000. Recharge or its affiliate will pay 70% of the working capital contribution, and I will pay 30%. I will have the right to use any portion of the Liu Credit that remains after Claims have been paid toward my 30% portion of working capital. Recharge or its affiliate and I shall deliver our proportionate shares of the US$750,000 to a designated escrow or attorney trust account in the United States of our own choosing within 14 days of the scheduled confirmation hearing date of the Plan.

- A Schedule of estimated Claims is annexed hereto as is a Schedule of how the monetary obligations of Recharge and me work.

- In order to reduce the administrative fees attributable to the chapter 11 trustee, we will ask the court to allow Recharge's affiliate to operate the Reorganized GFG Debtor as soon as practicable after the confirmation of the Plan.

- Recharge or its affiliate will own 70% of New GFG equity owner and I, or my assignee, will own 30% of New GFG Owner; and Recharge or its affiliate will control New GFG Owner's board of directors and will, through that mechanism, appoint New GFG's Owner's officers and managers, who will be responsible for the day-to-day management and operation of the business.

- I will continue to be a guarantor on the Reorganized GFG Debtor commercial lease.

- I will be entitled to designate one member of New GFG Owner's board of directors; Recharge or its affiliates shall appoint the remaining directors.

- Closing of the Transaction is subject to Plan confirmation, Recharge's completion of due diligence, finalizing a formal term sheet and definitive documentation of the Transaction, and successful transfer of Reorganized GFG Debtor's business and other operational licenses to New GFG Owner.
- Alexis Cancel lawsuit and Michelle Ramos DOL complaint cases will be defended and pass through the bankruptcy case. Reorganized Debtor will defend and/or settle these cases and indemnify and defend me. The parties agree that there will be approximately $500,000 left under the cap of $1.4 million to pay these Claims. Notwithstanding the foregoing, in the unlikely event the Reorganized GFG Debtor does not have sufficient funds to pay either claim when such claim(s) are liquidated, from (a) the approximately $500,000 balance of $1.4 million, and (b) the $750,000 we provide hereunder to the Debtor for working capital, and we cannot agree on the terms of the payments over and above $1.4 million, I will advance the sums necessary to pay such claims to the Reorganized GFG Debtor to pay these claims.
- Any officers/members/directors of the Reorganized GFG Debtor will receive customary indemnification from the Reorganized GFG Debtor, to be negotiated and confirmed in the Transaction definitive documents.

My counsel will handle the Plan amendment and its related hearings; and I will bear all costs related to the Plan and Plan confirmation. My counsel and I will provide you with drafts of the amended Plan and any other filings that include mention of Recharge and the Transaction so you can review and comment on language that relates to Recharge and the Transaction.

*[Remainder of Page Intentionally Left Blank]*

**Appendix Page 283**

If the foregoing accurately reflects our agreement, please sign, or have an authorized representative of Recharge sign, a copy of this letter in the space provided below and return it to me. A scanned pdf will be sufficient. We are excited to begin this new project with Recharge and look forward to working with your team to continue bringing GFG's industry-leading IVF and genetics services to a global client base.

Sincerely,

Annie Liu

AGREED:

Recharge Capital

By:_____

Name: Lorin Gu

Title: Director

## Schedule of Estimated Claims (per R. Spence email June 30, 2024)

| | SCHEDULE - Schedule of Assumed or Rejected Executory Contracts and Unexpired Leases, Including Proposed Cure Amounts1 | | | |
|---|---|---|---|---|
| **Description of Contract** | **Contract Counterparty** | **Proposed Treatment** | **Cure Amount** | **Annie's Proposal** |
| Real property lease for premises located at 115 East 57th St., Suites 420 and 430, New York, NY 10022 | Eldad Prime, LLC | Lease to be assumed. | $0.00 Dr. Hu understands that the Debtor is current on its lease obligations. | 0 |
| Administrative Services Agreement dated on or about September 27, 2019 between KID Fertility PLLC and the Debtor (contract subject without all rights reserved) | KID Fertility PLLC | Under Review | 0 | 0 |
| Equipment Lease (No. 9933681001) for Voluson P8 | GE HFS LLC, dba Healthcare Financial Services | Lease to be assumed. | $15.508,01 | $15.508,01 |

1 This schedule will be updated if, and when, additional contracts and/or leases are discovered. Pursuant to the Plan, any executory contract or unexpired lease that (i) does not appear on this Schedule and designated as "assumed" or (ii) is not the subject of a separate motion to assume filed prior to Confirmation, shall be deemed rejected as of the Effective Date of the Plan.

| | SCHEDULE - Preliminary List of Claims and Proposed Treatment | | | |
|---|---|---|---|---|
| **Creditor** | **Asserted Claim Amount** | **Claim Number** | **Annie's Plan Treatment2** | **Annie's Proposal - Paid On Effective Date** |
| Chase Card.member Service KJD 3003 | $65.792,00 | Scheduled | Allowed, to be paid in full. | $67.000,00 |
| Metro Drugs RX | $16.000.00 Corrected scheduled amount is $60,056.15 | Scheduled | Allowed, to be paid in full. | $60.056,15 |
| Chase KJD 6975 | $30.500.00 | Scheduled | Allowed, to be paid in full. | $51.000.00 |
| Littler | $20,000 Corrected amowt is $36,175.63 | Scheduled | Allowed, to be paid in full. | $36.175,63 |
| JPMorgan Chase Banlc, N.A. | $31.496,61 | POC 3 | Allowed, to be paid in full. | $31.496,61 |
| SND & Associates | $27.108,48 | POC 9 | Allowed, to be paid in full. | $27.108,48 |
| NYC Dept. Of Finance | $15.798,68 | POC 6 | Allowed, to be paid in full. | $15.798,68 |
| ProAssurance Companies | $13.719,00 | Scheduled | Allowed, to be paid in full. | $13.719,00 |
| Labcorp | $9.518,06 | Scheduled | To be paid to the extent different and not duplicative of proof of claim number 5 filed by Labcorp. Still being reviewed | $9.518,06 |
| Labcorp | $4.867,89 | POC 5 | Allowed, to be paid in full. | $4.867,89 |
| Time Payment | $4.703,40 | POC 7 | Allowed, to be paid in full. | $4.703,40 |
| GE Precision Healthcare LLC | $4.083,72 | POC 1 | Allowed, to be paid in full. | $4.083,72 |
| SHARPS Compliance of Texas LLC | $1.250,00 | Scheduled | Allowed, to be paid in full. | $1.250,00 |
| Healtheare Financial Srvices | $1.238,50 | Scheduled | Allowed, to be paid in full. | $1.238,50 |
| New York State Department Of Labor | $211,31 | POC 2 | Allowed, to be paid in full. | $211,31 |
| Internal Revenue Service | $0.00 | POC 4 | Claim asserted in amount of $0. To be expunged | $0,00 |
| Alexis Cancel | $1.000.000,00 | POC 8 | Claim to pass-through bankruptcy and be adjudicated on the | $0,00 |
| Dr. Hu | Contingent/unliquidated | POC 10 | Claim will be objected to | $0,00 |
| Annie Liu | $2,530,956.37 (Pre- and Post-petition Unpaid Compensation: $960,322.58; post-petition advances $170,000; Indemnification $1,675,496.01) | POC 11 | Settled; no distribution for compensation and advances; indemnification claim to be allowed. | $0,00 |
| Ashland Maintenance Org. | $1.514,66 | Scheduled | this claim has already been paid in full. | $0,00 |
| College of American Pathologists | $6.746,00 | Scheduled | this claim has already been paid in full. | $0,00 |
| Dr. Glenn Moodie | $16.000,00 | Scheduled | this claim has already been paid in full. | $0,00 |
| EIVF | $7.606,62 | Scheduled | this claim has already been paid in full. | $0,00 |
| Eldad Prime | $541.988,00 | Scheduled | This claim relates to the Debtor's real property lease. The real property lease will be assumed and any cure payment will be paid | $0,00 |
| First Insurance Funding | $3.456,82 | Scheduled | this claim has already been paid in full. | $0,00 |
| Henry Schein | $9.243,23 | Scheduled | this claim has already been paid in full. | $0,00 |
| Kitazato | $1.119,87 | Scheduled | this claim has already been paid in full. | $0,00 |
| Kntz Security Technology | $472.52 Corrected amout is $14,650.00 | Scheduled | this claim has already been paid in full. | $0,00 |
| RDL Billing | $4.081,80 | Scheduled | this claim has already been paid in full. | $0,00 |
| Roche Diagnostic | $12.314,00 | Scheduled | this claim has already been paid in full. | $0,00 |
| Rosh Maternal Fetal Med | $20.000,00 | Scheduled | this claim has already been paid in full. | $0,00 |
| Time Payment | $1.500,00 | Scheduled | Duplicative of, and included in, proof of claim number 7, which is to be paid in full. | $0,00 |
| Vitro Life | $7.685,00 | | this claim has already been paid infull. | $0,00 |
| **TOTAL UNSECURED CLAIMS PAID ON EFFECTIVE DATE** | | | | **$328.227,43** |

2 Amounts and treatment subject to change based on information received and review of claims.

| | SCHEDULE - ADMIN CLAIMS | | |
|---|---|---|---|
| **ESTIMATED ADMINISTRATIVE CLAIMS** | | | |
| • Dr Kevin J. Doody; | $0.00 | | |
| • KID Medical PLLC; | $0.00 | | |
| • Annie Liu | $0.00 | | |
| • Michael Kasen, Esq. (Debtor counsel) | $0.00 | | |
| Chapter 11 Trustee | $77.250,00 | Estimated: Based on $1.8 million distribution | |
| Farrell Fritz (Trustee Attorney) | $200.000,00 | Estimated | |
| Vendors (Post petition) | $250.000,00 | Estimated | |
| TOTAL EST ADMINISTRATIVE | $527.250,00 | | |
| TOTAL UNSECURED CLAIMS | $328.227,43 | | |
| Equipment Lease Cure | $15.508,01 | | |
| TOTAL CLAIMS TO BE PAID | $870.985,44 | | |
| | $42.898,63 | Post Pet Interest on GUCs 5.1% x 14 mos | |
| Annie Liu Credit | $500.000,00 | | |
| Payment to Equity Class | $1.000.000,00 | | |
| **TOTAL EST PLAN PAYMENTS** | **$2.413.884,07** | | |

| **Agreement between Recharge and Annie Liu:** | | Recharge | Annie Payment | Annie Credit | |
|---|---|---|---|---|---|
| Claims: | $1.413.884,07 | $913.884,07 | $500.000,00 | $424,165,22 | 30% of $1,413,884.0 |
| Payment to Equity Class | $1.000.000,00 | $700.000,00 | $150.000,00 | $150.000,00 | 15% of $1MM |
| Working Capital | $750.000,00 | $600.834,78 | $149.165,22 | $75.834,78 | |
| | $3.163.884,07 | | $299.165,22 | | |
| | | | $650,000,00 | $500.000,00 | Claim Waiver Credit |
| | | $2.214.718,85 | $949.165,22 | $150.000,00 | Equity Pmt Credit |
| | | 70,00% | 30,00% | $650.000,00 | Credits to Annie Liu |

4

**Appendix Page 285**

David N. Crapo, CIPP-US
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4523
Facsimile: (973) 639-6244
dcrapo@gibbonslaw.com
*Patient Care Ombudsman*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL FERTILITY & GENETICS NEW YORK LLC, | Case No. 23-10905-PB |
| Debtor and Debtor-in-Possession | |

## FIFTH PATIENT CARE OMBUDSMAN REPORT

**SUBMITTED: July 3, 2024**

**BY:**

**DAVID N. CRAPO, CIPP-US**
**PATIENT CARE OMBUDSMAN**

## I. INTRODUCTION

This fifth report of the Patient Care Ombudsman ("**PCO**") is issued pursuant to the author's appointment on July 19, 2023 as the PCO by the United States Trustee for Region 2 ("**U.S. Trustee**") for debtor Global Fertility & Genetics New York, LLC ("**Debtor**"). The appointment arises under section 333 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*), which provides for the appointment of a patient care ombudsman "to monitor the quality of patient care and to represent the interests of the patients of the health care business." The Debtor's operations constitute "health care businesses" for purposes of the Bankruptcy Code. *See* 11 U.S.C. §101(27A). This report covers the period from May 2, 2024 through July 3,2024 ("**Fifth Reporting Period**"). During the Fifth Reporting Period, the PCO found no evidence of a decline in the quality of patient care and safety at the Debtor's facility.

## II. THE PCO'S INVESTIGATION DURING THE FIFTH REPORTING PERIOD

<u>Staff Licensing</u>. During the Fifth Reporting Period the PCO reviewed the appropriate New York licensing agencies' records and confirmed that each member the Debtor's clinical staff has continued to maintain any required licenses or approvals. At least one of the Debtor's physicians has privileges at a nearby acute care hospital. None of the Debtor's clinical staff have been the subject of disciplinary proceedings in the State of New York. None of the clinical staff are on the exclusion list maintained by the Unites States Department of Health and Human Services. During the Fifth Reporting Period, the PCO was unable to locate any customer reviews concerning either the Debtor or its clinical staff issued during the Fifth Reporting Period.

<u>Chapter 11 Trustee</u>. Since April 4, 2024, Eric M, Huebscher ("**Trustee**") served as Chapter 11 Trustee for the Debtor and has been operating the Debtor's business. The impetus for Mr. Huebscher's appointment was corporate governance and financial issues and not issues concerning patient care and safety. Mr. Heubscher has not advised the PCO of any patient care or safety issues, thereby obviating the need for the PCO to resume visiting the Debtor's facility to assure that the quality of patient care and safety is not compromised.

<u>Confirmation Hearing</u>. A hearing on the confirmation of a plan proposed by Dr. Hu Bo has been set for July 9, 2024. The result of that hearing will determine the future need for the PCO's services in this case.

<u>Litigation and Reviews</u>. The PCO's review of media reports and other publicly available documentation did not reveal the initiation of any litigation against either the Debtor or its clinical employees alleging malpractice or professional negligence. There have been few reviews of the Debtor. The reviews in 2024 were positive.

## III. FINDINGS

Based on his investigation, publicly available information and information provided by the Debtor, and subject to receipt of the documents and information identified immediately above, the PCO, the PCO has made the following findings:

**Finding #1:**     The PCO has not received any information indicating that quality of care provided to the Debtor's patients (including patient safety) is not acceptable and is currently declining or is otherwise being materially compromised.

**Finding #2:**     In light of the lack of any negative information about the Debtor, its clinical staff and the Trustee, the oversight and supervision provided by the Debtor's clinical staff appears to sufficient to uncover quality of care deficits as they arise.

**Finding #3:**     The PCO's receipt on a regular basis of updates to the information the PCO requests from the Debtor and the Trustee will provide a reasonable basis to monitor whether the quality of care (including patient safety) provided by the Debtor is declining or otherwise materially compromised.


## IV.    CONCLUSION

An analysis of publicly available information, as well as information provided by the Debtor, regarding the current performance of the Debtor and its existing structures reveals a facility that apparently continues to provide the same level of patient care and safety it historically provided since before the Debtor's bankruptcy filing.

.           Respectfully submitted to the Court on July 3, 2024 by:

/s/ David N. Crapo
David N. Crapo, Esq.
Patient Care Ombudsman

2

```
                    UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF NEW YORK (NEW YORK)

                                      .
IN RE:                                .  Case No. 23-10905-pb
                                      .  Chapter 11
GLOBAL FERTILITY & GENETICS,          .
NEW YORK, LLC,                        .  One Bowling Green
                                      .  New York, NY 10004-1408
                  Debtor.             .
                                      .  Wednesday, July 3, 2024
. . . . . . . . . . . . . . . . .     .  11:00 a.m.



                      TRANSCRIPT OF CONFERENCE
             BEFORE THE HONORABLE PHILIP BENTLEY
               UNITED STATES BANKRUPTCY COURT JUDGE


ZOOM APPEARANCES:


 For Annie Liu:              Spence Law Office, P.C.
                             By:  ROBERT J. SPENCE, ESQ.
                             55 Lumber Road, Suite 5
                             Roslyn, NY 11576
                             (516) 336-2060

                             Wollmuth Maher & Deutsch LLP
                             By:  BRAD JEFFREY AXELROD, ESQ.
                             500 Fifth Avenue
                             New York, NY 10110
                             (212) 382-3300

APPEARANCES CONTINUED.

Audio Operator:             Courtroom ECRO Personnel

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

      Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

1

```
ZOOM APPEARANCES (Continued):


For the United States     DOJ-UST, Southern District of New
Trustee:                  York
                          By:  MARK BRUH, ESQ.
                          Alexander Hamilton Custom House
                          One Bowling Green, Room 534
                          New York, NY 10004-1408
                          (212) 510-0500

For Dr. Hu Bo:            Norton Rose Fulbright US LLP
                          By:  ANDREW ROSENBLATT, ESQ.
                               JUDI ARCHER, ESQ.
                          1301 Avenue of the Americas
                          New York, NY 10019-6022
                          (212) 408-5559

Chapter 11 Trustee:       Huebscher & Co.
                          By:  ERIC MICHAEL HUEBSCHER, ESQ.
                          301 East 87th Street, 20e
                          New York, NY 10128
                          (646) 584-3141

For the Chapter 11        Farrell Fritz P.C.
Trustee:                  By:  MARTIN G. BUNIN, ESQ.
                          622 Third Avenue, Suite 37200
                          New York, NY 10017
                          (212) 687-1230
```

```
 1                (Proceedings commence at 11:00 a.m.)

 2                THE COURT:  Let me just respond to the two issues you

 3      just raised.  First, with respect to Mr. Hu testifying

 4      remotely, I'm generally receptive to requests of that sort when

 5      there's a substantial basis for it.  I am going to wait and see

 6      if anyone objects, and then I'll rule at that time.  But I

 7      wanted to let you know that I am generally receptive to those

 8      sorts of motions.

 9                On the page limit, I'd like to return to that after

10      we address other matters.  So if you don't mind, if I don't

11      raise it at the end of today's conference, please remind me to

12      address that.

13                MR. ROSENBLATT:  Okay.  Thank you for that.  So, Your

14      Honor, that's what we have filed.  I would note that we also --

15                THE COURT:  I'm sorry, can I ask you a question?  I

16      saw your letter that, among other things, addressed the page

17      limit.  I was not aware.  Did you actually file a motion to

18      increase the page limit?

19                MR. ROSENBLATT:  We did it by letter motion, Your

20      Honor.  I -- we had seen others -- we reviewed your chamber's

21      rules, and we had seen other examples of parties submitting

22      their request by -- sort of moving by letter request, and so

23      that's what we did.

24                THE COURT:  So is it just the request in the one

25      letter, or is there a separate letter as well?
```

```
 1            MR. ROSENBLATT:  No, no, it's just the one letter,
 2   Your Honor.
 3            THE COURT:  Okay.  Okay.  I just want to make sure I
 4   haven't overlooked anything that was filed.
 5            MR. ROSENBLATT:  Right.  And Your Honor, I would also
 6   note that, I guess, from the last time we were before the court
 7   to now, consistent with the prior confirmation scheduling order
 8   that was entered, we did file a plan supplement providing all
 9   the information that we told the court we would provide and
10   also amending the plan.  And with respect to the amended plan,
11   Your Honor, again, we actually intend to file a second amended
12   plan prior to confirmation, reflecting what I really consider
13   nonmaterial changes.  We have been in constant discussions with
14   the U.S. Trustee and the Chapter 11 trustee, and it's really
15   just to address comments that they both had, you know, to
16   things such as the exculpation provision, and, Your Honor, we
17   want to be as accommodating as possible.  And thus far, you
18   know, I think that we have addressed all of the comments that
19   we have received from the Chapter 11 trustee and the U.S.
20   Trustee.  But we will be filing an amended plan with or shortly
21   before we file our reply brief.
22            The other update, Your Honor, which will be also
23   reflected in the amended plan, is we were able to reach a
24   settlement in principle with Dr. Doody and KJD.  So that will
25   be baked into the plan, as well.  That's actually probably the
```

1 | biggest change, and the biggest update is basically reflecting

2 | that settlement in the plan.

3 | You know, that is sort of the update as far as what

4 | we have filed and what we intend to file, Your Honor, on the

5 | evidence front or at the hearing.  I thought I would just tell

6 | the Court what our intentions at least are as we -- again, as

7 | we sit here today, things obviously are fluid and they may

8 | change.  But along with our confirmation brief, we are going to

9 | submit a declaration for Yihan Hu, who is our witness in chief.

10 | We would ask the Court's permission to submit that into

11 | evidence.  Ms. Hu will be in the courtroom.  She will be

12 | available if any party wishes to cross-examine her, and if

13 | necessary, she would be there if we need to elicit direct

14 | examination from her.

15 | We also want to -- we intended at some point to call

16 | the Chapter 11 trustee.  We felt it was important to -- for the

17 | Court to hear what has been happening from the Chapter (audio

18 | interference) trustee's perspective and the findings of his

19 | investigation, Your Honor.  My understanding, however, is that

20 | sometime later today, Chapter 11 trustee will be filing a

21 | formal report summarizing his findings and detailing his

22 | investigation.  You know, Your Honor, I think that from an

23 | evidentiary standpoint, we would simply asked the Court at the

24 | hearing to move that into evidence or ask the Court to take

25 | judicial notice of it.  I think that would dispense with the

```
1   need for us to elicit any testimony from the Chapter 11

2   trustee.

3           So, you know, really, Your Honor, that's -- between

4   the misused declaration, between the Chapter 11 trustee's

5   report and our plan itself, it -- you know, that basically sort

6   of is the sum and substance of our evidence.  I do have my

7   commercial litigation colleague with me.  Your Honor, I do want

8   to introduce Judi Archer.  I don't think she has appeared

9   before Your Honor in this case, but just to see if there's

10  anything else that you would want to raise or mention.

11          THE COURT:  All right.  So is that everything you

12  wanted to raise?  I want to let you finish before I respond.

13          MR. ROSENBLATT:  Well, the only other thing that I

14  would add is we did serve last night -- very late last night,

15  it might have actually been this morning technically -- we did

16  serve a discovery demand to Annie Liu's counsel.  We did try to

17  keep it narrow, Your Honor, but we do want to -- you know,

18  look, they've made many statements, many of which -- in their

19  objection, many of which we consider to be outlandish.  And

20  we're looking for, you know, the basis and support for some of

21  those statements.  We certainly would like to know before the

22  (audio interference) what, you know, what evidence, documents

23  they intend to introduce into evidence, and at a minimum, what

24  witnesses they intend to call at trial or at the hearing.  But

25  -- and again, Your Honor, I understand that the timeframe here
```

```
 1  is short, but respectfully, that is a timeframe that was of

 2  their own doing.  When I had put the original confirmation

 3  schedule together, Your Honor, it left a two-week period

 4  between when their objection was due and the hearing.  And --

 5  you know, and obviously they asked for more time.  You know,

 6  and again, one of the -- one of the reasons -- one of the

 7  things that I liked about the prior schedule, Your Honor, is

 8  that we would be submitting our papers, our reply papers, to

 9  the Court a week in advance of the hearing.  I don't like to

10  submit 50-page briefs on a Court and impose, you know, the

11  obligation to read those the day before a hearing, but, you

12  know, that's the circumstance.  And again, Your Honor,

13  respectfully, that is not one of our own choosing or making.

14  But that's where we are.

15          THE COURT:  All right.  You know what?  I think what

16  I'd like to do is go around the room and hear from whoever else

17  would like to be heard, and then I'll -- I do want to address a

18  few of the issues you've raised.  But first, I'd like to hear

19  what any of the other parties have to say.

20          So I guess, Mr. Spence, you're probably the

21  appropriate party to go next.

22          MR. SPENCE:  Thank you, Your Honor.  I appreciate the

23  time.  Good morning to you, and thank you for holding the

24  status conference this morning on such short notice for all of

25  us.
```

1         As you might have seen from the docket, my client,

2    Annie Liu, has filed her plan, withdrawing the prior plan that

3    she had filed along with Dr. Doody.  This plan, without getting

4    into the gory details -- I know this is a quick status

5    conference, or intended to be anyway, so the parties could get

6    adjusted to whatever schedule the Court puts us on.  But now

7    there is value in the enterprise.  There's been an arm's length

8    offer.  It's put in writing.  It's detailed.  It's -- as far as

9    the plan goes, we intended to match what the -- Dr. Hu put

10   forth, pay all the creditors in full.  We also include

11   post-petition interest because we believe the debtor to be

12   solvent, and we believe that there is value.

13       This plan offers $1 million to the equity holders.

14   Dr. Hu's plan doesn't offer anything to the equity holders.

15   And we believe that that plan is unconfirmable on its face.

16   Obviously, that's in the papers.  We think it's discriminatory,

17   and we also think it was filed in bad faith.  We've put that in

18   the papers.  I won't get into those arguments now, but we do

19   have a value now set on the equity of $1 million.  And I

20   thought this would be a moment where the parties could sit back

21   for a moment -- if you look at 1129(c), if there are competing

22   plans, more than one of those plans can meet the requirements

23   of 1129, and then it's up to -- I think the way it works is

24   then the Court basically goes to equity and the creditors and

25   to see which is in the best interest of everyone.

```
 1              But we've put a value on equity.  We think there
 2    should be a sale process, whether it's abbreviated or not,
 3    Judge.  We're willing to move on an expedited basis, but we
 4    think there should be some form of auction process.

 5              The purpose of Chapter 11, and I know Mr. Huebscher
 6    has been focused, judging by his eight- or nine-page letter
 7    that he just filed, focused on investigation.  But the purpose
 8    of Chapter 11 is also to maximize the value of the estate.  And
 9    I think we should get a reasonable opportunity to allow the
10    parties to consult with each other and see if we can come to a
11    resolution.  If not, then we would put up our plan as the
12    superior plan and allow it to be confirmed over Dr. Hu's plan.

13              We do pay additional -- we have two secured creditors
14    in the plan.  I know Dr. Hu addressed the secured interest of
15    creditors in a footnote.  He also intends, based on what
16    counsel has said, to make some significant material changes to
17    the exculpation, which we objected to.  He says nonmaterial
18    changes, but there's a settlement to -- with Doctor Doody and
19    KJD that we have not, or at least my client has not, seen yet.
20    That would be a significant item.  As you know, Dr. Doody is in
21    the same boat with equity as my client is.  He's a 15 percent
22    equity holder of the entity.  And I think knowing what that
23    settlement says and what it is, I think, is material to the
24    confirmation process, Judge, and I think we should get an
25    opportunity to review it and to respond to it.
```

```
 1              I'm not looking as I was when I tried to get a bit
 2    more time when I got into the case, Judge, and I appreciated
 3    that.  I know it was contested and we were on a tight
 4    timeframe, but I appreciated that time.  And I'm going to ask
 5    now for a bit more time.  I think we've put something real in
 6    front of the Court that shows value for the first time of the
 7    enterprise that Dr. Hu is trying to get without payment to
 8    equity.  And we believe it should be vetted by the creditors,
 9    by the equity parties, and that it will allow my client due
10    process to have an opportunity to be heard on our plan.  So
11    with all that said, I'll just note, you know, generally
12    speaking, Judge, I don't have any comment to the motion for
13    Dr. Hu to appear remotely.  I was a little bit surprised that
14    he was appearing remotely.  I assumed he would be here in
15    person for the confirmation hearing, notwithstanding even an
16    objection to the confirmation.  But that's fine.  That's up to
17    the Court and its rules.
18              I will note that the reply brief in Your Honor's
19    rules is ten pages, I think.  But again, that's up to the
20    Court, what it will allow as far as a reply brief.  But, you
21    know, they asked for a 55-page reply brief, and I think Your
22    Honor's rules are limited to 10.  But again, I'd like the
23    parties to have an opportunity in the process in a way that is
24    procedurally not expedited because we don't have anything right
25    now that shows prejudice to the enterprise, at least in a very
```

```
 1  short term.  And I think it would be appropriate to let my

 2  client have an opportunity to put her plan forward through the

 3  court and let the parties comment on it and see if we can also

 4  confirm our plan, which shows value for the equity holders.

 5  And I appreciate the opportunity to speak, Your Honor.

 6          Mr. Axelrod is also here if he has additional

 7  comments, my co-counsel, and thank you, Your Honor.

 8          MR. AXELROD:  Your Honor, I have nothing to add.

 9          THE COURT:  Okay.

10          MR. ROSENBLATT:  Your Honor, may I respond just to

11  just a few of those points?

12          THE COURT:  No, no, you'll have a chance to respond,

13  but I want to let everyone else be heard first, and then you

14  can respond globally.

15          I have one or two questions for you, Mr. Spence.  So,

16  when did Ms. Liu file her plan of reorganization?  I

17  actually -- I don't monitor the docket minute by minute, so if

18  it was filed late last night or this morning, I -- that might

19  explain why I'm not aware of it.

20          MR. SPENCE:  The plan was filed this morning, Your

21  Honor, just before this conference.  I could give you a time,

22  but it was probably ten minutes before the conference.

23          THE COURT:  Okay.  Okay.  I don't need an exact --

24          MR. SPENCE:  Exactly ten minutes before the

25  conference, yes.
```

| 1 | THE COURT:  And you mentioned in your initial remarks |
| 2 | that an arm's length offer has been made.  Are you referring to |
| 3 | --  I just want to make sure I'm understanding you.  You're |
| 4 | referring to Ms. Liu's offer in her plan, not to something |
| 5 | else? |
| 6 | MR. SPENCE:  Well, the offer involves an investor. |
| 7 | The name of the firm is Recharge Capital, and they are in the |
| 8 | in-vitro fertilization space with a number of different |
| 9 | business interests throughout the world.  I have received proof |
| 10 | of funds from them.  At the appropriate time, we would present |
| 11 | that, but, yes, it's a very real offer.  It is a joint offer by |
| 12 | Ms. Liu and Recharge.  Recharge would be owning 70 percent of |
| 13 | the equity in the reorganized debtor, and Ms. Liu, 30 percent. |
| 14 | I've discussed this with the Chapter 11 trustee and his counsel |
| 15 | yesterday to see if they had any comments in regard to the |
| 16 | plan.  They had a couple.  I took them under advisement.  Of |
| 17 | course, I always would solicit the Chapter 11 trustee's |
| 18 | comments and, really, any party in interest's comments.  But |
| 19 | that is what the plan says.  So it is -- |
| 20 | THE COURT:  Okay. |
| 21 | MR. SPENCE:  As far as arm's length, you know, |
| 22 | Ms. Liu doesn't act for the entity at this point.  She's been |
| 23 | fired from her job, so she's an interest holder.  But Recharge |
| 24 | Capital is coming in as a third-party interested party making |
| 25 | the offer. |

```
 1              THE COURT:  Okay.

 2              MR. SPENCE:  Thank you.

 3              THE COURT:  Let me just make one comment for you to

 4   consider as you prepare for next week's hearing.  This hearing

 5   has been scheduled for some time.  You and all the other

 6   parties have known what the schedule was.  It hasn't changed.

 7   And as you just explained, your client didn't file a plan until

 8   this morning.  If I'm faced with two competing plans on a

 9   similar schedule, then you're absolutely right.  That triggers

10   certain -- then under the Code, I'm entitled to, maybe

11   obligated, to look at the two plans together and compare them.

12   I'm not sure that's the case when we have one plan set for

13   confirmation and another plan gets filed on essentially the eve

14   of confirmation.  I'm not ruling on that now.  I'm just sharing

15   with you that that's a question in my mind.  And I think the --

16   the reason I'm sharing it now is cause I think the upshot for

17   next week's hearing is that, to the extent you want me to

18   consider Ms. Liu's plan in conjunction with my consideration of

19   Dr. Hu's plan, you should consider whether you want to put on

20   evidence about the feasibility of the plan.  Because I've got

21   to say that I have some skepticism about Ms. Liu based on the

22   prior proceedings in this case.  And as you know, I entered a

23   finding, the finding that resulted in the appointment of

24   Mr. Huebscher, finding that the then existing management, which

25   was essentially Ms. Liu, was guilty of either gross
```

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1   incompetence or fraud.  I didn't determine which of the two it

2   was, but I did make a finding that it was one or the other.

3   And that finding may be relevant to my consideration of any

4   plan that she proposes.  It may affect my assessment of any

5   testimony she might give about things -- well, about the

6   feasibility or otherwise lawfulness of her plan.  So just

7   consider that and think about whether -- if you want me to give

8   weight to the fact that she's just filed a plan, whether that

9   goal might be furthered by putting on evidence.

10          Okay, we're going around room.

11          MR. SPENCE:  Okay.

12          THE COURT:  I think, Mr. Bunin, would you like to add

13  anything?

14          MR. BUNIN:  That's Your Honor.  Marty Bunin from

15  Farrell Fritz for Eric Huebscher, the Chapter 11 trustee.

16          Just after this conference began, Your Honor,

17  Mr. Huebscher filed his statement of his investigation to date,

18  as well as his report under Section 1106(a)(5) regarding the

19  proposed plans of reorganization that have been filed in this

20  case.

21          THE COURT:  I'm sorry, I didn't hear you.  You

22  weren't coming through clearly.  Tell me exactly what he just

23  filed because I haven't seen it yet.

24          MR. BUNIN:  Can Your Honor hear me now?

25          THE COURT:  I can hear you.  You're slightly fuzzy,

1   but I can hear you.

2            MR. BUNIN:  Give me a moment Your Honor, and I'll

3   change microphones.

4            THE COURT:  Okay.

5            MR. BUNIN:  Is that any better, Your Honor?

6            THE COURT:  I think it is a little bit better.

7            MR. BUNIN:  All right, I'll turn up the volume.

8            Just after this conference began, Your Honor, Mr.

9   Huebscher filed his statement of investigation to date, as well

10  as his report under Section (1106(a)(5) of the Code regarding

11  the proposed plans that have been filed today.  Of course, it

12  does not directly address the plan that Mr. Spence filed this

13  morning, although we did get a preview of it as Mr. Spence

14  indicated yesterday.

15           THE COURT:  Okay, thank you.  So I cut you off.

16  Please proceed.  If there's anything further you wanted to add?

17           MR. BUNIN:  I -- nothing that I want to add further

18  at this time, although the trustee, Mr. Huebscher, may want to

19  add something.

20           THE COURT:  Okay.  Well, before we allow

21  Mr. Huebscher to speak if he wishes, let me raise one issue

22  with you that Mr. Rosenblatt touched on, and this is something

23  Mr. Rosenblatt may want to follow up on when it's his turn to

24  speak again, but I want to raise it with you first.  There's a

25  real question in my mind whether it's proper or permissible for

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

1   me to accept Mr. Huebscher's -- you know, any of his filings as

2   his testimony.  There's case law on this, and, you know, I --

3   an expert report is not admissible to the extent what he's

4   saying in his report -- by the way, I'm using the word "report"

5   loosely for whatever conclusions he's reached, whatever

6   opinions he's expressing.  I think that's probably -- I think

7   it's probably quite clear that that's expert testimony.  It's

8   not lay -- it's opinion testimony.  It's not lay opinion

9   testimony.  So that means it's got to qualify as expert opinion

10  testimony if I'm going to treat it as evidence.  I mean, I can,

11  I guess, take judicial notice of the fact that he has filed

12  something that says things, but if you want me to accept his

13  conclusions for the truth of them, that's hearsay, and he would

14  need to testify.

15          So I wanted to flag that now because, you know, I

16  want to give you an opportunity to consider whether you want to

17  put him on, whether, you know -- and I want to give

18  Mr. Rosenblatt the opportunity to consider whether he wants to

19  put on your client.  But I wanted to flag that for you.  You're

20  welcome to respond if you like.  You're not required to.

21          MR. BUNIN:  Thanks, Your Honor.  Mr. Huebscher will

22  be at the hearing in person next Tuesday.  He will be available

23  to be on the witness stand.  In order to be efficient, it may

24  be helpful for the report and his statement of investigation to

25  be a proffer, which would be essentially accepted as direct

1 | testimony if Mr. Huebscher swears to the truth of it, and then

2 | he could be cross-examined.  I don't know if that's something

3 | Your Honor would consider.

4 |        THE COURT:  Okay.  Well, I'm not going to tell you

5 | how to present your witness, but I did want to flag for you

6 | that this raises an issue, and so you should be prepared to

7 | deal with it.

8 |        MR. BUNIN:  We will, Your Honor.  Thank you.

9 |        THE COURT:  Okay.  All right.  So, Mr. Bruh, I think

10 | you're the one remaining party in the room, so to speak, who

11 | hasn't spoken.  Is there anything you'd like to add?

12 |        MR. BRUH:  Thank you, Your Honor.  Mark Bruh for the

13 | United States Trustee.

14 |        With respect to Dr. Hu's plan, I've been in touch

15 | with this counsel.  Like he said, we've had ongoing

16 | conversations.  They've been receptive to the comments of the

17 | United States Trustee, mainly focusing on the exculpation

18 | provisions in the plan.  I have not seen the plan filed by

19 | Ms. Liu or spoke to her counsel.  We weren't given a preview of

20 | it, so I do not know what it says or if the United States

21 | Trustee has any comment, and I guess we would reserve our

22 | rights with respect to those provisions.  Obviously, there are

23 | certain issues United States Trustee flags in cases.  I didn't

24 | see any releases or anything that would be problematic in this

25 | case.  And that's all we have at this time, and I plan to be

1    there on Tuesday as well, Your Honor.

2        THE COURT:  Okay.  I must say, given recent

3    developments in other courts, I'm relieved there are no

4    third-party releases in this plan.  All right, thank you

5    Mr. Bruh.

6        Mr. Rosenblatt, did you want to respond?

7        MR. ROSENBLATT:  I did, Your Honor, but you know, I

8    intentionally kept this as watered down as possible and try to

9    make it non-controversial, Your Honor, especially with release.

10   So I appreciate those comments.

11        Your Honor, I did not expect that issues on the

12   merits would be raised, and I don't intend to get into them

13   much beyond telling Your Honor that I pretty much disagree with

14   pretty much everything that Mr. Spence said, and we will

15   address this in our papers.  But this notion or this issue of

16   valuation and market testing is simply not required for

17   confirmation of our plan.  Mr. Spence is misreading the

18   Bankruptcy Code badly.  Cramdown does not require a market

19   test, Your Honor.  And they're trying to basically impose

20   obligations that simply do not exist under the Bankruptcy Code,

21   and we will address those in our papers.

22        As far as their plan goes Your Honor, Your Honor is

23   probably not aware of this, but for the past two months, we've

24   been providing funds to the Chapter 11 trustee to fund certain

25   of the debtor's operations.  So the notion that this can be --

1  that this could or should be delayed for any period of time,

2  quite frankly, is patently ridiculous, Your Honor.  They've had

3  six weeks and then longer.  They've had essentially over a year

4  to put a plan together, and they file -- you know, they file

5  this, dump it on everybody, essentially a couple of days before

6  confirmation.  I think it's pretty ridiculous, Your Honor.

7           I would also note, you know, they basically say,

8  well, Your Honor, the plans are the same and Ms. Liu's plan is

9  going to pay equity $1 million.  I would note, Your Honor, that

10 really fails to take into account the actual value that's being

11 provided and that's subsumed under Dr. Hu's --

12          THE COURT:  So, Mr. Rosenblatt, I really don't

13 want -- you're getting into argument now.  I really don't want

14 that.  I want to --

15          MR. ROSENBLATT:  Fair enough, Your Honor.  The last

16 thing I would say about that is I just want to make the point.

17 In any plan that Ms. Liu puts forward, you know, there are

18 massive expenses that Dr. Hu has incurred in this case, Your

19 Honor, several hundreds of thousands of dollars, filing and

20 pursuing the Chapter 11 trustee motion, filing the plan of

21 reorganization and related confirmation papers, which --

22          THE COURT:  Okay.  You're arguing again.  This is --

23          MR. ROSENBLATT:  Okay.  That's fine.

24          THE COURT:  That's appropriate for next week.

25          MR. ROSENBLATT:  No, that's fine, Your Honor.  I'll

```
 1   move on.

 2          The last thing I would just say about their plan is

 3   they haven't noticed it.  They haven't filed the disclosure

 4   statement with respect to their plan.  So we don't think that

 5   plan should be on the table or up for consideration at all,

 6   Your Honor.  As far as the issue with the Chapter 11 trustee's

 7   report, you know, we -- it would be great if that can come in

 8   and be proffered, but if not, we will be prepared to take

 9   testimony of the Chapter 11 trustee.  We think it's important

10   that his findings be presented to the Court.

11          And then I guess the last thing I would ask the Court

12   is to revisit the page limit issue, Your Honor.  Your Honor, I

13   would say this.  You know, the brief that we're submitting, as

14   you can probably appreciate --

15          THE COURT:  Actually, let me ask you to hold that

16   thought because I do want to deal with that last, and there's a

17   few process issues that I want to raise with you.  So first, I

18   wanted you to have a chance to respond to any process issues

19   others have raised, and if you're done with that -- I don't

20   want to cut you off, but if you're done with that, then I'll

21   turn to my points.

22          MR. ROSENBLATT:  No, Your Honor, I don't think so.  I

23   guess I would like to understand, just for purposes of our

24   preparation, whether or not anybody would have an objection to

25   us submitting Ms. Hu's declaration in lieu of direct
```

```
 1  examination but making her available for any party to

 2  cross-examine her and having her available for redirect.  I

 3  think that that's fairly common, Your Honor, and I think it

 4  would save a considerable amount of time.

 5          THE COURT:  So let me respond to that.  That's an

 6  appropriate question, but it's not fair to ask people to answer

 7  it before they've seen her declaration.  And the one other

 8  thing I'd add is I want to review it myself, as well, and make

 9  my own determination.  I usually -- if the parties all agree to

10  let direct testimony come in by declaration, you know, subject

11  to the party being -- to the witness being there and being

12  available for cross, if the parties agree to that process, I

13  usually defer to the parties and allow it.  Every once in a

14  while, based on the circumstances, I will determine that I

15  actually think it would be helpful for me to see the witness

16  testify, give their direct testimony live.  So I think it's a

17  matter for the other parties and me to all weigh in on after

18  you filed the declaration.

19          MR. ROSENBLATT:  That's fair enough, Your Honor.  I

20  appreciate the guidance there.

21          THE COURT:  Okay.  And the earlier you do it, you

22  know, the better chance you have of getting an early answer.  I

23  realize you may not be able to file it early, but that's -- you

24  know, that ball's in your court.

25          MR. ROSENBLATT:  No, I understand that.  I appreciate
```

```
1    that, Your Honor.

2            So again, I think just the open issues are, you know,

3    the remote testimony.  Well, again, we don't intend, at least

4    at this time, to elicit testimony from Dr. Hu, but we just want

5    to make sure that he can appear remotely with an interpreter if

6    the Court has questions for him or if any party wants to

7    examine him.

8            THE COURT:  And I -- so I don't have your motion on

9    that front -- in front of me, but I assume you put an objection

10   deadline.

11           MR. ROSENBLATT:  I think it might have just been on

12   presentment, Your Honor.

13           THE COURT:  So what's the presentment date that you

14   provided?

15           MR. ROSENBLATT:  Might have been today at noon.

16           THE COURT:  Whatever it is.  Whatever it is.

17           MR. ROSENBLATT:  I think 17 minutes from now, Your

18   Honor, but --

19           THE COURT:  Okay, whatever it is, that's the deadline

20   for anyone who might want to object to do so.  And whether

21   people object or not, in my mind, is, you know, an important

22   consideration.

23           MR. ROSENBLATT:  Sure.

24           THE COURT:  Okay.  So I will deal with that once the

25   presentment deadline passes.  I want to say -- was there
```

1   anything else you wanted to procedurally follow up on?

2        MR. ROSENBLATT:  The last -- again, the last issue

3   for me is just the page limits on the brief, although, Your

4   Honor, let me just ask my colleague Ms. Archer, if she has any

5   additional procedural issues that she wants to address.

6        MS. ARCHER:  We would simply want to -- given the

7   uncertainty with the late-filed plan and Your Honor's comments,

8   we would want to know if Mr. Spence plans to offer evidence

9   with respect to that plan in advance of the hearing.  We'd like

10  to know what exhibits and what witnesses he would intend to

11  call, given the very short timeframe here.

12       THE COURT:  So let me weigh in on the general topic

13  you're touching on.  I would expect in any case of this sort

14  that counsel for the two sides, or multiple sides, have worked

15  these things out among themselves in advance.  I mean, back in

16  my former life when I was a bankruptcy litigator, the standard

17  practice was that there'd be a letter -- an exchange of emails

18  agreeing on a process which usually included an agreement that

19  any witness that a party intended to offer at the hearing would

20  be available for deposition within a certain timeframe.  Have

21  the two of you worked out anything along those lines?

22       MR. ROSENBLATT:  Your Honor, we haven't.  I mean, we

23  just received their objection.  You know, given the timing in

24  this case, we didn't know whether they were going to file an

25  objection, and we obviously expected it, but we had no idea

1   what they were going to say or allege.  We literally served

2   discovery a day after their objection was filed, which was, you

3   know, moving at, you know, really as fast of a pace as we

4   possibly could.  Your Honor, I -- look, I practically -- we

5   don't expect there to be time to do depositions.  We've asked

6   for some documentary evidence, and, you know, like, we haven't

7   spoken to Mr. Spence.  We're certainly willing -- we're

8   certainly happy to speak with him to see if we can work out any

9   evidentiary and discovery-related issues in the next couple of

10  days.

11          THE COURT:  Well, I expect the two of you to do that.

12  You're both capable counsel, and in the event you both do your

13  best and are -- and there are still disputes, you know how to

14  bring them to me for a resolution.  But that is something that

15  I expect lawyers in my court to deal with proactively and

16  professionally among themselves.

17          MR. ROSENBLATT:  Understood.

18          THE COURT:  Okay.  Okay.  The one -- so I wanted to

19  raise a couple of issues, starting with a pure process issue,

20  the settlement with Mr. Doody.  So you've mentioned that you're

21  going to be filing a second amended plan on, I guess, Monday,

22  Monday morning, and that's not uncommon so long as the changes

23  that are being made are, in fact, ministerial.  The settlement

24  with Mr. Doody is not ministerial.  It's substantive.  And if

25  you're going to essentially blindside your adversary by sharing

```
 1   the -- waiting until less than 24 hours before the hearing to
 2   share the terms of that settlement with him, I'm not ruling --
 3   I'm not going to rule on the what the consequences would be
 4   now.  But I want to share with you my reaction that, to the
 5   extent that prejudices him, there might be consequences.  He
 6   may be entitled to relief, you know, which could include an
 7   adjournment.  So I want to raise that now because it sounds
 8   like the agreement was reached -- it has been reached.  It may
 9   have been reached some time ago.  And to the extent you are
10   able to share with your adversary the details now, that might
11   reduce your exposure on the prejudice front if you share it now
12   rather than waiting to share it.  So I'll let you do with that
13   comment what you wish.  Let me turn to a few other topics.
14            MR. ROSENBLATT:  Well, Your Honor, may I just respond
15   on that point?  The entire settlement with Dr. Doody is going
16   to be literally one paragraph and three bullet points in the
17   plan.  I've sent over today, in fact, to Dr. Doody's counsel a
18   draft.
19            THE COURT:  I don't want you to -- I don't want
20   argument on that issue now.  I just want to (audio
21   interference) with you that if you've already sent it over,
22   that's great.  And you may have anticipated and fully dealt
23   with my concerns.
24            MR. ROSENBLATT:  Well, no, Your Honor.  What I was
25   going to say is I will email it to Mr. Spence in the next day
```

1    or two, as soon as I get sign-off from Dr. Doody's counsel.  I

2    will immediately email him the entire settlement, which is a

3    paragraph in the plan.  So he will get that well in advance of

4    the hearing.

5               THE COURT:  Okay.  Like I said, I don't want argument

6    on that now.  I just wanted to be transparent about my concerns

7    on that front, and you may have addressed them 100 percent.

8               Okay, let me turn to the page limit.  And in

9    conjunction with the page limit, I want to share a couple of

10   substantive reactions that I have.  I think it's -- this case

11   is racing forward.  We're going to be at a hearing very

12   shortly, and I want to give a little bit of guidance so that I

13   don't wind up getting argument or evidence that I think is off

14   base.  And then I'll circle back to the page limit once I'm

15   done with that.  I think it relates to the page limit.

16              First off, on the disclosure statement, there -- I

17   can tell you now I'm not approving the disclosure statement

18   that you filed in March.  I mean, I think it's preposterous,

19   frankly.  That disclosure statement is built upon -- it

20   incorporates the financials prepared by prior management.  As

21   you very well know, I subsequently entered an order saying

22   prior management is either committing fraud or they're grossly

23   incompetent.  So how can you possibly expect me to give any

24   weight to the financials they prepared?  I already found those

25   -- in effect, that those financials are entitled to no weight.

```
 1    So I'm certainly not approving a disclosure statement that
 2    rests on those financials and that also, among other things, is
 3    not updated to reflect the changes that were made in the
 4    subsequently filed amended plan, not to mention the second
 5    amended plan.  But the first amended plan made changes that
 6    were a little more substantial.
 7             I think -- so you have two choices.  You could either
 8    update the disclosure statement.  I'm not urging you to do
 9    that.  I think that might be a waste of money.  Your
10    alternative is to argue that, in the circumstances of this
11    case, a disclosure statement is not required.  And if you want
12    to make that argument, I would consider that argument.  I don't
13    consider it -- in the circumstances, I don't consider that
14    waived or that it's too late to make that argument.  So I
15    wanted to flag that for you.  And that argument, if that's the
16    way you go, doesn't take more than a page or two to brief.  I'm
17    familiar with those issues.  So that's point number one.  And
18    part of the upshot of that is I don't think -- I'm not going to
19    give you a lot of pages to address the disclosure statement.
20    When I set the page limit, I'm not going to assume that a lot
21    of the pages are needed to address the disclosure statement.
22             Second, confirmation, I want to share with you the
23    following concern.  The plan that is currently -- that was
24    filed back on -- in March -- and I'm quite sure this has not
25    been changed, you can correct me if I'm wrong -- describes
```

1   Dr. Hu's contribution as a new value contribution.  I think

2   there's a very big question whether the new value doctrine and

3   body of case law supports confirmation of this plan.  I might

4   be wrong, but my understanding of the new value case law is it

5   involves -- every case I'm aware of, certainly the Supreme

6   Court cases that address it, involve equity that under a

7   waterfall analysis may be subject, you know, properly

8   extinguished, entitled to no value but that is getting value

9   nonetheless because of the contribution they're making.

10          Your plan is a bit different.  In your plan, you're

11  not giving anything to existing equity.  You're extinguishing

12  existing equity, the, you know, the corporate parent, the

13  HoldCo that currently owns 100 percent of the stock, and I'm

14  not aware of anything in the new value case law that justifies

15  extinguishing existing equity.  You're then transferring the

16  equity or issuing the equity of the reorganized debtor to a new

17  party, a third party, a third party that has a lot of

18  connections to the debtor, but that is not the existing

19  shareholder.  And you're going to need, in your brief and in

20  your evidentiary showing, to justify extinguishing the equity.

21  And, you know, I leave it to you how you're going to justify

22  it.  It's possible I'm overlooking new value cases that address

23  that.  I'm not aware of them, as I said.  If the new value case

24  law doesn't address it, then you may need to address it by

25  showing that equity -- that existing equity -- there's no value

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1 | for existing equity under a straight waterfall distribution.

2 | And how you show that is up to you, whether you do it by expert

3 | testimony or something else. But you're going to need to

4 | satisfy me one way or another that you have a sound basis to

5 | extinguish existing equity. And then separately you're going

6 | to need to satisfy me that, in effect, the purchase price that

7 | Dr. Hu is paying for the new equity is proper, that under one

8 | theory or another, I should deem it to be sufficient.

9 | So those are two distinct issues, and I just want to

10 | make sure you are aware that that's how I'm thinking of the

11 | issues. Now, I'm not asking you to respond now. I just wanted

12 | to share that with you.

13 | Page limits. I'm going to give you 40 pages. I

14 | think, to respond to the -- I think it was Mr. Spence who said

15 | that presumptively, my rules provide for a ten-page reply.

16 | This may be, you know, nominally treated as a reply, but this

17 | really is -- this is your brief in support of confirmation.

18 | So, you know, with -- and secondarily in support of the

19 | disclosure statement or the fact that one isn't needed. And so

20 | I don't think the ten-page limitation is appropriate. At the

21 | same time, I don't think 55 pages is needed. And part of my

22 | thinking there is I think most parties don't exercise as much

23 | discipline as they could and should in being concise in their

24 | briefs. So I think anything that can be said in 55 pages can

25 | actually be said in 40 pages if the party -- I think it was

```
 1    Mark Twain who said it takes -- he said it much more cleverly

 2    than this, but that it takes much more effort to write

 3    something short than something long.  But I have full

 4    confidence you can compress whatever points you need to make

 5    into 40 pages.  So that's my ruling on the page limit.

 6              So let me pause and ask whether you or anyone else

 7    has any questions or further issues that haven't been

 8    addressed.

 9              MR. ROSENBLATT:  I don't think so.

10              THE COURT:  Okay.  And I hear nothing from anyone

11    else, so I think we've covered what we need to cover today.

12              MR. SPENCE:  Your Honor, we were seeking -- Robert

13    Spence again.  Good morning again.

14              We were seeking an extension of time because if I'm

15    going to put on witnesses on Tuesday, one of my witnesses, I

16    believe, is in Singapore and would need to appear, and I don't

17    know his availability in that regard.  I didn't -- we were

18    seeking an extension of time to put the plans on the same

19    track.  So I just want to note that if Your Honor is ruling

20    that that is -- that request is denied, I'd at least like to

21    have that on the record, if it's okay with the Court.  But we

22    do request that extension of time so that we can properly put

23    on our plan at this time.

24              THE COURT:  So let me ask you two questions.  First,

25    the request -- you're asking to adjourn the confirmation
```

```
 1   hearing.

 2              MR. SPENCE:  I am, for a short time, yes, Judge, so

 3   we can put on our plan simultaneously.  The competing plans are

 4   having a value of $1 million for the equity.  And I know that

 5   is something.  Maybe it should have been filed sooner.  I

 6   concede that, Judge.  But we are where we are, unfortunately,

 7   and it does take time to negotiate these things with parties

 8   just coming into the scene.  You know, I could just --

 9              THE COURT:  So let me -- I wasn't asking for

10   argument.  I just want to make sure I'm understanding what

11   you're saying.  This request, has it been made?  Have you made

12   it in writing previously or --

13              MR. SPENCE:  I have not.

14              THE COURT:  Okay.  So you just made it orally at

15   today's --

16              MR. SPENCE:  I'm just making it orally today.  I can

17   put it in writing, Judge.  I wanted to have the plan on file.

18   I was hoping --

19              THE COURT:  No, no, I just wanted to make sure I'm

20   not --

21              MR. SPENCE:  -- (indiscernible) before I did that.

22              THE COURT:  I'm not overlooking anything.  Okay.  My

23   last question is, has anything happened recently that -- well,

24   let me start again.  You've known for quite some time what the

25   schedule was for confirmation.  You're now coming in at the
```

```
 1   very last minute to ask for an adjournment.  Has anything

 2   happened recently to change things such that I should consider

 3   your request for an adjournment?

 4             MR. SPENCE:  You know, other than, you know, I just

 5   got into the case nine days ago, so I don't know what water

 6   went under the bridge before that, but in my opinion, my entry

 7   into the case has only been for nine days.  So I'm asking on

 8   behalf of myself and new co-counsel to Annie Liu.  We also put

 9   the offer on the table only yesterday to the trustee.  So, you

10   know, the trustee has his opinion of it, I suppose, but that

11   value just came onto the table.  So, yes, that is brand new

12   information, and I think it's very significant and material

13   that there is value in the enterprise and that there should be

14   a full and fair opportunity for bidding if that's necessary or

15   it takes place for the opportunity for it to take place.  If I

16   have to put on a plan on Tuesday under these circumstances --

17   and I think other things were raised on the call today, that

18   there are significant changes to the plan being made going into

19   confirmation, also on the eve of confirmation, and I don't

20   think it prejudices the parties.  Counsel did say that they

21   were having to put money in, but I don't know the facts of

22   that, Judge.  I just have that statement.  Without knowing more

23   -- and I can't tell anything from the operating reports that

24   are filed with the court.  But I think under these

25   circumstances, where so many things are in flux, and wanting --
```

```
 1    and sincerely wanting an opportunity to look at everything and
 2    analyze it and consult with my client and the parties that are
 3    on my client's side, like Recharge Capital, I do need the time
 4    to prepare and present.  And I think it would prejudice my
 5    client to put this on -- all on for Tuesday, particularly when
 6    the variables, the things that we're seeing changes too, are
 7    not all of her own accord.  They're of the other parties, and
 8    there are other things in flux that are still moving parts.  I
 9    just want to do it thoroughly so that we're not -- at the end
10    of the day, we didn't miss something.  And I don't think a week
11    or two weeks is going to make a heck of a lot of difference.  I
12    think it could possibly add a significant amount of value to
13    the equity holders in the case.  That's all.  Thank you, Your
14    Honor.

15          MR. ROSENBLATT:  Your Honor, may I just make one
16    statement in response?  Yihan Yu has flown here from China
17    specifically to appear at the hearing on Tuesday.  She has to
18    fly back to China the following day.  It would be incredibly
19    prejudicial to push this back any further, and perhaps
20    Mr. Spence is not aware, but the debtor is pretty much out of
21    money, Your Honor.  We have, in the last two months, made two
22    contributions of over $100,000 to fund the debtor's -- to fund
23    operations.  So this notion that there won't be any prejudice
24    and there's -- you know, no one would be harmed by any delay is
25    absolutely incorrect, Your Honor.  It's completely erroneous.
```

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

34

```
 1    We can't wait any longer while Ms. Liu plays games, Your Honor.

 2    She has had counsel.  She's had co-counsel who's been engaged

 3    for months now.  So this notion -- and by the way, Your Honor,

 4    we had heard about this alleged investor several weeks ago.  So

 5    this didn't arise, you know, out of the blue this week or in

 6    the past couple of weeks.  And, Your Honor, I just think it's

 7    absolutely ridiculous to suggest that this thing should be

 8    adjourned further where my client is going to have to, you

 9    know, be prejudiced and have to fly back twice from China to

10    appear at this hearing.  So we absolutely would oppose any

11    adjournment request by Ms. Liu.

12                THE COURT:  Okay.

13                MR. HUEBSCHER:  Your Honor --

14                THE COURT:  Mr. Huebscher, would you like to be

15    heard?

16                MR. HUEBSCHER:  I apologize, Your Honor.  I too am

17    concerned about the late filing of this plan for a number of

18    reasons, Your Honor.  We met -- Mr. Bunin and I met with the

19    folks that are referenced in the plan, I believe, two months

20    ago.  We had a very, very brief meeting with them that lasted

21    no more than 10 or 15 minutes, followed by a phone call a

22    couple of days later, followed by me sending some financial

23    information prepared by the company's accountant, all of which

24    took place two months ago.  That company, Recharge, that

25    Mr. Spence has referred to has not had any contact with me, has
```

```
 1   not asked me any questions, has not engaged in any discussions

 2   with any of the employees at the business.  And so I'm

 3   concerned, more than just concerned, that what we're looking at

 4   today is not something of substance.  It was also questioned,

 5   as Your Honor I'm sure has not looked at it yet, the document

 6   is not actually from Recharge.  The letter is actually from

 7   Ms. Liu with a signature line for Recharge, which I found --

 8   and I mentioned this to Mr. Spence yesterday -- I found very

 9   unusual that the company couldn't even put it on its own

10   letterhead that -- what they had done.  And even in that

11   document, it's subject to due diligence that has not taken

12   place because I am responsible for that.  And as I said, I have

13   not heard from these people in -- I believe it's at least two

14   months.  Mr. Bunin can correct me if I'm wrong.  But I think

15   it's approximately two months.

16           So there's no connection between the document that

17   was filed an hour ago and the information contained in it and

18   my understanding of what their knowledge is or their

19   involvement in the business.  And so I also echo the fact that

20   the business needs funding, it needs to be restructured, and

21   time is critical in that regard.  And that's why I'm

22   questioning the timing of this filing.  Thank you, Your Honor.

23           THE COURT:  Okay.

24           MR. BUNIN:  Your Honor, Marty Bunin.  I just want to

25   add, I believe the date of the meeting Mr. Huebscher is
```

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

36

```
1   referring to with the principal of Recharge, who signed the

2   letter that contains the offer, was May 2nd.

3            THE COURT:  Okay.  Here's what I'm going to do.  I'm

4   not going to rule on this request.  I'm going to deny the

5   request to adjourn the confirmation hearing.  This is without

6   prejudice to any rights that Ms. Liu may have to present

7   evidence or make arguments at the confirmation hearing that I

8   should hold in abeyance any order confirming Dr. Hu's plan

9   while I wait for further developments and perhaps further

10  hearings with respect to Ms. Liu's plan.

11           Mr. Spence, you have the right to raise those issues

12  next week if you choose.

13           Okay.  Is there anything further before we wrap up

14  for the day?  All right, thank you all.  Try to carve out some

15  time to enjoy the holiday this weekend, and I will see you all

16  next Tuesday.

17           UNIDENTIFIED:  Thank you, Your Honor.

18           COUNSEL:  Thank you, Your Honor.

19      (Proceedings concluded)

20                         *  *  *  *  *

21

22

23

24

25
```

1                      **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428        DATE: July 9, 2024

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25